| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br>**WHITE & CASE LLP**<br>Gregory F. Pesce (*pro hac vice* pending)<br>Adam Swingle (*pro hac vice* pending)<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 881-5400<br>Email:  gregory.pesce@whitecase.com<br>           adam.swingle@whitecase.com<br><br>- and -<br><br>Andrew Zatz<br>Barrett Lingle (*pro hac vice* pending)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 819-8200<br>Email:  azatz@whitecase.com<br>           barrett.lingle@whitecase.com<br><br>*Proposed Counsel to Debtors and Debtors-in-Possession*<br><br>**KEN ROSEN ADVISORS PC**<br>Kenneth A. Rosen<br>80 Central Park West<br>New York, New York 10023<br>Telephone: (973) 493-4955<br>Email: ken@kenrosenadvisors.com<br><br>*Proposed Co-Counsel to Debtors and Debtors-in-Possession* |
| In re:<br><br>CBRM Realty Inc. *et al.*,<br><br>                              Debtors.[1] |

Chapter 11

Case No. 25–15343 (MBK)
(Joint Administration Requested)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (1115), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951). The location of the Debtors' service address in these chapter 11 cases is: In re CBRM Realty Inc., et al., c/o White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020.

**DECLARATION OF MATTHEW DUNDON,
PRINCIPAL OF ISLANDDUNDON LLC, IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Matthew Dundon, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Principal of Dundon Advisers LLC ("**Dundon**") and its real estate restructuring affiliate IslandDundon LLC ("**IslandDundon**"). IslandDundon has been engaged by the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") and will soon file an application to be retained as financial advisor and investment banker to the Debtors. In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I have been a principal of Dundon since 2016 and of IslandDundon and its predecessor joint venture vehicles with Island Capital Group LLC ("**Island**") since 2019. Dundon provides financial restructuring and asset management and places loans and other non-securities financings on the primary and secondary markets. Island invests in real estate transactions and holds interests in real estate services concerns. I previously worked as a credit hedge fund portfolio manager (2010 to 2016), an institutional brokerage fixed income analyst and head of research (2003 to 2010), and a securities and leveraged finance attorney (1998 to 2003). I received a Juris Doctor from the University of Chicago Law School and a Bachelor of Arts from the University of California at Berkeley. My testimony and declarations in relation to complex chapter 11 matters are regularly accepted by Bankruptcy Courts in this and many other Districts.

3. I submit this declaration (the "**Declaration**") in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed with the United States Bankruptcy Court for the District of New Jersey (the "**Court**") on May 19,

2025 (the "**Petition Date**") and (b) the various types of "first day" relief that the Debtors have requested pursuant to the motions and pleadings filed in connection therewith (collectively, the "**First Day Pleadings**"). A chart depicting the Debtors' organization structure as of the Petition Date is attached to this Declaration as **Exhibit A**.

4. I have reviewed the First Day Pleadings and consulted with the Debtors' legal and financial advisors. To the best of my knowledge, information, and belief formed after reasonable inquiry, I believe that approval of the relief requested in the First Day Pleadings is necessary to minimize disruption to the Debtors' business operations, permit a smooth and effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates. I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations, as described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

5. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' professional advisors, and/or my opinion based upon my experience.

6. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I could and would testify competently to the facts set forth herein.

I. **Company Background and Founder Misconduct**

7. The Debtors filed these chapter 11 cases on an expedited basis in light of numerous challenges, including a sheriff's sale in Rockland County, New York for Debtor CBRM Realty Inc. ("**CBRM**"), a critical lack of funding necessary to preserve the health and safety of

3

the Debtors' affordable housing projects in Pennsylvania and Louisiana, and challenges with raising capital due to the fact that the Debtors' ultimate equity owner was recently sentenced to prison for his role in defrauding the federal government in connection with an affordable housing project (which does not have a presently-identified connection to the Debtors or their past or present activities) (the "**Silber Prosecution-Related Property**").

8. The Debtors are part of a larger real estate portfolio indirectly owned by CBRM and formed by real estate investor Moshe "Mark" Silber and certain affiliated parties (the "**Crown Capital Portfolio**"). The Crown Capital Portfolio holds dozens of multifamily housing projects across the United States and has been historically funded, at least in part, by the federal government's housing assistance programs, such as Section 8. Ultimately, the Crown Capital Portfolio raised hundreds of millions of dollars of financing, including (i) over $200 million from the sale of bonds issued by Debtor Crown Capital Holdings LLC ("**Crown**") and guaranteed by Debtor CBRM (the "**Notes**") and (ii) approximately $450 million of property-level mortgage loans provided by an array of different financing sources.

9. Silber and certain of his co-investors, including Frederick Schulman, have been targets of extensive investigations by the federal government and certain state authorities. On April 17, 2024, Silber entered into a plea agreement in connection with the Silber Prosecution-Related Property with the Fraud Section of the Department of Justice and the United States Attorney for the District of New Jersey for conspiracy to commit wire fraud affecting an institution pursuant to 18 U.S.C. § 371. Schulman also entered into a plea agreement around the same time. Silber was sentenced to 30 months in prison and Schuman was sentenced to 12 months and one day in prison, to be followed by nine months of home confinement. Both have agreed to pay restitution. To my knowledge, none of Silber, Schulman, any Debtor or any past or present officer

4

of any Debtor has been indicted, made subject of a criminal information, civilly sued, or received a Wells Notice or a state equivalent thereof in relation to any properties or transactions of any Debtor.

10.     A considerable share of the Debtors' distress arises from the fact that many, if not all, of the properties of the Debtors and their affiliates (including properties that the Debtors lost before the commencement of these cases) are likely worth much less today than the appraised values which supported the issuance of the Notes and certain of the property-level mortgage loans. Although the reasons for this depreciation remain the subject of active investigation by me and my advisors, it may be explained by three factors alone or in combination.  First, commencing in 2023, if not earlier, perhaps in part or in whole due to the distraction of the government investigations and eventual prosecution, Silber and Schulman neglected the management of the Crown Capital Portfolio, causing numerous properties or property-holding Debtors or Debtor affiliates to fall into operational and/or physical disarray, jeopardize their eligibility for affordable housing programs which pay or subsidize all or most of the rent rolls, suffer declining occupancy rates, default on their obligations under their respective loan agreements, allow property-level mortgage loans to mature, fail to defend lawsuits (including the Acquiom litigation discussed *infra*) and become subject to default judgments, and/or become subject to receivership proceedings..  Second, the government successfully prosecuted Silber and Schulman in connection with the Silber Prosecution-Related Property for using false or misleading property-level information to obtain inflated appraisals for certain properties, obtaining excessive financing, and then siphoning the surplusage out of Crown.  The Debtors are investigating what relevance, if any, this misconduct has to them.  Third, many of the properties of the Debtors and their affiliates were valued for the purposes of the issuance of the Notes and some of the property-level mortgages in a period of

time — 2021 and 2022 — when multi-family projects such as the Debtors' were at all-time high values in part due to low interest rates and high investor demand during and after the COVID pandemic — and those properties would likely be worth less today even in the absence of management negligence or intentional misconduct.

**II.    Appointment of Independent Fiduciary**

11.    Once Silber's plea became public, Silber, as a convicted felon, was effectively disqualified from continuing to manage the Crown Capital Portfolio.  The Crown Capital Portfolio's stakeholders, including investors who purchased the Notes (the "**Noteholders**"), expressed concern about these developments because the Crown Capital Portfolio's value supported the payment of principal and interest under the Notes.

12.    Following discussions between Mr. Silber's counsel and the Noteholders' counsel (Faegre Drinker Biddle & Reath LLP) and financial advisers (at the time, IslandDundon), on August 29, 2024, the parties entered into a forbearance agreement (the "**Forbearance Agreement**").  The Forbearance Agreement addressed various matters involving pending defaults under the Notes and Mr. Silber's go-forward involvement with the portfolio and established a process to ensure the Crown Capital Portfolio had sufficient fiduciary oversight.  The Forbearance Agreement, among other things, required Mr. Silber to appoint an independent fiduciary acceptable to the Noteholders as the sole director of CBRM and Crown and provide that individual with an irrevocable proxy for so long as the obligations under the Forbearance Agreement remained pending.

13.    Thereafter, I and others of the Noteholders' advisors identified numerous potential candidates to serve as independent fiduciary as required by the Forbearance Agreement.  On September 26, 2024, the bondholders party to the Forbearance Agreement consented to the

appointment of Ms. Elizabeth A. LaPuma—a restructuring professional who for over 20 years has worked as an investment banker and corporate director, including for companies in distress—as the independent fiduciary for CBRM and Crown (the "**Independent Fiduciary**"). Since that time, Ms. LaPuma has acted in a fiduciary capacity for those entities and the dozens of other entities directly or indirectly owned by CBRM, including the Debtors.

### III. Factors Precipitating the Debtors' Chapter 11 Filings

14. Following her appointment, the Independent Fiduciary, with my assistance and that of her other advisors, including my IslandDundon colleagues, immediately got to work to maximize the value of the portfolio. The Independent Fiduciary ordered a review of all litigation involving the portfolio, including the systematic identification of defaults, lawsuits, and judgments entered against the properties. In addition, the Independent Fiduciary, with the assistance of entities within The Lynd Group Texas-based real estate management organization ("**Lynd Living**"), began the process of ensuring that each property owned by the portfolio had sufficient staffing and other resources, with the goal of ensuring that residents had safe, clean homes.

15. The Independent Fiduciary also took steps to ensure that she and the portfolio had the internal resources to maximize value for all stakeholders. Among other things, she obtained director and officer insurance (which the Crown Capital Portfolio inexplicably never obtained prior to the Independent Fiduciary's appointment) to enable her to fulfill her duties. The Independent Fiduciary also began providing periodic updates to the Noteholder advisers and steering committee (including weekly calls), engaged an investment advisor to seek refinancing and new capital opportunities for certain portfolio properties, and engaged with other creditors.

16. These efforts, however, required a pause in any negative enforcement actions contemplated by creditors of the Crown Capital Portfolio, including the Noteholders. Thus,

following her appointment, the Independent Fiduciary worked constructively with her advisors and the Noteholders' advisors to extend the Forbearance Agreement in order to allow additional time to restructure the portfolio in a manner which would maximize value for all stakeholders. Most recently, the Noteholders agreed to extend the Forbearance Agreement through April 14, 2025. However, prior to the expiration of that extension, the Noteholders informed the Independent Fiduciary's advisors that they would not extend the Forbearance Agreement any further.

17. Around the same time, one of the Debtors' judgment creditors similarly expressed its intent to execute on the Debtors' assets. Specifically, in June 2022, Mr. Silber purportedly entered into that certain Credit Agreement, dated June 2, 2022, between UBS O'Connor LLC, as lender ("**UBS**"), and Acquiom Agency Services LLC ("**Acquiom**"), as administrative agent (the "**Silber Credit Agreement**"). The Silber Credit Agreement was purportedly guaranteed by, among others, CBRM, and was purportedly secured by a pledge by CBRM of its equity in Crown. On March 6, 2024, Acquiom sent a letter to Mr. Silber asserting that a default had occurred under the Silber Credit Agreement resulting from Mr. Silber's failure to timely make certain interest payments which Acquiom asserted were properly due under the Silber Credit Agreement. On May 2, 2024, after failing to receive a response to its letter, Acquiom filed a lawsuit against, among others, Silber and CBRM (the "**UBS Defendants**") to recover the total aggregate principal balance under the Silber Credit Agreement in a suit captioned *Acquiom Agency Services LLC v. Fox Capital LLC et. al.*, Index No. 652265/2024, Supreme Court of the State of New York County of New York, Commercial Division Part 45 (May 2, 2024).

18. On August 2, 2024, the Supreme Court of the State of New York (the "**New York Court**") granted Acquiom's summary judgment motion and required that Silber repay the amounts

8

outstanding under the Silber Credit Agreement in an amount totaling $19,185,000 plus interest. On September 5, 2024, the New York Court entered a judgment against the UBS Defendants in the amount of $21,020,452.60. On September 9, 2024, Acquiom assigned the right to collect on this judgment to Spano Investor LLC (the "**Judgment Creditor**"). After the assignment, on December 14, 2024, the New York Court entered a property execution order requiring the UBS Defendants to satisfy the judgment and authorizing the Judgment Creditor to foreclose and collect upon certain assets in satisfaction of its judgment, including CBRM's right, title, and interest in Crown. The Rockland County sheriff was scheduled to conduct a sheriff's sale of certain assets of CBRM, including its equity interest in Crown, on Thursday, May 22, 2025. The sheriff's sale, had it proceeded, would have allowed a prepetition creditor to exercise remedies against CBRM's interest in Crown, the entity overseen by the Independent Fiduciary (a) that issued the Notes, (b) holds significant potential claims and causes of action against Silber and other affiliates, and (c) holds CBRM's interests in the Crown Capital Portfolio. The sheriff's sale, if it had proceeded, would have, therefore, allowed a single prepetition judgment creditor receive a recovery at the expense of other creditors (particularly the Noteholders). The Debtors commenced these chapter 11 cases to maximize value for all of CBRM's creditors.

## IV. Prepetition Secured Indebtedness

19.  On the basis of information available to and reviewed by me and my advisors, I presently believe the Debtors' prepetition secured indebtedness presently to consist of:

(i) a term loan in the original principal amount of $3,500,000 (the "**Prepetition Kelly Hamilton Loan**") pursuant to that certain Loan and Security Agreement, dated as of September 20, 2024, between Kelly Hamilton Apts LLC (the "**Kelly Hamilton Debtor**"), as Borrower, and Kelly Hamilton Lender LLC (the "**Kelly Hamilton Lender**"), as Lender, evidenced by that certain Term Note, dated as of September 20, 2024, by Kelly Hamilton Debtor in favor of the Kelly Hamilton Lender, and secured by an Open-End Commercial Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of September 20, 2024;

    (ii)    loans (the "**Prepetition CKD Loans**") issued to RH Lakewind East LLC, RH Copper Creek LLC, and RH Windrun LLC (together, with RH Chenault Creek LLC, collectively, the "**NOLA Debtors**") evidenced by that certain Non-Revolving Commercial Line of Credit Note, dated as of July 8, 2024, in the original principal amount of up to $10,000,000, in favor of CKD Funding LLC ("**CKD**") and secured by a Multiple Indebtedness Mortgage, Pledge of Leases and Rents and Security Agreement, dated as of July 8, 2024;

    (iii)    loans (the "**Prepetition DH1 Loans**") issued to RH Chenault Creek LLC evidenced by (a) an Amended and Restated Secured Promissory Note, dated as of March 12, 2024, in the principal amount of $4,060,875.87, and Assignment of Amended and Restated Secured Promissory Note and Mortgage, Pledge of Leases and Rents and Security Agreement, and Allonge to Amended and Restated Secured Promissory Note, dated as of September 6, 2024, and (b) that certain Non-Revolving Commercial Line of Credit Note, dated as of April 4, 2024, in the original principal amount of up to $7,500,000, in favor of DH1 Holdings LLC ("**DH1**"), each of which is secured by (a) a Mortgage, Pledge of Leases and Rents and Security Agreement, dated as of March 13, 2024, and (b) a Multiple Indebtedness Mortgage, Pledge of Lease and Rents and Security Agreement, dated as of April 4, 2024; and

    (iv)    amounts due under the Silber Credit Agreement, if and to the extent both the obligation and its security are validated as to one or more Debtor, and then only to the extent that the equity collateral therefore has any value.

20.    Additionally, I believe (i) CKD Investor Penn LLC ("**CKD Penn**") holds a mortgage on the properties held by the NOLA Debtors pursuant to a Multiple Indebtedness Mortgage, Pledge of Leases and Rents and Security Agreement, dated as of August 16, 2024, and (ii) Cleveland International Fund – NRP West Edge, LTD holds a mortgage on the property held by RH Lakewind East LLC pursuant to a Mortgage, Security Agreement, assignment of Leases and Rents and Fixture Filing, dated as of December 11, 2024.

### V.    Prepetition Unsecured Obligations

21.    On the basis of information available to and reviewed by me and my advisors, I presently believe the Debtors' prepetition unsecured obligations consist principally of (a) the Notes, which are a series of three bond issuances, each made under a purported exemption from registration under the Securities Act of 1933, each of which is structured as a series of

economically-identical bilateral agreements between the issuer and guarantor thereof, on the one hand, and each note purchaser (principally consisting of insurance companies and wealth management firms), on the other hand, and none of which possesses a trust indenture nor indenture trustee, (b) the obligations under the Silber Credit Agreement to the extent its obligations are validated but are determined to be unsecured or in excess of the value of any validated collateral, (c) operating trade obligations, and (d) obligations to Lynd Living and providers of professional services to or the payment of which was guaranteed by the Debtors.

## VI.    DIP Financing and Objectives of the Chapter 11 Cases

22.    Prior to the commencement of these chapter 11 cases, the Debtors' efforts to refinance and restructure their capital structure were severely impaired by Silber's prosecution and the nature of the allegations involving Silber.  The Debtors, with the assistance of an external financing broker and Lynd Living, engaged with numerous parties regarding potential financing initiatives.  None of those efforts succeeded and the Debtors determined that financing outside of a court-supervised restructuring process was not feasible.  In conjunction with that determination, the Debtors began to engage with Lynd Living and a capital partner, 3650 REIT, regarding a potential debtor-in-possession financing facility secured by the Kelly Hamilton Debtor's assets (the "**Original Kelly Hamilton DIP Proposal**").  At the same time, the Debtors also began to engage with a Noteholder regarding a potential financing facility secured by the assets of both the Kelly Hamilton Debtor and the NOLA Debtors (the "**Noteholder DIP Proposal**").

23.    In conjunction with the commencement of these cases, the Debtors determined that the Noteholder DIP Proposal was superior to the Original Kelly Hamilton DIP Proposal.  Among other things, the Noteholder DIP Proposal (1) provided financing for the NOLA Debtors as well as the Kelly Hamilton Debtor, (2) committed significant start-up funding for a litigation trust, and

11

(3) had the support of certain Noteholders. The Noteholder DIP Proposal, however, also contemplated a non-consensual priming lien on all of the NOLA Debtors' prepetition funded debt creditors, the approval of which would have required the Debtors to engage in costly, distracting litigation.

24. In the following days, as the Debtors sought to finish documenting the Noteholder DIP Proposal, the Debtors also recommenced discussions with Lynd Living and 3650 REIT regarding a revised financing proposal for the Kelly Hamilton Debtor. The Debtors also received unsolicited outreach from DH1, which as detailed above holds a mortgage on the NOLA Debtors' properties, regarding its interest in providing a consensual DIP facility secured by the NOLA Debtors' assets. Following extensive dialogue between the Debtors, the steering committee of Noteholders, and the proposed DIP financing providers, the Debtors finalized terms with both Lynd Living and 3650 REIT and DH1.

25. Specifically, the Kelly Hamilton Debtor has obtained a lending commitment from Lynd Living and 3650 REIT for a secured debtor-in-possession credit facility (the "**Kelly Hamilton DIP Facility**") in a principal amount of up to $9,830,162, comprised of one or more new term loans. Additionally, the NOLA Debtors have obtained a lending commitment from DH1, CKD and CKD Penn for a secured debtor-in-possession credit facility (the "**NOLA DIP Facility**" and, together with the Kelly Hamilton DIP Facility, the "**DIP Facilities**") in the aggregate principal amount of up to $17,422,728, comprised of (a) one or more new term loans and (b) a roll-up of the Prepetition DH1 Loans and the Prepetition CKD Loans.

26. The proceeds of the DIP Facilities will enable the Debtors to repay the existing mortgage indebtedness of the Kelly Hamilton Debtor and facilitate the rehabilitation of their affordable housing assets in Louisiana and Pennsylvania. Additionally, approximately $1.2

million of the proceeds of the DIP Facilities will be reserved to fund the costs of the investigation, development, and prosecution of valuable claims and causes of action against certain of the Debtors' insiders, including Silber and Schulman, and other parties for the benefit of the Debtors' unsecured creditors.

27. Pursuant to certain milestones in connection with the DIP Facility, the Debtors will also engage in a postpetition marketing process to solicit sale, financing, and plan sponsor proposals for the Kelly Hamilton Debtor and the NOLA Debtors and conduct an auction during the chapter 11 cases in order to obtain the highest and best transaction for the Kelly Hamilton Debtor and the NOLA Debtors.

## VII. Conclusion

28. The ultimate goal in these chapter 11 cases is to achieve a value-maximizing result for the Debtors' stakeholders. I presently anticipate that with the cooperation of all parties in interest and with the assistance of the Court, this result will include, perhaps among other things, (a) the realization for the benefit of unsecured creditors of any value in properties in excess of the enforceable amount of mortgage loans thereupon, and (b) the preliminary investigation of, and creation of suitable post-effective date structure(s) (e.g., a litigation trust with appropriate funding) to pursue, estate causes of action such as those which may exist against Silber, Schulman and other insiders, non-insider transferees of constructive and actual fraudulent and preferential transfers, participants in the issuance of the Notes who were negligent or reckless in fulfilling their duties to the Debtors, and aiders and abettors of any of the foregoing, and to coordinate for mutual benefit with the Noteholders and Acquiom in respect of causes of action which may have common facts, legal theories, or sources of recovery with causes of action which are their property. To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere

during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested by the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 27, 2025
      New York, New York

By: *Matthew Dundon*
Name: Matthew Dundon
Title: Principal
      IslandDundon LLC