| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY **Caption in Compliance with D.N.J. LBR 9004-1** | |
| In re:<br><br>CBRM Realty Inc. *et al.*,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 25–15343 (MBK)<br>(Jointly Administered) |

**Order Filed on June 19, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

## FINAL ORDER (I) AUTHORIZING
## THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR
## SECURED PRIMING SUPERPRIORITY POSTPETITION
## FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING
## THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered 2 through 54, is ORDERED.

**DATED: June 19, 2025**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

(Page 2)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Upon the motion (the "**Motion**")[2] of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 4001-3 and 9013-5 of the Bankruptcy Local Rules for the District of New Jersey (the "**Local Rules**"), seeking entry of this final order (this "**Final Order**"):

    i.       authorizing Kelly Hamilton Apts, LLC (the "**Kelly Hamilton Debtor**"), Kelly Hamilton Apts MM LLC, CBRM Realty Inc. ("**CBRM**") and Crown Capital Holdings, LLC (collectively, the "**Kelly Hamilton DIP Loan Parties**"), in their capacity as borrowers and as joint and several obligors, to obtain postpetition financing under a superpriority senior secured debtor in possession term loan credit facility (the "**DIP Facility**"), with an aggregate principal amount of up to $9,705,162 (the "**DIP Facility Amount**"), available upon entry of the Interim Order[3], subject to the terms and conditions of the Interim Order and Final Order, that certain financing term sheet [Doc. 42], substantially in the form attached to the Motion as <u>**Exhibit A**</u> (the "**DIP Term Sheet**"), and that certain Senior Secured Superpriority Debtor in Possession Term Loan Credit Agreement (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, which shall be filed with the Court upon execution, the "**DIP Credit Agreement**," and together with the Interim Order, the Final Order, the DIP Term Sheet, and all agreements, documents, and instruments delivered or executed in connection therewith, collectively, the "**DIP Documents**"), among the Kelly Hamilton DIP Loan Parties and 3650 SS1 Pittsburgh LLC (including any successors and assigns selected in accordance with the DIP Credit Agreement, the "**DIP Lender**") and any agent or servicer appointed by the DIP Lender (in such

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion and the DIP Documents.

[3]      The "**Interim Order**" as used herein, refers to that certain *Interim Order (I) Authorizing the Kelly Hamilton DIP Loan Parties to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 108] entered on June 4, 2025 by the United States Bankruptcy Court for the District of New Jersey.

(Page 3)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

capacity, the "**DIP Agent**" and, together with the DIP Lender, the "**DIP Secured Parties**");

ii.     authorizing the Kelly Hamilton DIP Loan Parties to open the Escrow Account (as defined below) with the terms and conditions provided in the DIP Documents and use the proceeds of the DIP Facility (i) to pay costs, fees and expenses of the DIP Secured Parties, as provided for in the DIP Documents, the Interim Order and this Final Order, as well as all scheduled payments of interest and principal pursuant to the DIP Documents, (ii) to provide working capital and for other general corporate purposes of the Kelly Hamilton DIP Loan Parties, and (iii) to satisfy the administrative expenses of these Chapter 11 Cases and other claims or amounts allowed by this Court;

iii.    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Kelly Hamilton DIP Loan Parties as set forth herein, whether such property is presently owned or after-acquired, and each Kelly Hamilton DIP Loan Parties' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the Carve-Out and the Purported Spano Judgment Lien (each as defined below);

iv.    granting superpriority administrative expense claims against each of the Kelly Hamilton DIP Loan Parties' estates to the DIP Secured Parties with respect to the DIP Obligations (as defined below) over any and all administrative expenses and other claims of any kind or nature subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Documents;

v.     effective as of the Petition Date, waiving the Kelly Hamilton DIP Loan Parties' and the estates' right to surcharge against the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vi.    effective as of the Petition Date, waiving the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and the proceeds, products, offspring, or profits thereof;

vii.   effective as of the Petition Date, waiving the equitable doctrine of marshaling with

(Page 4)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

respect to the DIP Collateral and the DIP Secured Parties;

viii.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the DIP Documents, and this Final Order;

ix.  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order and providing for immediate effectiveness of this Final Order; and

x.  granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Matthew Dundon, Principal of IslandDundon LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 44] and the other evidence submitted or adduced and the arguments of counsel made at the interim hearing held and concluded on June 2, 2025 ("**Interim Hearing**") and at the hearing on this Final Order ("**Final Hearing**") held pursuant to Bankruptcy Rule 4001(b)(2) on June 17, 2025; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested at the Interim Hearing, the Final Hearing and in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the Final Relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Kelly Hamilton DIP Loan Parties and their estates and otherwise is fair and reasonable and is essential for the continued operation of the Kelly Hamilton DIP Loan Parties' businesses and the preservation of the value of the Kelly Hamilton DIP Loan Parties' assets; and to preserve low-income and government subsidized housing for hundreds of tenants; and it appearing that the Kelly Hamilton DIP Loan Parties' entry

(Page 5)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

into the DIP Credit Agreement and all other DIP Documents is a sound and prudent exercise of the Kelly Hamilton DIP Loan Parties' business judgment; and the Kelly Hamilton DIP Loan Parties having provided reasonable notice of the Motion under the circumstances as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THIS FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.      *Petition Date*.  On May 19, 2025 (the "**Petition Date**"), the Kelly Hamilton DIP Loan Parties filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey ("**Court**"), commencing these Chapter 11 Cases.

B.      *Debtors in Possession*.  The Kelly Hamilton DIP Loan Parties continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.  Elizabeth A. LaPuma, as the independent fiduciary and authorized representative for each of the Kelly Hamilton DIP Loan Parties (the "**Independent Fiduciary**"), has full corporate authority to act on behalf of, and legally bind, each of the Kelly Hamilton DIP Loan Parties in the DIP Documents.

---

[4]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

(Page 6)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

C.     *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, these Chapter 11 Cases, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Venue for these Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  The bases for the relief sought in the Motion and granted in this Final Order are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-3.

D.     *Committee*.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "**Official Committee**").

E.     *Purpose and Necessity of Financing*.  The Kelly Hamilton DIP Loan Parties require the financing described in the Motion and as expressly provided in the DIP Documents, the Interim Order and this Final Order (i) to pay costs, fees and expenses of the DIP Secured Parties, as provided for in the DIP Documents, the Interim Order and this Final Order, as well as all scheduled payments of interest and principal thereunder, (ii) to provide working capital for operations and real property improvements and for other general corporate purposes of the Kelly Hamilton DIP Loan Parties, and (iii) to satisfy the administrative expenses of these Chapter 11 Cases and other claims or amounts allowed by this Court.  If this Final Order is not entered, the Kelly Hamilton DIP Loan Parties and hundreds of tenants subsidized by the U.S. Department of Housing and Urban Development ("**HUD**") will suffer immediate and irreparable harm.

(Page 7)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

F.      _No Credit Available on More Favorable Terms_.  The Kelly Hamilton DIP Loan Parties are unable to obtain financing or other financial accommodations from sources other than the DIP Lender on terms more favorable than those provided under the DIP Facility, the DIP Documents, the Interim Order and this Final Order. The Kelly Hamilton DIP Loan Parties are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Kelly Hamilton DIP Loan Parties are also unable to obtain adequate secured credit for money borrowed under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Kelly Hamilton DIP Loan Parties granting (a) the DIP Liens as first priority priming liens on all DIP Collateral, (b) the Superpriority Claims, and (c) the rights, benefits and protections to the DIP Secured Parties. After considering all available alternatives, the Kelly Hamilton DIP Loan Parties have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best source of debtor-in-possession financing available to them at this time. Additionally, the terms of the DIP Facility are fair and reasonable and reflect the Kelly Hamilton DIP Loan Parties' exercise of prudent business judgment consistent.

G.      _Kelly Hamilton DIP Loan Parties' Stipulations, Releases and Acknowledgements Regarding DIP Secured Parties_.  Without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 17 below), and after consultation with their attorneys, and in exchange for and as a material inducement for receiving this DIP Facility, the Kelly Hamilton DIP Loan Parties, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree as follows in this paragraph G:

(Page 8)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

a. *No Control*. None of the DIP Secured Parties (in their capacities as such) by virtue of making the DIP loans are deemed to be in control of the Kelly Hamilton DIP Loan Parties or their properties or operations, has authority to determine the manner in which any of the Kelly Hamilton DIP Loan Parties' operations are conducted, or is a control person, insider (as defined in the Bankruptcy Code), "responsible person," or managing agent of the Kelly Hamilton DIP Loan Parties or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Documents or the transactions contemplated by each.

b. *Prepetition Lienholders.* On and before the Petition Date, liens (the "**Prepetition Liens**") existed on certain of the Kelly Hamilton DIP Loan Parties' real properties and personal property (the "**Prepetition Collateral**") pursuant to that certain Loan and Security Agreement, dated as of September 20, 2024, between Kelly Hamilton Apts LLC, as Borrower, and Kelly Hamilton Lender LLC (the "**KH Lender**" or the "**Prepetition Lender**"), as Lender, evidenced by that certain Term Note, dated as of September 20, 2024, by Kelly Hamilton Debtor in favor of the KH Lender, and secured by an Open-End Commercial Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of September 20, 2024 (the "**Prepetition Secured Obligations**"). KH Lender possesses the Prepetition Liens on the Prepetition Collateral. The Prepetition Liens constitute valid, binding, enforceable and perfected first priority liens and are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Prepetition Secured Obligations constitute legal, valid and binding

(Page 9)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

obligations of the Kelly Hamilton DIP Loan Parties, enforceable in accordance with the terms of the underlying agreements giving rise to such obligations, other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code, and no portion of the Prepetition Secured Obligations is subject to avoidance or subordination pursuant to the Bankruptcy Code or non-bankruptcy law.  In accordance with the DIP Documents, the Prepetition Secured Obligations will be paid in full from the DIP Facility Amount contemporaneously with the closing on the DIP Facility.

c.  *No Claims, Defenses, or Causes of Action.*  The Kelly Hamilton DIP Loan Parties, the Kelly Hamilton DIP Loan Parties' estates, predecessors, successors, and assigns hold no (and hereby waive, discharge and release any) valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, defenses, setoff rights, or any other causes of action of any kind, and waive, discharge and release any right they may have to (i) challenge the validity, enforceability, priority, security and perfection of any of the DIP Obligations, DIP Documents, or DIP Liens, respectively, and (ii) assert any and all claims (as defined in the Bankruptcy Code) or causes of action against the DIP Secured Parties, the Indemnified Parties (defined below), or any of their respective current, former and future affiliates, subsidiaries, funds, or managed accounts, officers, directors, managers, managing members, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, accountants, investment bankers, consultants, and other professionals, and the successors and assigns of each of the foregoing (in their capacities as such), in each case, whether arising at law or in equity, including any recharacterization,

(Page 10)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

d.  *Indemnification*.  The DIP Lender has agreed to provide the DIP Facility, subject to the conditions set forth herein and in the DIP Documents, including indemnification of the Indemnified Parties[5] and the provisions of the Interim Order and this Final Order assuring that the DIP Liens and the various claims, Superpriority Claims and other protections granted pursuant to the DIP Documents, the Interim Order and this Final Order will not be affected, except as otherwise provided herein, by any subsequent reversal or modification of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility.  The DIP Lender has acted in good faith in consenting to and in agreeing to provide the DIP Facility. The reliance of the DIP Lender on the assurances referred to above is in good faith.

e.  *Releases*.  The DIP Lender has agreed to provide the DIP Facility, subject to the conditions set forth herein and in the DIP Documents, including the absolute, unconditional and irrevocable release and forever discharge of any and all actions, causes of action, claims, counter-claims, cross-claims, defenses, accounts, objections, challenges, offsets or setoff, demands, liabilities, responsibilities, disputes, remedies, indebtedness, obligations, guarantees, rights,

---

[5]      "Indemnified Parties" means, collectively, the DIP Secured Parties, 3650 REIT Investment Management LLC and any of its funds or separately-managed accounts, 3650 Special Situations Real Estate Investment Trust A LLC and its affiliated entities, the Prepetition Lender, The Lynd Group Holdings, LLC, Lynd Management Group LLC, Lynd Acquisitions Group LLC, and LAGSP, LLC ("**LAGSP**") and, with respect to each of the foregoing entities, each such entity's and its affiliates' successors and assigns and respective current and former principals, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accounts, attorneys, officers, directors, employees, agents and other representatives.

(Page 11)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

interests, indemnities, assertions, allegations, suits, controversies, proceedings, losses, damages, injuries, reimbursement obligations, attorneys' fees, costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, rule or regulation or by contract, of every nature or description whatsoever that the Kelly Hamilton DIP Loan Parties', their estates, predecessors, successors and assigns at any time had, now have or that their successors and assigns may have against any of the Released Parties[6] in connection with or related to the Kelly Hamilton DIP Loan Parties, their operations and businesses, the Interim Order, and this Final Order, the DIP Facility, the DIP Liens, the Superpriority Claims, the DIP Collateral, the DIP Obligations, the DIP Documents or the transactions contemplated thereunder or hereunder, including, without limitation, (i) any Avoidance Actions (as defined below), (ii) any so-called "lender liability" or equitable subordination claims or defenses, (iii) any claims or causes of action arising under the Bankruptcy Code, (iv) any claims or causes of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery or any other challenge arising under the Bankruptcy Code or applicable non-bankruptcy law with respect to the DIP

---

[6]     "Released Parties" shall mean the Indemnified Parties.

(Page 12)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Liens, the Superpriority Claims, the DIP Obligations, the DIP Documents or the DIP Collateral, or (v) any claim or cause of action with respect to the validity, enforceability, extent, amount, perfection or priority of the DIP Liens, the Superpriority Claims, the DIP Obligations or the DIP Documents; provided, however, that nothing contained in this clause (e) shall relieve the DIP Secured Parties from fulfilling any of their commitments under the DIP Credit Agreement or other DIP Documents and their estates, predecessors, have against the Released Parties of and from, that the Kelly Hamilton DIP Loan Parties.

    f.  *Final Order*.  Notwithstanding anything to the contrary set forth in the Interim Order or herein, the stipulations and releases set forth in subparagraphs (a), (b), (c), (d), and (e) of this paragraph G shall be subject to any Challenge (as defined herein).

    H.  *Good Cause*.  The ability of the Kelly Hamilton DIP Loan Parties to obtain sufficient working capital and liquidity under the DIP Documents, the Interim Oder and this Final Order is vital to the Kelly Hamilton DIP Loan Parties, their estates, tenants, and creditors and stakeholders.  The liquidity to be provided under the DIP Documents, the Interim Order, and this Final Order will enable the Kelly Hamilton DIP Loan Parties to continue to operate their businesses in the ordinary course and preserve the value of their businesses.  The Kelly Hamilton DIP Loan Parties' estates will be immediately and irreparably harmed if this Final Order is not entered.  Good cause has, therefore, been shown for the relief sought in the Motion.

    I.  *Good Faith*.  The DIP Facility, the DIP Documents, the Interim Order, and this Final Order have been negotiated in good faith and at arm's length among the Kelly Hamilton DIP

(Page 13)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Loan Parties and the DIP Secured Parties, and all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Facility, the DIP Documents, the Interim Order and this Final Order, including without limitation, all loans made to the Kelly Hamilton DIP Loan Parties pursuant to the DIP Documents, the Interim Order, and this Final Order, and any other obligations under the DIP Documents, the Interim Order and this Final Order (all of the foregoing, collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below), and the Superpriority Claims (as defined below), shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of the Interim Order and this Final Order regardless of whether this Final Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

J.      *Consideration*.  All of the Kelly Hamilton DIP Loan Parties will receive and have received fair consideration and reasonably equivalent value in exchange for the DIP Facility and all other financial accommodations provided under the DIP Documents, the Interim Order and this Final Order.

K.      *Immediate Entry of Final Order*.  The Kelly Hamilton DIP Loan Parties have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001.  The permission granted herein to enter into the DIP Facility and to obtain funds thereunder is necessary to avoid

(Page 14)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

immediate and irreparable harm to the Kelly Hamilton DIP Loan Parties. This Court concludes that entry of this Final Order will, among other things, allow for the continued operation of the Kelly Hamilton DIP Loan Parties' existing businesses and further enhance the Kelly Hamilton DIP Loan Parties' prospects for a successful restructuring.

L.    *Notice*. Upon the record presented to this Court at the Interim Hearing and the Final Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the emergency relief requested thereby and granted in this Final Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) and Local Rule 9013-5 on (i) the DIP Lender; (ii) counsel to the DIP Lender; (iii) the Prepetition Lienholder; (iv) the Office of the United States Trustee for the District of New Jersey (the "**U.S. Trustee**"); (v) the holders of the thirty (30) largest unsecured claims against the Kelly Hamilton DIP Loan Parties' estates (on a consolidated basis); (vi) all of the Kelly Hamilton DIP Loan Parties' prepetition secured creditors; (vii) the United States Attorney's Office for the District of New Jersey; (viii) the attorneys general in the states in which the Kelly Hamilton DIP Loan Parties conduct their business; (ix) the United States Department of Justice; (x) the Internal Revenue Service; (xi) HUD; (xii) the Ad Hoc Group of Holders of Crown Capital Notes; (xiii) counsel to the Official Committee (if any); and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002, which notice was appropriate under the circumstances and sufficient for the Motion. No other or further notice of the Motion or entry of this Final Order is required.

Based upon the foregoing findings and conclusions, the Motion and the record before the

(Page 15)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED**:

1.     ***DIP Facility Approved***.  The Motion, including all provisions of the DIP Credit Agreement (attached hereto as **Exhibit B**), the DIP Documents and the Motion is granted on a Final basis as set forth herein.  The financing described herein is authorized and approved subject to the "Conditions Precedent to the Closing" section of the DIP Term Sheet and any applicable provisions set forth in the DIP Documents, including but not limited to the DIP Credit Agreement.

2.     ***Objections Overruled***.  Any objections, reservations of rights, or other statements with respect to entry of the Final Order and the relief requested in the Final Order, to the extent not withdrawn, waived, settled or otherwise resolved, are overruled on the merits.  This Final Order shall become effective immediately upon its entry.

3.     ***Authorization of the DIP Facility and the DIP Documents***.

a.     Effective immediately upon the entry of the Interim Order and this Final Order, the Kelly Hamilton DIP Loan Parties are hereby authorized to enter into, and the Independent Fiduciary is authorized to execute and empowered to bind the Kelly Hamilton DIP Loan Parties to, the DIP Facility and the DIP Documents, including the DIP Credit Agreement, the terms of which are incorporated herein by reference.  Prior to entry of the Final Order, the DIP Documents and this Final Order governed the financial and credit accommodations to be provided to the Kelly Hamilton DIP Loan Parties by the DIP Secured Parties in respect of the DIP Facility Amount.  Following entry of this Final Order, the financial and credit accommodations to be

(Page 16)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

provided to the Kelly Hamilton DIP Loan Parties by the DIP Secured Parties in respect of the DIP Facility (including the DIP Facility Amount) shall be governed by the DIP Documents and this Final Order.

b.      Pursuant to and effective immediately upon the entry of the Interim Order and this Final Order, the Kelly Hamilton DIP Loan Parties are hereby authorized to close and borrow money pursuant to the DIP Documents and this Final Order, up to an aggregate principal amount of $9,705,162 (all of which amount was authorized to be drawn by the Kelly Hamilton DIP Loan Parties prior to entry of this Final Order), plus interest, costs, fees, and other expenses and amounts provided for in the DIP Documents, the Interim Order and this Final Order, in accordance with the terms of the DIP Documents, the Interim Order and this Final Order, which shall be used solely as expressly provided in the DIP Documents, this Final Order and the Approved Budget: (i) to pay costs, fees, and expenses of the DIP Secured Parties (including, without limitation, the reasonable and documented fees, costs and expenses of its legal counsel including, for the avoidance of doubt, the fees, costs and expenses of Lippes Mathias, McCarter & English LLP, and Akerman LLP and a financial advisor) as provided in the DIP Documents as such become earned, due and payable and the scheduled payments of principal and interest under the DIP Facility, (ii) to provide working capital and for other general corporate purposes of the Kelly Hamilton DIP Loan Parties, (iii) to satisfy the administrative expenses of these Chapter 11 Cases and other claims or amounts allowed by this Court, and (iv) pay off at closing from the draw of the DIP Facility Amount the existing mortgage indebtedness of the Prepetition Collateral (the

(Page 17)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

"**Kelly Hamilton Property**") and all other prepetition liens that are not Permitted Liens (as defined in the DIP Documents) and are secured by the Prepetition Collateral, in each case, subject to the Approved Budget.

   c. In furtherance of the foregoing and without further approval of this Court, each Kelly Hamilton DIP Loan Party is authorized and directed to promptly perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be required or necessary for the Kelly Hamilton DIP Loan Parties' performance of their obligations under the DIP Facility, including, without limitation:

   i. the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any guarantees, any security and pledge agreements, and any mortgages contemplated thereby;

   ii. the payment of the fees referred to in the DIP Documents and this Final Order and costs and expenses as may be due in accordance with the DIP Documents and this Final Order;

   iii. open and deposit $2,450,000 from the DIP Facility Amount into an escrow account ("**Escrow Account**") held by the Kelly Hamilton DIP Loan Parties or Debtors' counsel for the benefit of the Independent Fiduciary and the Kelly Hamilton DIP Loan Parties' Retained Professionals (as defined below) with the DIP Lender approving and being a party to the escrow agreement that governs the Escrow Account to effectuate the DIP Lender's  beneficial

(Page 18)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

interest in any residual cash not earned by the Independent Fiduciary or the Kelly Hamilton DIP Loan Parties' Retained Professionals and approved by the Court;[7]

iv.        except as otherwise agreed by the Kelly Hamilton DIP Loan Parties and the DIP Lender, open restricted lockbox accounts at a bank acceptable to and for the benefit of DIP Lender and United States Trustee whereby all revenue generated from the Kelly Hamilton Property shall be paid directly (the "**Clearing Account**");

v.        except as otherwise agreed by the Kelly Hamilton DIP Loan Parties and the DIP Lender, subject to any order by the Court regarding the Debtors' cash management system, open an account controlled by DIP Lender whereby funds in the Clearing Account shall be swept monthly into (the "**Cash Management Account**");

vi.        except as otherwise agreed by the Kelly Hamilton DIP Loan Parties and the DIP Lender, subject to any order by the Court regarding the Debtors' cash management system, open an account for remaining cash flow (the "**Excess Cash Flow**") after all funds in the Cash Management Account are be applied by DIP Lender to payments of debt service, required reserves, approved operating expenses and other items required under the Approved Budget (the "**Excess Cash Flow Reserve**"); and

vii.        the performance of all other acts required under or in connection

---

[7]        For the avoidance of doubt, all such funds shall remain the property of the Debtors' estates unless and until they are paid to the Independent Fiduciary or to a professional after Court approval of such professionals fee application approving the same or pursuant to other Court order.

(Page 19)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

with the DIP Documents and this Final Order.

d.      Effective immediately upon the entry of the Interim Order and this Final Order, the DIP Documents and the provisions of this Final Order constitute valid, binding and non-avoidable obligations of the Kelly Hamilton DIP Loan Parties enforceable against each person or entity party thereto in accordance with their respective terms for all purposes during the Chapter 11 Cases, any subsequently converted case of any Kelly Hamilton DIP Loan Party under chapter 7 of the Bankruptcy Code, or after the dismissal of any case. No obligation, payment, transfer, or grant of security under the DIP Documents or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any Challenge.

4.      ***No Priming of DIP Liens***.  Effective immediately upon the entry of the Interim Order, the DIP Documents and provisions of this Final Order, until such time as all DIP Obligations are indefeasibly paid in full in cash, the Kelly Hamilton DIP Loan Parties shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lender by offering a subsequent lender or any party-in-interest a superior or pari passu lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the

(Page 20)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Bankruptcy Code or otherwise.

5.    ***Carve-Out***.

a.    <u>Amount of Carve-Out</u>.  The relative priority of all amounts owed under the DIP Facility will be subject only to a "**Carve-Out**" in an amount equal to, without duplication: (a) the costs and administrative expenses permitted to be incurred by any chapter 7 trustee under section 726(b) of the Bankruptcy Code pursuant to an order of this Court following any conversion of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $25,000; (b) the amount equal to: (i) any fees and expenses incurred by the Independent Fiduciary, the Kelly Hamilton DIP Loan Parties' counsel, the Kelly Hamilton DIP Loan Parties' notice and claims agent, the Kelly Hamilton DIP Loan Parties' financial advisor (the Kelly Hamilton DIP Loan Parties' counsel, claims and noticing agent, and financial advisor, together, the "**Debtors' Retained Professionals**"), and any professionals retained by the Official Committee (if any) prior to an Event of Default (as defined below) in an amount not to exceed the amount set forth in the Approved Budget, whether or not such fees, expenses, and costs have been approved by the Court as of such date and whether or not the retention of the Debtors' Retained Professionals and any professionals retained by the Official Committee (if any) have been authorized as of such date, subject to the DIP Secured Parties' DIP Lien on all residual cash in the Escrow Account, plus (ii) up to $150,000 in the aggregate to pay any allowed fees, expenses, and costs incurred by the Independent Fiduciary, the Debtors' Retained Professionals, and any professionals retained by the Official Committee (if any) following the occurrence of an Event of

(Page 21)

| Debtors: | CBRM REALTY INC., *et al.* |
|---|---|
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Default, whether or not such fees, expenses, and costs have been approved by the Court as of such date and whether or not the retention of the Debtors' Retained Professionals and any professionals retained by the Official Committee (if any) have been authorized as of such date; and (c) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall not be limited by any Budget ("**Statutory Fees**"). All claims and liens granted by the Final Order are subject to the Carve-Out.

   b. <u>Payment of Allowed Professional Fees Prior to Event of Default</u>. Any payment or reimbursement made prior to the occurrence of an Event of Default in respect of any allowed fees, expenses, and costs incurred by the Independent Fiduciary, the Debtors' Retained Professionals, and any professionals retained by the Official Committee (if any) shall not reduce the Carve Out.

   c. <u>Payment of Allowed Professional Fees After Event of Default</u>. Any payment or reimbursement made on or after the occurrence of an Event of Default in respect of any allowed fees, expenses, and costs incurred by the Independent Fiduciary, the Debtors' Retained Professionals, and any professionals retained by the Official Committee (if any) shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

   6. ***Superpriority Claims***. Effective immediately upon the entry of the Interim Order and this Final Order, the DIP Secured Parties are hereby granted allowed superpriority administrative expense claims (the "**Superpriority Claims**") pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code for all DIP Obligations, having priority over any and all other

(Page 22)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

claims against the Kelly Hamilton DIP Loan Parties (including CBRM) and their estates, including the Prepetition Liens, now existing or hereafter arising, including, to the extent allowed under the Bankruptcy Code, any and all administrative expenses or other claims arising under sections 105(a), 328, 330, 331, 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Kelly Hamilton DIP Loan Parties and their estates and all proceeds thereof (other than the Estate Litigation Assets or the proceeds thereof). The Superpriority Claims granted in this paragraph shall be subject and subordinate in priority of payment only to the Carve-Out. The Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Kelly Hamilton DIP Loan Party on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Kelly Hamilton DIP Loan Parties and all proceeds thereof, including without limitation, any subsequent Final Order, and subject and subordinate only to the payment of the Carve-Out as provided herein. Other than as expressly provided in the DIP Documents and this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any successor case of any of the Kelly Hamilton DIP

(Page 23)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Loan Parties ("**Successor Cases**"), and no priority claims are, or will be, senior to, prior to, or on

a parity with the Superpriority Claims or the DIP Obligations, or with any other claims of the DIP

Lender arising hereunder.

7.      ***DIP Liens***.

a.      Effective immediately upon entry of the Interim Order and this Final Order,

and without the necessity of the execution, recordation or filing of any pledge, collateral or security

documents, mortgages, deeds of trust, financing statements, notations of certificates of title for

titled goods, or any other document or instrument, or the taking of any other action (including,

without limitation, entering into any lockbox or deposit account control agreements or other action

to take possession or control of any DIP Collateral), as security for the prompt and complete

payment and performance of all DIP Obligations when due (whether at stated maturity, by required

prepayment, acceleration or otherwise), the DIP Agent, for the benefit of itself and the DIP Secured

Parties, is hereby granted valid, binding, enforceable, non-avoidable, and automatically and

properly perfected liens and security interests (the "**DIP Liens**") in all DIP Collateral, subject and

subordinate to (i) the Carve-Out and (ii) any prepetition judgment lien or any purported claim or

interest secured by the Purported Spano Judgment Lien held by Spano Investor LLC against

CBRM Realty Inc. in connection with the obligations under that certain Credit Agreement, dated

June 2, 2022, among Moshe "Mark" Silber, as borrower, Spano Investor LLC, as assignee of UBS

O'Connor LLC, as lender, and Acquiom Agency Services LLC, as administrative agent, (the

"**Purported Spano Judgment Lien**"), *provided, however*, that entry of this Final Order is without

(Page 24)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

prejudice to the rights of any Debtor or any other party in interest to object to or otherwise challenge the Purported Spano Judgment Lien or any purported claim or interest secured by the Purported Spano Judgment Lien and the rights of all parties in interest (including the Debtors, Spano Investor LLC, and Acquiom Agency Services LLC).

      b.    The term "**DIP Collateral**" means all assets and properties of each of the Kelly Hamilton DIP Loan Parties (including CBRM) and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, the Kelly Hamilton DIP Loan Parties (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation, all of the Kelly Hamilton DIP Loan Parties' rights, title and interests in (1) all Prepetition Collateral; (2) all money, cash and cash equivalents; (3) all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (4) all accounts and other receivables (including those generated by intercompany transactions); (5) all contracts and contract rights; (6) all instruments, documents and chattel paper; (7) all securities (whether or not marketable); (8) all goods, as-extracted collateral, furniture, machinery, equipment, inventory and fixtures; (9) all real property interests; (10) all interests in leaseholds; (11) all franchise rights; (12) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses and all other intellectual property; (13) all general intangibles, tax or other refunds, or insurance proceeds; (14)

(Page 25)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

all equity interests, capital stock, limited liability company interests, partnership interests and

financial assets; (15) all investment property; (16) all supporting obligations; (17) all letters of

credit and letter of credit rights; (18) all commercial tort claims; (19) all proceeds of any claims or

causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code or

any other avoidance actions under the Bankruptcy Code or other federal or applicable state law

(collectively, "**Avoidance Actions**") including but not limited to those held by the Kelly Hamilton

DIP Loan Parties against any Indemnified Party (the "**DIP Lender Litigation Claims**"); (20) all

books and records (including, without limitation, customers lists, credit files, computer programs,

printouts and other computer materials and records); and (21) all products, offspring, profits, and

proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and

rents, profits and products of, each of the foregoing, including any and all proceeds of any

insurance (including any business interruption and property insurance), indemnity, warranty or

guaranty payable to any Kelly Hamilton DIP Loan Party from time to time with respect to any of

the foregoing.  Notwithstanding anything to the contrary herein, the DIP Collateral does not

include: (i) Avoidance Actions and other causes of action and proceeds thereof held by the Kelly

Hamilton DIP Loan Parties or their estates against Moshe (Mark) Silber, Frederick Schulman,

Piper Sandler & Co., Mayer Brown LLP, Rhodium Asset Management LLC and its affiliates,

Syms Construction LLC, Rapid Improvements LLC, NB Affordable Foundation Inc., title

agencies, independent real estate appraisal firms, and any other current or former insiders or

affiliates of the Kelly Hamilton DIP Loan Parties, and their respective affiliates, partners,

(Page 26)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

members, managers, officers, directors, and agents (collectively, the "**Estate Litigation Assets**"), and (ii) an amount equal to $443,734 of the proceeds of the DIP Facility, which shall be reserved to fund the hard costs of investigating, developing, and prosecuting the Estate Litigation Assets.

c.      Effective immediately upon entry of this Interim Order and this Final Order the Kelly Hamilton DIP Loan Parties are hereby authorized and directed to assign, grant, and pledge to the DIP Agent, for the benefit of the DIP Secured Parties, a valid, binding, enforceable, and automatically perfected first-priority lien and security interest (subject only to the Carve-Out) in and to all of the Kelly Hamilton DIP Loan Parties' right, title, and interest in and to all rents, income, profits, and proceeds generated from or relating to the use or occupancy of any real property owned or leased by the Kelly Hamilton DIP Loan Parties, including, without limitation, all rights arising under leases, tenancies, licenses, occupancy agreements, and all other agreements affecting the use or occupancy of such real property, whether now existing or hereafter arising.

8.      ***Perfection of DIP Liens***.

a.      The DIP Secured Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

(Page 27)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge dispute or subordination, at the time and as of the date of entry of this Final Order subject to paragraph 17 herein.  The Kelly Hamilton DIP Loan Parties shall, if requested, promptly execute and deliver to the DIP Secured Parties all such agreements, financing statements, instruments and other documents as the DIP Secured Parties may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the date of entry of this Final Order.

b.      A certified copy of this Final Order may, in the discretion of the DIP Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Final Order for filing and recording.

9.      ***Priority of DIP Liens***.  Effective immediately upon the entry of the Interim Order and this Final Order, the DIP Liens shall have the following ranking and priorities (subject in all cases to the Carve-Out):

a.      *First Priority Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subjected to Prepetition Liens as set forth in the DIP Documents, which DIP

(Page 28)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Liens shall be subject and subordinate only to the Carve-Out.

b.   *Priming DIP Liens*.  Pursuant to sections 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral (other than as described in subparagraph (a) above), which DIP Liens (a) shall be subject and subordinate only to the Carve-Out and the Purported Spano Judgment Lien, and (b) shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in any DIP Collateral that would otherwise be subject to the Prepetition Liens.  For the avoidance of doubt, the DIP Liens are senior to and prime any and all other liens and security interests in the Kelly Hamilton Property, with the understanding that the indebtedness secured by the Prepetition Liens held by KH Lender will be paid in full contemporaneously with the draw of the DIP Facility Amount under the DIP Facility and from proceeds of the DIP Facility.

c.   *DIP Liens Senior to Other Liens*.  Except to the extent expressly permitted hereunder, subject to the Carve-Out and the Purported Spano Judgment Lien, the DIP Liens and the Superpriority Claims shall not be made subject to or pari passu with (a) any lien, security interest, or claim granted in any of the Chapter 11 Cases or any Successor Cases, including any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Kelly Hamilton DIP Loan Parties, (b) any lien or security interest that is avoided and preserved for the benefit of the Kelly Hamilton DIP Loan Parties and their estates under section 551 of the

(Page 29)

| Debtors: | CBRM REALTY INC., *et al.* |
|---|---|
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien or security interest of the Kelly Hamilton DIP Loan Parties or their affiliates, or (d) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

10.    ***Maintenance of DIP Collateral***.  Until such time as all DIP Obligations are paid in full (or as otherwise agreed in writing by the DIP Lender), the Kelly Hamilton DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Documents.  Effective immediately upon entry of the Interim Order and this Final Order, the DIP Agent, for the benefit of itself and the applicable DIP Secured Parties, shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the Kelly Hamilton DIP Loan Parties that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Kelly Hamilton DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity.

11.    ***Cash Management***.  Until such time as all DIP Obligations and Prepetition Obligations are paid in full, the Kelly Hamilton DIP Loan Parties shall also maintain the cash management system in effect as of the Petition Date, as modified by this Final Order and any order of the Court authorizing the continued use of the cash management system that is reasonably acceptable to the DIP Lender. The Kelly Hamilton DIP Loan Parties shall open the new deposit or securities accounts provided in the DIP Documents and make deposits in accordance with the DIP Documents, including the Escrow Account. The Kelly Hamilton DIP Loan Parties shall not open

(Page 30)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Secured Parties; provided, however, if the Kelly Hamilton DIP Loan Parties do open such accounts then, in each case they shall be subject to the lien priorities and other provisions set forth in this Final Order.

12.     ***Fees***.  Effective immediately upon the entry of the Interim Order and this Final Order, all fees paid and payable and costs or expenses reimbursed or reimbursable by the Kelly Hamilton DIP Loan Parties to the DIP Secured Parties are hereby approved.  The Kelly Hamilton DIP Loan Parties are hereby authorized and directed to promptly pay all such fees, costs, and expenses (including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsel and professional advisors in connection with the DIP Facility, the DIP Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP  Documents) on demand, without the necessity of any further application with the Court for approval or payment of such fees, costs or expenses, subject to receiving a written invoice thereof.  Notwithstanding anything to the contrary herein, the fees, costs and expenses of the DIP Secured Parties under the terms of the DIP Documents, whether incurred prior to or after the Petition Date are deemed fully earned, non-refundable, irrevocable, and non-avoidable as of the date of the entry of this Final Order.  All unpaid fees, costs, and expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the DIP Liens.

| Debtors: | CBRM REALTY INC., *et al.* |
|---|---|
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

None of such fees, costs, expenses or other amounts shall be subject to further application to or approval of this Court, and shall not be subject to allowance or review by this Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court; *provided, however*, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to any Official Committee (if one exists) (together with the Kelly Hamilton DIP Loan Parties and counsel to the Ad Hoc Group of Holders of Crown Capital Notes, the "**Review Parties**") and such invoices shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; provided, however, that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional; *provided further, however*, that such invoices may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine (the U.S. Trustee shall be provided with unredacted copies of such invoices upon request).  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices

(Page 32)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

to the Review Parties (such ten (10) day calendar period, the "**Review Period**").  If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Kelly Hamilton DIP Loan Parties shall pay such invoices within five (5) calendar days following the expiration of the Review Period.  If an objection is received within the Review Period, the Kelly Hamilton DIP Loan Parties shall promptly pay the undisputed amount of the invoice within five (5) calendar days, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court.  Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded in the DIP Loan Documents) and this Final Order. Notwithstanding anything to the contrary herein, subject to and effective upon entry of the Final Order granting such relief, and subject to the above concerning payments to attorneys or advisors to the DIP Lender, the fees, costs and expenses of the DIP Secured Parties under the terms of the DIP Documents, whether incurred prior to or after the Petition Date shall be deemed fully earned, non-refundable, irrevocable, and non-avoidable .  All unpaid fees, costs, and expenses shall be included and constitute part of the principal amount of the DIP Obligations and be secured by the DIP Liens.

(Page 33)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

13.      ***Authority to Execute and Deliver Necessary Documents***.

a.      Effective immediately upon the entry of the Interim Order and this Final Order, all of the DIP Liens shall be effective and perfected and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

b.      Each of the Kelly Hamilton DIP Loan Parties are hereby further authorized and directed to (i) promptly perform all of its obligations under the DIP Documents and this Final Order, and such other agreements as may be required by the DIP Documents and this Final Order to give effect to the terms of the financing provided for therein and in this Final Order, and (ii) perform all acts required under the DIP Documents and this Final Order.

c.      The Kelly Hamilton DIP Loan Parties shall promptly execute all documents and take all actions required to effectuate the DIP Documents and this Final Order, including, without limitation, executing all instruments which may be requested by the DIP Secured Parties and in accordance with the DIP Documents.

d.      All obligations under the DIP Documents, the Interim Order and this Final Order shall constitute valid and binding obligations of each of the Kelly Hamilton DIP Loan Parties enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Final Order.  No obligation, payment, transfer, or grant of a security interest under the DIP Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or

(Page 34)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any Challenge.

14. ***Amendments, Consents, Waivers, and Modifications***. The Kelly Hamilton DIP Loan Parties, with the express written consent of the DIP Lender, may enter into any amendments, consents, waivers, supplements, or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, provided that such amendments, consents, waivers, or modifications do not shorten the Maturity Date (as defined below), increase commitments or the rate of interest payable under the DIP Documents and this Final Order, require the payment of a fee, change any Event of Default, add any covenants, or amend the covenants in the DIP Documents and this Final Order to be materially more restrictive; *provided*, *however*, that the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to the Official Committee (if appointed), to the U.S. Trustee, and counsel to the Ad Hoc Group of Holders of Crown Capital Notes (collectively, the "**Amendment Notice Parties**"), each of whom shall have five (5) business days from the date of such notice to object in writing to any such amendment, consent, waiver, supplement, or other modification. If all Amendment Notice Parties indicate that they have no objection to the amendment, modification or supplement (or if no objections are timely received), the Debtors may proceed to execute the amendment, modification or supplement, which shall become effective immediately upon execution. If an Amendment Notice Party timely objects to such amendment, modification or supplement, approval of the Court

(Page 35)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

(which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification or supplement; provided that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard. Any modification, amendment, or supplement that becomes effective in accordance with this paragraph shall be filed with the Court.

15. ***Approved Budget; Use of Proceeds and Cash Collateral***. Subject to the terms and conditions of this Final Order and the DIP Documents, the Kelly Hamilton DIP Loan Parties shall be and are hereby authorized to use Cash Collateral in accordance with, and solely and exclusively for the disbursements set forth in, the Approved Budget attached to **Exhibit C** to this Final Order. The DIP Lender's consent to the use of Cash Collateral is subject to the Kelly Hamilton DIP Loan Parties' compliance with the Approved Budget, which budget shall depict, on a weekly basis and line item basis, (i) projected cash receipts, (ii) projected disbursements, and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date. The budget shall be updated, modified, or supplemented by the Kelly Hamilton DIP Loan Parties not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the DIP Lender, and no such updated, modified or supplemented budget shall be effective until so approved. The Kelly Hamilton DIP Loan Parties shall not permit aggregate expenditures under the Approved Budget to exceed one hundred and fifteen percent (115%) of the total budgeted expenses or aggregate cash receipts under the Approved Budget to be less than eighty-five percent (85%) of

(Page 36)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

the total budgeted cash receipts ("**Permitted Variances**"), in each case calculated on a rolling two-week basis commencing as of the Petition Date; *provided*, *however*, that the cash disbursements considered for determining compliance with this covenant shall exclude disbursements in respect of (x) restructuring professional fees and expenses and (y) restructuring charges arising on account of the Chapter 11 Cases, including payments made to vendors that qualify as "Critical Vendors" and interest due under the existing mortgage on the Kelly Hamilton Property.  Any material modifications to the Approved Budget must be filed with the Court on notice to parties-in-interest, and any non-material modifications to the Approved Budget shall be sent to the U.S. Trustee and counsel to the Official Committee (if any).

16.      ***Financial Reporting***.  After entry of the Final Order, the Kelly Hamilton DIP Loan Parties shall provide to the DIP Lender, counsel to the Official Committee (if any), and counsel to the Ad Hoc Group of Crown Capital Notes, as soon as available but no later than 5:00 p.m. Eastern Time on the last Friday of the rolling two-week period, a budget variance and reconciliation report ("**Financial Report**") setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date, (iii) projections for the following nine weeks, including a rolling cash receipts and disbursements forecast for such period and (iv) such other information requested from time to time by DIP Lender in accordance with the

(Page 37)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

terms and conditions of the DIP Documents.

17.    ***Effect of Stipulations on Third Parties***.

a.    Effective immediately upon entry of the Interim Order and this Final Order the Kelly Hamilton DIP Loan Parties' stipulations, admissions, waivers, releases, and indemnities with respect to the Released Parties, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Kelly Hamilton DIP Loan Parties' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Kelly Hamilton DIP Loan Parties, in all circumstances and for all purposes unless: (i) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in this paragraph) by the earlier of (a) the deadline to object to confirmation of the chapter 11 plan for the Kelly Hamilton Debtors or a sale of all or substantially all of the Kelly Hamilton Debtors' assets and (b) sixty (60) calendar days after entry of the Final Order (the "**Challenge Period**"); *provided* that any party in interest and the Official Committee, if any, reserves the right to seek relief to modify the Challenge Period or oppose such requested relief; *provided further* that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for the Chapter 7 trustee or the Chapter 11 trustee to forty-five

(Page 38)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

(45) days after their appointment or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in this paragraph) seeking to avoid, object to, or otherwise challenge the findings or Kelly Hamilton DIP Loan Parties' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Lender; (b) the validity or enforceability of any releases or indemnities contained in this Final Order; or (c) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Secured Obligations (any such claim, a "**Challenge**"); and (iii) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

b.      If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Kelly Hamilton DIP Loan Parties' stipulations, admissions, agreements and releases with respect to the Released Parties contained in this Final Order shall be binding on all parties in interest; (ii) the

(Page 39)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

obligations of the Prepetition Secured Obligations shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iii) the Prepetition Liens on the Prepetition Secured Debt Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Kelly Hamilton DIP Loan Parties' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Kelly Hamilton DIP Loan Parties) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Kelly Hamilton DIP Loan Parties' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Kelly Hamilton DIP Loan Parties), whether arising under the Bankruptcy Code or otherwise, against any of the Released Parties arising out of or relating to any of the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred.

(Page 40)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

c.      If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases with respect to the Released Parties contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Kelly Hamilton DIP Loan Parties or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Obligations, or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

d.      For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph  (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Final Order.

(Page 41)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Official Committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Kelly Hamilton Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Liens, or Prepetition Secured Obligations, and a separate order of the Court conferring such standing on any Official Committee or party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Official Committee (if any) or such other party-in-interest.  The filing of a motion seeking standing to file a Challenge action before the Challenge Period, which attaches a proposed Challenge action, shall extend the Challenge Period with respect to that party until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion.  The DIP Lenders stipulate and agree that each of the DIP Lenders will not raise as a defense in connection with any Challenge the ability of creditors to file derivative suits on behalf of limited liability companies. For the avoidance of doubt, as to the Debtors, upon entry of this Final Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' Stipulations shall be binding in all respects on the Debtors irrespective of the filing of any Challenge.

18.     ***Maturity Date***.  The maturity date ("**Maturity Date**") shall be the earliest to occur of (i) November 30, 2025; (ii) the closing date following entry of one or more final orders approving the Kelly Hamilton Restructuring Transaction (as defined below); (iii) the acceleration

(Page 42)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

of any of the outstanding DIP Obligations following the occurrence of an Event of Default; (iv) the filing of a chapter 11 plan which is inconsistent with terms of this Final Order or the DIP Documents; or (v) entry of an order by the Court in the Chapter 11 Cases either (a) dismissing one or more Chapter 11 Cases or converting one or more Chapter 11 Cases to chapter 7 of the Bankruptcy Code, (b) determining not to authorize or approve the DIP Liens or the DIP Documents in accordance with their terms, or (c) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Kelly Hamilton DIP Loan Parties (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Lender; *provided, however*, that to the extent that the Kelly Hamilton DIP Loan Parties, with the DIP Lender's prior written consent, effectuate a Kelly Hamilton Restructuring Transaction as a sale under section 363 of the Bankruptcy Code, rather than under the Chapter 11 Plan, the Maturity Date shall be abated pending confirmation of the Chapter 11 Plan and consummation of the Chapter 11 Plan. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate on the Maturity Date.

19. ***Events of Default***. Subject to any applicable grace period, the occurrence of any of the following events, unless waived, as applicable and in accordance with the terms of the applicable DIP Documents, by the DIP Secured Parties, shall constitute an event of default (each, an "**Event of Default**" and collectively, the "**Events of Default**") under the DIP Facility: (a) the failure of the Kelly Hamilton DIP Loan Parties to perform, in any material respect, any of the

(Page 43)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

terms, provisions, conditions, covenants, or obligations under this Final Order; or (b) the occurrence of an "Event of Default" under the DIP Credit Agreement and/or the DIP Loan Documents.

20.     ***Remedies Upon Event of Default***.   Upon the occurrence of and during the continuance of an Event of Default, (i) the Kelly Hamilton DIP Loan Parties shall be bound by all restrictions, prohibitions and other terms as provided in this Final Order and the DIP Documents, and (ii) the DIP Secured Parties, shall be entitled to take any act or exercise any right or remedy as provided in this Final Order or the DIP Documents, including, without limitation, suspending or immediately terminating the DIP Facility; *provided*, *however*, that in the case of the enforcement of rights pursuant to this paragraph, the DIP Secured Parties shall provide counsel to the Kelly Hamilton DIP Loan Parties, counsel to any Official Committee (if any), counsel to the Ad Hoc Group of Crown Notes, and the U.S. Trustee with five (5) business days' prior written notice (such period, the "**Remedies Notice Period**"). Immediately upon the expiration of the Remedies Notice Period, the Court shall hold an emergency hearing when the Court is available (the "**Enforcement Hearing**") at which the Kelly Hamilton DIP Loan Parties, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Court may fashion an appropriate remedy that is consistent with the terms of this Final Order. Notwithstanding anything to the contrary herein, no enforcement rights set forth in this paragraph shall be exercised prior to the Court holding an Enforcement Hearing, subject to Court availability,

(Page 44)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Court if such Enforcement Hearing is conducted by the Court.

21. ***No Waiver by Failure to Seek Relief***. The failure or delay of the DIP Lender to seek relief or otherwise exercise its respective rights and remedies under the Interim Order, this Final Order, the DIP Documents, or applicable law, shall not constitute a waiver of any rights.

22. ***Automatic Stay Modified***. Effective immediately upon the entry of the Interim Order and this Final Order, the automatic stay provisions of section 362 of the Bankruptcy Code hereby are, to the extent applicable, vacated, and modified to the extent necessary without the need for any further order of this Court, to permit: (a) the Kelly Hamilton DIP Loan Parties to grant the DIP Liens and the Superpriority Claims, and to perform such acts as the DIP Secured Parties may request to assure the perfection and priority of the DIP Liens; (b) the Kelly Hamilton DIP Loan Parties to incur all liabilities and obligations, including all of the DIP Obligations, to the DIP Secured Parties as contemplated under this Final Order and the DIP Documents; (c) the Kelly Hamilton DIP Loan Parties to pay all amounts required hereunder and under the DIP Documents; (d) the DIP Secured Parties to retain and apply payments made in accordance with the terms of this Final Order and the DIP Documents; (e) subject to the Remedies Notice Period, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in this Final Order, the DIP Documents, or applicable law; (f) to perform under this Final Order and the DIP Documents, and to take any and all other

(Page 45)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

actions that may be required, necessary, or desirable for the performance by the Kelly Hamilton DIP Loan Parties under this Final Order and the DIP Documents and the implementation of the transactions contemplated hereunder and thereunder, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the DIP Documents.

23. ***Subsequent Reversal or Modification***. This Final Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties all protections afforded by section 364(e) of the Bankruptcy Code. The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

24. ***Collateral Rights***. In the event that any person or entity that holds a lien or security interest in DIP Collateral of the Kelly Hamilton DIP Loan Parties or their estates that is junior or subordinate to the DIP Liens in such DIP Collateral of the Kelly Hamilton DIP Loan Parties or their estates receives or is paid the proceeds of such DIP Collateral of the Kelly Hamilton DIP Loan Parties or their estates, or receives any other payment with respect thereto from any other source, other than the payment in full of the Prepetition Lender as contemplated herein and the Prepetition Lender's subsequent use of such funds, prior to indefeasible payment in full in cash

(Page 46)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

and the complete satisfaction of all DIP Obligations under the DIP Documents and this Final Order, and termination of the commitments in accordance with the DIP Documents and this Final Order, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral of the Kelly Hamilton DIP Loan Parties or their estates in trust for the DIP Secured Parties, and shall immediately turnover such proceeds to the DIP Secured Parties for application in accordance with the DIP Documents and this Final Order.

25. **_No Third Party Beneficiary_**.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26. **_Rights Under Section 363(k)_**.  The DIP Lender shall have the right to credit bid all or any portion of the DIP Loan balance in any sale under section 363 of the Bankruptcy Code or the Chapter 11 Plan as provided for in section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Documents and this Final Order without the need for further Court order authorizing the same, which purchase shall include the right of the DIP Lender to request that the Kelly Hamilton DIP Loan Parties assume the HAP Contract (as defined in the DIP Term Sheet) and assign the HAP Contract to the DIP Lender (subject to HUD approval).

27. **_Limitation on Charging Expenses Against DIP Collateral_**.  Effective as of the Petition Date, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (except to the

(Page 47)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

extent of the Carve-Out) or the DIP Secured Parties, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties.

28.    **_No Marshaling_**.  Effective as of the Petition Date, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Final Order and the DIP Documents, notwithstanding any other agreement or provision to the contrary; *provided*, *however*, that proceeds from the DIP Lender Litigation Claims shall be used to satisfy the DIP Obligations only after the exhaustion of all other DIP Collateral.

29.    **_Equities of the Case_**.  The DIP Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring, or profits of any of the DIP Collateral, and, effective as of the Petition Date but subject to and effective upon entry of the Final Order granting such relief and the terms thereof, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral.

30.    **_Indemnification_**.  Subject only to the rights and limitations of any third party under paragraph 17 of this Final Order, effective upon the entry of this Final Order, the Kelly Hamilton DIP Loan Parties shall protect, defend, indemnify, and hold harmless the Indemnified Parties for, from and against any and all claims, suits, liabilities, losses, costs, expenses (including reasonable,

(Page 48)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

out-of-pocket attorneys' fees and costs) imposed upon or incurred by or asserted against any Indemnified Party arising out of or relating to the Kelly Hamilton DIP Loan Parties (and any successors and assigns, and any subsidiaries or affiliates), prior loans, mortgages, all Avoidance Actions, the DIP Documents or the transactions contemplated thereby, except for those arising out of the fraud, willful misconduct or gross negligence of an Indemnified Party as determined by a non-appealable court order.   Indemnification under this provision shall include the right of advancement for any indemnified claim or expense, subject to prompt notice by DIP Lender and approval by the Court after notice and a hearing, and any costs and expenses incurred in the enforcement of any binding provisions of the DIP Documents.

31.    **_Release_**.   Subject only to the rights and limitations of any third party under paragraph 17 of this Final Order, effective upon entry of this Final Order, the Kelly Hamilton DIP Loan Parties forever and irrevocably (a) release, discharge, and acquit the Released Parties[8] of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type arising prior to the Petition Date, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the Released Parties and the Kelly Hamilton DIP Loan Parties and their affiliates including any equitable subordination claims or defenses, with respect to or relating to the DIP Obligations, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims

---

[8]      "Released Parties" means the Indemnified Parties.

| Debtors: | CBRM REALTY INC., *et al.* |
|---|---|
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP

Lender; and (b) waive any and all defenses (including, without limitation, offsets and

counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-

avoidability of the DIP Obligations.  Notwithstanding anything to the contrary herein, Moshe

(Mark) Silber, Frederick Schulman, Piper Sandler & Co., Mayer Brown LLP, Rhodium Asset

Management LLC and its affiliates, Syms Construction LLC, Rapid Improvements LLC, NB

Affordable Foundation Inc., title agencies, independent real estate appraisal firms, and any other

current or former insiders or affiliates of the Kelly Hamilton DIP Loan Parties, and each of the

aforementioned entities affiliates, partners, members, managers, officers, directors, transferees,

and agents shall not constitute an Indemnified Party or Released Party under this Final Order, and

no claims or causes of action against such parties shall be released under this Final Order or

otherwise without further order of the Court.

32.    ***Binding Effect of Final Order***.  Immediately upon entry by this Court, this Final

Order shall be valid and binding upon and inure to the benefit of the DIP Lender, the Kelly

Hamilton DIP Loan Parties, and the property of the Kelly Hamilton DIP Loan Parties' estates, all

other creditors of any of the Kelly Hamilton DIP Loan Parties, the Official Committee (if any),

and all other parties in interest and their respective successors and assigns (including any chapter

11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the

Kelly Hamilton DIP Loan Parties), in any of the Chapter 11 Cases, any Successor Cases, or upon

dismissal of any of the Chapter 11 Cases or Successor Cases. Any order dismissing one or more

(Page 50)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

of the Chapter 11 Cases or any of the Successor Cases under section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claims and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, and (c) this court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claims, and the DIP Liens. In the event any court modifies any of the provisions of this Final Order or the DIP Documents following a Final Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lender pursuant to this Final Order with respect to the DIP Collateral or any portion of the DIP Obligations which arise or are incurred or are advanced prior to such modifications, and (ii) this Final Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

33.     ***Conversion Option***. Notwithstanding anything in the DIP Term Sheet to the contrary, subject to approval by the Court (at a hearing to confirm the Chapter 11 Plan or otherwise) after notice and a hearing and subject to the rights of parties in interest to object, the Kelly Hamilton DIP Loan Parties may seek to effectuate a sale, recapitalization, reorganization, or other transaction (whether in a single transaction or a series of transactions) related to the Kelly Hamilton Debtor and its real estate assets and related operating assets (the "**Kelly Hamilton Restructuring Transaction**") under section 363 of the Bankruptcy Code or under the Chapter 11 Plan.  To the extent that a Kelly Hamilton Restructuring Transaction is not approved by the Court

(Page 51)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

under section 363 of the Bankruptcy Code prior to confirmation of the Chapter 11 Plan, the Kelly Hamilton DIP Loan Parties may, subject to approval by the Court (at a hearing to confirm the Chapter 11 Plan or otherwise) after notice and a hearing and subject to the rights of parties in interest to object, with the DIP Lender's consent, effectuate a Kelly Hamilton Restructuring Transaction under the Chapter 11 Plan. To the extent that the DIP Lender sponsors the Kelly Hamilton Restructuring Transaction (as an asset acquirer, plan sponsor, or other similar capacity), the Kelly Hamilton DIP Loan Parties may, subject to approval by the Court as part of confirmation of the Chapter 11 Plan, implement such transaction through the Chapter 11 Plan. In connection with the Kelly Hamilton Restructuring Transaction, the DIP Lender shall have the option, exercisable at its sole discretion, to convert all or a portion of the outstanding principal amount of the DIP Loan, including any accrued but unpaid interest, into shares of a newly created series of preferred equity in the Kelly Hamilton Debtor or other Kelly Hamilton DIP Loan Parties, or any reorganized Debtor (the "**Preferred Equity**"), in a manner acceptable to the Kelly Hamilton DIP Loan Parties and the DIP Lender. In the event any portion of DIP Lender's debt is converted into any form of equity (i.e., common shares or preferred shares), the DIP Lender or an affiliated entity shall be the general partner/managing member of such newly formed ownership entity.

34. ***Notice of Entry of Final Order***. The Kelly Hamilton DIP Loan Parties shall promptly serve copies of this Final Order to (i) the DIP Lender; (ii) counsel to the DIP Lender; (iii) the Prepetition Lienholder; (iv) the U.S. Trustee; (v) the holders of the thirty (30) largest unsecured claims against the Kelly Hamilton DIP Loan Parties' estates (on a consolidated basis);

(Page 52)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

(vi) all of the Kelly Hamilton DIP Loan Parties' prepetition secured creditors; (vii) the United States Attorney's Office for the District of New Jersey; (viii) the attorneys general in the states in which the Kelly Hamilton DIP Loan Parties conduct their business; (ix) the United States Department of Justice; (x) the Internal Revenue Service; (xi) HUD; (xii) the Ad Hoc Group of Holders of Crown Capital Notes; (xiii) counsel to the Official Committee (if any); and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

35.    *Notice*.  All notices required or permitted under this Final Order shall be sent to the respective party and attorney at the address listed below, which notice shall be in writing and sent by certified mail, return receipt requested, hand delivery, email or by facsimile.

If notice is given to the Kelly Hamilton DIP Loan Parties, it shall be sent to:

Elizabeth A. LaPuma
c/o White & Case LLP
111 S. Wacker Dr., Suite 5100
Chicago, Illinois 60606
T: (312) 881-5400
Attn: Gregory F. Pesce, Adam T. Swingle
Email: gregory.pesce@whitecase.com
adam.swingle@whitecase.com

1221 Avenue of the Americas
New York, New York 10020
T: (212) 819-8200
Attn: Barrett Lingle
barrett.lingle@whitecase.com

(Page 53)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al.* |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

If notice is given to DIP Lender, it shall be sent to:

Lippes Mathias, LLP
54 State Street, Suite 1001
Albany, New York 12207
T: (518) 462-0110
Attn: Joann Sternheimer; Leigh A. Hoffman
JSternheimer@lippes.com
lhoffman@lippes.com

&

McCarter & English, LLP
100 Mulberry Street
Newark, NJ 07102
T: (973) 639-2082
Attn: Joseph Lubertazzi Jr.
jlubertazzi@mccarter.com

36.     ***Headings***.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

37.     ***Conflicts***.  To the extent there exists any conflict among the terms and conditions of the Motion, the DIP Documents, or this Final Order, the terms and conditions of this Final Order shall govern and control.

38.     ***Effect of this Final Order***.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof, notwithstanding Bankruptcy Rules 6003 or 6004 or any other statute, rule, or provision to the contrary.

39.     ***Retention of Jurisdiction***.  This Court retains exclusive jurisdiction with respect to

(Page 54)

| | |
|---|---|
| Debtors: | CBRM REALTY INC., *et al*. |
| Case No. | 25-15343 (MBK) |
| Caption of Order: | FINAL ORDER (I) AUTHORIZING THE KELLY HAMILTON DIP LOAN PARTIES TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF |

all matters arising from or related to the implementation, interpretation, and enforcement of this

Final Order.

# EXHIBIT A

**DIP Term Sheet**

*Execution Version*

**Binding Term Sheet For**

**Senior Secured, Superpriority**

**Debtor-in-Possession Financing**

**Date: May 26, 2025**

This term sheet (this "**Term Sheet**") is being presented by 3650 SS1 Pittsburgh LLC (the "**DIP Lender**"). Capitalized terms used in this Term Sheet shall have the meanings ascribed to such terms in this Ter Sheet.

This Term Sheet is subject solely to the following conditions:  (i) satisfaction of all conditions precedent set forth herein, including any modifications or supplements hereinafter requested by the DIP Lender, are satisfied or waived in the sole discretion of the DIP Lender; (ii) the DIP Lender agrees to and executes this Term Sheet; (iii) the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), in connection with the Chapter 11 Cases, authorizes and approves the DIP Facility on terms and conditions, including any modifications or supplements thereto except as expressly set forth in this Term Sheet, which are satisfactory to the Debtors and the DIP Lender in each of its respective sole discretion and pursuant to order(s) of the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole discretion; (iv) the signing of formal loan documents ("**Loan Documents**") signed by an authorized signatory of DIP Lender; (vi) notice and opportunity to object provided to the United States Department of Justice; (vii) the Debtors filing within 30 days of the Petition Date a chapter 11 plan providing for the establishment of the Litigation Trust and the Kelly Hamilton Restructuring Transaction (such plan, the "**Chapter 11 Plan**") and a related disclosure statement (the "**Disclosure Statement**"); (vii) receipt by the DIP Lender of a collateral assignment of the Housing Assistance Payments Contract entered into by and between the U.S. Department of Housing and Urban Development ("**HUD**") and Kelly Hamilton Debtor (as successor in interest) on October 10, 1982 (as amended, the "**HAP Contract**") from HUD; and (viii) the Bankruptcy Court approving the Disclosure Statement, confirming the Chapter 11 Plan, and approving the Kelly Hamilton Restructuring Transaction in accordance with the milestones in this Term Sheet.  The transaction contemplated herein shall be structured in all events to be REIT compliant in a manner determined by the Debtors and the DIP Lender.

| **Debtors** | CBRM Realty Inc., Crown Capital Holdings, LLC, Kelly Hamilton Apts, LLC (the "**Kelly Hamilton Debtor**"), and Kelly Hamilton Apts MM LLC (collectively, the "**Debtors**" and,  each, a "**Debtor**"), as debtors and debtors in possession under title 11 of chapter 11 of the United States Code (the "**Bankruptcy Code**"). |
| --- | --- |
| | Not later than May 19, 2025, each Debtor shall commence a case under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**" and the date of filing such cases, the "**Petition Date**"). |
| | Any individual or entity that the Debtors determine, after reasonable inquiry, either directly or indirectly controls or owns 20.0% or more of the direct or indirect equity interests in any Debtor must be disclosed for KYC purposes and shall be depicted on an organizational chart to be provided by the Debtors to the DIP Lender as soon as reasonably practicable following the Petition Date. |

*Execution Version*

| | |
|---|---|
| **Kelly Hamilton Property** | The Kelly Hamilton Debtor is the 100% owner of that certain project commonly known as Kelly Hamilton that consists of approximately 115 units (the "**Kelly Hamilton Property**"). |
| **DIP Facility** | The DIP Lender shall extend to the Debtors, as joint and several obligors, a secured debtor-in-possession credit facility (the "**DIP Facility**") made available to the Debtors in a principal amount of up to $9,705,162 (the "**DIP Facility Amount**"), comprised of one or more new term loans made by the DIP Lender on the Closing Date (as defined herein) (such new loan and obligations, the "**DIP Loan**" and commitments with respect to such DIP Loan, the "**DIP Commitments**") to be funded as set forth below under the heading "Draw Funding Conditions", subject to, among other things, the entry of an interim order (the "**Interim Order**") and final order (the "**Final Order**" and collectively with the Interim Order, the "**DIP Orders**"), as applicable, by the Bankruptcy Court approving the DIP Facility. All DIP Loan and other obligations outstanding under the DIP Facility shall become due and payable on the Maturity Date.

As used herein, the Interim Order and the Final Order shall each mean an unstayed order in form and substance consistent with this Term Sheet and, to the extent not consistent with this Term Sheet, otherwise satisfactory to the DIP Lender in its sole discretion, entered upon an application or motion of the Debtors that is in form and substance consistent with this Term Sheet and, to the extent not consistent with this Term Sheet, otherwise satisfactory to the DIP Lender, which order: (i) authorizes the Debtors to enter into the transactions contemplated by this Term Sheet, including the authorization to borrow under the DIP Facility on the terms set forth herein, (ii) grants to the DIP Lender the superpriority claim status and senior priming and other liens contemplated in this Term Sheet, (iii) subject to entry of the Final Order, contains provisions prohibiting claims against the collateral of the Indemnified Parties pursuant to section 506(c) of the Bankruptcy Code, a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and a waiver of the equitable doctrine of marshalling, (iv) approves payment by the Debtors of all of the fees and expenses provided for herein, (v) prohibits the Debtors or any party in interest from seeking to cram down the DIP Loan in a manner objected to by the DIP Lender, and (vi) shall not have been stayed, vacated, reversed, or rescinded or, without the prior written consent of the DIP Lender in its sole discretion, amended or modified. |
| **Assumption of Existing Property-Level Agreements** | The DIP Orders and any other similar order shall provide that Elizabeth A. LaPuma, as independent fiduciary, has the full authority to act on behalf of, and legally bind, each Debtor.

***Critical Vendor Real Estate Advisor.*** The DIP Orders shall require the Debtors to appoint Lynd Management Group LLC and LAGSP as real estate advisors (the "**Critical Vendor Real Estate Advisor**"; together with the Debtors' other professionals, collectively, the |

2

*Execution Version*

"**Professionals**"). The DIP Orders shall provide an acknowledgment by the Debtors of the critical nature of the contracts between the Debtors and the Critical Vendor Real Estate Advisor.

*Assumption of Service Agreements.* The DIP Facility shall require the Debtors to file a motion to assume all Service Agreements, as amended and restated as of the Petition Date, between the Debtors and the Critical Vendor Real Estate Advisor (collectively, the "**Service Agreements**") and Asset Management Agreements as amended and restated as of the Petition Date, between the Debtors and the Critical Vendor Real Estate Advisor for the health and safety of the tenants residing in the Debtors' real estate properties during the continued operation of the those real estate properties (collectively, the "**Asset Management Agreements**").

*LAGSP Administrative Expense Claim.* For purposes of the Debtors' assumption of the Service Agreements, the Debtors shall stipulation that the Service Agreements have an approximate balance owed of $953,000 ("**Cure Amount**") after application of the Kelly Hamilton Lender LLC Funding Reserve. The Cure Amount shall be satisfied from cash flow from Debtor in the amount $328,000, and the remaining $625,000 outstanding shall be treated as an administrative expense claim (the "**LAGSP Administrative Expense Claim**"). The LAGSP Administrative Expense Claim shall be released upon consummation of the Kelly Hamilton Restructuring Transaction without any further approval or action by any person or entity.

*Assignment of Service Agreements.* Pursuant to 11 U.S.C. 365(b), and in order to ensure the health and safety of the tenants residing at the Kelly Hamilton Property, funding of the DIP Loan is contingent upon entry of one or more orders of the Bankruptcy Court authorizing the Debtors' assumption of, and assignment to the DIP Lender or an affiliate thereof, in connection with the Kelly Hamilton Restructuring Transaction the Service Agreements and any and all contracts between the Kelly Hamilton Debtor and HUD entered into by Kelly Hamilton Debtor in connection with the Kelly Hamilton Property.

| | |
|---|---|
| **<u>Draw Funding Conditions</u>** | The Debtors shall be limited to one (1) draw request per month. All draws shall be subject to DIP Lender's customary and standard disbursement practices and procedures to be set forth in the Loan Documents (including, but not limited to, no pending defaults and such funds being disbursed pursuant to the Approved Budget). |
| | The Debtors shall, following entry of the Interim Order, draw $9,705,162 from the DIP Facility. At such time, the DIP Lender shall transfer $2,450,000.00 into an escrow account (the "**Escrow Account**") established for the benefit of Elizabeth A. LaPuma as independent fiduciary, the Debtors' counsel, the Debtors' financial advisor, and the Debtors' notice and claims agent. |
| | The applicable beneficiary shall be entitled to receive payment from the Escrow Account subject to: (1) the Bankruptcy Court entering orders authorizing the Debtors to retain such counsel and financial |

| | |
|---|---|
| | advisor, as applicable; (2) approval by the Bankruptcy Court of any fees, expenses, and costs of the Debtors' counsel and financial advisor, as applicable; and (3) the presentment by the applicable beneficiary or its designee of a draw notice that certifies the satisfaction of each of the preceding conditions.  Notwithstanding anything to the contrary in this paragraph, Ms. LaPuma shall be entitled to payment from the Escrow Account as provided in that certain letter agreement dated September 26, 2024. |
| | If an Event of Default occurs after the funding of the Initial Draw or if the DIP Facility is terminated after the funding of the Initial Draw, then, the DIP Lender shall be entitled to all funds remaining in the Escrow Account after an amount equal to the fees, costs, and expenses of the Debtors' counsel, the Debtors' financial advisor, the Debtors' notice and claims agent, and Ms. LaPuma as independent fiduciary as of the date of any such Event of Default or termination of the DIP Facility, as applicable, to the extent provided in the Approved Budget. |
| | The DIP Lender shall be a beneficiary and party to the Escrow Account's escrow agreement to permit the DIP Lender to enforce its right to the residual funds, subject to the terms of this Term Sheet, the Interim Order, and the Loan Documents. |
| **Separate Cash Accounts** | Other than the proceeds of the DIP Facility transferred to the Escrow Account, the proceeds of the DIP Facility and all other cash from operation of the Debtors and the Kelly Hamilton Property during the period in which the DIP Facility is in place shall be maintained in one or more segregated accounts over which the DIP Lender shall have a lien as described below. |
| | Following entry of the Interim Order, Debtors shall establish (i) a restricted lockbox account at a bank acceptable to and for the benefit of DIP Lender whereby all revenue generated from the Kelly Hamilton Property shall be paid directly (the "**Clearing Account**"), for the avoidance of doubt, the pre-petition unpaid HUD rent monies owed to the Debtor shall be deposited in to the Clearing Account and are subject to the super-priority lien of the DIP Lender and remain collateral of the DIP Lender, and (ii) an account controlled by DIP Lender whereby funds in the Clearing Account shall be swept monthly into (the "**Cash Management Account**"). All funds in the Cash Management Account shall be applied by DIP Lender to payments of debt service, required reserves, approved operating expenses and other items required under the loan documents and the Approved Budget and the remaining cash flow (the "**Excess Cash Flow**") shall be deposited in an account controlled by the DIP Lender (the "**Excess Cash Flow Reserve**") as additional collateral for the DIP Loan. |
| | All Debtor accounts shall be collaterally assigned to Lender and Borrower and the respective bank shall deliver a deposit account control agreement with respect to the Clearing Account and Borrower's operating account, each such agreement to be in form and substance reasonably acceptable to Lender. |

4

*Execution Version*

| | |
|---|---|
| **Payments** | All interest shall compound monthly, and be calculated on an actual/360 basis. The accrual period shall run from the first day of the month preceding the payment date through and including the last day of the month in which the payment date occurs. The monthly payment shall be payable on the first day of the month. The DIP Loan (and all amounts due thereon) shall be due and payable in full on the Maturity Date. |
| **Interest Rate** | Interest shall accrue on the outstanding principal balance at a per annum fixed rate of 16%, which shall be a combination of: (a) a current pay ("**CP**") component at 10% fixed and (b) a payment in kind ("**PIK**") component at 6% fixed. |
| **Default Rate** | Maximum allowed by applicable law. |
| **Origination Fee** | 3.0% of the DIP Facility, which fee is deemed fully earned, due and payable at Closing. |
| **Servicer** | DIP Lender shall have the right to appoint an agent or a servicer, which may be an affiliate of DIP Lender, of the DIP Facility.  The servicer's fee (the "**Servicing Fee**") shall be $7,500 per month and shall be payable by the Debtors to the DIP Lender monthly in equal installments. |
| **Maturity Date** | The maturity date ("**Maturity Date**") shall be the earliest to occur of (i) November 30, 2025; (ii) the closing date following entry of one or more final orders approving the sale of all or substantially all of the real estate and related operating assets belonging to the Debtors in the Chapter 11 Cases, (iii) the acceleration of any outstanding DIP Loan following the occurrence of an Event of Default (as defined herein or in the Loan Documents) that has not been cured in accordance with the Loan Documents, or (iv) the filing of a plan which is inconsistent with terms of this Term Sheet or (v) entry of an order by the Bankruptcy Court in the Chapter 11 Cases either (a) dismissing the Chapter 11 Cases or converting one or more Chapter 11 Cases  to Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Lender; *provided, however*, that to the extent that the Debtors effectuate the Kelly Hamilton Restructuring Transaction as a sale under section 363 of the Bankruptcy Code, rather than under the Chapter 11 Plan, the Maturity Date shall be abated pending confirmation of the Chapter 11 Plan and consummation of the Chapter 11 Plan. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate on the Maturity Date. |
| **Anticipated Closing Date** | The parties shall use their commercially reasonable efforts to facilitate the date (the "**Closing Date**") of the closing of the funding of the DIP |

*Execution Version*

| | |
|---|---|
| | Facility (the "**Closing**") to occur on or prior to 10 business days after the entry of the Interim Order, provided, however, the aforementioned closing date shall be subject to satisfaction of all conditions to the Closing set forth in the Loan Documents. |
| **Use of DIP Loan Proceeds** | The Debtors will be permitted to use the proceeds of the DIP Facility to payoff the existing mortgage indebtedness of the Kelly Hamilton Property, to pay Kelly Hamilton Debtor's ordinary course operating expenses (including any expenses related to bring units back online and critical/life safety issues at the property), payment of prepetition fees due to the Critical Vendor Real Estate Advisor, operational, capital, and other costs of the Debtors, including, without limitation, any payments authorized to be made under "first day" or "second day" orders, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Approved Budget (as defined herein) (collectively, the "**Permitted Uses**"). |
| | No portion of the proceeds under the DIP Facility or any cash collateral subject to the liens of the DIP Lender may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the DIP Lender, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the DIP Lender with respect thereto. |
| | The DIP Order shall provide that each Debtor shall not knowingly transfer any of such Debtor's property and /or cash or other proceeds of the DIP Facility to Mark Silber ("**Silber**"); Frederick Schulman ("**Schulman**"); any professional, attorney, representative, or other agent of Silber, Schulman, or any "relative" (as such term is defined under section 101(45) of the Bankruptcy Code) of either Silber or Schulman; or any "entity" (as such term is defined under section 101(15) of the Bankruptcy Code) that is owned or controlled by Silber, Schulman, or any affiliate " (as such term is defined under section 101(2) of the Bankruptcy Code) of either Silber or Schulman. |
| | As soon as reasonably practicable following entry of the DIP Order, the Debtors shall cause counsel or any advisor engaged by or on behalf of the Debtors to provide any information reasonably requested by the United States of America regarding: (a) the projected uses of the DIP Facility (including any payments or other transfer to any Debtor or any non-Debtor affiliate); or (b) any potential violation of federal criminal law involving Silber or Schulman. |
| | Notwithstanding anything to the contrary in the DIP Order or the Loan Documents, the foregoing shall not prohibit, restrict, or otherwise affect (or be deemed to prohibit, restrict, or otherwise affect) the Debtors from making any payment or other transfer contemplated by the Approved Budget or that is otherwise approved by the Bankruptcy |

| | |
|---|---|
| | Court after notice and a hearing (in all cases subject to DIP Lender's consent and the limitations provide in the Approved Budget), including, without limitation: (a) any payment or other transfer by the Debtors to or on behalf of any professional person retained by (or proposed to be retained by the Debtors or any non-debtor affiliate), including, without limitation, White & Case LLP (in its capacity as counsel to the Debtors and certain non-debtor affiliates), IslandDundon (in its capacity as financial advisor to the Debtors an certain non-debtor affiliates), LAGSP, LLC and Lynd Management Group LLC its capacity as property manager and asset manager to the Debtors and certain non-debtor affiliates, or Verita Global (in its capacity as noticing and claims agent to the Debtors); (b) Elizabeth A. LaPuma (in her capacity as independent fiduciary); (c) the United States Trustee; or (d) the DIP Lender or any affiliate thereof, including counsel to the DIP Lender and LAGSP, LLC or any of their respective designated affiliates. |
| **Approved Budget** | "**Approved Budget**" shall mean the rolling consolidated 13-week cash flow and financial projections of the Debtors covering the period ending on November 30, 2025, and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues or other payments projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lender, which Approved Budget may be amended only with the consent of the DIP Lender. The Approved Budget is included in **Exhibit A** of this Term Sheet. |
| **Budget – Permitted Variance** | The Debtors shall not make or commit to make any payments other than those identified in the Approved Budget. The Debtors shall not permit aggregate expenditures under the Approved Budget to exceed one hundred and fifteen percent (115%) of the total budgeted expenses or aggregate cash receipts under the Approved Budget to be less than eighty-five percent (85%) of the total budgeted cash receipts, in each case calculated on a rolling two-week basis commencing as of the **Petition Date**") , with the first such testing to begin two weeks after the Petition Date; *provided* that the cash disbursements considered for determining compliance with this covenant shall exclude disbursements in respect of (x) restructuring professional fees and (y) restructuring charges arising on account of the Chapter 11 Cases, including payments made to vendors that qualify as "Critical Vendors" and interest due under the existing mortgage. <br><br> Subject to the provisions of this Term Sheet, budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of the Debtors, in which event, the Approved Budget shall be deemed so amended for the purpose of calculating variances. |
| **Reporting** | After entry of the Interim Order, the Debtors shall provide to the DIP Lender, as soon as available but no later than 5:00 p.m. Eastern Time on the last Friday of the rolling two-week period, a budget variance |

*Execution Version*

| | |
|---|---|
| | and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date, (iii) projections for the following nine weeks, including a rolling cash receipts and disbursements forecast for such period and (iv) such other information requested from time to time by DIP Lender. |
| **Bankruptcy Sale** | The DIP Funding Term Sheet and Loan Documents shall include a milestone for the Debtors to file the Chapter 11 Plan and the Disclosure Statement within 30 days after the Petition Date.<br><br>Notwithstanding anything to the contrary herein and in all events subject to DIP Lender's conversion option as set forth herein, the Debtors shall have the right to solicit proposals for the Debtors' assets and, subject to approval by the Bankruptcy Court, to sell the Debtors' assets to a potential acquirer other than the DIP Lender, provided that the Debtors satisfy the DIP Facility in full in cash as provided herein. |
| **Rights to Credit Bid** | The DIP Lender shall have the right to credit bid the DIP Loan balance in a Kelly Hamilton Restructuring Transaction effectuated under section 363 of the Bankruptcy Code or the Chapter 11 Plan, which purchase shall include the right of the DIP Lender to request that the Debtors assume the HAP Contract and assign the HAP Contract to the DIP Lender (subject to HUD approval). |
| **Conversion Option** | The Debtors may seek to effectuate a sale, recapitalization, reorganization, or other transaction (whether in a single transaction or a series of transactions) related to the Kelly Hamilton Debtor and its real estate assets and related operating assets (the "**Kelly Hamilton Restructuring Transaction**") under section 363 of the Bankruptcy Code or under the Chapter 11 Plan.<br><br>To the extent that a Kelly Hamilton Restructuring Transaction does not occur prior to confirmation of the Chapter 11 Plan, the Debtors may, with the DIP Lender's consent, effectuate a Kelly Hamilton Restructuring Transaction under the Chapter 11 Plan.<br><br>To the extent that the DIP Lender sponsors the Kelly Hamilton Restructuring Transaction (as an asset acquirer, plan sponsor, or other similar capacity), the Debtors may, subject to approval by the Bankruptcy Court as part of confirmation of the Chapter 11 Plan.<br><br>In connection with the Kelly Hamilton Restructuring Transaction, the DIP Lender shall have the option, exercisable at its sole discretion, to convert all or a portion of the outstanding principal amount of the DIP Loan, including any accrued but unpaid interest, into shares of a newly created series of preferred equity in the Kelly Hamilton Debtor or other Debtors, or any reorganized Debtor (the "**Preferred Equity**"), in a manner acceptable to the Debtors and the DIP Lender. In the event any |

| | |
|---|---|
| | portion of DIP Lender's debt is converted into any form of equity (i.e., common shares or preferred shares), the DIP Lender or an affiliated entity shall be the general partner/managing member of such newly formed ownership entity. |
| **Prepayments** | Notwithstanding any prepayment of the DIP Loan, the Debtors shall be obligated to pay a minimum amount of standard interest (i.e., non-default interest or fees) equal to six (6) months of interest on the full principal amount of the DIP Loan (the "**Minimum Interest**"). If the DIP Loan is repaid in whole or in part prior to the date that is six (6) months from the Closing Date, the Debtor shall, on the date of such repayment, pay to the DIP Lender the amount of standard interest that would have accrued on the amount repaid through the end of such six-month period, less any interest previously paid with respect to such amount. |
| **Mandatory Prepayments** | Except as otherwise provided in the Approved Budget, mandatory repayments of any draws under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales of the Collateral (including, without limitation, a sale of all or substantially all of the Debtors' assets), (ii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business, (iii) 100% of insurance proceeds received by the Debtors (only in the event that such receipt is an extraordinary receipt that relates to an acquired asset and exceeds $250,000), and (iv) any condemnation proceeds received by the Debtors. |
| **Security/Priority** | Subject to the Carve-Out, all amounts owing by the Debtors to the DIP Lender under the DIP Facility shall be joint and several as to each Debtor and (a) will be entitled to superpriority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing Debtors' existing secured credit facilities and other indebtedness (the "**Existing Indebtedness**"). |
| | The relative priority of all amounts owed under the DIP Facility will be subject only to a carve-out for (collectively, the "**Carve-Out**"): |
| |    (i)    the costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $25,000; |
| |    (ii)   the amount equal to: (a) any fees and expenses incurred by the Debtors' independent fiduciary, the Debtors' counsel, and the Debtors' financial advisor prior to an Event of Default in an amount not to exceed the amount set forth in the Approved |

| | |
|---|---|
| | Budget, whether or not such fees, expenses, and costs have been approved  by the Bankruptcy Court as of such date, plus (b) up to $150,000  in the aggregate to pay any allowed fees, expenses, and costs incurred by the Debtors' independent fiduciary, counsel, financial adviser, and notice and claims agent  following occurrence of an Event of Default,); and |
| | (iii) the payment of fees pursuant to 28 U.S.C. § 1930. |
| | Nothing herein shall be construed as impairing the ability of any party in interest to object to any fees and expenses of a professional in the Chapter 11 Cases. |
| | All of the liens described herein shall be effective and perfected as of the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| **Collateral** | Subject to the Carve-Out, all amounts owing by the Debtors under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on (the "**DIP Facility Liens**") all assets (tangible, intangible, real, personal and mixed) of the Debtors, including any collateral granted in respect of the Kelly Hamilton Debtor's existing loan agreement, including, without limitation, (1) all assets (tangible, intangible, real, personal and mixed) of the Debtors, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, (2) upon entry of the Final Order, any proceeds of any DIP Lender Litigation Claims, and (3) any proceeds of the foregoing (the property described in clauses (1), (2), and (3), collectively, the "**Collateral**").  Notwithstanding anything to the contrary in this Term Sheet, the Collateral shall not include the Estate Litigation Assets, the Litigation Trust Fund Amount, or the proceeds thereof. |
| | The obligations under the DIP Facility shall be the joint and several obligation of each Debtor and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. Subject to entry of the Final Order, the Debtors shall waive and the DIP Orders shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory. |
| **Litigation Trust** | "**Estate Litigation Assets**" means any claims or causes of action, including claims or causes of action under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law, held by the Debtors or their estates and the proceeds thereof, other than any such claims or causes of action against any Indemnified Party.  For the avoidance of any doubt, the Estate Litigation Assets shall include any claim or cause of action, including any claim or cause of action under chapter 5 of the |

*Execution Version*

Bankruptcy Code or applicable non-bankruptcy law, held by the Debtors or their estates and the proceeds thereof against Moshe (Mark) Silber, Frederick Schulman, Piper Sandler & Co., Mayer Brown LLP, Rhodium Asset Management LLC and its affiliates, Syms Construction LLC, Rapid Improvements LLC, NB Affordable Foundation Inc., title agencies, independent real estate appraisal firms, any other current or former insiders of the Debtors, and each of the aforementioned entities' affiliates, partners, members, managers, officers, directors, and agents.

"**DIP Lender Litigation Claims**" means, upon entry of the Final Order approving the DIP Facility, any claims or causes of action, including claims or causes of action under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law, held by the Debtors against any Indemnified Party.[1]

"**Litigation Trust Fund Amount**" means an amount equal to $443,734 of the proceeds of the DIP Facility pursuant to the Interim DIP Facility Amount, which amount shall be reserved to fund the hard costs of the investigation, development, and prosecution of the Estate Litigation Assets. To the extent additional funds are sought to fund the hard costs of the investigation, development, and prosecution of the Estate Litigation Assets, the DIP Lender shall be entitled to submit a proposal to provide financing to the Debtors with respect to the Estate Litigation Assets, and the Debtors shall consider any such proposal in good faith. The Debtors shall, and shall cause their professionals to provide, reasonable information and updates if requested by the DIP Lender regarding the Debtors' efforts to obtain any financing with respect to the Estate Litigation Assets.

Provided that the steering committee of certain holders of notes issued by Crown Capital Holdings LLC that is represented by Faegre Drinker Biddle & Reath LLP (the "**Steering Committee of Noteholders**") does not object to the DIP Facility or the rights and remedies of the DIP Lender thereunder, the DIP Lender shall be deemed to agree that:

- the Debtors may either retain or transfer to a trust or other entity established under the Chapter 11 Plan for the benefit of the holders of notes issued by Crown Capital Holdings LLC and the Debtors' other general unsecured creditors (the "**Litigation Trust**") cash in an amount equal to the Litigation Trust Funding Amount;

- the Final Order will (subject to a customary challenge period) fully release all DIP Lender Litigation Claims, and provide the Indemnified Parties a full release from the Debtors and their estates, including any successors or assigns; *provided,*

---

[1]    For the avoidance of doubt, the Estate Litigation Assets, the Assigned Litigation Assets, and the DIP Lender Litigation Claims shall not include any claims or causes of action against Elizabeth A. LaPuma, in her capacity as the Debtors' independent fiduciary, the Debtors' counsel, the Debtors' financial advisor, or the Debtors' notice and claims agent.

|  |  |
|---|---|
|  | *however,* that such indemnity or release shall not, as to any Indemnified Party, be available to the extent that any losses, claims, damages, liabilities or expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party as determined by a final, non-appealable judgment of a court of competent jurisdiction;<br><br>• the Estate Litigation Assets shall not constitute Collateral under the DIP Facility;<br><br>• the Estate Litigation Assets shall not include any DIP Lender Litigation Claims;<br><br>• the Debtors shall not transfer or seek to transfer any DIP Lender Litigation Claims to the Litigation Trust; and<br><br>• the DIP Lender Litigation Claims shall constitute and remain the DIP Lenders' Collateral for purposes of the DIP Facility until the DIP Lender Litigation Claims are fully released. |
| **Conditions Precedent to the Closing** | The obligations of the DIP Lender to consummate the transactions contemplated herein and to make the DIP Facility available to the Debtors are subject to the satisfaction, in each case in the sole judgment of the DIP Lender, of the following:<br><br>• The Debtors shall have paid all fees and expenses (including reasonable fees and out-of-pocket expenses of counsel) required to be paid to the DIP Lender on or before the Closing Date.<br>• All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall comply with the terms of this Term Sheet and be in form and substance reasonably satisfactory to the DIP Lender.<br>• The Interim Order shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed for a period of five (5) business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of the DIP Lender.<br>• The DIP Lender shall have received and approved the Approved Budget to the extent the version attached as Exhibit A to this Term Sheet is amended prior to the Closing Date.<br>• The United States of America does not object to, or the Bankruptcy Court overrules an objection to, approval of the DIP Facility. |
| **Representations and Warranties** | The Loan Documents will contain customary representations and warranties to be made as of the Closing Date and upon each draw request made by the Debtors. |

| | |
|---|---|
| **Affirmative, Negative and Financial Covenants** | The Loan Documents will include certain covenants, including, without limitation: (a) approval over the Approved Budget, (b) approval over all brokerage and management agreements, (c) approval of all leases that do not satisfy the approved leasing parameters set forth in the Loan Documents, and (d) single purpose entity restrictions. |
| **Events of Default** | The events of default in the Loan Documents shall be usual and customary for a DIP Loan of this nature including, without limitation, failure to make debt-service or other payments when due pursuant to the Loan Documents; failure of the Debtors to make deposits into the required accounts for which the Debtors are required to make such deposits; breach of any covenant; breach of representations and warranties; any action by the U.S. Department of Justice to initiate forfeiture proceedings against any asset owned either partially or entirely by any Debtor; judgments and attachments; making payments outside of the Approved Budget; failure to file and confirm the Chapter 11 Plan; and the filing of a chapter 11 plan inconsistent with this Term Sheet. |
| **Bankruptcy Court Filings** | As soon as practicable in advance of filing with the Bankruptcy Court, Debtors shall furnish to the DIP Lender (i) the motion seeking approval of and proposed form of the DIP Orders, which motion shall be in form and substance reasonably satisfactory to the DIP Lender; (ii) as applicable, any motions seeking approval of bidding procedures and any section 363 sale, and the proposed forms of orders related thereto, which shall be in form and substance reasonably satisfactory to the DIP Lender; and (iii) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive, retention or severance plan, and/or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance reasonably satisfactory to the DIP Lender). |
| **Indemnification and Release** | The Debtors hereby agree to protect, defend, indemnify, release and hold harmless the DIP Lender, 3650 REIT Investment Management LLC ("**REIT 3650**"), any fund or separately-managed account that REIT 3650 manages, 3650 Special Situations Real Estate Investment Trust A LLC and its affiliated entities, Kelly Hamilton Lender LLC, The Lynd Group Holdings, LLC, Lynd Management Group LLC, Lynd Acquisitions Group, LLC, LAGSP, LLC and in each case such entity's respective affiliates, principals, affiliates, officers, employees, agents and other representatives (collectively, "**Indemnified Parties**") for, from and against any and all claims, suits, liabilities, losses, costs, expenses (including reasonable, out-of-pocket attorneys' fees and costs) imposed upon or incurred by or asserted against any Indemnified Party arising out of or relating to the Debtors (and any subsidiaries or affiliates), prior loans, mortgages, all avoidance actions under Title 11 of the U.S.C., this Term Sheet or the transactions contemplated thereby, except for those arising out of the willful misconduct or gross |

|  | negligence of the DIP Lender as determined by a non-appealable court order.  The foregoing indemnity shall include, without limitation, any costs and expenses incurred in the enforcement of any binding provisions of this Term Sheet.  This indemnification provision shall survive in the event the Bankruptcy Court fails to approve the DIP Facility.<br><br>The consideration for this indemnification and release is the DIP Lender's agreement, subject to approval by the Bankruptcy Court, to enter into the DIP Facility as provided in this Term Sheet. |
|---|---|
| **Third-Party Release of Indemnified Parties** | The Debtors agree that the Chapter 11 Plan filed with the Bankruptcy Court will include a third-party release of the Indemnified Parties subject to the right of third parties affected by such release to "opt out" of the release. For the avoidance of any doubt, the Debtors shall not be obligated under this Term Sheet to file or seek approval of a chapter 11 plan that includes a non-consensual third-party release of any person or entity. |
| <u>**Stalking Horse Purchase Agreement**</u> | The DIP Lender shall be entitled, subject to approval by the Bankruptcy Court, to enter into a stalking horse purchase agreement with respect to the Kelly Hamilton Debtor's assets under section 363 of the Bankruptcy Code. Subject to entry of the Interim Order and execution of a stalking horse purchase agreement for the Debtors' assets under section 363 of the Bankruptcy Code or the Chapter 11 Plan, the Debtors agree to seek approval of a reasonable stalking horse break-up fee of $250,000 to the DIP Lender to compensate the DIP Lender for out of pocket due diligence expenses, among other costs. |
| <u>**Fiduciary Duties**</u> | No term of this Term Sheet to the contrary, the Debtors shall have the right to take any action (or to refuse to take any action) to the extent that the Debtors determine that taking any such action (or declining to take any such action) is consistent with the Debtors' fiduciary duties. |

*Additional Agreement Terms*

**Closing Fees, Costs, and Expenses:** Subject to approval of the DIP Facility by the Bankruptcy Court, whether or not the transaction contemplated herein closes, subject to available liquidity, the Kelly Hamilton Debtor shall be obligated to pay all of DIP Lender's out-of-pocket fees, costs and expenses (in each case, without markup) related to this transaction, including, without limitation, the fees and expenses of DIP Lender's outside counsel, title report fees and costs, survey costs, and costs incurred in obtaining and/or reviewing due diligence materials, including, without limitation, environmental and engineering reports and travel costs of DIP Lender's personnel or representatives.

**Waiver of Right to Trial by Jury**:  Debtors, and by its acceptance hereof, DIP Lender, hereby expressly waive any right to trial by jury of any claim, demand, action or cause of action (1) arising under this Term Sheet, loan or DIP Funding or any other instrument, document or agreement executed or delivered in connection therewith, including, without limitation, any present or future modification thereof or (2) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect to this Term Sheet (as now or hereafter modified) or the transaction related hereto, in each case whether such claim, demand, action or cause of action is new existing or hereafter arising, and whether sounding in contract or tort of otherwise; and each party hereby agrees and consents that any such claim, demand or cause of action shall be decided by a court trial without a jury.

**Break-up Fee:** In the event the Bankruptcy Court authorizes the Kelly Hamilton Debtor to obtain financing secured by the Kelly Hamilton Property from an alternative DIP lender (an "**Approved Alternative Financing Transaction**"), the Kelly Hamilton Debtor will immediately pay to the DIP Lender $250,000 (the "**Break-up Fee**"), which shall be an obligation of the Kelly Hamilton Debtor and payable upon, and solely from the proceeds of, the Approved Alternative Financing Transaction. Subject to approval of the DIP Facility by the Bankruptcy Court, the obligation of the Kelly Hamilton Debor to pay the Break-up Fee shall survive the termination of this Term Sheet.

DIP Lender has specifically advised Debtors that it is devoting considerable internal resources to successfully consummate a transaction as contemplated in this Term Sheet and as such, it is not only expending meaningful costs and expenses in addition to reimbursable third-party out-of-pocket expenses, but, also and more importantly, foregoing other investment opportunities. To address this significant financial commitment to be made by DIP Lender, prior to the execution of this Term Sheet, the parties hereto have (i) discussed a potential determination of DIP Lender's damages in the event that Debtors were to breach the exclusivity provision set forth herein, and (ii) concluded that such determination is difficult and impractical as of the date of this Term Sheet. Therefore, given such discussions between the parties, which are hereby expressly acknowledged and confirmed, Debtors agree that the amount of the applicable Break-up Fee is a reasonable estimate of DIP Lender's damages as of the date of this Term Sheet and provides a satisfactory alternative to Debtor's performance of its obligations under the "Exclusivity" paragraph set forth above and is not intended as a penalty.

**Miscellaneous**: This Term Sheet shall be governed, construed and interpreted in accordance with the laws of the State of New York and any action brought regarding this Term Sheet must be brought in a state or federal court in New York, New York. The United States Bankruptcy Court for the District of New Jersey shall have exclusive jurisdiction over any matters involving this Term Sheet or the transactions contemplated by this Term Sheet. The Debtors hereby represent, warrant, covenant and agree that: (i) each Debtor has the power and authority to execute this Term Sheet, to bind Debtors hereunder, (ii) the proposed transaction described herein is not the subject of a commitment or term sheet executed by Debtors from another lender; and (iii) no other party has a right of refusal or other option which could cause the DIP Facility not to be consummated.

IN WITNESS WHEREOF, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers as of the day and year first above written.

DIP LENDER:

3650 SS1 PITTSBURGH LLC,
a Delaware limited liability company

By: _____
Name: Peter LaPointe
Title: Managing Partner

DEBTORS:

CBRM REALTY, INC.,
a New York corporation

By: _____
Elizabeth LaPuma, Authorized Signatory

CROWN CAPITAL HOLDINGS, LLC.,
a Delaware limited liability company

By: _____
Elizabeth LaPuma, Authorized Signatory

KELLY HAMILTON APTS MM, LLC.,
a Delaware limited liability company

By: _____
Elizabeth LaPuma, Authorized Signatory

KELLY HAMILTON APTS, LLC.,
a Delaware limited liability company

By: _____
Elizabeth LaPuma, Authorized Signatory

## EXHIBIT A

### Approved Budget

| Sources and Uses | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Loan Proceeds | $9,705,162 | Repayment of Existing Senior Loan | $3,575,000 |
| | | Working Capital | $313,021 |
| | | Kelly Hamilton Capex - Phase 1 | $1,300,000 |
| | | Professional Fees | $2,450,000 |
| | | Litigation Trust | $453,734 |
| | | Asset Management Fees (Lynd) | $400,000 |
| | | Kelly Hamilton Tax Payments | $47,000 |
| | | DIP Lender Professional Fees / Contingency | $460,000 |
| | | Origination Fee | $291,155 |
| | | Interest Reserve | $370,252 |
| | | Servicing Fee Reserve | $45,000 |
| | **$9,705,162** | | **$9,705,162** |

# EXHIBIT B

**DIP Credit Agreement**

EXECUTION VERSION

SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT


dated as of June [20], 2025

among

CBRM REALTY INC.,
CROWN CAPITAL HOLDINGS, LLC
KELLY HAMILTON APTS, LLC
KELLY HAMILTON APTS MM, LLC

as Borrowers/Debtors,

THE OTHER BORROWERS FROM TIME TO TIME PARTY HERETO

and

3650 SS1 PITTSBURGH LLC,

as Lender

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ............................................................................................ 2

1.1    Definition of Certain Terms ........................................................................ 2
1.2    Accounting Terms ...................................................................................... 11
1.3    Other Terms Defined in UCC ..................................................................... 11
1.4    Interpretation ............................................................................................. 11

ARTICLE 2 THE LOAN ............................................................................................... 11

2.1    Loan .......................................................................................................... 11
2.2    Interest Rate. ............................................................................................. 12
2.3    Terms of Payment. ..................................................................................... 13
2.4    Prepayment. ............................................................................................... 14
2.5    Fees ........................................................................................................... 15
2.6    Appointment of Servicer and Delegation of Lender Rights ........................ 15
2.7    Conversion Option ..................................................................................... 15
2.8    Bankruptcy Sale ........................................................................................ 16
2.9    Stalking Horse Agreement ......................................................................... 16

ARTICLE 3 ADDITIONAL COSTS; INDEMNIFICATION ............................................ 16

3.1    Additional Costs. ....................................................................................... 16
3.2    Indemnification of Lender .......................................................................... 16
3.3    Statements by Lender ...............................................**Error! Bookmark not defined.**

ARTICLE 4 CONDITIONS PRECEDENT ..................................................................... 17

4.1    Conditions to Closing ................................................................................ 17
4.2    Conditions for the Benefit of Lender .......................................................... 18

ARTICLE 5 GENERAL REPRESENTATIONS AND WARRANTIES ............................ 18

5.1    Organization and Existence ....................................................................... 18
5.2    Due Authorization; Non-Contravention ...................................................... 19
5.3    Financing Orders; Recoupment / Setoff ..................................................... 20
5.4    General ...................................................................................................... 20
5.5    Loan Documents ........................................................................................ 20
5.6    No Default ................................................................................................. 20
5.7    Intentionally Omitted. ..............................................**Error! Bookmark not defined.**
5.8    Tax Returns ............................................................................................... 20
5.9    Business Loan ............................................................................................ 20
5.10   Locations ................................................................................................... 20
5.11   Ownership of Collateral; Encumbrances .................................................... 20
5.12   Environmental ........................................................................................... 21
5.13   Corporate Information ................................................................................ 21
5.14   Names; Assumed Names ............................................................................ 21
5.15   Litigation ................................................................................................... 21
5.16   Existing Indebtedness ................................................................................ 21

i

5.17    Effectiveness ................................................................................................. 21
5.18    Investment Company Act .............................................................................. 22
5.19    Margin Stock ................................................................................................. 22
5.20    ERISA ........................................................................................................... 22
5.21    Complete Information .................................................................................... 22
5.22    Use of Loan Proceeds .................................................................................... 22
5.23    Security Interest. ........................................................................................... 22
5.24    HAP Contract............................................................**Error! Bookmark not defined.**
5.25    Title ............................................................................................................... 23

ARTICLE 6 COVENANTS OF BORROWERS .............................................................. 24

6.1    Financial Statements and Reports. ................................................................ 24
6.2    Chapter 11 Plan............................................................................................. 25
6.3    Intentionally Omitted. ................................................................................... 25
6.4    Borrowers' Existence .................................................................................... 25
6.5    Compliance with Legal Requirements .......................................................... 26
6.6    Notice of Litigation & Acceleration ............................................................. 26
6.7    Notice of Other Events.................................................................................. 26
6.8    Payment of Taxes and Other Claims ............................................................ 26
6.9    Payment of Obligations................................................................................. 26
6.10    Governmental Consents and Approvals......................................................... 27
6.11    Intentionally Omitted. ................................................................................... 27
6.12    Further Assurances; Maintenance of Liens................................................... 27
6.13    Use of Proceeds............................................................................................. 28
6.14    Environmental Matters.................................................................................. 29
6.15    Acquisition of Margin Securities ................................................................. 30
6.16    Payment of Claims; Encumbrances .............................................................. 30
6.17    Borrowers' Organizational Documents; Name Changes ............................... 30
6.18    Prohibition of Assignments, Transfers and Encumbrances .......................... 30
6.19    Prohibition of Other Indebtedness ............................................................... 31
6.20    Loans, Acquisitions, Guaranties, Affiliate Transactions .............................. 31
6.21    Dividends; Distributions ............................................................................... 31
6.22    Expenses; Taxes; Indemnity ......................................................................... 31
6.23    Pension or Profit Sharing Plans .................................................................... 32
6.24    Field Audits................................................................................................... 32
6.25    Collateral....................................................................................................... 33
6.26    Change in Control ......................................................................................... 33
6.27    Qualified Estate Litigation Assets Transaction............................................. 33
6.28    Intentionally Omitted. ................................................................................... 34
6.29    Additional Subsidiaries ................................................................................ 34
6.30    Intentionally Omitted .................................................................................... 34
6.31    Bankruptcy Court Filings .............................................................................. 34
6.32    Inspection ...................................................................................................... 34
6.33    Budget ........................................................................................................... 34
6.34    Single Purpose Entity.................................................................................... 35
6.35    Intentionally Omitted .................................................................................... 35
6.36    Intentionally Omitted .................................................................................... 35

ME1\53156050.v2
81162026;6

6.37    Negative Covenants ................................................................................. 35

ARTICLE 7 RESERVES AND CASH MANAGEMENT ............................................ 37

7.1    Reserves ................................................................................................... 37
7.2    General Provisions Regarding Reserves ................................................. 40
7.3    Cash Management ................................................................................... 40

ARTICLE 8 INSURANCE ....................................................................................... 43

8.1    Insurance. ................................................................................................ 43
8.2    Casualty ................................................................................................... 47
8.3    Condemnation ......................................................................................... 48
8.4    Application of Loss Proceeds ................................................................. 48
8.5    Restoration .............................................................................................. 48

ARTICLE 9 DEFAULTS AND REMEDIES ............................................................. 48

9.1    Events of Default .................................................................................... 48
9.2    Certain Remedies .................................................................................... 51
9.3    Automatic Stay ........................................................................................ 52
9.4    No Implied Waiver; Rights Cumulative .................................................. 52

ARTICLE 10 MISCELLANEOUS PROVISIONS ..................................................... 53

10.1    Consent or Approval .............................................................................. 53
10.2    Duration ................................................................................................. 53
10.3    Survival of Representations ................................................................... 53
10.4    Binding Effect; Assignment; Third-Party Beneficiaries ........................ 53
10.5    Counterparts .......................................................................................... 53
10.6    Notices ................................................................................................... 54
10.7    Waiver of Jury Trial ............................................................................... 54
10.8    Entire Agreement ................................................................................... 54
10.9    Jurisdiction; Governing Law .................................................................. 55
10.10    Headings .............................................................................................. 55
10.11    Severability .......................................................................................... 55
10.12    Relationship ......................................................................................... 55
10.13    Patriot Act ............................................................................................ 55
10.14    Press Releases ..................................................................................... 56
10.15    Counsel ................................................................................................ 56
10.16    Construction ......................................................................................... 56
10.17    Waivers ........................................................................**Error! Bookmark not defined.**
10.18    Incorporation of Financing Orders by Reference ................................. 56
10.19    Fiduciary Duties ................................................................................... 56

**EXHIBITS**

Exhibit A        Form of Compliance Certificate
Exhibit B        Budget
Exhibit C        Loan Documents

ME1\53156050.v2
81162026;6

**SCHEDULES**

Schedule 5.10          Locations
Schedule 5.16(b)      Prepetition Permitted Prior Liens

ME1\53156050.v2
81162026;6

### SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**") is made as of June [20], 2025, by and among 3650 SS1 Pittsburgh LLC, a Delaware limited liability company ("**Lender**"), and CBRM Realty Inc., a New York corporation ("**CBRM**"), Crown Capital Holdings, LLC, a Delaware limited liability company ("**Crown Capital**"), Kelly Hamilton Apts, LLC, a Delaware limited liability company ("**Kelly Hamilton Debtor**") and Kelly Hamilton Apts MM LLC ("**KH MM**"; together with CBRM, Crown Capital and Kelly Hamilton Debtor, collectively, the "**Borrowers**" and each, a "**Borrower**").

### RECITALS

**WHEREAS**, on May 19, 2025 (the "**Petition Date**"), CBRM (a "**Debtor**" and together with the other Borrowers, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), commencing chapter 11 proceedings (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are being jointly administered under Case No. 25-15343;

**WHEREAS**, from and after the Petition Date, the Debtors continue to operate their business and manage their property as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, Kelly Hamilton Lender LLC, a Delaware limited liability company, as lender (in such capacity, the "**Prepetition Lender**"), provided certain financing to certain Borrowers, as borrowers (in such capacity, the "**Prepetition Borrowers**"), pursuant to that certain Loan and Security Agreement, dated as of September 20, 2024, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time through the date hereof but prior to giving effect to this Agreement, the "**Prepetition Loan Agreement**");

**WHEREAS**, as of the Petition Date, the Prepetition Lender under the Prepetition Loan Agreements is owed $3,624,625 with respect to the Prepetition Loan Obligations (defined herein);

**WHEREAS**, Debtors seek to obtain and Lender has agreed to make available a senior secured, super-priority post-petition debtor-in-possession credit financing consisting of a new credit facility in an aggregate amount not to exceed $9,705,162 in accordance with the terms and conditions set forth in this Agreement and the Loan Documents (defined below) (collectively, the "**DIP Facility**") to provide the Debtors with the funds necessary to meet their working capital needs, repay certain of the Prepetition Loan Obligations, pay professional fees and expenses, and pay other expenses, all as set forth in the Budget;

**WHEREAS**, as security for the repayment of the loans made available pursuant hereto and payment of the other obligations of Debtors hereunder, Debtors have agreed to provide to Lender,

in each case, subject and subordinate to the Carve Out (as defined below), valid, perfected, and enforceable superpriority Liens (as defined below) on the Collateral (as defined below), senior to all other security interests in the Collateral, pursuant to section 364(c)(1) and (d)(1) of the Bankruptcy Code, which Liens are a material and necessary condition of Lender's willingness to provide the credit contemplated herein; and

**WHEREAS**, Lender's willingness to extend financial accommodations to Debtors as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to Debtors and at Debtors' request and in furtherance of Debtors' enterprise.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrowers agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    <u>Definition of Certain Terms</u>. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Account Agreement</u>" shall have the meaning set forth in <u>Section 7.3(a)</u> hereof.

"<u>Advance</u>" shall mean the Loan proceeds, or any part thereof, which may be disbursed by Lender to or for the account of Debtors pursuant to this Agreement, including, without limitation, the Initial Advance.

"<u>Affiliate</u>" of any Person shall mean (a) any other Person that, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) intentionally omitted, and (c) with respect to Lender, any Person administered or managed by Lender, or an Affiliate or investment advisor thereof and that is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled" by another Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract, ownership of voting securities, membership interests or otherwise (it being acknowledged that a Person shall not be deemed to lack control of another Person even though certain decisions may be subject to "major decision" consent or approval rights of limited partners, shareholders or non-managing members or representative body or bodies of the foregoing, as applicable).

"<u>Alternative Asset Purchase Agreement</u>" means an asset purchase agreement (other than the Stalking Horse Agreement) selected by Borrowers in accordance with the Sale Procedures as representing the highest and otherwise best offer for the purchase and sale of all or substantially all of the Debtors' assets, provided that the terms of any such asset purchase agreement shall require the Payment in Full of all Obligations immediately upon the consummation of such Sale Transaction and payment of the Stalking Horse Break-Up Fee to the Stalking Horse Bidder.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals hereto.

2

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereto.

"Budget" shall mean the rolling consolidated thirteen (13)-week cash flow and financial projections of the Debtors covering the period ending on November 30, 2025, and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues or other payments projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to Lender, which Budget may be amended only with the written consent of Lender, and subject to any other requirements and limitations set forth in the Financing Orders. The Budget is included in Exhibit B attached hereto.

"Business Day" shall mean any day other than Saturday or Sunday on which commercial banking institutions are open for business in New York, New York.

"Capital Securities" shall mean all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Carve Out" shall have the meaning set forth in the Interim Order.

"Cash Collateral" shall have the meaning specified in the Interim Order.

"Cash Management Account" shall have the meaning set forth in Section 7.3(a) hereof.

"Cash Management Account Bank" shall mean City National Bank of Florida.

"Change in Control" shall occur if the holders of the Capital Securities of Borrowers shall cease to own and control all or substantially all of the Capital Securities of Borrowers.

"Chapter 11 Cases" shall have the meaning set forth in the Recitals hereto.

"Chapter 11 Plan" shall mean a chapter 11 plan filed by the Debtors in the Chapter 11 Cases with a related schedule to obtain Bankruptcy Court confirmation of that Chapter 11 Plan not later than August 29, 2025, which plan shall (1) provide for the establishment of the Creditor Recovery Trust and the Kelly Hamilton Restructuring Transaction as set forth in that Term Sheet dated May 26, 2025 and (2) contain other terms otherwise acceptable to the Debtors and the Lender.

"Chief Restructuring Officer" shall mean a restructuring officer appointed for the Debtors who is acceptable to Lender.

"Closing" shall mean this Agreement and all of the other Loan Documents required to be delivered concurrently with this Agreement shall have been executed and delivered to

Lender, the conditions precedent to the Initial Advance shall have been satisfied and the proceeds of the Initial Advance shall have been disbursed to or for the benefit of Borrowers.

"<u>Closing Date</u>" shall mean the date of the Closing, which Borrowers and Lender shall use their commercially reasonable efforts to ensure is no later than ten (10) Business Days after entry of the Interim Order, subject to the conditions set forth in <u>Section 4.1</u>.

"<u>Collateral</u>" shall mean (a) a first priority mortgage on the Kelly Hamilton Property; and (b) a first priority perfected security interest in all assets of the Debtors, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivable, investment property, instruments, chattel paper, contracts, patent, copyrights, trademarks and other intangibles and all proceeds of the foregoing. The Collateral shall not include the Estate Litigation Assets, the Litigation Trust Fund Amount, each as defined in the Interim Order, or the proceeds thereof.

"<u>Commitment Amount</u>" shall mean $9,705,162, which shall be advanced pursuant to <u>Section 2.1(a)</u>.

"<u>Committee</u>" shall mean the official committee of unsecured creditors appointed in the Debtors' Chapter 11 Cases.

"<u>Creditor Recovery Trust</u>" shall have the meaning set forth in <u>Section 6.27(c)</u>.

"<u>Debt</u>" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"<u>Debtor</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Default Interest Rate</u>" shall mean, as of any day, the Maximum Rate.

"<u>Deposit Account Control Agreement</u>" shall mean the Deposit Account Control Agreement among Debtors, Lender and an Eligible Bank reasonably satisfactory to Lender.

"<u>DIP Facility</u>" shall have the meaning set forth in the Recitals hereto.

"<u>Eligible Bank</u>" shall mean any depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

"<u>Environmental Laws</u>" shall mean all applicable Legal Requirements of any Governmental Authority pertaining to health, hazardous substances, natural resources, conservation, wildlife, pollution or the environment.

4

"Escrow Account" shall mean an escrow account established for the benefit of Elizabeth A. LaPuma, as independent fiduciary, Debtors' counsel, Debtors' financial advisors, and Debtors' notice and claims agent.  The applicable beneficiary shall be entitled to receive payment from the Escrow Account, subject to: (a) the Bankruptcy Court entering orders authorizing Borrowers to retain such counsel and financial advisors, as applicable; (b) approval by the Bankruptcy Court of any fees, expenses and costs of Debtors' counsel and financial advisors, as applicable; and (c) the presentment by the applicable beneficiary or its designee of a draw notice that certifies the satisfaction of each of the preceding conditions. Notwithstanding anything to the contrary in this paragraph, Ms. LaPuma shall be entitled to payment from the Escrow Account as provided in that certain letter agreement dated September 26, 2024.

"Estate Litigation Assets" shall have the meaning set forth in the Interim Order.

"Event of Default" shall mean any of the events specified in Section 7.1.

"Excess Cash" shall have the meaning set forth in Section 2.6(b).

"Final Order" shall mean an order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving on a final basis, among other things, the Interim Order with no modifications of the Interim Order.

"Final Order Date" shall mean the date on which the Final Order is approved and entered by the Bankruptcy Court.

"Financial Officer" shall mean, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person. Unless otherwise specified, all references herein to a Financial Officer shall mean a Financial Officer of Borrowers.

"Financing Orders" shall mean, together or individually, as applicable, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles of the United States, consistently applied.

"Governmental Authorities" shall mean, collectively, all Federal, state and local or regional governmental agencies, boards, tribunals, courts or instrumentalities having jurisdiction over any Borrower or the Property.

"HAP Contract" shall mean that certain Housing Assistance Payments Contracts dated as of October 1, 1982 between Kelly Hamilton Apts LLC, U.S. Department of Housing and Urban Development and Pennsylvania Housing Financing Agency, as renewed and amended pursuant to that certain Renewal HAP Contract for Section 8 Mark-Up-To-Market Project entered into as of September, 2023.

"Hazardous Materials" shall mean any substance that is defined or listed as a hazardous, toxic or dangerous substance under any Environmental Law or is otherwise regulated or prohibited or subject to investigation or remediation under any Environmental Law because of its hazardous, toxic or dangerous properties, including (a) any substance that is a "hazardous

5

substance" under applicable Environmental Law, and (b) asbestos, petroleum, petroleum products and polychlorinated biphenyls.

"Head Office" shall mean Lender's headquarters, located at 2977 McFarlane Road, Suite 300, Miami, Florida 33133, or such other location as Lender may designate by providing Borrowers with not less than ten (10) days' prior written notice.

"Initial Advance" shall mean the Advance extended by Lender to Debtors as of the Closing Date pursuant to Section 2.1(a) hereof.

"Interim Financial Statements" shall have the meaning set forth in Section 5.7.

"Interim Order" shall mean that certain Interim Order (I) Authorizing the Kelly Hamilton DIP Loan Parties to obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief dated June 4, 2025 and filed on June 4, 2025 by the Clerk of the U.S. Bankruptcy Court District of New Jersey.

"Interest" shall have the meaning set forth in Section 2.2(a).

"Interest Commencement Date" means the date of the Initial Advance.

"Interest Rate" shall mean an interest rate of sixteen percent (16%) per annum. The Interest Rate shall consist of a "Current Pay Rate" of ten percent (10%) per month and a "PIK Rate" of six percent (6%) per month.

"Kelly Hamilton Debtor" shall mean Kelly Hamilton Apts, LLC, a Delaware limited liability company.

"Kelly Hamilton Property" shall mean that certain 110-unit multifamily assemblage and two (2) vacant lots owned by the Kelly Hamilton Debtor and located in Pittsburgh, PA.

"Legal Requirements" shall mean all applicable laws, rules, regulations, ordinances, judgments, orders, decrees, injunctions, arbitral awards, permits, licenses, authorizations, directions and requirements of all Governmental Authorities.

"Lien" shall mean (a) any lien (statutory or otherwise), mortgage, deed of trust, pledge, hypothecation, assignment, security interest, charge, levy, restraint, or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Capital Securities, any purchase option, call or similar right of a third party with respect to such Capital Securities.

"Litigation Trust Fund Amount" shall have the meaning set forth in Exhibit A of the Interim Order.

6

"Loan" shall mean the loans and other extensions of credit advanced by Lender to Debtors hereunder.

"Loan Documents" shall mean, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, any Security Agreements, the Security Instrument, the Deposit Account Control Agreement, or similar agreements entered into by any Debtor with Lender or any Affiliate of Lender, and any other document, instrument or agreement evidencing or securing the Loan, together with any and all modifications and amendments to any of the foregoing, including without limitation those set forth in Exhibit C attached hereto.

"Loss Proceeds" means amounts, awards or payments payable to any Borrower or to Lender in respect of all or any portion of the Property in connection with a casualty or condemnation thereof (after the deduction therefrom and payment to Borrower and Lender, respectively, of any and all reasonable out-of-pocket expenses incurred by Borrower, Lender in the recovery thereof, including all reasonable attorneys' fees and disbursements, the fees of insurance experts and adjusters and the costs incurred in any litigation or arbitration with respect to such casualty or condemnation) including proceeds from rental or business interruption insurance.

"Make-Whole Premium" means an amount equal to Seven Hundred Seventy-Six Thousand Four Hundred Twelve and 96/100 Dollars ($776,412.96 less the sum of the aggregate amount of Interest on the Loan that has accrued at the Interest Rate and been paid as of the Prepayment Date, expressly excluding any fees (i.e. Servicing Fee, etc.) and interest accrued at the Default Interest Rate; provided, however, it is expressly agreed and understood that (a) the Make-Whole Premium shall be due under any and all circumstances where the Loan is paid in full before November 30, 2025, whether such payment is voluntary or involuntary, and even if such payment results from Lender's acceleration of the Maturity Date of the Note upon an Event of Default (and irrespective of whether foreclosure proceedings have been commenced), and shall be in addition to any other sums due hereunder or under any of the other Loan Documents, (b) no Make-Whole Premium is payable at the time of a partial prepayment and (c) in no event shall the Make-Whole Premium be a negative amount.

"Material Adverse Effect" shall mean a material, adverse effect on (a) the business, property or condition (financial or otherwise) of Debtors, taken as a whole, or (b) the validity or enforceability of this Agreement or any other Loan Document against Debtors.

"Maturity Date" shall have the meaning set forth in the Interim Order.

"Maximum Rate" shall mean the maximum non-usurious rate of interest permitted for that day by whichever of applicable federal or New York (or any jurisdiction whose usury laws are deemed to apply to the Loan or any documents executed in connection therewith) Legal Requirements permit the higher interest rate, stated as a rate per annum. Without notice to Debtors or any other Person, the Maximum Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable Legal Requirements fluctuates.

"Note" shall have the meaning set forth in Section 2.1(b).

"Obligations" shall mean, collectively, (a) the due and punctual payment by Debtors of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the Loan) the Loan, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of Debtors to Lender under this Agreement, the other Loan Documents and the Financing Orders, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of Debtors to Lender under or pursuant to this Agreement, the other Loan Documents and the Financing Orders.

"Operating Account" shall have the meaning set forth in Section 7.3(a) hereof.

"Operating Account Bank" shall mean Western Alliance Bank or such other Eligible Bank approved by Lender.

"PBGC" shall mean the Pension Benefit Guaranty Corporation, or any successor thereto.

"Person" shall mean an individual, partnership, corporation, limited liability company, trust, unincorporated association, or other entity or association.

"Permitted Liens" shall mean with respect to any Person:

(a)     Liens in favor of Lender granted pursuant to the Loan Documents;

(b)     Liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by proceedings diligently pursued;

(c)     deposits to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance;

(d)     zoning restrictions, easements, licenses, rights-of-way or other restrictions or encumbrances on the use of any real property or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value or marketability of such real property;

(e)     Liens on the unearned portion of insurance premiums in favor of insurers (or other Persons financing the payment of insurance premiums) securing the premiums payable in respect of insurance policies issued by such insurers; provided that such Liens attach solely to returned premiums in respect of such insurance policies and the proceeds of such policies;

(f)     the Carve Out;

(g)     Prepetition Permitted Prior Liens; and

(h)     Exceptions set forth in the Lender's title insurance policy.

8

"Petition Date" shall have the meaning set forth in the Recitals hereto.

"Prepayment Date" means the date that Lender receives all amounts required under Section 2.3(6)(a).

"Prepetition Borrowers" shall have the meaning set forth in the Recitals hereto.

"Prepetition Collateral" shall mean the Collateral as defined in the Prepetition Loan Agreements.

"Prepetition Loan Debt" shall mean the Total Debt of the Prepetition Borrowers and their Subsidiaries outstanding immediately prior to the Petition Date.

"Prepetition Lender" shall have the meaning set forth in the Recitals hereto.

"Prepetition Loan Agreements" shall have the meaning set forth in the Recitals hereto.

"Prepetition Loan Documents" shall have the meaning assigned to the term "Loan Documents" in the Prepetition Loan Agreements.

"Prepetition Loan Obligations" shall mean any and all indebtedness outstanding immediately prior to the Petition Date under the Prepetition Loan Agreements or any other Loan Document (as defined in the Prepetition Loan Documents).

"Prepetition Permitted Prior Liens" shall have the meaning set forth in Section 5.16.

"Professional Fees" shall have the meaning specified in the Interim Order.

"Property" shall have the meaning defined in Section 5.12.

"Qualified Estate Litigation Asset" shall have the meaning defined in Section 6.27.

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Responsible Officer" shall mean, Elizabeth A. LaPuma.

"Restoration" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"Sale Procedures" shall mean the marketing process and procedures for the purposes of soliciting bids for the purchase of all or substantially all of the Debtors' assets and consummating a Sale Transaction, in form and substance acceptable to Lender, which shall be filed with the Bankruptcy Court in connection with the Sale Procedures Motion.

"<u>Sale Procedures Motion</u>" shall mean the motion (together with all exhibits thereto), in form and substance acceptable to Lender, to be filed by the Debtors with the Bankruptcy Court (a) authorizing the Debtors' entry into the Stalking Horse Agreement, (b) approving the Sale Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (c) approving and authorizing the payment of certain bidding protections, if any (each as shall be described in the Stalking Horse Agreement), including the Stalking Horse Break-Up Fee, (d) scheduling a hearing with respect to the sale, and (e) granting other related relief.

"<u>Sale Transaction</u>" shall mean the Stalking Horse Sale, or the sale of all or substantially all of the Debtors' assets pursuant to the Alternative Asset Purchase Agreement.

"<u>Security Agreements</u>" shall mean, collectively, all instruments, documents or agreements, now or hereafter executed by any Debtor or any other Person as security for the payment or performance of the Obligations or this Agreement, as such agreements may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Security Instrument</u>" shall mean the Open-End Mortgage, Commercial Mortgage, Security Agreement and Assignment of Leases and Rents given by the Kally Hamilton Debtor to the Lender and encumbering the Kelly Hamilton Property.

"<u>Servicer</u>" shall have the meaning defined in <u>Section 2.6</u>.

"<u>Servicing Fee</u>" shall have the meaning defined in <u>Section 2.6</u>.

"<u>Single Purpose Entity</u>" shall mean a corporation, limited partnership or limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements set forth on Exhibit D attached hereto and made a part hereof unless it has received prior consent to do otherwise from Lender.

"<u>Stalking Horse Agreement</u>" shall mean that certain Stalking Horse Agreement to be executed among Debtors and the Stalking Horse Bidder in a form reasonably acceptable to Lender and Kelly Hamilton Debtor.

"<u>Stalking Horse Bidder</u>" shall mean Lender or its designee.

"<u>Stalking Horse Break-Up Fee</u>" shall mean $250,000.

"<u>Stalking Horse Sale</u>" shall mean the sale of all or substantially all of Debtors' assets pursuant to the Stalking Horse Agreement whether under Chapter 11 Plan or section 363 of the Bankruptcy Code.

"<u>Subsidiaries</u>" shall mean, in respect of any Person, any corporation, association, joint stock company, limited liability company, partnership (whether general, limited or both), or business trust (in any case, whether now existing or hereafter organized or acquired), of which more than fifty percent (50%) of the outstanding voting Capital Securities or other ownership interest is owned either directly or indirectly by such Person and/or one or more of its Subsidiaries,

or the management of which is otherwise controlled either directly or indirectly by such Person and/or one or more of its Subsidiaries. Unless otherwise specified to the contrary herein or the context otherwise expressly requires, the term Subsidiary(ies) shall refer to the Subsidiary(ies) of any Borrowers.

"Superpriority Claims" shall have the meaning specified in Section 5.14(b).

"Total Debt" shall mean, as of any applicable date, all amounts outstanding, including all amounts of principal and accrued but unpaid interest, with respect to all of Debtor's consolidated indebtedness for borrowed money.

"UCC" shall mean the Uniform Commercial Code in effect in the State of New York from time to time.

1.2   Accounting Terms.  Any accounting terms used in this Agreement that are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP. Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Lender pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as in effect on the date of this Agreement.

1.3   Other Terms Defined in UCC.  All other capitalized words and phrases used in this Agreement and not otherwise specifically defined in this Agreement shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined in the UCC.

1.4   Interpretation. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly stated in each such instance and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), and any reference to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, (b) any reference herein to any person or entity shall be construed to include such person's or such entity's successors and permitted assigns, and (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof.

## ARTICLE 2
## THE LOAN

2.1   Loan  and Note.

(a)   Loan. The Loan covered by this Agreement consists of Advances in the amount up to the Commitment Amount, in each such case conditioned upon there being no Event

11

of Default. All Advances shall be made in accordance with the Budget and shall include funds to establish the Escrow Account. The Loan and Advances shall be subject to the terms and conditions of this Agreement, the other Loan Documents and the Financing Orders. The Initial Advance and all subsequent Advances shall accrue interest at the Interest Rate (or Default Interest Rate, as applicable), and shall be repaid in accordance with this Agreement.  The Loan is not a revolving credit loan, and Debtors are not entitled to any re-advances of any portion of the Loan that they may (or is otherwise required to) prepay pursuant to the provisions of this Agreement. Notwithstanding anything to the contrary set for in this Agreement or any of the other Loan Documents, Lender shall not be obligated to fund Advances in excess of the Commitment Amount.

(b)    Note.  The Loan shall be evidenced by a promissory note of even date herewith of Debtors, payable to Lender, in the aggregate principal amount of up to $9,705,162.00 (the "**Note**").

(c)    Loss, Theft, Destruction or Mutilation of Note.  In the event of the loss, theft or destruction of the Note, upon Debtors' receipt of an indemnification agreement and lost note affidavit executed in favor of Debtors by the holder of such Note, or in the event of the mutilation of the Note, upon the surrender of such mutilated Note by the holder thereof to Debtors, Debtors shall execute and deliver to such holder a new replacement Note in lieu of the lost, stolen, destroyed, or mutilated Note.  Such replacement Note shall not be deemed a novation of the Loan and shall not negate the then-existing priority of the Security Instrument or any other of the Loan Documents.

(d)    Use of Proceeds.  Debtors shall use the proceeds of the Loan as set forth in Section 6.13.

2.2    Interest Rate.

(a)    Interest Rate.  Interest shall accrue on the outstanding principal balance of the Loan, together with any and all other amounts due and owing from Debtors to Lender, inclusive of the accrued interest, at the Interest Rate (such sums accrued, the "**Interest**").  Interest shall commence accruing under the Note as of the Interest Commencement Date.

(b)    Calculation of Interest.  Interest owing for each month shall be computed on the basis of a fraction, the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed from the first day of such month (or, for the month in which the Closing Date occurs, from the date of such advance).  Debtors understand and acknowledge that such interest accrual method results in more interest accruing on the Loan than if the actual number of days and a three hundred sixty five (365) day year were used to compute the accrual of interest on the Loan.

(c)    Late Fees. If Debtors fail to make any payment of interest or principal on the date on which the same is due (but excluding the failure to pay the outstanding principal amount on the Maturity Date), Borrower shall pay to Lender a late charge on such past due amount, as liquidated damages and not as a penalty, equal to five percent (5%) of such amount; however, in no event shall the interest charged exceed the maximum rate of interest allowed by applicable Legal Requirements, as amended from time to time.  The foregoing late charge is intended to

ME1\53156050.v2
81162026;6

compensate Lender for the expenses incident to handling any such delinquent payment and for the losses incurred by Lender as a result of such delinquent payment. Debtors agree that, considering all of the circumstances existing on the date this Agreement is executed, the late charge represents a reasonable estimate of the costs and losses Lender will incur by reason of late payment. Debtors and Lender further agree that proof of actual losses would be costly, inconvenient, impracticable, and extremely difficult to fix. Acceptance of the late charge shall not constitute a waiver of the default arising from the overdue installment and shall not prevent Lender from exercising any other rights or remedies available to Lender.

(d)    Default Interest Rate. At all times after the occurrence and during the continuance of an Event of Default, interest on overdue payments and interest accruing during the continuance of an Event of Default shall accrue and bear interest at the Default Interest Rate.

(e)    Maximum Rate. In the event that the application of any fee or other amount would cause the effective rate of interest on the Loan to be greater than the Maximum Rate, such fees shall be reduced such that the effective rate of interest on the Loan is equal to the Maximum Rate. For the avoidance of doubt, the fees shall not be included in the calculation of the Maximum Rate unless otherwise required by applicable Legal Requirements.

2.3    Terms of Payment.

(a)    Interest Generally. For the period commencing on the Interest Commencement Date up to and including the Maturity Date, the outstanding principal balance and Interest shall be payable as follows:

(i)    PIK Interest. PIK Interest on the Loan will accrue at the PIK Rate and be payable by increasing the principal balance of the Loan by an amount equal to the amount of PIK Interest for the applicable monthly interest period (the "**PIK Amount**"). Following an increase in the principal balance of the Loan as a result of the addition of the PIK Amount, the Loan will bear interest at the Interest Rate.

(ii)    Current Pay Interest. Borrower shall pay to Lender, accrued, but unpaid, interest on the outstanding principal balance of the Loan (as the same may be increased in accordance with clause (a) above) at the Current Pay Rate ("**Current Pay Interest**") from the Interest Commencement Date through and including June 30, 2025. Commencing on August 1, 2025, and continuing on each payment date thereafter, Borrower shall pay Current Pay Interest in arrears in cash until all amounts due under the Loan Documents are paid in full.

(b)    No Principal Amortization. The Loan shall be an interest only loan and Debtor shall not be required to make any regularly scheduled principal amortization payments.

(c)    Maturity. On the Maturity Date, Debtors shall pay to Lender all outstanding principal, accrued and unpaid Interest, and any other amounts due under the Loan Documents.

(d)    Application of Payments. So long as no Event of Default is continuing, except as otherwise expressly set forth herein or the other Loan Documents, all payments received by Lender under the Loan Documents shall be applied in the following order: (a) to any fees and

13

expenses due to Lender under the Loan Documents, including the Make-Whole Premium, if applicable; (b) to amounts owed under any Reserves (c) to any Current Pay Interest or late charges as provided in Section 2.3; (d) to accrued and unpaid interest; (e) to any other amounts due under the Loan Documents; and (f) to the outstanding principal balance.  While any Event of Default is continuing, Lender may apply all payments to amounts then owing in any manner and in any order as determined by Lender.

(e)    Place of Payment.  All payments in respect of the Loan shall be paid by Borrower to Lender to the account or other place of payment designated by Lender in writing. Lender shall have the right to change the account to which payment is to be made or other place of payment from time to time in Lender's sole and absolute discretion, provided such change will not be effective as to Debtors until Debtors receive notice of such change in accordance with the notice provisions of this Agreement.

(f)    Credit for Payments.  Any payment made upon the outstanding principal balance of the Loan, or the accrued Interest thereon, shall be credited as of the Business Day received, provided that such payment is made by Debtors no later than 1:00 p.m. (New York Standard Time or New York Daylight Time, as applicable) and constitutes immediately available funds.  Any payment made after such time or which does not constitute immediately available funds shall be credited as of the next Business Day upon such funds having become unconditionally and immediately available to Lender.

(g)    Source of Payments.  All payments in respect of this Agreement to be made by Debtors shall be made from an account solely in Debtors' name or an escrow to which Debtors are a party.  If Lender receives payments from any other account or escrow, Lender may in its sole and absolute discretion, return the payment to such other Person or Persons having made such payment.  Payments from accounts not solely in Debtors' name or an escrow to which Debtors are a party shall be deemed non-payment and Lender shall have all rights and remedies for such non-payment, including, without limitation, the continuing accrual of Interest at the applicable Interest Rate.

2.4    Prepayment.

(a)    Optional Prepayments. Debtors may prepay the Loan in whole or in part at any time upon delivery of written notice to Lender no later than 5:00 p.m. (New York Standard Time or New York Daylight Time, as applicable) three (3) Business Days prior to the date of such prepayment (or such later time as Lender may agree to in writing in its sole discretion). Any amounts so prepaid may not be reborrowed.

(b)    Mandatory Prepayments. Until the Loan and the Obligations have been indefeasibly paid and performed in full, Borrowers shall pay the following amounts over to Lender upon receipt as follows, provided that any sale or resolution of an insurance claim shall require the advance written consent of the Lender in its sole and absolute discretion:

(i)    100% of the net cash proceeds of a Sale Transaction, or any other sale or disposition of all or substantially all of any Debtor's assets pursuant to section 363 of the Bankruptcy Code;

14

(ii)    100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets outside the ordinary course of business;

(iii)    100% of the net cash proceeds from any casualty event or in connection with any eminent domain or condemnation proceeding (or settlement thereof);

(iv)    100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions) by any Debtor; and

(v)    100% of the net cash proceeds from any indebtedness incurred after the Closing Date that is not permitted hereunder or under the other Loan Documents or on account of a Qualified Estate Litigation Assets Transaction.

(c)    Prepayments Generally. In the event of any such prepayment of the Loan, any amounts prepaid shall be retired from the credit extended pursuant to this Agreement, and the Commitment Amount shall be reduced by the amount of principal that is prepaid. In the event that Debtors prepay the Loan, such prepayment shall first be applied in accordance with Section 2.3(d). If Debtors are prepaying the Loan in full, then, in addition to the outstanding principal amount of the Loan, Borrower shall also pay: (i) the Make-Whole Premium, if applicable; (ii) any other fees or expenses then due and payable; and (iii) accrued, but unpaid Interest on the outstanding principal amount of the Loan as of the Prepayment Date.

2.5    Fees. As partial consideration for Lender's agreement to make the Loan:

(a)    Origination Fee. Debtors have paid to Lender or its designee an origination fee of $291,154.86 (i.e., 3.00% of the Loan Amount, the "**Origination Fee**").

(b)    Servicing Fee. Debtors shall pay to Lender on the first day of each month during the term of the Loan, in immediately available funds, the Servicing Fee (as defined below). Such payment shall be paid monthly from the Interest and Servicing Reserve. Lender shall have the option to assign, reassign, or apportion, the Servicing Fee to any Person or Persons it determines in its sole and absolute discretion.

2.6    Appointment of Servicer and Delegation of Lender Rights. Debtors acknowledge and agree that at the option of Lender, the Loan may be serviced by a servicer/trustee that is an Affiliate of Lender and selected by Lender (the "**Servicer**") and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement between Lender and Servicer; provided, however, that such delegation will not release Lender from any of its obligations under the Loan Documents. Debtors shall be responsible for paying to Servicer (on each payment date) Servicer's monthly servicing fee, in an amount equal to $7,500.00 (the "**Servicing Fee**").

2.7    Conversion Option. In connection with the Chapter 11 Plan, or in the event the Kelly Hamilton Debtor desires to sell the Kelly Hamilton Property, Lender shall have the option, exercisable at its sole discretion, to convert all or a portion of the outstanding principal amount of the Loan, including any accrued but unpaid interest, into shares of a newly created series of

15

preferred equity in the Kelly Hamilton Debtor or any other reorganized Debtor pursuant to the terms outlined in the Loan Document entitled "Debt Conversion Agreement". In the event any portion of the DIP Facility is converted into any form of equity (i.e. common shares or preferred shares), Lender shall be the general partner/managing member of such newly formed ownership entity.

2.8    Bankruptcy Sale.  Notwithstanding anything to the contrary herein and in all events subject to Lender's conversion option as set forth in Section 2.7, Debtors shall have the right to solicit proposals for Debtors' assets and, subject to approval by the Bankruptcy Court, to sell such assets to a potential acquirer other than Lender, provided that Debtors' satisfy the DIP Facility in full in cash as provided herein plus the Stalking Horse Break-Up Fee. Lender shall have the right to credit bid the DIP Loan balance in any sale under Section 363 of the Bankruptcy Code.

2.9    Stalking Horse Agreement.  Lender shall be entitled, subject to approval by the Bankruptcy Court, to enter into the Stalking Horse Agreement with respect to the Kelly Hamilton Debtor's assets under Section 363 of the Bankruptcy Code.

## ARTICLE 3
## ADDITIONAL COSTS; INDEMNIFICATION

3.1    Additional Costs.  Notwithstanding any conflicting provision of this Agreement to the contrary, if any applicable Legal Requirements shall subject Lender  to any tax, levy, impost, duty, charge, fee, deduction or withholding of any nature with respect to the Loan, this Agreement or any other Loan Document or the payment by Debtors of any amounts payable to Lender with respect to the Loan, this Agreement or any other Loan Document then, and in each such case, Debtors will pay to Lender, within ten (10) days of written notice, such additional amounts sufficient to compensate Lender for such additional tax, levy, impost, duty, charge, fee, deduction or withholding Anything in this paragraph to the contrary notwithstanding, the foregoing provisions of this paragraph shall not apply in the case of any additional tax, levy, impost, duty, charge, fee, deduction or withholding resulting solely from or arising solely as a consequence of any taxes charged upon or by reference to the overall net income, profits or gains of Lender.

3.2    Indemnification of Lender.  Without derogating from any of the other provisions of this Agreement or any other Loan Document, each Debtor hereby absolutely, jointly, severally, and unconditionally agrees to indemnify, protect, defend, release and hold harmless Lender, 3650 REIT Investment Management LLC, any fund or separately-managed account that it manages, 3650 Special Situations Real Estate Investment Trust A LLC and its affiliated entities, The Lynd Group Holdings, LLC, Lynd Management Group LLC, Lynd Acquisitions Group, LLC, LAGSP, LLC, Kelly Hamilton Lender LLC and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns, upon demand by Lender at any time and as often as the occasion therefor may require, against any and all claims, demands, suits, actions, damages, losses, costs, expenses and all other liabilities whatsoever that Lender or any of its respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers,

16

shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns (collectively, the "**Indemnified Parties**") may sustain or incur as a consequence of or relating to (a) any failure by any Debtor to pay any amount payable under this Agreement or any other Loan Document as and when such amount shall first have become due and payable (giving effect, however, to expiration of the period of grace (if any) applicable thereto), or (b) the acceleration of the maturity of any of the Obligations, or (c) any failure by a Debtor to perform or comply with any of the terms and provisions of this Agreement or any other Loan Document to which such Debtor is a party, (d) Borrowers (and any subsidiaries or affiliates), prior loans, mortgages, all avoidance actions under Title 11 of the Bankruptcy Code and the Loan Documents, (e) any matter arising in connection with or related to this Agreement; provided that, no Debtor shall be required to indemnify any Indemnified Party due to any claims, demands, suits, actions, damages, losses, costs, expenses or other liabilities resulting from the gross negligence or willful misconduct of Lender or any of its successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns as determined by a court of competent jurisdiction. The foregoing indemnity shall include, without limitation, any costs and expenses (including reasonable attorneys' fees) incurred in the enforcement of any provisions of this Agreement.

      3.3    <u>Statements by Lender</u>.

A statement signed by an officer of Lender setting forth the amount required to be paid by the Debtors under Section 3.1 or 3.2 of this Agreement shall be submitted by Lender to Debtors in connection with each demand made at any time by Lender under this Section. A claim by Lender may be made before or after any payment to which such claim relates. Each such statement shall, absence of manifest error or bad faith, constitute conclusive evidence of the additional amount required to be paid to Lender.

**ARTICLE 4**
**CONDITIONS PRECEDENT**

      4.1    <u>Conditions to Closing</u>.  Lender shall not be required to consummate the transactions contemplated by this Agreement or to disburse the Initial Advance unless the conditions set forth in this <u>Section 4.1</u> shall have been completed to Lender's reasonable satisfaction. Each Borrower shall have executed this Agreement and the other Loan Documents to which it is a party and shall have delivered the same to Lender, and this Agreement, and other Loan Documents shall be in full force and effect;

      (a)    Each Borrower shall provide a resolution authorizing such Borrower's execution and delivery of this Agreement and the other Loan Documents to which Borrower is a party and its performance of its obligations under this Agreement and the other Loan Documents, and confirming that such resolution is in full force and effect;

      (b)    The Bankruptcy Court shall have entered the Interim Order, which Interim Order shall be in full force and effect and not stayed or subject to appeal and Borrower shall be in compliance in all respects with the Interim Order;

17

(c)    Each Borrower shall have provided Lender with a certificate of its good existence, formation, incorporation, or analogous document and a certificate of good standing;

(d)    Lender shall have received all fees and amounts due and payable by Borrower in accordance with the terms of the Interim Order on or prior to the Closing Date, including reimbursement or payment of all reasonable and documented (in summary form) out-of-pocket fees and expenses required to be reimbursed or paid by such Borrower under the Financing Orders (including reasonable attorneys' fees and expenses of Akerman LLP and McCarter & English LLP, as counsel to Lender);

(e)    Intentionally Omitted;

(f)    Debtors shall have received authority for appointment of the Critical Vendor Real Estate Advisor (as defined in Exhibit A of the Interim Order) as real estate advisors;

(g)    Debtors have received authority to assume all Service Agreements (as defined in Exhibit A of the Interim Order) with Lynd Management Group LLC;

(h)    The HAP contract has been collaterally assigned to the Lender;

(i)    No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases;

(j)    Intentionally Omitted;

(k)    Since the Petition Date, no Material Adverse Effect shall have occurred; and

(l)    Intentionally Omitted.

4.2    <u>Conditions for the Benefit of Lender</u>.  All of the foregoing conditions are imposed for the benefit of Lender. No party other than Lender shall have standing to require the satisfaction of any such conditions, and no party shall be entitled to assume that Lender would refuse to make advances of Loan proceeds if any one or more of such conditions were to remain unfulfilled. No party other than Lender shall be or be deemed to be the beneficiary of any such conditions; any one or more, or all, of such conditions may be waived if Lender shall deem it advisable to do so.

## ARTICLE 5
## GENERAL REPRESENTATIONS AND WARRANTIES

Each Debtor represents and warrants to Lender, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire term of this Agreement, and thereafter, so long as any Obligations remain unpaid and outstanding, that:

5.1    <u>Organization and Existence</u>.

(a)    Subject to any restriction arising on account of each Debtor's status as a "debtor" under the Bankruptcy Code and any required approvals of the Bankruptcy Court, each

18

Debtor (i) is duly organized, validly existing and in good standing as a limited liability company or corporation under the laws of its state of formation or incorporation; (ii) is duly qualified to conduct business and in good standing in each other state in which it conducts its business; (iii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iv) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents, in each case, not subject to the automatic stay under the Chapter 11 Cases or executed after the Petition Date.

(b)     Each Debtor has provided Lender with true, correct and complete copies of its Certificate of Incorporation, Articles/Certificate of Formation or similar organizational document, and Limited Liability Company Agreement, Bylaws or similar organizational document (in each case as amended and/or restated) and all of the exhibits thereto, as amended through the date hereof (collectively, "**Borrowers' Organizational Documents**"). All of Borrowers' Organizational Documents as certified and delivered to Lender are otherwise unmodified and in full force and effect.

5.2     Due Authorization; Non-Contravention.

(a)     Subject to the Financing Orders, the execution and delivery by each Debtor of this Agreement and the other Loan Documents to which such Borrower is a party, the performance by such Borrower of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly authorized by all necessary action on the part of such Borrower and do not and will not (i) contravene any provision of the applicable Borrowers' Organizational Documents; (ii) except those in which consent has been procured, conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any Lien (other than those in favor of Lender pursuant to the Loan Documents) upon any of its property under any material agreement, indenture, mortgage or other instrument to which such Borrower is a party or by which such Borrower is bound or affected; (iii) violate or contravene or constitute a default any provision of any material Legal Requirements (including, without limitation, the Regulations of the Board of Governors of the Federal Reserve System) binding on such Borrower; (iv) contravene or constitute a default under any covenant, indenture or agreement of or affecting such Borrower or any of its property or (iv) except for those that have been procured, require any waivers, consents or approvals by any of the creditors or trustees for creditors of such Borrower.

(b)     Except as to matters that each Borrower has procured, obtained or performed prior to or concurrently with its execution and delivery of this Agreement (including without limitation the Financing Orders), no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required under any provision of any applicable Legal Requirements:

(i)     for such Borrower's execution and delivery of this Agreement and the other Loan Documents to which it is a party or such Borrower's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement; or

19

(ii)     for the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

5.3     <u>Financing Orders; Recoupment / Setoff</u>.  The stipulations of Borrowers in each of the Financing Orders are true, complete and correct in all material respects. None of the Obligations shall be subject to setoff or recoupment or any such rights under section 553 of the Bankruptcy Code or otherwise with respect to any claim any Borrower may have against Lender.

5.4     <u>General</u>.  There are no actions, suits or proceedings pending or, to the actual knowledge of any Borrower, threatened against any Borrower, that could, if determined adversely to such Borrower, reasonably be expected to have a Material Adverse Effect.

5.5     <u>Loan Documents</u>.  On or before the Closing Date and subject to the Financing Orders, each Borrower will have duly executed and delivered each of the Loan Documents to which it is a party and each such Loan Document will be in full force and effect. Each Loan Document to which any Borrower is a party shall constitute the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights and by general principles of equity).

5.6     <u>No Default</u>.  No event has occurred and is continuing, and no condition exists, that constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default. No Borrower has any right to rescind, cancel or terminate this Agreement or any other Loan Document.

5.7     <u>Intentionally Omitted</u>.

5.8     <u>Tax Returns</u>.  Except to the extent Borrower is a disregarded entity and another entity files tax returns on such disregarded entity's behalf, each Borrower has filed all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Agreement (or has been granted extensions with respect to same), and has paid or made reasonable provision, in accordance with applicable laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits). Each Borrower has paid or caused to be paid all real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against such Borrower or its property (other than those presently payable without payment of interest or penalty and those that are subject to contests initiated in good faith and diligently prosecuted and as to which adequate reserves have been provided).

5.9     <u>Business Loan</u>.  The Loan is intended solely for business purposes. Proceeds of the Loan shall be used solely in accordance with the Budget. No proceeds of the Loan shall be used for personal, family or household purposes.

5.10     <u>Locations</u>.  <u>Schedule 5.10</u> includes the surveys which set forth the locations of all real property and improvements thereon owned by any Borrower

5.11     <u>Ownership of Collateral; Encumbrances</u>.  Borrowers own each item of Collateral. Except for Permitted Liens, there are no liens of any nature whatsoever on any property of

20

Borrowers other than Liens permitted hereunder, under the other Loan Documents or under the Financing Orders. Borrowers are not party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a lien on any property of Borrowers (other than liens permitted hereunder or under the Financing Orders) or otherwise result in a violation of the DIP Facility.

5.12    <u>Environmental</u>.  No Borrower has used any Hazardous Materials on, in, under or otherwise affecting any real or personal property now or at any time owned, occupied or operated by any Borrower or upon which any Borrower has a place of business (collectively and severally the "**Property**") in any manner that violates any Environmental Law(s), to the extent that any such violation could reasonably be expected to result in a Material Adverse Effect; and, to the best of any Borrower's knowledge, no prior owner, occupant or operator of any of the Property, or any current or prior owner, occupant or operator thereof, has used any Hazardous Materials on or affecting the Property in any manner that violates any Environmental Law(s), to the extent that any such violation could reasonably be expected to result in a Material Adverse Effect. No Borrower has ever received any notice of any violation of any Environmental Law(s), and to the best of each Borrower's knowledge, there have been no actions commenced or threatened by any party against any Borrower or any of the Property for non-compliance with any Environmental Law(s), that, in any case, could reasonably be expected to result in a Material Adverse Effect.

5.13    <u>Inentionally Omitted</u>

5.14    <u>Names; Assumed Names</u>.   The name and jurisdiction of formation of each Borrower is exactly as set forth in this Agreement. Within the past five (5) years no Borrower has conducted its business under any corporate, trade, assumed or fictitious name. Following the date hereof, no Borrower will conduct its business under any other corporate, trade, assumed or fictitious name, without thirty (30) days' prior written notice to Lender, and execution and delivery of such additional documents as Lender may request.

5.15    <u>Litigation</u>. Except for the Chapter 11 Cases and as specified in the Financing Orders, there is no action, suit or proceeding pending, or to the knowledge of any Borrower threatened in writing, against any Borrower, or before any court, governmental department, administrative agency or instrumentality that, if such action, suit or proceeding were adversely determined, would result in a Material Adverse Effect on the financial position or the results of operations of any Borrower, or their business or their ability to perform their obligations under this Agreement or any Loan Document to which they are a party.

5.16    <u>Existing Indebtedness</u>.  Schedule 5.16(a) sets forth an accurate and complete list as of the Closing Date of the principal amount of all indebtedness for borrowed money of any Borrower. Schedule 5.16(b) sets forth an accurate and complete list as of the Closing Date of all Liens on the property of any Borrower (the "**Prepetition Permitted Prior Liens**").

5.17    <u>Effectiveness</u>.   There are no conditions precedent to the effectiveness of this Agreement that have not been satisfied or waived.

5.18    Investment Company Act.  No Borrower is an "investment company" or an "affiliated person" of, or "promotor" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

5.19    Margin Stock.  No Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. No Borrower will take any action that might cause this Agreement, the other Loan Documents, the Financing Orders or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve System of the United States.

5.20    ERISA.  As of the date hereof, no Borrower has any material liabilities with respect to any (a) Title IV plans, or (b) multiemployer plans. On the date hereof, no ERISA Event has occurred in connection with which material obligations or liabilities of Borrowers are outstanding.

5.21    Complete Information.  None of the representations or warranties made by any Borrower in this Agreement or any documentation delivered in connection herewith as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Borrower in connection with this Agreement or any such documentation (other than any statement which constitutes projections, forward looking statements, budgets, estimates or general market data), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered (it being recognized by Lender that any projections and forecasts provided by Borrowers are based on good faith estimates and assumptions believed by Borrowers to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

5.22    Use of Loan Proceeds.  Each Debtor shall not knowingly transfer any of such Debtor's property and /or cash or other proceeds of the DIP Facility to Moshe "Marc" Silber ("**Silber**"); Frederick Schulman ("**Schulman**"); any professional, attorney, representative, or other agent of Silber, Schulman, or any "relative" (as such term is defined under section 101(45) of the Bankruptcy Code) of either Silber or Schulman; or any "entity" (as such term is defined under section 101(15) of the Bankruptcy Code) that is owned or controlled by Silber, Schulman, or any "affiliate" (as such term is defined under section 101(2) of the Bankruptcy Code) of either Silber or Schulman.

5.23    Security Interest.

(a)    This Agreement and the other Loan Documents, upon execution and delivery thereof by the parties thereto and entry of the Interim Order (and subject to the terms therein), will create in favor of Lender a legal, valid and enforceable security interest in the Collateral described therein and the proceeds thereof, which security interest shall be deemed valid and perfected as of the Closing Date by entry of the Interim Order with respect to each Borrower and that shall constitute continuing Liens on the Collateral pursuant to 364(c(2), (3) and (d), having

22

priority over all other Liens on the Collateral, securing all the Obligations, other than the Carve Out and as otherwise set forth in the Financing Orders. Lender shall not be required to file or record (but shall have the option and authority to file or record) any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the Liens and security interest granted by or pursuant to this Agreement, any other Loan Document or the Financing Orders.

(b)     Pursuant to Section 364(c)(1) of the Bankruptcy Code, the Obligations of Debtors shall at all times constitute allowed senior administrative expenses against each of Borrowers in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 361, 362, 363, 503(b), 506(c) (with any claims arising under Section 506(c) only subject to the entry of the Financing Orders), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other nonconsensual Lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of Borrowers and their estates and all proceeds thereof, subject, as to priority, only to the Carve Out and as otherwise set forth in the Financing Orders (such Obligations, collectively, the "**Superpriority Claims**").

5.24     <u>HAP Contract</u>.  The HAP Contract is in full force and effect.  There is no material default, breach or violation existing thereunder, and, to Debtors' knowledge, no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto. The Debtors shall continue to comply with the terms and conditions of the HAP Contract and shall use best efforts to ensure that the HAP Contract continues in full force and effect and shall promptly cure any breaches or events of default under the same within any notice or cure period provided therein.

5.25     <u>Title</u>.  Kelly Hamilton Debtor has good, marketable, and insurable title to the Property, free and clear of all Liens whatsoever, including mechanics' liens, except for the Permitted Liens and has rights and the power to transfer each item of the Property upon which it purports to grant a Lien under the Security Instrument or any of the other Loan Documents.  Upon proper recordation of the Security Instrument and any related financing statements in the appropriate records, the Security Instrument creates a valid, perfected first-priority Lien on the Property, subject only to Permitted Liens.  There are no claims for payment for work, labor or materials affecting the Property which are or may become Liens prior to, or of equal priority with, the Liens created by the Loan Documents.  None of the Permitted Liens, individually or in the aggregate, materially interferes with the benefits of the security intended to be provided by the Security Instrument and this Agreement, materially and adversely affects the value of the Property, impairs the use or operations of the Property or impairs Borrower's ability to pay their obligations in a timely manner.

## ARTICLE 6
## COVENANTS OF BORROWERS

Each Borrower covenants with and warrants to Lender that until all of the Obligations are paid and satisfied in full, such Borrower shall comply with, observe, perform or fulfill all of the covenants set forth in this Article 6, unless Lender shall have otherwise consented in writing.

6.1    Financial Statements and Reports.

(a)    Each Borrower shall keep complete and accurate books and records, in accordance with GAAP, consistently applied at all times during the pendency of the Loan, and shall permit Lender and its representatives to examine and make copies of the same at any reasonable time during business hours and upon reasonable prior notice.

(b)    Simultaneously with the submission of Monthly Operating Reports to the U.S. Trustee, each Borrower shall provide a copy of the same to the Lender.

(c)    After entry of the Interim Order, the Debtors shall provide to the Lender, as soon as available but no later than 5:00 p.m. Eastern Time on the last Friday of the rolling two-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date, (iii) projections for the following nine weeks, including a rolling cash receipts and disbursements forecast for such period and (iv) such other information requested from time to time by DIP Lender.

(d)    Intentionally Omitted.

(e)    Within thirty (30) days after the end of each fiscal quarter, The Financial Officer shall deliver to Lender a covenant compliance certificate in the form attached hereto as Exhibit A, certified by the Financial Officer or another officer of such entity which is approved in writing by Lender stating that except for any Event of Default specifically described therein, no Event of Default has occurred and/or is continuing.

(f)    Intentionally Omitted.

(g)    Borrowers shall, promptly upon receipt, provide Lender with copies of any detailed audit reports, management letters or recommendations submitted to Borrowers by auditors in connection with the accounts or books of Borrowers or any audit of Borrowers.

(h)    Borrowers shall promptly notify Lender of each of the following (and in no event later than five (5) Business Days after an officer of Borrowers becomes aware thereof):

(i)    the commencement of, or any material development in, any litigation or proceeding affecting Borrowers;

(ii)    any ERISA Events that have occurred, could reasonably be expected to result in liability of Borrowers and their Subsidiaries in an aggregate amount exceeding $10,000;

(iii)    receipt of written notice of any governmental investigation or any litigation or proceeding commenced or threatened in writing against Borrowers that (i) seeks damages in excess of $10,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any benefit plan, its fiduciaries, or its assets, (iv) alleges criminal conduct by Borrowers;

(iv)    alleges the violation, in any material respect, of any law regarding, or seeks remedies in connection with any Environmental Laws, or (vi) contests any tax, fee, assessment or other governmental charge in excess of $30,000; or

(v)    the occurrence of any Event of Default or event which with the giving of notice or lapse of time or both would be an Event of Default.

(i)    Intentionally Omitted.

(j)    At least three (3) Business Days in advance of filing with the Bankruptcy Court of any document, motion or pleading relating to or impacting (i) any rights or remedies of Lender, (ii) the Financing Orders, the Loan Documents, (iii) the Collateral, any Liens thereon or any Superpriority Claims (including, without limitation, any sale or other disposition of Collateral outside the ordinary course of business or the priority of any such Liens or Superpriority Claims), (iv) use of cash collateral, (v) debtor-in-possession financing, (vi) reserved, (vii) any Chapter 11 Plan, (viii) any sale under section 363 of the Bankruptcy Code, or (ix) any transaction outside of the ordinary course of business, Debtors shall provide Lender with a copy of all such documents and a reasonable opportunity to review and comment on all such documents.

(k)    Subject to any confidentiality requirements, Borrowers shall promptly deliver to Lender any and all material documentation received after the Closing Date that constitutes a written, bona fide solicitation, offer, or proposed sale or disposition of a material amount of property of any of Borrowers' estates actually received by a Responsible Officer of a Borrower or its counsel or financial advisor, including, without limitation, letters of inquiry, solicitations, letters of intent, or asset purchase agreements.

(l)    Each Borrower will furnish such other information regarding its financial matters as Lender may reasonably request promptly after Lender's request therefor.

6.2    <u>Chapter 11 Plan</u>.  Borrowers shall file no later than June 30, 2025, a Disclosure Statement and a Chapter 11 Plan to effectuate a Kelly Hamilton Restructuring Transaction as set forth in that Term Sheet dated May 26, 2025, under a schedule to obtain Bankruptcy Court confirmation of that Chapter 11 Plan not later than August 29, 2025.

6.3    <u>Intentionally Omitted</u>.

6.4    <u>Borrowers' Existence</u>.  Each Borrower shall preserve and maintain its existence and all of its rights, franchises and privileges.

25

6.5     Compliance with Legal Requirements.  Borrowers shall comply in all material respects with all applicable Legal Requirements, and will promptly notify Lender in the event that any Borrower receives any notice, claim or demand from any Governmental Authority asserting the violation of any applicable Legal Requirement which could reasonably be expected to have a Material Adverse Effect upon any Borrower. Any Borrower may contest the propriety or the applicability of any Legal Requirement, provided (a) that the Financial Officer shall provide Lender with written notice of such contest; (b) that there shall then be no uncured Event of Default; (c) that such contest shall be initiated in good faith in accordance with the appropriate legal or administrative procedure therefor and diligently prosecuted to a timely completion; (d) that such contest shall not, in Lender's judgment, jeopardize the security for the Loan or any portion of such Borrower's assets to imminent risk of loss or forfeiture; and (e) Borrowers shall indemnify Lender from and against any and all  liability, loss, cost, damage and expense that may be  incurred by or asserted against such party in connection with or arising from such contest except for any liability, loss, cost, damage or expense resulting due to the gross negligence or willful misconduct of Lender.

6.6     Notice of Litigation & Acceleration.  Debtors shall furnish or cause to be furnished to Lender within five (5) Business Days after any Debtor shall have first become aware of the same via written notice, a written notice identifying, and describing Debtors' proposed response to (a) the commencement or institution of any legal or administrative action, suit, proceeding or investigation by or against any Debtor in or before any Governmental Authority, in each case which could reasonably be expected to have a Material Adverse Effect, or (b) acceleration of any outstanding indebtedness for borrowed money of any Borrower.

6.7     Notice of Other Events.

(a)     If (and on each occasion that) any Event of Default shall occur, Debtors shall, promptly after any Debtor becoming aware of the same, furnish Lender with a written notice specifying the nature of such Event of Default and describing Debtors' proposed response thereto.

(b)     Immediately upon any Borrower first becoming aware of any of the following occurrences, Debtor will notify Lender in writing of: (i) the rescission, cancellation or termination of, or the occurrence of a breach, default or event of default under or with respect to any material agreement or contract to which any Borrower is a party; or (ii) any events of default under any material agreement of any Borrower or any material violations of any applicable Legal Requirements.

6.8     Payment of Taxes and Other Claims.  Subject to the Budget, each Borrower shall pay and discharge promptly before interest and penalties accrue, all taxes, assessments and other governmental charges or levies at any time imposed upon it or upon its income, revenues or property, as well as all claims of any kind (including claims for labor, material or supplies) that, if unpaid, might by applicable Legal Requirements reasonably be expected to become a Lien upon all or any part of its income, revenues or property other than Permitted Liens, to the extent that payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases.

6.9     Payment of Obligations.  Borrowers will duly and punctually pay or cause to be paid the Obligations under this Agreement.

26

6.10    <u>Governmental Consents and Approvals</u>.

(a)    Each Borrower will obtain all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any Governmental Authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable Legal Requirement:

(i)    for the performance by such Borrower of any of its agreements or obligations under this Agreement or any other Loan Document to which it is a party or for the payment by such Borrower to Lender at its Head Office of any sums that shall become due and payable by such Borrower thereunder;

(ii)    to ensure the continuing legality, validity, binding effect or enforceability of this Agreement and any other Loan Document;

(iii)    to continue the proper operation of the business and operations of such Borrower.

6.11    <u>Intentionally Omitted</u>.

6.12    <u>Further Assurances; Maintenance of Liens</u>.

(a)    Borrowers shall execute and deliver, or cause to be executed and delivered, such agreements, documents and instruments in furtherance of this Agreement, the other Loan Documents and the Financing Orders as Lender may from time to time reasonably request (i) to carry out more effectively the purposes of this Agreement, the other Loan Documents and the Financing Orders, (ii) to subject to the liens created hereby any of the Collateral, (iii) to perfect and maintain the validity, effectiveness and priority of the Liens created hereby and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to Lender the rights granted or now or hereafter intended to be granted to Lender under this Agreement, the other Loan Documents and the Financing Orders. Borrowers shall maintain the security interest created  under the Loan Documents as a perfected security interest having at least the priority required hereby and defend such security interest against all other claims and demands.

(b)    Pursuant to the terms of the Financing Orders, no filings or other action (including the taking of possession or control) will be necessary to perfect or protect the Liens and security interests created pursuant to this Agreement, the Financing Orders or any other Security Agreement. Upon entry by the Bankruptcy Court, the Liens and security interests created by the Financing Orders shall automatically constitute fully perfected first priority Liens on, and security interests in, all right, title and interest of Borrowers in the Collateral covered thereby (including after-acquired Collateral), in each case free of all Liens other than Permitted Liens, and prior and superior to all other Liens other than as provided in the Financing Orders. Notwithstanding the foregoing, upon the reasonable request of Lender, Borrowers and each of their Subsidiaries shall take any additional actions requested, with respect to any property of Borrowers, in each case constituting Collateral, to cause such property to be subject to a Lien pursuant to the Financing Orders or any Security Agreement or to evidence the Lien on such property, including to execute

27

and deliver such security documents (in proper form for filing, registration or recordation, as applicable) as are requested by Lender, and take such actions necessary or advisable to subject such property to a Lien or evidence of the Lien on such property pursuant to the Financing Orders or any Security Agreement.

6.13    <u>Use of Proceeds</u>.

(a)    The proceeds of the Loan and the Cash Collateral shall be used solely in accordance with the Budget, including without limitation to pay off the existing Prepetition Loan Obligations secured by the Kelly Hamilton Property, to pay Kelly Hamilton Debtor's ordinary course operating expenses (including any expenses created to bring residential units back online and critical/life safety issues at the Kelly Hamilton Property).

(b)    The proceeds of the Loan may not be used for any other purpose, including but not limited to personal, family or household purposes.  Unless previously set forth in the Budget, no portion of the proceeds of the Loan or any cash collateral subject to the liens of Lender may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (a) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of Debtors owing to Lender, or (b) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of Lender with respect thereto; provided, notwithstanding anything to the contrary herein, no more than an aggregate of $25,000 of the Carve-Out may be used by the Committee to investigate the matters described in the foregoing clauses (a) and (b) prior to the date of the hearing to approve the Sale Transaction.  Collateral shall not be used to commence any action against Lender, Kelly Hamilton Lender LLC, The Lynde Group Holdings, LLC, Lynd Management Group LLC, Lynd Acquisitions Group, LLC LAGSP, LLC or their Affiliates, employees, directors, officers or principals.

(c)    No Borrower shall knowingly transfer any cash or other proceeds of the DIP Facility to Silber, Schulman, any professional attorney, representative, or other agent of Silber, Schulman or any "relative" (as such term is defined under Section 101(45) of the Bankruptcy Code) of either Silber or Schulman or any "entity" (as such term is defined under Section 101(15) of the Bankruptcy Code) that is owned or controlled by Silber, Schulman or any "affiliate" (as defined under Section 101(2) of the Bankruptcy Code) of either Silber or Schulman.

(d)    As soon as reasonably practicable following entry of the Interim Order, Borrowers shall cause the Chief Restructuring Officer (to the extent in her possession) or any other counsel or advisor engaged by or on behalf of Borrowers to provide any information reasonably requested by the United States of America regarding: (i) the projected uses of the DIP Facility (including any payments or other transfer to any Borrower or any non-Borrower affiliate); or (ii) any potential violation of federal criminal law involving Silber or Schulman.

(e)    Notwithstanding anything to the contrary in the Interim Order or this Agreement, the foregoing shall not prohibit, restrict or otherwise affect (or be deemed to prohibit, restrict or otherwise affect) Borrowers from making any payment or other transfer contemplated by the Budget or that is otherwise approved by the Bankruptcy Court after notice and a hearing (in all cases subject to Lender's consent and the limitations provided in the Budget), including, without

limitation,: (i) any payments or other transfer by Borrowers or on behalf of any professional retained by (or proposed to be retained by Borrowers or any non-Borrower affiliate), including, without limitation, White & Case, LLP (in its capacity as counsel to Borrowers and certain non-Borrower affiliates), IslandDundon, LLC (in its capacity as financial advisor to Borrowers and certain non-Borrower affiliates), LAGSP, LLC and Lynd Management Group LLC (in their capacity as property manager and asset manager to Borrowers and certain non-Borrower affiliates), or Verita Global (in its capacity as noticing and claims agent to Borrowers); (ii) Elizabeth A. LaPuma (in her capacity as independent fiduciary); (iii) the United States Trustee; or (iv) Lender or any affiliate thereof, including counsel to Lender and LAGSP, LLC or any of their respective designated affiliates.

      6.14   <u>Environmental Matters</u>.

      (a)   Each Borrower shall timely comply, and shall cause each of its Affiliates to timely comply, in all material respects with all applicable Environmental Laws.

      (b)   Each Borrower shall provide to Lender, immediately upon receipt, copies of any correspondence, notice, pleading, citation, indictment, complaint, order, decree, or other document from any source asserting or alleging a circumstance or condition that requires or may reasonably be expected to require a material financial contribution by such Borrower or any of its Affiliates or a cleanup, removal, remedial action, or other response by or on the part of such Borrower or any of its Affiliates under applicable Environmental Laws or which seeks material damages or civil, criminal or punitive penalties from such Borrower or any of its Affiliates for an alleged violation of Environmental Laws.

      (c)   Each Borrower shall promptly notify Lender in writing as soon as it becomes aware of any condition or circumstance which makes the environmental warranties contained in this Agreement incomplete or inaccurate in any material respect as of any date.

      (d)   Each Borrower hereby indemnifies, saves and holds Lender and each of its past, present and future officers, directors, managers, shareholders, members, employees, representatives and consultants harmless from any and all loss, damages, suits, penalties, costs, liabilities and expenses (including but not limited to reasonable investigation, environmental audit(s), and legal expenses) arising out of any claim, loss or damage of any property, injuries to or death of persons, contamination of or adverse effects on the environment, or any violation of any applicable Environmental Laws, caused by or in any way related to any property owned, leased or operated by such Borrower, or due to any acts of such Borrower, or any of its Affiliates or any of their officers, directors, shareholders, employees, consultants and/or representatives. In no event shall any Borrower be liable hereunder for any loss, damages, suits, penalties, costs, liabilities or expenses (i) arising from any act of gross negligence or willful misconduct of Lender, or its agents or employees or (ii) arising from any action taken by Lender while it is in sole possession of any such property.

      (e)   Each Borrower has and shall maintain all permits, licenses and approvals required under applicable Environmental Laws.

(f)     Each Borrower shall promptly conduct and complete, at such Borrower's expense, all such investigations, studies, samplings and testings as may be reasonably requested by Lender or any Governmental Authority relative to any Hazardous Material at or affecting any property or any facility owned, leased or used by such Borrower.

(g)     The provisions of this Section 6.14 shall survive the repayment of the Loan and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the assets of any Borrower, whether by foreclosure or otherwise.

6.15     Acquisition of Margin Securities.  No Borrower shall use the proceeds of the Loan to purchase or acquire (or enter into any contract to purchase or acquire) any "margin security" as defined by any regulation of the Federal Reserve Board as now in effect or as the same may hereafter be in effect.

6.16     Payment of Claims; Encumbrances.  Each Borrower shall (a) keep the Collateral free of any Lien, encumbrance, charge or claim (other than the Permitted Liens and except for the Liens arising under the Loan Documents); and (b) other than Permitted Liens, not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any Lien to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof.

6.17     Borrowers' Organizational Documents; Name Changes.  No Borrower shall modify, amend or terminate any of Borrowers' Organizational Documents (including, without limitation, to change its name), or permit any of Borrowers' Organizational Documents to be modified, amended or terminated (including, without limitation, to change its name) which materially and adversely affect the rights and remedies of Lender (and provided that such modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of this Agreement), without the prior written consent of Lender. Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Event of Default at the time of such Borrower's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of this Agreement. No Borrower shall appoint or permit the appointment of any officer, director or manager without the prior written consent of Lender.

6.18     Prohibition of Assignments, Transfers and Encumbrances.  No Borrower shall, directly or indirectly (a) except in the ordinary course of business, sell, transfer, lease or otherwise dispose of all or any portion of its assets or any interest therein, or seek authority of the Bankruptcy Court to do any of the foregoing, without the prior written consent of Lender; (b) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any Lien upon or affecting the Collateral; (c) assign, transfer or encumber any interest of any Borrower under this Agreement or under any other Loan Document, or delegate any of any Borrower's duties or obligations hereunder or thereunder; make any material change in its capital structure except as expressly permitted herein; (e) change its name without providing 30 days' prior written notice to

30

Lender, or consolidate with or merge into any other Person or permit any other Person to merge into it (except where a Borrower is the surviving entity); (f) or enter into any sale-leaseback transaction.

6.19    <u>Prohibition of Other Indebtedness</u>.  Without Lender's prior written consent, which may be withheld or conditioned in Lender's sole discretion, no Borrower shall directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible.

6.20    <u>Loans, Acquisitions, Guaranties, Affiliate Transactions</u>.   No Borrower shall, directly or indirectly, (a) make any loan, investment, advance or extension of credit to any Person, (b) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (c) incur any obligation as surety or guarantor, other than in the ordinary course of business, (d) enter into any transaction with an Affiliate that is not on terms and conditions as favorable to such Borrower as would be obtainable in a transaction with a Person that is not an Affiliate or (e) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

6.21    <u>Dividends; Distributions</u>.  Without the prior written consent of Lender and the Bankruptcy Court, no Borrower shall (a) make any transfers of cash or other property to any Persons that are not Borrowers hereunder or (b) pay any Dividends on its Capital Securities.

6.22    <u>Expenses; Taxes; Indemnity</u>.

(a)    Borrowers hereby agree to pay all reasonable and documented professional fees and out-of-pocket expenses incurred by Lender in connection with the establishment of the DIP Facility, including, without limitation, the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, but not limited to, the fees and expenses of Lender's counsel), and including expenses incurred in connection with defending the validity and enforceability of Obligations or any of the liens or adequate protection securing the same, shall be promptly paid by Borrowers on no less than a monthly basis.

(b)    Borrowers hereby agree to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and each Borrower agrees to save Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions. All payments of the Loan shall be made by Borrowers to Lender free and clear of and without deduction or withholding for or on account of any taxes whatsoever, withholdings or other deductions. If any taxes are required to be withheld or paid, then Borrowers shall pay such taxes to the applicable Governmental Authority and Borrowers shall send the original or a certified copy of the receipt evidencing such tax payment, within five (5) Business Days of its receipt of the same. Borrowers shall pay and indemnify and hold Lender

31

harmless from and against, any taxes that may at any time be asserted in respect of the Loan, unless resulting from the gross negligence or willful misconduct of Lender as determined by final and non appealable judgment of a court of competent jurisdiction.

(c)     Borrowers hereby agree that Lender shall have no liability for, and to reimburse and indemnify the Indemnified Parties from and against, any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby including, without limitation, with respect to any Hazardous Materials or a violation of Environmental Laws, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as finally determined by a court of competent jurisdiction.

(d)     All out-of-pocket costs and expenses of Lender relating to the DIP Facility and the Chapter 11 Case,  including without limitation, prepetition and post-petition reasonable and documented fees, costs, expenses and disbursements of Akerman LLP and McCarter & English LLP, as counsel to Lender, and Island Dundon, as financial advisors to Lender, and as necessary, other counsel and advisors (collectively, the "**DIP Professionals**"), shall be payable by Borrowers promptly upon written demand without reference to the Budget, subject to the Financing Orders, including any notice and objection procedures set forth therein.

(e)     This Section 6.22 shall survive the repayment of the Obligations (and the termination of all commitments hereunder), any foreclosure under, or any modification, release or discharge of, or termination of, this Agreement and the other Loan Documents.

6.23    Pension or Profit Sharing Plans. No Borrower shall allow any fact, condition or event to occur or exist with respect to any employee pension or profit sharing plan established or maintained by such Borrower which might reasonably be expected to constitute grounds for termination of any such plan or for the court appointment of a trustee to administer any such plan; or permit any such plan to be the subject of termination proceedings (whether voluntary or involuntary) which may reasonably be expected to result in a liability of such Borrower to the PBGC which, in the reasonable opinion of Lender, could reasonably be expected to have a Material Adverse Effect.

6.24    Field Audits. Each Borrower agrees that Lender may conduct audits of such Borrower and its operations, the results of which shall be reasonably satisfactory to Lender, and the costs of which shall be paid by Borrowers. Such audits will be conducted no more than one (1) time per calendar year absent an Event of Default. Lender may conduct a field examination of the Collateral at Borrowers' expense (such expense not to exceed $15,000), no more than one (1) time per year absent an Event of Default.

6.25    Collateral. Borrowers shall maintain in good working order all material Properties used in the business of Borrowers (other than ordinary wear and tear, casualty and condemnation and to the extent not causing a material adverse effect), as and to the extent in good working order as of the Petition Date.

6.26    Change in Control. No Borrower shall consummate a Change in Control.

6.27    Qualified Estate Litigation Assets Transaction.

(a)    Following the Petition Date, Borrowers shall have the right to solicit proposals from litigation financing investors with respect to any claims or causes of action held by Borrowers against any person or entity (other than any Indemnified Party), including, for the avoidance of any doubt, the Estate Litigation Assets.

(b)    Lender shall be entitled to submit a proposal to provide financing to Borrowers with respect to the Estate Litigation Assets and Borrowers shall consider any such proposal in good faith.  Borrowers shall, and shall cause their professionals to provide, reasonable information and updates if requested by Lender regarding Borrowers' efforts to obtain financing with respect to the Estate Litigation Assets.

(c)    Provided that the steering committee of certain holders of notes issued by Crown Capital Holdings LLC that is represented by Faegre Drinker Biddle & Reath LLP (the "**Steering Committee of Noteholders**") does not object to the DIP Facility or the transactions contemplated thereby and executes a general Release in favor of Lender, Lender shall be deemed to agree to release any liens securing the DIP Facility with respect to the Estate Litigation Assets (i) if Borrowers obtain approval by the Bankruptcy Court to enter into a financing transaction with respect to the Estate Litigation Assets (a "**Qualified Estate Litigation Assets Transaction**"); or (ii) if Borrowers transfer the Estate Litigation Assets to a trust or other entity established under the Chapter 11 Plan for the benefit of Borrowers unsecured creditors (the "**Creditor Recovery Trust**").

(d)    No portion of the DIP Facility shall be used to fund the Creditor Recovery Trust.

(e)    Borrowers shall have the sole and exclusive right to determine the terms and conditions of the Creditor Recovery Trust, including the identity and compensation of any fiduciary appointed under the Chapter 11 Plan to administer the Creditor Recovery Trust, and the priority of distributions from the Creditor Recovery Trust to Borrowers' unsecured creditors, including whether to subordinate any such distributions to the payment of any fees, expenses, and costs of Borrowers' counsel, Borrowers' financial advisor, and counsel to the Steering Committee of Noteholders, in each case, to the extent that any such fees, expenses, and costs are not paid in full in cash as of the effective date of the Chapter 11 Plan.

(f)    Notwithstanding anything in this Agreement to the contrary, and for the avoidance of any doubt, as material consideration for Lender's commitment to provide the DIP Facility as provided under this Agreement, Borrowers and Lender agree that:

ME1\53156050.v2
81162026;6

(i)    the Estate Litigation Assets shall not include any claims or causes of action under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law against any Indemnified Party;

(ii)    Borrowers shall not transfer or seek to transfer any claims or causes of action against an Indemnified Paty under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law, to the Creditor Recovery Trust; and

(iii)    all claims or causes of action under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law against any Indemnified Party shall constitute and remain Lender's Collateral for purposes of the DIP Facility.

6.28    <u>Intentionally Omitted</u>.

6.29    <u>Additional Subsidiaries</u>. No Borrower shall create or acquire any Subsidiary after the Closing Date without the prior written consent of Lender.

6.30    <u>Intentionally Omitted</u>.

6.31    <u>Bankruptcy Court Filings</u>.  As soon as practicable in advance of filing with the Bankruptcy Court, Borrowers shall furnish Lender for its review and approval in its sole discretion:

(a)    the motion seeking approval of any proposed form of Final Order, which motion shall be in form and substance reasonably satisfactory to Lender;

(b)    as applicable, any motions seeking approval of bidding procedures and any Section 363 sale, and the proposed forms of orders related thereto, which shall be in form and substance reasonably satisfactory to Lender;

(c)    any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive, retention or severance plan, and/or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance reasonably satisfactory to Lender); and

(d)    any Disclosure Statement or Plan of Reorganization.

6.32    <u>Inspection</u>. Borrowers shall permit Lender and its representatives and designees to visit and inspect the properties, books and records of Borrowers upon reasonable notice; *provided* that no disclosure of information by Borrowers to Lender in connection with any such inspection shall be required to the extent that such disclosure would result in the breach of any confidentiality obligations to which Borrowers are subject or if such disclosure would compromise attorney-client privilege or require the disclosure of attorney work product.

6.33    <u>Budget</u>.

(a)    Commencing on August 31, 2025 (pursuant to the Interim Order) for the 13-week period ending November 30, 2025 and continuing no less frequently than every four weeks thereafter (and if such date is not a Business Day, the following Business Day), Borrowers

34

shall furnish to Lender a supplement to the initial Budget, updating and/or extending the period covered by the initial Budget (or the previously supplemented Budget) so that it covers at least the period ending 13 weeks from the week in which the supplement is delivered. Such supplemental Budgets shall be subject to Lender's approval in its sole and absolute discretion, in consultation with the Committee, and without further order of the Bankruptcy Court. The approved Budget shall remain the Budget in effect with respect to the period covered by such Budget until such time as Lender approves such supplemental Budget.

(b)     Borrowers shall not make or commit to make any payments other than those identified in the Budget. Borrowers shall not permit aggregate expenditures under the Budget to exceed one hundred and fifteen percent (115%) of the total budgeted expenses or aggregate cash receipts under the Budget to be less than eighty-five percent (85%) of the total budgeted cash receipts, in each case calculated on a rolling two-week basis commencing as of the Petition Date, with the first such testing to begin two weeks after the Petition Date; *provided* that the cash disbursements considered for determining compliance with this covenant shall exclude disbursements in respect of (x) restructuring professional fees and expenses and (y) restructuring charges arising on account of the Chapter 11 Cases, including payments made to vendors that qualify as "Critical Vendors" and interest due under the existing mortgage on the Collateral.

(c)     Subject to the provisions of this Agreement, budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of Borrowers, in which event, the Budget shall be deemed so amended for the purpose of calculating variances.

(d)     Borrowers shall provide to Lender such other financial and operational reporting as reasonably requested by Lender from time to time.

6.34   <u>Single Purpose Entity</u>.  Each Borrower is and has at all times since its formation been a Single Purpose Entity.  In addition, each Borrower agrees that in no event shall such Borrower modify, during the term of the Loan, its organizational documents with respect to such status as a Single Purpose Entity.

6.35   <u>Intentionally Omitted</u>.

6.36   <u>Intentionally Omitted</u>.

6.37   <u>Negative Covenants</u>. So long as any amount remains due and outstanding under the DIP Facility, Borrowers shall not, nor shall they permit any of their Affiliates to, do any of the following:

(a)     without the prior written consent of Lender, take any action that could restrain, prevent or otherwise impose adverse conditions on the DIP Facility and the actions contemplated thereby;

(b)     incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred consistent with the Budget, any other indebtedness permitted to be incurred by (and with the prior written consent of) Lender and the Bankruptcy Court, and any unsecured obligations incurred in the ordinary course of business by Borrowers);

(c)    incur any liens (other than the Permitted Liens, liens securing indebtedness required or permitted by the DIP Facility to be secured, other liens permitted (with prior written consent) by Lender, and customary nonconsensual liens);

(d)    make any investments in any other person or make any loan to any other person (other than investments contemplated by and consistent with the Budget, intercompany loans made with the proceeds of Loans that are evidenced by promissory notes pledged to Lender to secure the Obligations on a first- priority basis, other investments permitted (with prior written consent) by Lender);

(e)    engage in any business other than the business engaged in by Borrowers on the Petition Date and other business activities that are reasonably related or ancillary to the foregoing or otherwise permitted (with prior written consent) by Lender;

(f)    sell or transfer any assets outside the ordinary course of business, unless such sale or transfer results in the indefeasible payment in full in cash of the Obligations (other than dispositions permitted (with prior written consent) by Lender);

(g)    directly or indirectly, by operation of law or otherwise, acquire any material assets or equity interests of another person, merge, consolidate or dissolve (other than acquisitions of assets contemplated by and consistent with the Budget or permitted (with prior written consent) by Lender);

(h)    terminate or make any modification to the capital structure or any organizational documents of any Borrower that would be adverse to Lender in any respect or restraining, prohibiting or imposing material and adverse conditions upon the DIP Facility;

(i)    engage in any transactions with affiliates, except as set forth in the Budget, transactions in the ordinary course of business upon fair and reasonable terms no less favorable to Borrowers and their Subsidiaries than would be obtained in a comparable arm's length transaction with a non-affiliate or otherwise as permitted (with prior written consent) by Lender;

(j)    use the Collateral (including the Cash Collateral) except as set forth in the Financing Orders or the DIP Facility;

(k)    amend any of the Financing Orders or any Bankruptcy Court order relating to cash management or the Budget without the prior written consent of Lender in its sole and absolute discretion;

(l)    agree to entry of any order precluding or modifying Lender's rights to credit bid up to the full amount of the outstanding Obligations for Borrowers' assets;

(m)    consent to the granting of adequate protection payments or liens, super priority administrative expense claims or liens having priority senior to or pari passu with those granted to Lender, except as otherwise expressly permitted by the DIP Facility;

(n)    reserved;

36

(o)     make any dividends or other distributions on account of the capital stock of Borrowers or their Subsidiaries (other than ordinary course tax distributions and corporate overhead expenses in accordance with the Budget and other dividends or distributions permitted (with prior written consent) by Lender); or

(p)     except upon 30 days' prior written notice to Lender and delivery to Lender of all additional financing statements and other documents reasonably requested by Lender as to the validity, perfection and priority of the security interests provided for herein, with respect to any Borrower: (i) change the location of its chief executive office from that specified on the signature pages hereto or in any subsequent notice delivered pursuant to this provision; or (ii) change its name, jurisdiction of incorporation or organization, identity, federal employer identity identification number, organizational identification number or corporate structure.

Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, if any provision of any Loan Document conflicts with the provisions contained in this Section 6.37, this Section 6.37 shall control in all respects and for all purposes.

## ARTICLE 7
## RESERVES AND CASH MANAGEMENT

7.1     Reserves.  The following reserves (together with any other reserves or escrows required  under the Loan Documents, each a "**Reserve**" and collectively, the "**Reserves**") shall be required in connection with the Loan:

(a)     Servicing Reserve. As part of the Initial Advance, Lender shall fund an amount equal to $45,000 into a reserve held by or on behalf of Lender (the "**Servicing Reserve Account**") for the Servicing Fee due on a monthly basis. So long as no Event of Default is continuing, Lender shall apply funds from the Servicing Reserve Account to the payment of all Servicing Fees due and payable on the Loan. For avoidance of doubt, Borrowers shall be obligated to pay the Servicing Fee, when due, whether or not the amount on deposit and available in the Servicing Reserve Account is available or sufficient to pay such Servicing Fee. If at any time Lender reasonably determines that the amounts on deposit in the Servicing Reserve Account will not be sufficient to pay the Servicing Fee through the Maturity Date, Lender shall notify Borrowers and Borrowers will deposit with or on behalf of Lender the amount of such insufficiency within five (5) Business Days after its receipt of such notice from Lender. Other deposits by Borrower into the Servicing Reserve Account shall be made to the extent required by this Agreement.

(b)     Interest Reserve. As part of the Initial Advance, Lender shall fund an amount equal to $370,252 into a reserve held by or on behalf of Lender (the "**Interest Reserve Account**") for the interest due on a monthly basis. So long as no Default exists and no Event of Default is continuing, Lender shall apply funds from the Interest Reserve Account to the payment of all Interest due and payable on the Loan. For avoidance of doubt, Borrowers shall be obligated to pay Interest, when due, whether or not the amount on deposit and available in the Interest Reserve Account is available or sufficient to pay such Interest. If at any time Lender reasonably determines that the amounts on deposit in the Interest Reserve Account will not be sufficient to pay Interest through the Maturity Date, Lender shall notify Borrowers and Borrowers will deposit with or on behalf of Lender the amount of such insufficiency within five (5) Business Days after

its receipt of such notice from Lender. Other deposits by Borrowers into the Interest Reserve Account shall be made to the extent required by this Agreement.

(c)    Tax and Insurance Reserve.  At Closing, Lender shall establish a reserve held by or on behalf of Lender (the "**Tax and Insurance Reserve**") for (i) Property Taxes anticipated to come due through the end of 2025 and (ii) Insurance Premiums.  On each payment date, Borrowers shall fund into the Tax and Insurance Reserve an amount that Lender determines is necessary in order to accumulate sufficient funds to pay all such Property Taxes and Insurance Premiums required hereby at least thirty (30) days prior to their respective due dates (*i.e.*, one-twelfth (1/12) of the estimated annual Property Taxes and Insurance Premiums) (the "**Monthly Tax and Insurance Deposit**").  With respect to the Insurance Premiums, Borrowers shall be required to provide evidence to Lender by no later than the yearly anniversary of the Effective Date that Borrowers have paid the Insurance Premiums for the following twelve (12)-month period.  Borrowers shall furnish Lender with bills for the Property Taxes and Insurance Premiums for which Tax and Insurance Reserve funds are required at least thirty (30) days prior to the date on which such Property Taxes or Insurance Premiums become due.  So long as (i) no Event of Default is continuing, (ii) the amount on deposit in the Tax and Insurance Reserve is sufficient to pay such Property Taxes and Insurance Premiums, and (iii) Lender has received a bill for such Property Taxes and Insurance Premiums (if applicable) from Borrower, Lender shall pay (or provide Borrower with funds from the Tax and Insurance Reserve to pay) such Property Taxes and Insurance Premiums (if applicable).  Borrowers shall be required to pay Property Taxes in accordance with Section 6.8 and Insurance Premiums regardless of whether amounts on deposit in the Tax and Insurance Reserve are sufficient or available to pay such Property Taxes and Insurance Premiums.  If at any time Lender reasonably determines that the amounts on deposit in the Tax and Insurance Reserve will not be sufficient to pay the Property Taxes and such Insurance Premiums, Lender shall notify Borrowers and Borrowers will deposit with or on behalf of Lender the amount of such insufficiency within five (5) Business Days after its receipt of such notice from Lender.

(d)    CapEx Reserve.

(i)    As part of the Initial Advance, Lender shall fund an amount equal to $1,300,000 into a reserve held by or on behalf of Lender (the "**CapEx Reserve**") for the replacements and repairs required to be made to the Property during the term of the Loan (collectively, the "**Replacements**") and working capital.  Amounts deposited pursuant to this Section 7.1(d) are referred to herein as the "**CapEx Reserve Funds.**"

(ii)    Lender shall disburse to Borrowers the CapEx Reserve Funds only for Replacements upon satisfaction of each of the following conditions: (i) Borrowers shall submit a request for payment to Lender at least five (5) Business Days prior to the date on which Borrowers request such payment be made, which request shall specify the Replacements to be made using the CapEx Reserve Funds being requested; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall be continuing, (iii) Lender shall have received a certificate from Borrowers (A) stating that the items to be funded by the requested disbursement are Replacements, (B) stating that the Replacements to be funded by the requested disbursement have been completed (or completed to the extent of the requested

38

disbursement) in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the Replacements, (C) identifying each Person that supplied materials or labor in connection with the Replacements to be funded by the requested disbursement, and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment reasonably satisfactory to Lender; (iv) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances other than Permitted Liens; (v) at Lender's option, if the cost of any individual Replacement exceeds $25,000.00 or is structural in nature, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the required repairs; provided, however, that if Borrowers are required to generate such a report in connection with the issuance of any building permit for the construction or installation of the Replacement, Borrowers shall also provide such report to Lender upon request; (vi) Borrowers shall have paid any actual out of pocket costs incurred by Lender or Servicer, if applicable, and (vii) Lender shall have received such other evidence as Lender shall reasonably request that the Replacements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrowers. Lender shall not be required to disburse CapEx Reserve Funds more frequently than once each calendar month.

(iii)    Nothing in this Section 7.1(d) shall (i) make Lender responsible for making or completing the Replacements; (ii) require Lender to expend funds in addition to the CapEx Reserve Funds to complete any Replacements; (iii) obligate Lender to approve or proceed with the Replacements (other than the funding thereof pursuant to this Section 7.1(d)); or (iv) obligate Lender to demand from Borrower additional sums to complete any Replacements.

(iv)    Upon reasonable prior written notice by Lender to Borrower, Borrower shall permit Lender and Lender's agents and representatives (including Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of tenants under their leases) to inspect the progress of any Replacements and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Replacements. Borrowers shall cause all contractors and subcontractors to cooperate with Lender and Lender's representatives and such other Persons described above in connection with inspections described in this Section 7.1(d).

(e)    Excess Cash Flow Reserve. All Excess Cash Flow Funds shall be deposited into an account controlled by Lender (the "**Excess Cash Flow Reserve**") to be held as additional collateral for the Loan, which funds shall be held and disbursed by Lender, as determined by Lender in Lender's sole and absolute discretion. Borrowers agree to timely pay all fees and expenses in connection with the Excess Cash Flow Reserve, such fees and expenses are established from time to time; provided, however, that absent and Event of Default, Lender shall make such amounts available for emergency repairs and capital expenditures reasonably approved by Lender. In addition, unpaid fees due under the Service Agreements in the amount of Three Hundred Twenty-Eight Thousand and 00/100 Dollars ($328,000) (the "**Unpaid Service Fees**") shall be paid out of the Excess Cash Flow Reserve in a lump sum to the extent that funds are available in the Excess Cash Flow Reserve. If sufficient funds are not available in the Excess Cash Flow Reserve

39

to pay the Unpaid Service Fees in a lump sum, any amounts available in the Excess Cash Flow Reserve shall be used to pay the Unpaid Services Fees, with the remaining amount of Unpaid Services Fees due and payable to be paid with amounts in the Excess Cash Flow Reserve as soon as the same become available.

7.2    <u>General Provisions Regarding Reserves</u>.  All funds deposited in the Reserves shall be held by Lender and shall accrue interest at the Interest Rate or Default Interest Rate, as applicable, to and for the benefit of Lender and may be commingled with Lender's general funds. To secure the Loan, Borrowers hereby grant to Lender a first-priority security interest in all funds deposited in the Reserves.  While an Event of Default is continuing, Lender shall have no obligation to disburse any funds from the Reserves and Lender shall be entitled, without notice to, or consent of, Borrowers, to apply any funds in the Reserves to satisfy the Liabilities in such order and manner as Lender shall determine, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender. Upon repayment of the Obligations in full, Lender shall return any remaining amounts escrowed in the Reserves to Borrowers, net of any expenses owed to Lender, by crediting such amount against the payoff amount.

7.3    <u>Cash Management</u>.

(a)    <u>Establishment of Certain Accounts</u>. On or prior to the Closing Date, Lender shall establish a restricted lockbox account for the benefit of the Lender with the Cash Management Account Bank (the "**Cash Management Account**"), whereby all revenue generated from the Kelly Hamilton Property (including, but not be limited to, pre-petition unpaid HUD rent monies owed to Borrowers) shall be deposited into and Lender shall  use funds on deposit in the Cash Management   Account as necessary to pay debt service on the Loan, fund required reserves, to pay approved operating expenses of the Property, amounts due under the Loan Documents, Replacements, alterations and other capital expenditures reasonably approved by Lender. Borrower shall also establish an operating account (the "**Operating Account**"), which operating account shall be subject to a blocked account control agreement between Borrowers, Lender and the Operating Account Bank (the "**Account Agreement**"), whereby all funds released by Lender from the Reserves or payment of approved operating expenses shall be funded into and paid from and all remaining cash flow shall be deposited in the Excess Cash Flow Reserve. Except during the existence of an Event of Default, Borrower and Lynd Management Group LLC (in its capacity as property manager) may make withdrawals from the Operating Account in order to pay all such operating expenses and payments required for any release of funds from the Reserves; however, during the existence of an Event of Default, Borrower and Lynd Management Group LLC (in its capacity as property manager) shall have no right or ability to effect withdrawals from the Operating Account without Lender's prior written consent, which may be withheld in Lender's sole and absolute discretion, and shall have no right to exercise dominion or control over the Operating Account

(i)    Neither Borrowers nor any other Person shall open any other such account with respect to the direct deposit of income or security deposits in connection with the Property. Borrowers warrant and covenant that they shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this <u>Section 7.3</u> without Lender's prior written consent. If, notwithstanding the provisions of this <u>Section 7.3</u>, Borrowers receive any rents or security deposits or other income from the Property, then (X) such amounts shall be deemed to

be collateral for the Loan and shall be held in trust for the benefit, and as the property, of Lender, (Y) such amounts shall not be commingled with any other funds or property of Borrowers or any other Person, and (Z) Borrowers shall deposit (or cause to be deposited) such amounts in the Cash Management Account within three (3) Business Days of receipt.

(b)    <u>Disbursements from the Cash Management Account</u>.

(i)    Upon the occurrence of and during the continuance of any Event of Default, all funds on deposit in the Cash Management Account shall be applied by Lender as follows:

(A)    First, funds sufficient to pay the Monthly Tax Deposit (and if applicable any amounts required to pay for the Insurance Premiums) due for the then applicable payment date, if any, shall be deposited in the Tax and Insurance Reserve;

(B)    Second, to the extent then applicable, funds sufficient to pay any interest accruing under the Loan at the Default Interest Rate and late payment charges, if any, in respect of the Loan shall be deposited with or as directed by Lender;

(C)    Third, funds sufficient to pay the debt service due on the then applicable payment date shall be deposited with or as directed by Lender;

(D)    Fourth, funds sufficient to pay any other amounts due and owing to Lender pursuant to the terms hereof and/or of the other Loan Documents, if any (other than the outstanding principal balance of the Loan), shall be deposited with or as directed by Lender;

(E)    Fifth, funds sufficient to pay the Servicing Fee due on the then applicable payment date;

(F)    Sixth, to the payment and/or replenishment of any Reserves (other than the Tax and Insurance Reserve) in accordance with <u>Section 7.1</u>; and

(G)    Seventh, any remaining funds (the "**Excess Cash Flow Funds**") shall be deposited into the Excess Cash Flow Reserve.

(ii)    So long as any portion of the Obligations remains outstanding, neither Borrowers nor any other Person acting on behalf of, or claiming through, Borrowers, shall have any right or authority to change the identity, name, location, account number, bank location or other feature or attribute of the Operating Account,  without the prior written consent of Lender, which consent may be withheld by Lender in its sole and absolute discretion.

(c)    <u>Default Generally</u>.  Notwithstanding any other provision of this Agreement or of the other Loan Documents, Lender reserves the right, exercisable at its sole option, to (i) take such enforcement actions (including acceleration and foreclosure of the Collateral) as it deems appropriate under the Loan Documents or otherwise under law or in equity, and/or (ii) apply all

41

sums on deposit in or deposited into the Accounts and any other sums deposited by Borrower with Lender to the payment of the Obligations, in such order, manner, amounts and times as Lender in its sole discretion determines, and such reserved rights shall be in addition to all other rights and remedies provided to  Lender under this Agreement and the other Loan Documents.  Nothing in this Section 7.3 shall limit, reduce or otherwise affect Borrower's obligations to make any and all payments due under this Agreement and under the other Loan Documents, whether or not rents or revenue are available to make such payments.

(d)     Security Interest.  Borrower does hereby and has granted to Lender a first-priority security interest in the Operating Account, the Cash Management Account, and the sums on deposit therein.  Without limitation of any other provisions of this Agreement, the Security Instrument, or the other Loan Documents, during the continuance of an Event of Default, Lender may use the Operating Account, the Cash Management Account, and/or any sums on deposit in either of them for any or all of the following purposes: (i) repayment of the Loan, including interest, principal and any prepayment premium or fee applicable to any such full or partial prepayment, (ii) reimbursement of Lender for all losses, fees, costs and expenses (including legal fees and disbursements) suffered or incurred by Lender as a result of such Event of Default, (iii) payment of any amount expended in exercising any or all rights and remedies available to Lender at law or in equity or under this Agreement or any of the other Loan Documents, (iv) payment of any item as required or permitted by this Agreement or any of the other Loan Documents, or (v) any other purpose permitted by applicable Legal Requirements; provided, however, that any such application of funds shall not cure or be deemed to waive any Event of Default.  Without limiting any other provisions hereof, each of the remedial actions described in the immediately preceding sentence shall be deemed to be a commercially reasonable exercise of Lender's rights and remedies as a secured party with respect to the Operating Account, the Excess Cash Flow Reserve, the Cash Management Account, and any sums on deposit in any of them and shall not in any event be deemed to constitute a setoff or a foreclosure of a statutory banker's lien.  Nothing in this Agreement shall obligate Lender to apply all or any portion of the Operating Account or Cash Management Account to effect a cure of any Event of Default, or to pay the Loan in any specific order of priority.  The exercise of any or all of Lender's rights and remedies under this Agreement with respect to the Operating Account, the Excess Cash Flow Reserve, the Cash Management Account, and/or the sums on deposit therein shall not in any way prejudice or affect Lender's right to initiate and complete a foreclosure under the Security Instrument or exercise any other remedy available to Lender under the Loan Documents or pursuant to applicable Legal Requirements.

(e)     Indemnification by Borrowers.  Lender shall be responsible for the performance only of such duties with respect to the Operating Account, the Excess Cash Flow Reserve, and Cash Management Account as are specifically set forth herein, and no duty shall be implied from any provision hereof.  Lender shall not be under any obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies.  Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including with respect to proceeds on deposit in the Operating Account, the Excess Cash Flow Reserve or Cash Management Account.  Borrowers shall indemnify and hold Lender, its successors, assigns, shareholders, directors, officers, employees, and agents (including any Servicers) harmless from and against any actual loss, cost or damage (including reasonable attorneys' fees and disbursements) incurred by such parties in connection with the Operating Account, the Excess Cash Flow Reserve, the Cash Management

42

Account or the investment by Lender of amounts in the Cash Management Account, other than such as result from the gross negligence or willful misconduct of Lender or intentional nonperformance by Lender of its obligations under this Agreement.

(f)      Fees, Costs, and Expenses. Borrower agrees to timely pay all fees and expenses of the Operating Account Bank and the Cash Management Account Bank in connection with the Operating Account and Cash Management Account, as such fees and expenses are established from time to time.  In the event that any such bank seeks reimbursement of any item deposited into any such account but returned or disallowed or reimbursement of any other monetary sum pursuant to the agreements governing such accounts, Borrowers shall promptly and timely pay such sum.  Failure of Borrowers to pay any sum due and payable to the Operating Account Bank and the Cash Management Account Bank in connection with such accounts within ten (10) Business Days after written demand by Lender shall constitute an Event of Default under this Agreement.

(g)      Escrow Account. $2,450,000 of the Initial Advance shall be deposited into the Escrow Account. If an Event of Default occurs or if the DIP Facility is terminated after the funding of the Initial Advance, then the Lender shall be entitled to all funds remaining in the Escrow Account after deduction of an amount equal to the fees, costs, and expenses of the Debtors' counsel, Debtors' financial advisor, Debtors' notice and claims agent, and Elizabeth A. LaPuma as independent fiduciary as of the date of the Event of Default or termination of the DIP Facility, to the extent provided in the approved Budget.

## ARTICLE 8
## INSURANCE

8.1    Insurance.

(a)      Borrower, at its sole cost and expense, for the mutual benefit of Borrower and Lender, shall obtain and maintain, or cause to be maintained, during the entire term of the Loan policies of insurance for Borrower and the Property providing at least the following coverages:

(i)      comprehensive all risk "special form" insurance ("**Special Form**") including, but not limited to, loss caused by any type of windstorm or hail on the Property, (A) in an amount equal to one hundred percent (100%) of the "**Full Replacement Cost,**" which for purposes of the Security Instrument shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Property waiving all co-insurance provisions or to be written on a no co-insurance form; (C) providing for no deductible in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) for all such insurance coverage; provided, however, with respect to windstorm and earthquake coverage, providing for a deductible not to exceed five percent (5%) of the total insurable value of the Property; and (D) if any of the improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, coverage for loss due to operation of law in an amount equal to the Full Replacement Cost, and coverage for demolition costs and coverage for increased costs of construction in an amount not less than ten percent (10%) of the Full Replacement Cost.  In

43

addition, Borrower shall obtain:  (x) if any portion of the improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to (1) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus (2) such greater amount as Lender shall require; (y) if excluded from coverage in the Special Form insurance policy, insurance against loss or damage by windstorm in an amount equal to the lesser of (1) the maximum amount of such insurance available, or (2) the amount of the Loan; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity and a "probable maximum loss" exceeding twenty percent (20%) of the Full Replacement Cost; provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the Special Form policy required under this subsection (i);

(ii)      business income or rental loss insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) in an amount equal to one hundred percent (100%) of the projected gross revenues from the operation of the Property (as reduced to reflect expenses not incurred during a period of Restoration), for a period of at least twelve (12) months, after the date of the casualty, and notwithstanding that the Policy may expire prior to the end of such period; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the improvements and the personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was prior to the loss, or the expiration of six (6) months from the date of the completion of the Restoration, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period.  All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Debt from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Debt on the respective dates of payment provided for in the Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iii)      at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella/excess liability insurance, covering claims related to the structural construction, repairs or alterations being made at the Property which are not covered by or under the terms or provisions of the below mentioned commercial general liability insurance and umbrella/excess liability insurance policies; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) including permission to occupy the Property, (3) against all risks insured against pursuant to subsection (i) above, (4) including in addition to the insured against pursuant to subsection (i) above, coverage for hard costs of construction as well as coverage for property in transit, off-site storage, soft costs that are recurring costs, including one hundred percent (100%) of construction loan interest and delayed completion, and (5) with an agreed amount endorsement waiving co-insurance provisions;

44

(iv)    comprehensive boiler and machinery/equipment breakdown insurance, if steam boilers or other pressure-fixed vessels are in operation, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(v)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million and No/100 Dollars ($2,000,000.00) in the aggregate and One Million and No/100 Dollars ($1,000,000.00) per occurrence per location; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:  (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written contracts on a policy form to be approved by Lender's insurance consultant;

(vi)    if applicable, automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00);

(vii)    if applicable, worker's compensation insurance in such amounts as are reasonably satisfactory to Lender or if such limits are established by applicable laws, in such amounts, and employee's liability insurance in an amount not less than One Million and No/100 Dollars ($1,000,000) per disease or per accident and disease aggregate;

(viii)    follow form umbrella and excess liability insurance in an amount not less than Five Million and No/100 Dollars ($5,000,000.00) per occurrence per location on terms consistent with the commercial general liability insurance policy required under subsection (v) above, including, but not limited to, supplemental coverage for workers' compensation and automobile liability, as applicable, which umbrella liability coverage shall apply in excess of the automobile liability coverage in clause (vi) above;

(ix)    pollution liability insurance coverage in the name of Lender in an amount to be determined by Lender for the term of the Loan;

(x)    the insurance required under this Section 8.1(a)(i), (ii), (v) and (viii) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Section 8.1(a)(i), (ii), (v) and (viii) above at all times during the term of the Loan; and

(xi)    upon sixty (60) days' written notice, such other reasonable insurance such as sinkhole or land subsidence insurance, and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

45

(b)      All insurance provided for in Section 8.1(a) hereof, shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), shall be satisfactory in form and substance to Lender and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies (i) shall be issued by financially sound and responsible insurance companies approved by Lender and authorized or licensed to do business in the state where the Property is located, with a claims paying ability rating of "A" or better by Standard & Poor's Corporation or a rating of "A:VIII" or better in the current Best's Insurance Reports; (ii) except for the Policy referenced in Section 6.1(a)(vii), shall name Borrower as the insured, shall name the Lender as a loss payee and shall name the Lender as an additional insured with respect to liability coverage required hereunder; (iii) in the case of property policies, including, but not limited to, terrorism, boiler and machinery, flood and earthquake insurance, shall contain a  standard non-contributory mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender; (iv) shall contain a waiver of subrogation against Lender; (v) shall be maintained throughout the term of the Loan without cost to Lender; (vi) shall be assigned and the originals (or duplicate originals certified to be true and correct by the related insurer) delivered to Lender upon issuance; and (vii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under said Policies and that Lender shall receive at least thirty (30) days prior written notice of any cancellation other than a cancellation due to non-payment of premiums, in which case Lender shall receive at least ten (10) days prior written notice of such cancellation. Any blanket Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder or shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 8.1(a). Borrower shall pay the premiums for such Policies (the "**Insurance Premiums**") as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the new Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender (provided that such Insurance Premiums have not been paid to Lender or Servicer). If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any apparently expiring Policy, then Lender may procure, but shall not be obligated to procure, such insurance and pay the Insurance Premiums therefor, and Borrower agrees to reimburse Lender for the cost of such Insurance Premiums promptly on demand. Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

(c)      Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 8.1(a) hereof.

(d)      All Policies provided for or contemplated by Section 8.1(a) hereof, shall name Borrower as the insured and Lender and its successors and assigns as a loss payee and as an additional insured with respect to liability coverage required hereunder, as its interests may appear, and in the case of property policies, including but not limited to, terrorism, boiler and machinery, flood and earthquake insurance, shall contain a standard non-contributing mortgagee clause in

46

favor of Lender and its successors and assigns providing that the loss thereunder shall be payable to Lender and its successors and assigns.

(e)    All Policies shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)    the Policy shall not be canceled without at least thirty (30) days' prior written notice to Lender, other than a cancellation due to non-payment of premiums, in which case Lender shall receive at least ten (10) days prior written notice of such cancellation;

(iii)    the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate after three (3) Business Days' notice to Borrower if prior to the date upon which any such coverage will lapse or at any time Lender deems necessary (regardless of prior notice to Borrower) to avoid the lapse of any such coverage.  All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Security Instrument and shall bear interest at the Default Interest Rate.

8.2    <u>Casualty</u>.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**") Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property substantially the same to the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by Lender (the "**Restoration**") and otherwise in accordance with Section 8.4 hereof.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  In case of loss covered by Policies, Lender may either (1) settle and adjust any claim without the consent of Borrower, or (2) allow Borrower to agree with the insurance company or companies on the amount to be paid upon the loss; provided, that (A) Borrowers may adjust losses aggregating not in excess of $500,000 if such adjustment is carried out in a competent and timely manner and (B) if no Event of Default shall have occurred and be continuing, Lender shall not settle or adjust any such claim without the consent of Borrowers, which consent shall not be unreasonably withheld or delayed.  In any case Lender shall and is hereby authorized to collect and receipt for any such insurance proceeds; and the expenses reasonably incurred by Lender in the adjustment and collection of insurance proceeds

47

shall become part of the Debt and be secured hereby and shall be reimbursed by Borrower to Lender upon demand.

8.3 <u>Condemnation</u>. Borrowers shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of the Property and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by a condemning authority, Borrowers shall promptly commence and diligently prosecute, or cause to be promptly commenced and prosecuted, the Restoration of the Property pursuant to <u>Section 8.5</u> hereof and otherwise comply with the provisions of Section 8.4 hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award, or a portion thereof sufficient to pay the Debt.

8.4 <u>Application of Loss Proceeds</u>. Loss Proceeds shall be one hundred (100%) applied to the payment of the Loan, unless Lender, in its sole discretion, agrees to make such Loss Proceeds available to Borrowers for Restoration or other purposes. Borrowers, upon request by Lender, shall execute all instruments requested to confirm the assignment of the Loss Proceeds to Lender, free and clear of all liens, charges or encumbrances. Notwithstanding anything to the contrary set forth herein, any Loss Proceeds applied to the payment of Loan in accordance with this Section 8.4 shall not be subject to the Make-Whole Premium.

8.5 <u>Restoration</u>. Promptly after the occurrence of any damage or destruction to all or any portion of the Property, Borrowers shall commence, and diligently prosecute, or cause to be commenced and diligently prosecuted, to completion, the repair, Restoration and rebuilding of the Property so damaged, destroyed or remaining free and clear of any and all Liens except Permitted Encumbrances.

## ARTICLE 9
## DEFAULTS AND REMEDIES

9.1 <u>Events of Default</u>. Any of the following events shall constitute an "**Event of Default**" under this Agreement:

(a) Any "Event of Default" identified in the Financing Orders.

(b)    Any Borrower shall fail to perform or comply with any term, condition, covenant or Obligation contained in this Agreement, any other Loan Document, or the Financing Orders, unless such failure to perform or comply is remedied within five (5) Business Days; or

(c)    Any representation or warranty made by any Borrower in this Agreement, any other Loan Document, or the Financing Orders shall prove untrue in any material respect or materially misleading; provided, however, that for purposes of this paragraph, any materiality qualifier (but not a "Material Adverse Effect" qualifier) included in any representation or warranty made by Borrowers in this Agreement or in any other Loan Document shall be disregarded; provided, (x) that if such untrue representation or warranty is unintentional, non-recurring, and susceptible of being cured or corrected, Borrower shall have the right to cure or correct such representation or warranty within fifteen (15) days of the earlier of: (A) receipt of notice from Lender to Borrower or (B) Borrower's obtaining of knowledge thereof; or

(d)    The cessation of the DIP Facility or any provision of this Agreement, any other Loan Document, or the Financing Orders being in full force and effect or the DIP Facility or any provision of this Agreement, any other Loan Document, the Financing Orders being declared by the Bankruptcy Court to be null and void or the validity or enforceability of any provision of the DIP Facility or this Agreement, any other Loan Document, the Financing Orders being contested by any Borrower or any Borrower denying in writing that it has any further liability or obligation under any provision of the DIP Facility, this Agreement, any other Loan Document, or the Financing Orders, or Lender ceasing to have the benefit of the Liens granted by the Loan Documents or the Financing Orders; or

(e)    Any of the Financing Orders being amended or modified without the prior written consent of Lender; or

(f)    (i) An ERISA Event occurs that has resulted or could reasonably be expected to result in liability of Borrowers, any Subsidiary or any ERISA affiliate in an aggregate amount which could reasonably be expected to result in material liability, (ii) there is or arises an unfunded pension liability (taking into account only pension plans with positive unfunded pension liability) that could reasonably be expected to result in material liability, or (iii) any of Borrowers, any Subsidiary or any ERISA affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a multiemployer plan in an aggregate amount which could reasonably be expected to result in a material liability; or

(g)    A Change in Control; or

(h)    The entry of a Financing Order in form or substance that is not acceptable to Lender in its sole discretion; or

(i)    The entry of an order of the Bankruptcy Court approving any claims for recovery of amounts under Section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any Collateral; or

(j)    The use of Cash Collateral for any purpose other than to fund the Carve Out or in a manner consistent with the Budget, the Loan Documents and the Financing Orders; or

ME1\53156050.v2
81162026;6

(k)    The filing of any application by any Borrower (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Cases that is *pari passu* with or senior to the DIP Liens (as defined in the Interim Order), excluding liens arising under the Financing Orders, or pursuant to any other financing agreement made with the prior written consent of Lender; or

(l)    The commencement of any action by any Borrower or other authorized person (other than an action permitted by the Financing Orders) against any of Lender or any of their agents and employees, to contest or challenge in any manner the Loan or any other Obligation payable to, the Collateral and the Liens therein and any claims (including any Superpriority Claim) of, Lender; or

(m)    Any Borrower files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Financing Order and/or any Loan Document, or to disallow the Obligations, in whole or in part, or (2) any material provision of the Financing Orders, or any other order of the Bankruptcy Court approving any Borrower's use of Cash Collateral, shall for any reason cease to be valid and binding (without the prior written consent of Lender); or

(n)    Any request made for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a Financing Order, as entered by the Bankruptcy Court, without the prior written consent of Lender; or

(o)    The filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 or a Chapter 11 Plan in the Chapter 11 Cases, without the consent of Lender that, in either case, does not provide for indefeasible payment in full in cash to Lender of the Obligations and all other amounts outstanding under this Agreement, the other Loan Documents and/or the Financing Orders on closing of such sale or the effective date of such Chapter 11 Plan; or

(p)    The appointment in the Chapter 11 Cases of a trustee, receiver, examiner or disinterested person with expanded powers (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); or

(q)    The granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the Collateral exceeding $50,000 in value in the aggregate, provided, however, that this provision shall not apply to personal injury or wage/hour claimants seeking relief from the automatic stay to proceed solely against applicable insurance policies; or

(r)    Failure to pay principal, interest or other Obligations in full when due, including without limitation, on the Maturity Date; or

(s)    If any Borrower requests authority to obtain any financing not consented to by Lender; or

(t)    The filing of any Chapter 11 Plan or related Disclosure Statement either not consented to by Lender, other than a Chapter 11 Plan that indefeasibly satisfies the Obligations in full in cash, or that is not consistent with this Agreement; or

(u)    The conversion of any of the Chapter 11 Cases to chapter 7; or

(v)    The termination of the Debtor's exclusive right to file and/or solicit acceptances of a Chapter 11 Plan; or

(w)    The Bankruptcy Court enters an order modifying, reversing, revoking, staying, amending, supplementing, rescinding, vacating or otherwise modifying the Interim Order, the Final Order or any Loan Document; or

(x)    The dismissal of any of the Chapter 11 Cases; or

(y)    Failure to file and confirm the Chapter 11 Plan as and when required under this Agreement; or

(z)    If the Policies are not kept in full force and effect, or if copies of the certificates evidencing the Policies (or certified copies of the Policies if requested by Lender) are not delivered to Lender within ten (10) days after written request therefor; provided, however, there shall be no Event of Default under this Section 9.1(z) if: (x) sufficient funds exist in the Tax and Insurance Reserve to pay all premiums and any other amounts owing with respect to such Policies, and (y) in violation of this Agreement, Lender fails to release such funds in order to pay same; or

(aa)    Failure to make any deposits required pursuant to Article 8; or

(bb)    The termination of the HAP Contract as a result of Debtors' failure to comply with Section 5.24 hereof.

9.2    Certain Remedies. Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before or order from the Bankruptcy Court, but subject to the terms of the Final Order, Lender may send a written notice to Borrowers, counsel to the Committee and the U.S. Trustee (such notice, the "**Termination Notice**"), which shall be filed on the docket of the Chapter 11 Cases, electing that one or more (without limitation) of the following shall occur:

(a)    Borrowers' authority to use Cash Collateral shall immediately terminate;

(b)    all of the unpaid Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under this Agreement, any other Loan Document and the Financing Orders to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrowers;

51

(c)      the termination, reduction or restriction of the commitment of Lender to make the Loan or any Advance thereunder (if any), whereupon such commitment shall be terminated;

(d)      the DIP Facility shall be terminated with respect to any future liability or obligation of Lender, but, for the avoidance of doubt, without affecting any of the DIP Liens, the Superpriority Claims or the Obligations;

(e)      any and all obligations of Lender in connection with the DIP Facility under the Financing Orders and the Loan Documents shall immediately terminate; or

(f)      any other action or exercise any other right or remedy (including, without limitation, with respect to credit bidding and the liens in favor of Lender) permitted under this Agreement, any other Loan Document, the Financing Orders, or by applicable legal (including, without limitation, the rights of a secured creditor under the Uniform Commercial Code).

9.3      <u>Automatic Stay</u>. Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), Lender shall be entitled to immediate indefeasible payment of all Obligations under the DIP Facility and to enforce the remedies provided for under this Agreement, the other Loan Documents, the Financing Orders and under applicable Legal Requirements, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject to the following conditions (the "**Waiting Period Procedures**"):

(a)      Lender shall notify Borrowers in writing that the Maturity Date has occurred (such notice, a "**Maturity Date Notice**" and the date of any such notice, the "**Maturity Date Notice Date**"). A copy of any Maturity Date Notice shall be provided by email to Borrowers' counsel and counsel to the Committee.

(b)      A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire five (5) Business Days after the Maturity Date Notice Date (the "**Waiting Period**"). During the Waiting Period, Borrowers shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting the occurrence of the Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date).

(c)      During the Waiting Period, Borrowers may continue to use the Collateral, including the Cash Collateral, so long as such Collateral (including the Cash Collateral) is used solely to pay any expenses that are (a) necessary to preserve Borrowers' going concern value or (b) necessary to contest in good faith the occurrence of the Maturity Date or underlying Event of Default.

9.4      <u>No Implied Waiver; Rights Cumulative</u>. No failure or delay on the part of Lender in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver thereof (including without limitation, a waiver of any default or Event of Default). No right, remedy,

power or privilege conferred on or reserved to Lender under any of the Loan Documents, in equity or at law is intended to be exclusive of any other right, remedy, power or privilege which may then be, or may thereafter become, available to Lender. All rights, remedies, powers and privileges available to Lender shall be cumulative; any of the same may be exercised at such time or times and in such order and manner as Lender shall (in its sole discretion) deem expedient.

## ARTICLE 10
## MISCELLANEOUS PROVISIONS

10.1    Consent or Approval.

(a)    In all instances in which Lender's approval of or consent to any item, matter or circumstance is contemplated by the terms of this Agreement or any other Loan Document, such approval or consent or the exercise of such judgment shall (unless otherwise specified in this Agreement or the Financing Orders) (i) be within the absolute discretion of Lender, and (ii) be expressed only by a specific writing intended for such purpose and signed by Lender.

(b)    Lender shall not, by reason of its consent or approval of any item or matter submitted to it, be deemed to have assumed or undertaken any responsibility or obligation for the adequacy, accuracy, completeness, efficacy, form or content of any such matter or item.

10.2    Duration. This Agreement shall continue in full force and effect and the duties, covenants, and liabilities of Borrowers hereunder and all the terms, conditions, and provisions hereof relating thereto shall continue to be fully operative until all Obligations shall have been fully, finally and indefeasibly satisfied in full.

10.3    Survival of Representations. All representations and warranties made by or on behalf of Borrowers in this Agreement or any other Loan Document shall be deemed to have been relied upon by Lender notwithstanding any investigation that may be made by Lender. All such representations and warranties shall survive the closing of the transactions described herein and the disbursement of the proceeds of the Loan until all of the Obligations shall have been fully, finally and indefeasibly satisfied in full.

10.4    Binding Effect; Assignment; Third-Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon Borrowers, Lender, and their respective successors and assigns; provided, however, that this Agreement, the other Loan Documents and the Loan may not be assigned by Borrowers without the consent of Lender. No other person or entity shall be a direct or indirect legal beneficiary of or have any direct or indirect cause of action or claim in connection with, this Agreement or any other Loan Document.

10.5    Counterparts. This Agreement and the other Loan Documents may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement. Receipt by telecopy or electronic transmission of any executed signature page to this Agreement or any other Loan Document shall constitute effective delivery of such signature page.

ME1\53156050.v2
81162026;6

10.6    Notices. Except for any notice required under applicable law to be given in another manner, all notices, requests, consents, demands, or other communications required or permitted to be given pursuant to this Agreement shall be deemed sufficiently given when delivered either (a) personally with a written receipt acknowledging delivery, (b) three (3) Business Days after the posting thereof by United States first class, registered or certified mail, return receipt requested, with postage fee prepaid, or (c) one (1) Business Day after delivery to a reputable overnight courier service (such as Federal Express or UPS) or (d) addressed to the following and via electronic mail at the address below (with a hard copy sent as otherwise permitted in this Section 10.6):

|  |  |
|---|---|
| If to Lender: | 3650 SS1 PITTSBURGH LLC |
|  | 2977 McFarlane Road, Suite 300 |
|  | Miami, FL 33133 |
|  | Attn:  Loan Servicing |
|  | Email:  servicing@3650reit.com |
|  |  |
|  | 3650 SS1 PITTSBURGH LLC |
|  | 2977 McFarlane Road, Suite 300 |
|  | Miami, FL 33133 |
|  | Attn:  Jonathan Roth and Mark Jefferis |
|  | Email: jroth@3650capital.com and |
|  | mjefferis@3650capital.com |
|  |  |
| With a copy to: | Akerman LLP |
|  | Attn:  William Ellis, |
|  | 633 West 5th Street Suite 6400 |
|  | Los Angeles, CA 90071 |
|  | william.ellis@akerman.com |
|  |  |
| If to Borrowers: | Elizabeth A. LaPuma |
|  | c/o White and Case LLP |
|  | 111 S. Wacker Drive, Suite 5100 |
|  | Chicago, IL 60606 |
|  | Attn: Gregory F. Pesce |
|  | Email: Gregory.pesce@whitecase.com |

Any party, at any time, may designate additional or different addresses for subsequent notices or communication by furnishing notice to the other party in the manner described above.

10.7    Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, Legal Requirements to jury trial with respect to any claim, demand, action or cause of action arising under this Agreement and the other Loan Documents or in any way connected with or related to the dealings in respect hereof or thereof, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise.

10.8    Entire Agreement. This Agreement, together with other Loan Documents and the Financing Orders, constitutes the entire agreement among Borrowers and Lender with respect to

the making and funding of the Loan, and no representations or agreements, express or implied, have been made to or with Borrowers not herein or therein contained. This Agreement, the other Loan Documents and the Financing Orders shall not be amended or modified, nor may any of their terms or conditions be waived, except by an instrument in writing duly executed by both Lender and Borrowers.

10.9    Jurisdiction; Governing Law. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal, substantive laws of the State of New York, without giving effect to conflicts of laws principles. Each party hereto hereby consents and agrees that the state and federal courts located in the State of New York shall have jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to this Agreement or any other Loan Document or to any matter arising out of or relating to this Agreement or any other Loan Document; provided that during the Chapter 11 Cases the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to this Agreement or any other Loan Document or to any matter arising out of or relating to this Agreement or any other Loan Document; provided, further that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on any security for the DIP Obligations, or to enforce a judgment or other court order in favor of Lender. Borrowers hereby expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and Borrowers hereby waive any objection that Borrowers may have based upon lack of personal jurisdiction, improper venue or *forum non-conveniens* and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court.

10.10    Headings. Paragraph headings used in this Agreement are intended for convenience of reference only, and shall not be deemed to alter, affect or limit the meaning of any provision of this Agreement.

10.11    Severability. In case any provision in or obligation hereunder or in any related document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.12    Relationship. The relationship among Borrowers and Lender is strictly contractual in nature, and is governed entirely by this Agreement and the other Loan Documents. Nothing contained in this Agreement, and no action which Lender may take hereunder or in respect of the Loan, will create any agent, partnership, co-venture or joint venture among Borrowers and Lender or will make Lender liable in any manner to any party dealing with Borrowers.

10.13    Patriot Act. No Borrower is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury of the United States of America (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not knowingly engage in any dealings or transactions or otherwise be associated with such persons. In addition, each Borrower hereby agrees to provide to

55

Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with all applicable laws concerning money laundering and similar activities.

10.14    Press Releases. With the written consent of Borrowers in each instance, which shall not be unreasonably withheld or delayed, Lender may publish press releases and advertising material relating to the Loan using any Borrower's name, logo or trademark. Lender shall provide Borrowers with a draft reasonably in advance of publication.

10.15    Counsel. EACH BORROWER HEREBY ACKNOWLEDGES THAT SUCH BORROWER HAS BEEN ADVISED BY LENDER TO SEEK THE ADVICE OF AN ATTORNEY OR AN ACCOUNTANT IN CONNECTION WITH THE LOAN AND THIS AGREEMENT. EACH BORROWER HEREBY ACKNOWLEDGES THAT SUCH BORROWER HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY AND ACCOUNT OF SUCH BORROWER'S CHOICE IN CONNECTION WITH THE LOAN AND THIS AGREEMENT. EACH BORROWER HEREBY REPRESENTS AND ACKNOWLEDGES THAT SUCH BORROWER HAS EITHER BEEN REPRESENTED BY LEGAL COUNSEL AND AN ACCOUNTANT PRIOR TO SUCH BORROWER'S EXECUTION HEREOF OR HAS KNOWINGLY ELECTED NOT TO BE SO REPRESENTED.

10.16    Construction. This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to each party hereto and thereto and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed against Lender merely because of Lender's involvement in their preparation.

10.17    Intentionally Omitted.

10.18    Incorporation of Financing Orders by Reference. Each Borrower and Lender hereby agrees that any reference contained herein to the Financing Orders shall include all terms, conditions and provisions of such Financing Order and that the Financing Orders are incorporated herein for all purposes. To the extent there is any conflict or inconsistency between the terms of any of the Loan Documents and the terms of the Financing Orders, the terms of the Interim Order or the Final Order, as applicable, shall govern.

10.19    Assignments and Participations. Lender may assign, negotiate, pledge or otherwise hypothecate all or any portion of this Agreement or grant participations herein, or in any of its rights and security hereunder, including, without limitation, the Note and, in case of such assignment, Borrower will accord full recognition thereto and agree that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such assignee with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment provided that any such assignee agrees to be bound by the Loan Documents.  In connection with any such assignment, participation or other transfer, Borrower agrees that Lender may deliver copies to any potential participant or other transferee of the Loan Documents and all other documents, instruments, financial statements and other related information from time to time furnished to Lender pursuant hereto provided that the recipient thereof has agreed in writing to be bound by any confidentiality requirements.

ME1\53156050.v2
81162026;6

10.20   <u>Lender Expenses</u>. Debtors covenant and agree to pay or, if Debtors fail to pay, to reimburse, Lender upon receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) actually incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby; (ii) Debtors' ongoing performance of and compliance with this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iii) any requested modifications to the Loan Documents by Debtors or any requests for Lender's approval by Debtors with respect to the Loan; (iv) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (v) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents;  (vi) filing, recording and title insurance fees in connection with this Agreement; and (vii) enforcing any obligations of or collecting any payments due from Debtors under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceedings; provided, however, that Debtors shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.

[Remainder of Page Intentionally Left Blank]

ME1\53156050.v2
81162026;6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered of the day and year first set forth above.

**BORROWERS:**

CBRM REALTY INC.,
a New York corporation

By:_____
Name:
Title:


CROWN CAPITAL HOLDINGS LLC,
a Delaware limited liability company

By:_____
Name:
Title:

KELLY HAMILTON APTS. LLC,
a Delaware limited liability company

By:_____
Name:
Title:

KELLY HAMILTON APTS. MM LLC,
a Delaware limited liability company

By:_____
Name:
Title:

**LENDER:**

3650 SS1 PITTSBURGH LLC,
a Delaware limited liability company

By:_____
Name:
Title:

[Signature Page to DIP Credit Agreement]

# EXHIBIT C

**Approved Budget**

Crown Capital et al.

| Line Item | 5/25/2025–5/31/2025 (1) | 6/1/2025–6/7/2025 (2) | 6/8/2025–6/14/2025 (3) | 6/15/2025–6/21/2025 (4) | 6/22/2025–6/28/2025 (5) | 6/29/2025–7/5/2025 (6) | 7/6/2025–7/12/2025 (7) | 7/13/2025–7/19/2025 (8) | 7/20/2025–7/26/2025 (9) | 7/27/2025–8/2/2025 (10) | 8/3/2025–8/9/2025 (11) | 8/10/2025–8/16/2025 (12) | 8/17/2025–8/23/2025 (13) | Remaining 14 Week(s) | 27 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows** | | | | | | | | | | | | | | | |
| **Revenue Inflows** | | | | | | | | | | | | | | | |
| Rental Income - Renter's Portion | -- | $16,266.8 | $16,266.8 | -- | -- | -- | $16,266.8 | $16,266.8 | -- | -- | $16,266.8 | $16,266.8 | -- | $97,601.0 | $195,202.1 |
| Rental Income - Voucher | -- | $29,465.0 | $29,465.0 | -- | -- | -- | $29,465.0 | $29,465.0 | -- | -- | $29,465.0 | $29,465.0 | -- | $176,789.9 | $353,579.8 |
| Other Income | -- | $1,135.0 | -- | -- | -- | -- | $1,135.0 | -- | -- | -- | $1,135.0 | -- | -- | $3,405.0 | $6,810.0 |
| Interest Income | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Utilities Income | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Revenue Inflows** | -- | $46,866.8 | $45,731.8 | -- | -- | -- | $46,866.8 | $45,731.8 | -- | -- | $46,866.8 | $45,731.8 | -- | $277,795.9 | $555,591.8 |
| **Operating Outflows** | | | | | | | | | | | | | | | |
| Insurance | -- | -- | -- | -- | ($33,000.0) | -- | -- | -- | -- | -- | -- | -- | -- | ($33,000.0) | ($66,000.0) |
| Taxes | -- | -- | -- | -- | ($9,000.0) | -- | -- | -- | -- | -- | -- | -- | -- | ($9,000.0) | ($18,000.0) |
| Utilities Expense | -- | -- | ($22,588.8) | -- | -- | -- | -- | ($22,588.8) | -- | -- | -- | ($22,588.8) | -- | ($67,766.3) | ($135,532.5) |
| Payroll & Benefits | ($8,378.9) | -- | ($8,378.9) | -- | ($8,378.9) | -- | ($8,378.9) | -- | ($8,378.9) | -- | ($8,378.9) | -- | ($8,378.9) | ($58,632.0) | ($117,303.9) |
| Administrative Expenses | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($593.1) | ($8,303.1) | ($16,013.2) |
| Maintenance & Operating Expenses | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($653.1) | ($9,143.1) | ($17,633.2) |
| Contract Services | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($754.6) | ($10,564.7) | ($20,374.7) |
| Make Ready & Deco | ($1,446.9) | -- | ($1,446.9) | -- | ($1,446.9) | -- | ($1,446.9) | -- | ($1,446.9) | -- | ($1,446.9) | -- | ($1,446.9) | ($10,128.4) | ($20,256.9) |
| Advertising & Promotional | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($72.7) | ($1,011.7) | ($1,962.6) |
| Professional Expenses | ($750.0) | -- | -- | -- | -- | ($350.0) | -- | -- | -- | ($750.0) | -- | -- | -- | ($5,250.0) | ($4,500.0) |
| Financial Expense | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Operating Outflows** | ($12,649.2) | ($2,073.5) | ($34,488.0) | ($2,073.5) | ($53,899.2) | ($2,423.5) | ($11,899.2) | ($24,662.2) | ($11,899.2) | ($2,823.5) | ($11,899.2) | ($24,662.2) | ($11,899.2) | ($209,825.2) | ($417,577.0) |
| **Real Estate Management Fees** | | | | | | | | | | | | | | | |
| Management Fees | ($4,629.9) | -- | -- | -- | -- | ($4,629.9) | -- | -- | -- | ($4,629.9) | -- | -- | -- | ($13,889.8) | ($27,779.6) |
| Asset Management Fee | ($4,000.0) | -- | -- | -- | -- | ($4,000.0) | -- | -- | -- | ($4,000.0) | -- | -- | -- | ($12,000.0) | ($24,000.0) |
| **Total Real Estate Management Fees** | ($8,629.9) | -- | -- | -- | -- | ($8,629.9) | -- | -- | -- | ($8,629.9) | -- | -- | -- | ($25,889.8) | ($51,779.6) |
| **Net Operating Cash Flow** | ($21,279.2) | $44,793.4 | $11,243.8 | ($2,073.5) | ($53,899.2) | ($11,053.4) | $34,967.6 | $21,069.6 | ($11,899.2) | ($11,453.4) | $34,967.6 | $21,069.6 | ($11,899.2) | $42,080.9 | $86,235.3 |

Crown Capital et al.

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Remaining 14 Week(s) | 27-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning:** | 5/25/2025 | 6/1/2025 | 6/8/2025 | 6/15/2025 | 6/22/2025 | 6/29/2025 | 7/6/2025 | 7/13/2025 | 7/20/2025 | 7/27/2025 | 8/3/2025 | 8/10/2025 | 8/17/2025 | | |
| **Week Ending:** | 5/31/2025 | 6/7/2025 | 6/14/2025 | 6/21/2025 | 6/28/2025 | 7/5/2025 | 7/12/2025 | 7/19/2025 | 7/26/2025 | 8/2/2025 | 8/9/2025 | 8/16/2025 | 8/23/2025 | | |
| **Sources and Liquidity** | | | | | | | | | | | | | | | |
| **Operating Cash Properties** | | | | | | | | | | | | | | | |
| BOP Balance | -- | $71,218.3 | $116,011.7 | $127,255.5 | $125,182.0 | ($1,977.8) | -- | $34,967.6 | $56,037.2 | $44,137.9 | $32,684.5 | $67,652.1 | $88,721.7 | -- | -- |
| Starting Cash | $92,497.5 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | $42,080.9 | $92,497.5 |
| Net Cash Flow | ($21,279.2) | $44,793.4 | $11,243.8 | ($2,073.5) | ($553,899.2) | $1,977.8 | $34,967.6 | $21,069.6 | ($11,899.2) | ($11,453.4) | $34,967.6 | $21,069.6 | ($11,899.2) | -- | $99,666.4 |
| UST Fees | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | ($573,260.6) |
| **EOP Cash Balance** | $71,218.3 | $116,011.7 | $127,255.5 | $125,182.0 | ($1,977.8) | -- | $34,967.6 | $56,037.2 | $44,137.9 | $32,684.5 | $67,652.1 | $88,721.7 | $76,822.5 | -- | $118,903.4 |
| *Deficit, Unpowered from PropCos* | | | | | ($513,431.2) | | | | | | | | | | ($513,431.2) |
| **Corporate Liquidity** | | | | | | | | | | | | | | | |
| BOP Balance | -- | $1,936,020.8 | $507,713.1 | $100,000.0 | $13,431.2 | $113,431.2 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | -- | -- |
| Starting Cash | $100,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | $100,000.0 |
| DIP Facility Capacity | $1,836,020.8 | ($1,428,307.0) | ($407,713.1) | | | | | | | | | | | | |
| **EOP Cash Balance** | $1,936,020.8 | $507,713.1 | $100,000.0 | $13,431.2 | $113,431.2 | $113,431.2 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | $100,000.0 | -- | $100,000.0 |
| **Restructuring and Turnaround Outflows** | | | | | | | | | | | | | | | |
| **Non-Recurring Outflows** | | | | | | | | | | | | | | | |
| Debt Balance (Payoff) | ($3,575,000.0) | | | | | | | | | | | | | | ($3,575,000.0) |
| Accounts Payable (Critical Vendors) | ($362,713.1) | | | | | | | | | | | | | ($276,877.2) | ($276,877.2) |
| Capital Improvement and Rehab | | ($574,573.7) | ($362,713.1) | | | | | | | | | | | | ($1,299,999.9) |
| Post-Petition Interest (Adequate Protection) | ($507,000.0) | ($863,734.0) | ($45,000.0) | | | | | | | | | | | | ($1,405,734.0) |
| Other Debts | ($313,021.0) | | | | | | | | | | | | | | ($313,021.0) |
| Other Deficits and Reserves | ($52,450,000.0) | | | | | | | | | | | | | | ($52,450,000.0) |
| Pre-Petition Administrative Expenses | | | | | | | | | | | | | | | |
| Post-Petition Administrative Expenses | | | | | | | | | | | | | | ($276,877.2) | ($276,877.2) |
| **Total Non-Recurring Outflows** | ($7,207,734.1) | ($1,428,307.7) | ($407,713.1) | | | | | | | | | | ($11,899.2) | ($276,877.2) | ($59,320,632.1) |
| **Total Non-Recurring Net Cash Flow** | ($7,229,013.3) | ($1,383,514.4) | ($396,469.3) | ($2,073.5) | ($553,899.2) | ($11,431.2) | $34,967.6 | $21,069.6 | ($11,899.2) | ($11,453.4) | $34,967.6 | $21,069.6 | ($11,899.2) | ($276,877.2) | ($59,407,323.8) |
| **Corporate Cash** | | | | | | | | | | | | | | | |
| **Pre-Petition Bridge / Post-Petition DIP Capacity** | | | | | | | | | | | | | | | |
| BOP Balance | -- | $1,836,020.8 | $407,713.1 | | | | | | | | | | | | |
| Bridge Funding | | | | | | | | | | | | | | | |
| Interim Funding | $9,705,161.8 | | | | | | | | | | | | | | $9,705,161.8 |
| Final Funding | | | $13,846.5 | | | | | | | | | | | | $13,846.5 |
| Origination Fee | ($291,154.9) | | ($415.4) | | | | | | | | | | | | ($291,570.2) |
| Reserves | ($370,252.0) | | | | | | | | | | | | | | ($370,252.0) |
| Outflows | ($7,207,734.1) | ($1,428,307.7) | ($407,713.1) | | | | | | | | | | | | ($9,057,186.1) |
| Payoff | | | | | | | | | | | | | | | |
| **EOP Balance** | $1,836,020.8 | $407,713.1 | | | | | | | | | | | | | |
| **Post-Petition Bridge / Post-Petition DIP Balance** | | | | | | | | | | | | | | | |
| BOP Balance | -- | $7,498,889.0 | $8,927,196.7 | $9,334,909.8 | $9,335,325.1 | $9,335,325.1 | $9,488,786.2 | $9,488,786.2 | $9,488,786.2 | $9,488,786.2 | $9,631,118.0 | $9,631,118.0 | $9,631,118.0 | | |
| Fees and Expenses | $291,154.9 | $1,428,307.7 | $415.4 | | $13,431.2 | | | | | | | | | | $291,570.2 |
| Accrual | $7,207,734.1 | $407,713.1 | | | $140,029.9 | | | | $142,331.8 | | | | | $291,100.0 | $9,057,186.1 |
| Outflows | | | | | | | | | | | | | | | $573,461.2 |
| Min. Interest / Prepayment / Yield Maint. | | | | | | | | | | | | | | | |
| Payoff | | | | | | | | | | | | | | | |
| **EOP Balance** | $7,498,889.0 | $8,927,196.7 | $9,334,909.8 | $9,335,325.1 | $9,335,325.1 | $9,488,786.2 | $9,488,786.2 | $9,488,786.2 | $9,488,786.2 | $9,631,118.0 | $9,631,118.0 | $9,631,118.0 | $9,631,118.0 | ($9,631,118.0) | |