UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J
LBR 9004-1**

MOSHE ("MARK") SILBER
FCI Danbury
Federal Correctional Institution
33½ Pembroke Road
Danbury, CT 06811
Tel: n/a
Email: n/a

Unrepresented pro se party in interest

In re:

CBRM REALTY INC., et al.,

          Debtors.

Chapter 11

Case No. 25-15343 (MBK)
(Jointly Administered)

U.S. BANKRUPTCY COURT
FILED
TRENTON, NJ

2025 JUL 18  P 3: 02

JEAN _ _ _ _ _ _GHTON

BY:_____
DEPUTY CLERK

MOTION OF PARTY IN INTEREST MOSHE ("MARK") SILBER FOR
ISSUANCE OF A SUBPOENA DUCES TECUM PURSUANT TO
FED. R. BANKR. P. 2004(c) AND 9016

Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016, party in interest Moshe ("Mark") Silber hereby moves pro se for the Bankruptcy Court to order the issuance of a subpoena duces tecum to Elizabeth LaPuma ("LaPuma"), Lynd Management Group LLC ("LMG"), and LAGSP LLC (together with LMG, "Lynd"), for the production of certain documents and electronically stored information ("ESI") relating to the Debtors' prepetition and postpetition management, operation, assets, liabilities, and financial condition, and other matters relevant to formulating a plan of reorganization. In support hereof, Silber states as follows:

## INTRODUCTION

1. Silber is the founder and sole shareholder of Debtor CBRM Realty Inc. ("CBRM"), the top-level entity in the roughly 15,000-unit residential real estate portfolio he built, which is now the subject of this bankruptcy case. Having assembled and overseen that portfolio for years, Silber believes that at least as recently as mid-2024 it had significant equity value, and that it may still. And he is troubled by certain decisions and actions by LaPuma and Lynd that appear to have exacerbated crises at his companies, as well as by glaring inaccuracies contained in certain filings made on behalf of the Debtors in this bankruptcy case which appear calculated to sweep those failures under the rug and to paint a misleading portrait of the business in service of a (too) hasty plan confirmation that risks failing to maximize value for the estate. This motion seeks disclosure to shed light on those issues before it is too late, to reveal overlooked value in the estate, and to ensure that all parties in interest are being treated fairly.

## FACTS

2. Silber is the sole shareholder of CBRM and a party in interest in this bankruptcy case. Having founded CBRM and having assembled and overseen for years its roughly 15,000-unit residential real estate portfolio, he is intimately familiar with its history, composition, and value.

3. On July 9, 2024, Silber pled guilty in the United States District Court for

1

the District of New Jersey to one count of conspiracy to commit wire fraud affecting

a financial institution, in violation of 18 U.S.C. §371. The conviction arose out

of a loan transaction involving a property owned by Williamsburg of Cincinnati

Apts, LLC, a subsidiary of Crown. No other debtor-affiliated entity or property was

implicated or involved in that transaction.

4. In March 2025, Silber was sentenced to 30 months imprisonment and to pay a

yet-to-be-determined amount of restitution. He is currently incarcerated at FCI

Danbury, a low-security federal prison in Danbury, Connecticut. Owing to his personal

financial difficulties, Silber is not currently represented by counsel in this

bankruptcy case. Although he is a party in interest, he has not received formal

notice of any filings in the case. His access to the numerous filings that potent-

ially or actually affect his rights has only been sporadic, informal, and often

weeks-delayed (sometimes more).

5. Silber's guity plea precipitated a crisis for his real estate business by

making CBRM, Crown, and their dozens of subsidiaries unbankable while he remained

in control of them. This left the business unable to access capital and credit it

needed to perform day-to-day operations and pay expenses such as maintenance,

repairs, utilities, wages, salaries, and debt service.

6. To alleviate the crisis, and at the insistence of a group of bondholders of

Crown, Silber agreed to relinquish control over his business while retaining his

equity interest in it. Pursuant to a series of agreements and corporate resolutions,

executed on September 26, 2024 after months of painstaking negotiations, Silber turned

control over the operation and management of the real estate portfolio to LaPuma,

who agreed to act as an independent fiduciary. LaPuma's engagement was to last up

to three years. She was to be paid $60,000 per month for her services.

7. Upon taking control of the business, LaPuma retained LMG and LAGSP to act

as the property and asset manager, respectively, for the real estate portfolio owned

directly and indirectly by CBRM, Crown, and their subsidiaries comprising properties

throughout the United States. LaPuma committed the busines to paying Lynd $200,000 monthly

for its services. In addition, Lynd separately charged and received well over $1

million to prepare and implement an asset recovery plan for the business - a plan

that to Silber's knowledge has never been implemented.

8. On or about May 19, 2025, LaPuma filed Chapter 11 petitions for CBRM, Crown,

RH New Orleans Holdings MM LLC, and seven of their subsidiaries. Many more subsid-

iaries wholly or majority-owned by CBRM and/or Crown remain under LaPuma and Lynd's

control but have not been made debtors in this bankruptcy case. Some of those

entities hold significant value.

9. On or about June 18, 2025, the Debtors assumed their agreements with Lynd.

To the best of Silber's knowledge, LaPuma and Lynd remain in control of the entire

real estate business - debtor and non-debtor entities alike - of which he is the

sole shareholder.

10. Serious questions have arisen abou LaPuma and Lynd's performance as

fiduciaries and/or managers of the large real estate portfolio they control. In

addition to their apparent failure to implement the asset recovery plan for which

Lynd was paid over $1 million, LaPuma and Lynd appear to have allowed valuable estate

assets to be lost or diminished, and to have supplied their financial advisor,

IslandDundon, with inaccurate information that has been repeated in filings in this

bankruptcy case. These are troubling developments that warrant examination before

a plan can be confirmed.

11. For example, after LaPuma took control over the portfolio, Spano Investor

LLC ("Spano"), which is identified as a judgment creditor in this bankruptcy case,

foreclosed on the equity of Westwood Apts LLC ("Westwood"), a subsidiary of CBRM.

At the foreclosure sale, which was minimally advertised, Spano reportedly credit

bid just a few thousand dollars for that equity, despite the fact that Westwood

owned property worth nearly ten million. To Silber's knowledge, LaPuma and Lynd

took no steps to prevent Spano from obtaining this windfall.

3

12. LaPuma and Lynd have also apparently failed to prevent, cure, or otherwise address problematic conditions at multiple other portfolio properties, costing the business millions. For exmaple, they have failed to correct conditions at Mon View Heights Apartments, a portfolio property located in Allegheny County, Pennsylvania, owned by Mon View Apts LLC ("Mon View"), a non-debtor subsidiary of CBRM and/or Crown. In November 2024, Allegheny County filed criminal complaints against Mon View arising out of uncured violations at the property. LaPuma and Lynd failed to respond to those complaints or fix the underlying issues (falsely claiming they somehow lacked authority to do so), resulting in the imposition of over $232,000 in fines.

13. As a direct result of that apparent mismanagement of Mon View, on or about February 4, 2025, Allegheny County also lodged a criminal complaint against Silber personally, citing allegedly poor conditions at Mon View Heights Apartments that LaPuma and Lynd had failed to address. Those charges were eventually dropped against Silber, but not before they resulted in a violation of the terms of his bail and his being tarred in the local press as a "slumlord" (a false accusation that reflected negatively on the entire portfolio). To Silber's knowledge, the conditions at Mon View Heights Apartments that precipitated those charges remain unaddressed.

14. Other portfolio properties have had similar problems on LaPuma and Lynd's watch. The city of New Orleans has tagged the New Orleans portfolio - consisting of six properties and 2,204 units that Lynd has managed since 2019 - with hundreds of violations since September 2024. And the business's Creekwood and Forester properties in Tuscaloosa, Alabama, are currently being pusued by local authorities there for violations arising out of condictions LaPuma and Lynd apparently failed to address.

15. These examples, which comprise affordable and market-rate projects alike, hint at potentially more-widespread mismanagement of the portfolio that may have already cost - and is continuing to cost - the estate, its creditors, and Silber as sole shareholder, millions in lost value. Silber seeks Rule 2004 disclosure, in part, to identify and protect value in the estate that is at risk from such

4

mismanagement. The need for that disclosure has become especially pressing now that Debtors, under LaPuma's direction, have proposed a plan that would release and excupate LaPuma and Lynd from liability for their actions as fiduciaries and/or contractual managers of the portfolio. See, e.g., Proposed Disclosure Statement (Docket No. 247) at 9-10.

16. Additionally, Silber has reason to belive that Debtors' financial advisor, Island/Dundon, has not received accurate information from LaPuma and Lynd - another troubling development that merits exploration through Rule 2004 disclosure, insofar as that information undergirds the proposed plan of reorganization Debtors filed on June 30, 2025 (Docket No. 246), which Silber only obtained this week.

17. For example, the First Day Declaration of Matthew Dundon (Docket No. 44) (also only obtained by Silber this week) inaccurately claims that Silber was prosecuted for manipulating the value of property appraisals and "siphoning the surplusage" of "excessive financing" out of Crown. Dundon Decl. at ¶10. That claim is repeated in the proposed Disclosure Statemen (again, only obtained by Silber this week). See Proposed Disclosure Statement at 17.

18. Those allegations, were they true, might tend to call into question the valuations of portfolio properties produced while Silber was in control of the business. That is certainly what they appear intended to accomplish, insofar as Dundon makes them in suggesting that "many, if not all" of the portfolio's properties are "likely worth much less today than the appraised values that supported issuance of the [Crown] Notes and certain of the property-level mortgage loans." Dundon Decl. at ¶10; Proposed Disclosure Statement at 16.

19. But those allegations are not true. Silber was not "successfully prosecuted" for "using false or misleading property-level information to obtain inflated appraisals for certain properties, obtaining excessive financing, and then siphoning the surplusage out of Crown." Dundon Decl. at ¶10; Proposed Disclosure Statement at 17. He was prosecuted in connection with a single loan transaction involving

5

Williamsburg of Cincinnati. To Silber's understanding, the Department of Justice subpoenaed and reviewed all of the portfolio's loans and found no basis to prosecute him for anything other than that transaction. Moreover, Silber has never misappropriated a dollar from Crown. The implication that he did so in the Williamsburg of Cincinnati transaction to the detriment of Crown's bondholders is particulary egregious, given that the bonds had not even been issued when that loan occurred. (Curiously, Dundon also identifies Williamsburg of Cincinnati as an "affordable housing project" when, in fact, it is a market-rate property. He also seems unaware that its owner was a Crown subsidiary. See Dundon Decl. at 7; Proposed Disclosure Statement at 16.)

20. Dundon also incorrectly asserts that Silber did not respond to a letter from Acquiom Agency Services LLC ("Acquiom") asserting a default under a credit agreement between Silber and UBS O'Connor LLC. Dundon Decl. at ¶17. As above, that allegation, if it were true, might tend to call Silber's management of the portfolio into question. But it, too, is not true. Silber did respond to Acquiom's default notice and vigorously disputed its asserted claim, but Acquiom was able to obtain judgment notwithstanding those objections.

21. It is also striking that Debtors, under LaPuma and Lynd's control, paint a narrow and wholly inaccurate portrait of the real estate portfolio. The Proposed Disclosure Statement implausibly claims that CBRM and Crown's "primary business is the ownership, financing, and operation of [the] single affordable housing asset" referred to as the Kelly Hamilton Property (a 110-unit apartment complex). Proposed Disclosure Statement at 15. The organizational chart for CBRM and Crown appended to the Proposed Disclosure Statement at Exhibit B refers only to that property. Id. at Ex. B. To Silber's knowledge, that is simply untrue. CBRM, Crown, and their debtor and non-debtor subsidiaries collectively owned and controlled roughly 15,000 units, with properties throughout the United States. And as noted above, many of those properties have been cited for violations on LaPuma and Lynd's watch.

6

22. The apparent aim of these inaccuracies is to portray the portfolio as having either declined in value under Silber's control, or never having had the value Silber ascribed to it, while casting LaPuma and Lynd's tenure as purely value-maximizing. Silber disputes that narrative. He does not deny that his criminal convictions took a toll on his real estate business. But he believes that a fair and objective assessment of the value of the portfolio will reveal that the enterprise was fundamentally sound as of when he handed over control to LaPuma and Lynd, and that the estate should have significantly greater value than Debtors' filings to date in this bankruptcy case have suggested. He seeks Rule 2004 disclosure to bear that out and to correct inaccuracies that may impact the analysis of any proposed plan.

## DISCUSSION

23. Rule 2004(c) provides that "an entity may be compelled under Rule 9016 to... produce documents and [ESI]." Fed. R. Bankr. P. 2004(c). A subpoena issued pursuant to Rules 2004(c) and 9016 may seek "very broad" disclosure, provided it relates to the debtor's acts, conduct, or property; the debtor's liabilities and financial condition; any matter that may affect the administration of the debtor's assets; or the debtor's right to a discharge. In re Recoton Corp., 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); Fed. R. Bankr. P. 2004(b)(1); see also In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 626 (Bankr. D.N.J. 2016) (likening Rule 2004 disclosure to a "fishing expedition").

24. In a Chapter 11 case, a subpoena under Rules 2004(c) and 9016 may also seek disclosure of records relating to the operation of any business and the desirability of its continuing; the source of any money or property the debtor acquired or will acquire for the purposes of consummating a plan and the consideration given or offered; and any other matter relevant to the bankruptcy case or to formulating a plan. Fed. R. Bankr. P. 2004(b)(2).

25. A Rule 2004(c) subpoena may be issued to "any third party who can be shown to have a relationship with the debtor". In re Ionosphere Clubs, Inc., 156 B.R.

7

414, 432 (S.D.N.Y. 1993), aff'd 17 F.3d 600 (2d Cir. 1994). LaPuma and Lynd are
therefore proper recipients of a Rule 2004(c) subpoena in this bankruptcy case.

26. A subpoena may issue under Rule 2004 only upon motion by a party in interest.
See Fed. R. Bankr. P. 2004(a). Silber, as the sole shareholder of CBRM, is such a
party. See 11 U.S.C. §1109(b) (defining equity security holder as party in interest).

27. Accordingly, Silber respectfully requests that the Bankruptcy Court enter
an order that a subpoena duces tecum be issued pursuant to Rules 2004(c) and 9016
to LaPuma and Lynd for the disclosure of documents and ESI regarding any topic
permitted under Rule 2004(b), including without limitation:

    a. Records relating to the prepetition and postpetition management and
operation of Debtors and their non-debtor subsidiaries by Lapuma and/or
Lynd;

    b. Records relating to any complaints, violations, charges, fines, and/or
other actual or potential sanctions against Debtors and/or their non-debtor
subsidiaries while under the control of LaPuma and/or Lynd;

    c. Records relating to the asset recovery plan commissioned from Lynd and
steps taken, if any, to implement it, including specifically but without
limitation any before-and-after images of repairs or improvements at any
portfolio property;

    d. Records relating to the fair market value of properties owned in whole
or in part by Debtors and/or their non-debtor subsidiaries, including any
appraisals of or offers to purchase such properties;

    e. Records regarding any prepetition action taken by any alleged creditor
of any Debtor and/or any non-debtor subsidiary, including without limitation
Spano, to enforce any debt against any property or interest of any Debtor
and/or any non-debtor subsidiary; and

    f. All communications between or among LaPuma, Lynd, and/or IslandDundon
regarding any topic above.

8

Respectfully submitted,

Moshe ("Mark") Silber, pro se
Reg. No. 24293-511
FCI Danbury
Federal Correctional Institution
33½ Pembroke Road
Danbury, CT 06811

CERTIFICATION OF SERVICE

I, Moshe ("Mark") Silber, hereby certify that on July 18, 2025, I served the Motion of Party in Interest Moshe ("Mark") Silber for Issuance of a Subpoena Duces Tecum Pursuant to Fed. R. Bankr. P. 2004(c) and 9016 on the Debtors by placing a copy of it in the United States mail addressed to their counsel, White & Case LLP. I further understand that upon its filing on the electronic docket by the Clerk, electronic copies of the motion and accompany materials will be sent to Debtors and other parties in interest.

_____
Moshe ("Mark") Silber