| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** |
| **WHITE & CASE LLP**<br>Gregory F. Pesce (admitted *pro hac vice*)<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 881-5400<br>Email:  gregory.pesce@whitecase.com<br><br>-and-<br><br>Andrew Zatz<br>Samuel P. Hershey (admitted *pro hac vice*)<br>Barrett Lingle (admitted *pro hac vice*)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 819-8200<br>Email:  azatz@whitecase.com<br>sam.hershey@whitecase.com<br>barrett.lingle@whitecase.com<br><br>*Counsel to Debtors and Debtors-in-Possession*<br><br>**KEN ROSEN ADVISORS PC**<br>Kenneth A. Rosen<br>80 Central Park West<br>New York, New York 10023<br>Telephone: (973) 493-4955<br>Email: ken@kenrosenadvisors.com<br><br>*Co-Counsel to Debtors and*<br>*Debtors-in-Possession* |

| | |
|---|---|
| In re:<br><br>CBRM REALTY INC., *et al*.<br><br>                              Debtors.[1] | Chapter 11<br><br>Case No. 25-15343 (MBK)<br>(Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (9071), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951).  The location of the Debtors' service address in these chapter 11 cases is: In re CBRM Realty Inc., et al., c/o White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020.

**DECLARATION OF
MATTHEW DUNDON, PRINCIPAL
OF ISLANDDUNDON LLC, IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF AN
ORDER (I) APPROVING (A) BIDDING PROCEDURES,
THE SALE TIMELINE, AND THE FORM AND MANNER
OF NOTICE THEREOF FOR THE KELLY HAMILTON PROPERTY,
(B) THE DEBTORS' ENTRY INTO AND PERFORMANCE UNDER THE
STALKING HORSE AGREEMENT, (C) BID PROTECTIONS IN CONNECTION
WITH THE STALKING HORSE AGREEMENT, AND (D) ASSUMPTION
AND ASSIGNMENT PROCEDURES, AND (II) GRANTING RELATED RELIEF**

I, Matthew Dundon, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Principal of Dundon Advisers LLC ("**Dundon**") and its real estate restructuring affiliate IslandDundon LLC ("**IslandDundon**"), the proposed financial advisor for the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**").

2. Based on my work with the Debtors, my review of relevant documents, and my discussions with members of the Debtors' management team and other professionals, including the Independent Fiduciary,[2] I am familiar with the Debtors' day-to-day operations and business affairs. I submit this declaration (this "**Declaration**") in support of the *Debtors Motion for Entry of an Order (I) Approving (A) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof for the Kelly Hamilton Property, (B) the Debtors' Entry into and Performance Under the Stalking Horse Agreement, (C) Bid Protections in Connection with the Stalking Horse Agreement, and (D) Assumption and Assignment Procedures, and (II) Granting Related Relief* [Docket No. 281] (the "**Bidding Procedures Motion**").

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures and Bidding Procedures Motion (as defined herein).

2

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations and finances; (b) information learned from my review of relevant documents; (c) information supplied to me by the Debtors' professional advisors; or (d) my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I previously submitted the *Declaration of Matthew Dundon in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 156] (the "**DIP Declaration**"), which provides additional information regarding the Debtors' efforts to secure debtor in possession financing and is incorporated herein by reference.

4. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments received by IslandDundon as a professional engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is complete and accurate to the best of my knowledge.

**I.      Background and Qualifications**

5. I have been a principal of Dundon since 2016 and of IslandDundon and its predecessor joint venture vehicles with Island Capital Group LLC ("**Island**") since 2019. Dundon provides financial restructuring and asset management advice and places loans and other non-securities financings on the primary and secondary markets. Island invests in real estate

transactions and holds interests in real estate services concerns. I previously worked as a credit hedge fund portfolio manager (2010 to 2016), an institutional brokerage fixed income analyst and head of research (2003 to 2010), and a securities and leveraged finance attorney (1998 to 2003).

6. I received a Juris Doctor from the University of Chicago Law School and a Bachelor of Arts from the University of California at Berkeley. My testimony and declarations in relation to complex chapter 11 matters are regularly accepted by bankruptcy courts in this and many other districts.

## II.  Events Leading to the Stalking Horse Agreement and Marketing Process

7. In May 2025, the Debtors retained IslandDundon as their financial advisor and investment banker. Among other things, the Debtors have tasked IslandDundon with advising the Debtors in connection with one or more postpetition transaction(s) concerning the Kelly Hamilton Property with the goal of maximizing its value for the Debtors' stakeholders.

8. As the first step in that process, the Debtors, with IslandDundon's assistance, secured a debtor-in-possession loan facility (the "**Kelly Hamilton DIP Loan**") from the Kelly Hamilton DIP Lender. *See* Kelly Hamilton DIP Order [Docket No. 178].

9. Next, as required by the terms of the Kelly Hamilton DIP Loan, the Debtors, with IslandDundon's assistance, negotiated with the Kelly Hamilton DIP Lender to become the "stalking horse" bidder for the Kelly Hamilton Property.

10. These negotiations culminated in the Kelly Hamilton DIP Lender's presentation of proposed transaction terms. The Debtors, with the assistance of IslandDundon and the Debtors' legal counsel, evaluated (a) the amount of consideration provided; (b) the structure of the proposed plan transactions; (c) the requested bid protections and any possible impact on the upcoming auction; (d) the risk that Kelly Hamilton DIP Lender might be unable to consummate the purchase;

4

and (e) the potential consequences of refusing the proposal, including but not limited to being required to repay the Kelly Hamilton DIP Loan with cash. On the basis of this evaluation, the Debtors determined that acceptance of the terms proposed by the Kelly Hamilton DIP Lender was in the best interests of the estates and therefore authorized the drafting, execution and delivery of definitive documentation embodying the accepted terms.

11. On July 11, 2025, the Kelly Hamilton Debtor and the Kelly Hamilton DIP Lender entered into a purchase and sale agreement whereby the Kelly Hamilton DIP Lender agreed to purchase the Kelly Hamilton Property for a purchase price equal to the balance of the Kelly Hamilton DIP Loans (the "**Stalking Horse Agreement**"). The Stalking Horse Agreement includes procedures that treat the Kelly Hamilton DIP Lender's purchase commitment as a "stalking horse" bid, i.e., subject to a continued marketing process by the Debtors and to being supplanted, albeit with the benefit of a compensatory fee for capital commitment and reimbursement of expenses, by a third party's higher and better bid, should one emerge from such continued marketing process.

12. Recognizing the likely need for a sales process for the Kelly Hamilton Property that includes potential buyers other than the Kelly Hamilton DIP Lender, the Debtors have, with the assistance of IslandDundon and their other advisors, been developing such a sales process since before the petition date of these chapter 11 cases. To date, IslandDundon has identified 37 parties that in its experience may be interested in purchasing and/or financing the purchase of the Kelly Hamilton Property. These include both "strategic" buyers (i.e., operators of other multifamily affordable housing projects) and "financial" buyers (i.e., managers of real estate investment funds and other institutional investors). In my experience, publicity for the Court's approval of the Bidding Procedures, should the Court see fit to approve them, is likely to catalyze expressions of

interest from one or more strategic and/or financial buyers in addition to those 37 prospects. The Debtors intend to distribute a non-confidential marketing overview (a "teaser" in industry parlance) to IslandDundon-identified or self-identified potentially interested parties as soon as practicable after approval of the Bidding Procedures, and will provide extensive additional material to the subset of potential purchasers who agree to execute and deliver confidentiality agreements with the Debtors. Moreover, the Debtors and IslandDundon will continue to conduct discussions with any party that complies with the requirements of the Bidding Procedures.

13. I believe that the proposed Bidding Procedures, taken together with the Stalking Horse Agreement serving as a baseline for the Debtors' marketing and sale process, will enable the Debtors to achieve the greatest possible level of interest and consideration for the Kelly Hamilton Property. Further, I believe that the proposed Bidding Procedures and the Debtors' proposed Sale Timeline provide sufficient time and flexibility to conduct a robust marketing and sale process that will allow the Debtors to confirm whether the Stalking Horse Bid represents the highest and otherwise best offer for the Kelly Hamilton Property.

**III.     Terms of the Stalking Horse Agreement Generally**

14. The Stalking Horse Agreement provides for the purchase of the Kelly Hamilton Property by the Kelly Hamilton DIP Lender for the aggregate purchase consideration of (i) a credit bid in the amount equal to the sum of the balance of the Kelly Hamilton DIP Loan[3] and the Manager Administrative Expense Claim, (ii) assumption of the Assumed Liabilities as of the Closing Date, (iii) payment of the Cure Payment, and (iv) to the extent that any sums shall be required to pay the obligations of the Kelly Hamilton DIP Lender as described in clause (ii) above

---

[3] Credit bidding of the balance of the Kelly Hamilton DIP Loan for the Kelly Hamilton Property, in the event of the Kelly Hamilton Property's sale, was already authorized by the Kelly Hamilton DIP Order.

6

or to pay closing costs for which the Kelly Hamilton DIP Lender is responsible hereunder, the Kelly Hamilton DIP Lender shall also deliver such a cash payment to the Escrow Agent as may be required for purposes of paying such sums (collectively, the "**Stalking Horse Bid**").  In the event that a third party submits a bid for the Kelly Hamilton Property which the Debtors determine to be higher and better than the Stalking Horse Bid (a "**Topping Bid**"), the Stalking Horse Agreement permits, but does not require, the Kelly Hamilton DIP Lender to increase its bid to an amount higher and better than the Topping Bid.

15.    The negotiation of the stalking horse bidder exclusivity provisions of the Kelly Hamiton DIP Loan and the subsequent negotiation of the Stalking Horse Agreement were each led for the Debtors by the Debtors' Independent Fiduciary Elizabeth LaPuma, who was closely assisted by her advisors, including me and my senior colleagues at IslandDundon.  Based on my involvement in the negotiations, I believe that those stalking horse bidder exclusivity provisions and the Stalking Horse Agreement were each negotiated in good faith and at arm's-length.

**IV.    Bidding Procedures and the Bid Protection**

16.    Critical to my view that this Court's approving the Stalking Horse Agreement will maximize the value of the Kelly Hamilton Property to the Debtors' stakeholders is the fact that the Bidding Procedures placed into effect by such approval subjects the Stalking Horse Bid to an open and transparent auction and sale process led by the Debtors, with the assistance of IslandDundon and the Debtors' other advisors.  The purchase consideration provided by the Stalking Horse Bid will therefore be market-tested to ensure the highest and otherwise best offer is received for the Kelly Hamilton Property.

17. The customary fee provision the Stalking Horse Agreement provides to the Kelly Hamilton DIP Lender in the event a Topping Bid is successful (the "**Bid Protection**") is in my view necessary and appropriate, and was negotiated by the Debtors to minimize any appearance or reality of "chilling" competing bids.

18. The Bid Protection would, if approved by the Court, fairly compensate the Kelly Hamilton DIP Lender for the time, effort, expense, and risk that it incurred in negotiating, documenting, and seeking to consummate the Sale Transaction. The Bid Protection would provide the Kelly Hamilton DIP Lender a break-up fee in the amount of $250,000, which shall only be payable in the event that a Topping Bid succeeds, and would only be payable on the Effective Date or the closing of the Sale Transaction from the cash proceeds of the transaction, as applicable.

19. From my experience in bankruptcy sales, I believe that in the absence of bid protections such as the Bid Protection, the Kelly Hamilton DIP Lender, like most proposed stalking horse purchasers in bankruptcy sales, would not have accepted the commitment to purchase without the corresponding obligation to sell, provided by the Stalking Horse Agreement.

20. Here, I believe that the terms of the Bid Protection are customary and usual under the circumstances and adequately compensate the Kelly Hamilton DIP Lender for its time, effort, and resources in connection with its diligence of the Kelly Hamilton Property and entry into the Stalking Horse Agreement. I believe that the specific amount of the Bid Protection is well within the range – in fact fall close to the *bottom of the range* – of breakup compensation with which I am familiar in bankruptcy sales processes for assets such as the Kelly Hamilton Property. The Bid Protection was the result of the Debtors' good-faith, arm's-length negotiations with the Kelly Hamilton DIP Lender.

21. In sum, I believe approval of the Bid Protection will help to preserve value for the Debtors' estates in connection with the marketing and sale process for the Kelly Hamilton Property.

## V. The Sale Timeline

22. The Debtors, with IslandDundon's assistance, carefully designed the sale process required by the Bidding Procedures, including the sale timeline embedded therein (the "**Sale Timeline**"). Without limiting the generality of the foregoing, I believe the Sale Timeline provides potentially interested parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. The sufficiency of the Sale Timeline is due in part to the previously-noted commencement of the sales process's development several months ago, beginning before commencement of these chapter 11 cases. From my extensive experience in bankruptcy sales processes, I believe approval of the Bidding Procedures will allow the Debtors to conduct their marketing and sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close a transaction.

23. Based on the foregoing, I believe the Sale Timeline provides sufficient time and flexibility to conduct a competitive and robust postpetition auction and sale process for the Kelly Hamilton Property.

## VI. Conclusion

24. In conclusion, I believe that approval of the Stalking Horse Agreement, the Bidding Procedures, Bid Protection, and Sale Timeline is necessary and appropriate to maximize the value of the Kelly Hamilton Property to the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 23, 2025

Respectfully submitted,

/s/ *Matthew J. Dundon*
Matthew J. Dundon
Principal
IslandDundon LLC

*Proposed Financial Advisor and Investment Banker of the Debtors and Debtors-in-Possession*