FILED
JEANNE A. NAUGHTON, CLERK
JUL 25 2025
U.S. BANKRUPTCY COURT
TRENTON, N.J.
BY_____ DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in compliance with D.N.J
LBR 9004-1

MOSHE ("MARK") SILBER
FCI Danbury
Federal Correctional Institution
33½ Pembroke Road
Danbury, CT 06811
Tel: n/a
Email: n/a

Unrepresented pro se party in interest

---

In re:

CBRM REALTY INC., et al.,

    Debtors.

Chapter 11

Case No. 25-15343 (MBK)
(Jointly Administered)

---

**MOTION OF PARTY IN INTEREST MOSHE ("MARK") SILBER FOR APPOINTMENT OF AN EQUITY SECURITY HOLDERS COMMITTEE OR, IN THE ALTERNATIVE, APPOINTMENT OF COUNSEL**

I, party in interest Moshe ("Mark") Silber, hereby move pro se pursuant to 11 U.S.C. §1102(a)(2) for appointment of a committee of equity security holders in the above-captioned bankruptcy case, or in the alternative, for appointment of counsel pursuant to 28 U.S.C. §1915(e)(1). In support hereof, I state as follows:

### INTRODUCTION

1. I am the sole shareholder of Debtor CBRM Realty Inc. ("CBRM"), the top-level entity in the roughly 15,000-unit real estate portfolio that I built over years, which is now the subject of this bankruptcy case. I am also currently incarcerated, having pled guilty in July 2024 to one count of conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. §371.

2. Although I am indisputably a party in interest in this bankruptcy case, I have been shut out of it. I received no prior notice that the case would be filed. I have not received notices under Rule 2002. No filings have been served on or sent to me by Debtors. Owing to my incarceration, my access to filings has been sporadic, informal, and often weeks (or more) delayed. I have not had the opportunity to be heard or to appear on numerous issues, lacking sufficient notice of them. And I have only recently learned that the case has proceeded in a manner that lays virtually all of the fault for Debtors' difficulties at my feet.

3. That is a false narrative. Notwithstanding my criminal conviction, the real estate business I built was fundamentally sound as of mid-2024, when I was forced to turn day-to-day control of it over to the independent fiduciary, Elizabeth LaPuma ("LaPuma"). If I had access to the business's records and the ability to participate meaningfully in this case with the assistance of counsel, I believe I could prove that the portfolio had equity value at that point, and that it still may. And if it does not, then I believe the decisions and actions of LaPuma and the property and asset managers she hired, Lynd Management Group LLC ("LMG") and LAGSP LLC ("LAGSP", and together with LMG, "Lynd"), deserve careful scrutiny in this case. On their watch, numerous portfolio properties have fallen into disrepair

1

and numerous violations have gone unaddressed, to the estate's significant detriment.

4. Now, a proposed plan of reorganization (Docket No. 246) has been hastily proposed that would essentially immunize LaPuma and Lynd from responsibility for lost estate value, sell a valuable estate asset to a Lynd affiliate for what appears (to me) to be a generous discount, and wipe me out while targeting me as potentially liable to the estate for damages. Meanwhile, filings on behalf of the Debtors in this case contain significant inaccuracies that appear calculated to gloss over LaPuma and Lynd's deficient performance and to misrepresent the true nature and value of the Debtors' sizeable real estate portfolio. Indeed, some filings seem to reflect that Debtors' management does not even know what properties the business owns.

5. I need a seat at the table to ensure that these issues do no get swept under the rug. It is not too late for me to make a valuable contribution to this case that, first, assists creditors in securing a full recovery so that, second, equity may share in a distribution. I respectfully request that the Court give me that opportunity by exercising its discretion to direct the United States Trustee to appoint an equity committee empowered to hire counsl and advocte for and protect the interests of equity, since those interests are not otherwise adequately represented in this case. In the alternative, I ask that counsel be appointed to represent me pursuant to 28 U.S.C. §1915(e)(1).

FACTS

6. I am the sole shareholder of CBRM, the top-level entity in the real estate portfolio I assembled and managed for years. As of mid-2024, that portfolio comprised roughly 15,000 residential units across dozens of properties spread throughout the United States, each owned by a direct or indirect subsidiary of CBRM.

<u>The Government's Investigation of Me</u>

7. In or around September 2023, I was notified that I was the subject of a federal criminal investigation centered on a mortgage loan conspiracy. It is my

2

understanding that in connection with that investigation, the government subpoenaed and reviewed all of the loans in the real estate portfolio. Ultimately, the government's attention focused on the Williamsburg of Cincinnati loan transaction (see below). To my understanding, the investigation did not identify any other grounds to charge me. I was prosecuted only with respect to that single loan transaction.

My Guilty Plea and Incarceration

8. On July 9, 2024, I pled guilty in the United States District Court for the District of New Jersey to one count of conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. §371. The conviction arose out of a loan transaction involving a property owned by Williamsburg of Cincinnati Apts, LLC ("Williamsburg of Cincinnati"), a subsidiary of (now-Debtor) Crown Capital Holdings LLC ("Crown"), which itself is a wholly-owned subsidiary of CBRM. No other debtor-affiliated entity or property was implicated or involved in that transaction or my plea.

9. In March 2025, I was sentenced to 30 months of imprisonment, three years of supervised release, and to pay a yet-to-be-determined amount of restitution. I have been in custody since February 28, 2025.

10. I am currently incarcerated at FCI Danbury, a low-security federal prison in Danbury, Connecticut. My legal and practical resources here in prison are extremely limited. Although I have access to an electronic law library of federal case law and statutes, I do not have access to the internet or, by extension, the Court's electronic case filing ("ECF") system. I have not been served with or directly received formal notice of any filings in this case. I cannot receive emails from the ECF system. What I know about the case I have learned by relying on contacts outside prison to mail me voluminous paper copies of filings - a slow, cumbersome, unreliable process that means I routinely receive thousands of pages of case material weeks (or more) after they are filed. For example, I only just last week received the First Day Declaration of Matthew Dundon (Docket No. 44), the

3

proposed plan of reorganization (Docket No. 246), and the proposed disclosure statement (Docket No. 247).

11. In prison, I also have no access to standard word processing or communication technology of the sort I would need to participate effectively in this case as a pro se litigant. This motion, for instance, was typed on a typewriter. I have no ability to scan documents or to send or receive them by email. I cannot receive unscheduled telephone calls. I cannot review documents in electronic format, such as a .pdf or .xls file. To my understanding, while the prison can connect with federal courtroom video systems, it cannot connect to proceedings held over Zoom.

12. For all intents and purposes, I am foreclosed by my circumstances from meaningful participation in this bankruptcy case. My efforts to stay informed about and be heard in it have felt like driving a golf cart in a Formula 1 race - it's impossible to keep up and I keep getting lapped by deadlines, decisions, and developments that I only learn about after it is too late for me to appear and be heard on them. For example, I did not learn of the deadline for objecting to interim approval of the proposed disclosure statement until less than 24 hours before a submission would have been due - far too little time to assemble a response given the limitations I face.

Effect of My Guilty Plea on My Real Estate Business

13. My guilty plea precipitated a crisis for my real estate business by making CBRM, Crown, and their dozens of subsidiaries unbankable while I remained in control of them. This left the business unable to access capital and credit it needed to perform day-to-day operations and pay expenses such as maintenance, repairs, wages, salaries, and debt service.

14. To alleviate the crisis, and at the insistence of a group of bondholders of Crown, I agreed to relinquish control over my business while retaining my equity interest in it. Pursuant to a series of agreements and corporate resolutions executed on September 26, 2024 after months of painstaking negotiations, I turned

4

control over the operation and management of the real estate portfolio to LaPuma, who agreed to act as an independent fiduciary. LaPuma's engagement was to last up to three years. She was to be paid $60,000 per month for her services.

15. Upon taking control of the business, LaPuma retained LMG and LAGSP to act as the property and asset manager, respectively for the real estate portfolio. LaPuma committed the business to paying Lynd $200,000 per month for its services. In addition, Lynd separately charged and received well over $1 million to prepare and implement an asset recovery plan for the business - a plan that to my knowledge has never been implemented.

LaPuma and Lynd's Apparent Mismanagement of the Portfolio

16. Serious questions have arisen about LaPuma and Lynd's performance as fiduciaries and/or managers of the large real estate portfolio they control. In addition to their apparent failure to implement the asset recovery plan for which Lynd was paid over $1 million, LaPuma and Lynd appear to have allowed valuable estate assets to be lost or diminished, and to have supplied their financial advisor, IslandDundon, with inaccurate information that has been repeated in filings in this bankruptcy case.

17. For example, after LaPuma took control over the portfolio, Spano Investor LLC ("Spano"), identified as a judgment creditor in this case, foreclosed on the equity of Westwood Apts LLC ("Westwood"), a subsidiary of CBRM. At the foreclosure sale, which was minimally advertised, Spano reportedly credit bid just a few thousand dollars for that equity, despite the fact that Westwood owned property worth nearly ten million dollars. To my knowledge, LaPuma and Lynd took no steps to prevent Spano from obtaining this windfall.

18. LaPuma and Lynd have also apparently failed to prevent, cure, or otherwise address problematic conditions at multiple other portfolio properties, costing the business millions. For example, they have failed to correct conditions at Mon View Heights Apartments, a portfolio property located in Allegheny County, Pennsylvania,

which is owned by Mon View Apts LLC ("Mon View"), a non-debtor subsidiary of CBRM and/or Crown. In November 2024, Allegheny County filed criminal complaints against Mon View arising out of uncured violations at the property. LaPuma and Lynd failed to respond to those complaints or to fix the underlying issues (falsely claiming they somehow lacked authority to do so), resulting in the imposition of over $232,000 in fines.

19. As a direct result of that apparent mismanagement of Mon View, on or about February 4, 2025, Allegheny County also lodged a criminal complaint against me personally, citing allegedly poor conditions at Mon View Heights Apartments that LaPuma and Lynd had failed to address. Those charges were eventually dropped against me, but not before they resulted in a violation of my bail terms that led to me being taken into custody early, and to my being tarred in the local press as a "slumlord" (a false allegation that reflected negatively on the entire portfolio). To my knowledge, the conditions at Mon View Heights Apartments that precipitated those charges remain unaddressed.

20. Other portfolio properties have had similar problems on LaPuma and Lynd's watch. The City of New Orleans has tagged the business's New Orleans portfolio - consisting of six properties and 2,204 unit that Lynd has managed since 2019 - with hundreds of violations since September 2024. And the business's Creekwood and Forester properties in Tuscaloosa, Alabama are currently being pursued by local authorities there for violations arising out of conditions LaPuma and Lynd have apparently failed to address.

21. These examples, which cover affordable and market-rate projects alike, hint at potentially more-widespread mismanagement of the portfolio that may have already cost - and may continue to cost - the estate, its creditors, and equity millions in lost value.

The Debtors' Inaccurate Bankruptcy Filings

22. On May 19, 2025, LaPuma filed Chapter 11 bankruptcy petitions for CBRM, Crown, RH New Orleans MM LLC, and seven of their subsidiaries. On July 8, 2025, LaPuma filed a revised Chapter 11 petition for RH Lakewind East LLC (Docket No. 265).

23. Many more subsidiaries wholly or majority-owned by CBRM and/or Crown remain under LaPuma and Lynd's control, but have not been made debtors in this bankruptcy case. The equity of those entities is, however, property of the estate, by virtue of being held by CBRM, Crown, or another debtor.

24. Filings in this jointly administered bankruptcy case have contained significant inaccuracies that gloss over LaPuma and Lynd's deficient performance, misrepresent the nature and value of Debtors' real estate portfolio, and mischaracterize my legal troubles and their effect on the business and its stakeholders.

25. The First Day Declaration of Matthew Dundon is one such filing, and inaccuracies it contains are repeated in the proposed disclosure statement. It would appear that Dundon received incomplete and inaccurate from LaPuma and Lynd. Had Dundon spoken with me instead, those errors would not likely have occurred.

26. For example, Dundon's Declaration inaccurately claims that I was prosecuted for manipulating the value of property appraisals and "siphoning the surplusage" of "excessive financing" out of Crown. Dundon Decl. at ¶10; see also Proposed Disclosure Statement ("PDS") at 17. Those allegations, were they true, might tend to call into question the valuations of portfolio properties produced while I was in control of the business. That is certainly what they appear intended to convey, insofar as Dundon makes them (and the proposed disclosure statement repeats them) in the context of alleging that "many, if not all" of the portfolio properties are "likely worth much less today than the appraised value that supported issuance of the [Crown] Notes and certain of the property-level mortgage loans." Dundon Decl. at ¶10; PDS at 16.

7

27. But those allegations are not true. I was not "successfully prosecuted" for "using false or misleading property-level information to obtain inflated appraisals for certain properties, obtaining excessive financing, and then siphoning the surplusage out of Crown." Dundon Decl. at ¶10; PDS at 17. I was prosecuted in connection with a single loan transaction involving Williamsburg of Cincinnati. Nor have I ever misappropriated so much as a dollar out of Crown; and the implication that I did so to the Crown Noteholders' detriment is particularly egregious, given that the Notes were not even issue until years after the loan transaction took place. Further, Dundon wrongly describes Williamsburg of Cincinnati as an "affordable housing project" when, in fact, it is a market-rate asset, and he seems never to have been told that it was a Crown subsidiary. See Dundon Decl. at ¶7.

28. Dundon also incorrectly claims, and the proposed disclosure statement repeats, that "due to the distraction of the government investigations and eventual prosecution," I "neglected the management of the [portfolio], causing numerous properties and property-holding Debtors and Debtor affiliates to fall into operational and/or physical disarray" and to suffer all manner of other legal and financial calamities. Dundon Decl. at ¶10; PDS at 16-17. That, too, is not true. Under my management, issues that arose in the portfolio were promptly addressed and significant investments were continuously made in maintaining and upgrading assets. No real estate operation with 15,000 units can avoid the occasional violation at a property, of course. But on my watch, the business never experienced anything like the hundreds of violations that have occurred at individual properties since LaPuma and Lynd took over, nor was it ever subject to serial lawsuits or criminal complaints, as it has been since I surrendered control.

29. Dundon's Declaration is not alone in containing striking inaccuracies. The proposed disclosure statement paints an inaccurate picture of the Debtors' business and real estate portfolio by claiming that CBRM and Crown's "primary business is the ownership, financing, and operation of [the] single affordable

8

housing asset" referred to as the Kelly Hamilton Property (a 110-unit apartment complex). PDS at 15. An exhibit to the proposed disclosure statement purports to show Kelly Hamilton-related entities as the only subsidiaries of CBRM and Crown. Id. at Ex. B. That badly mischaracterizes the portfolio and business I built and handed over to LaPuma last year. As of mid-2024, CBRM and/or Crown owned roughly 15,000 units at buildings across the United States. Its "primary business" was managing and operating all of them, not a single, 110-unit complex. I have no reason to think the composition of the portfolio has changed so dramatically in the past ten months that it has shrunk to a single asset.

30. Given that inaccuracy, the proposed disclosure statement and plan amount to promoting a sideshow as the main event. They cast the sale of the Kelly Hamilton Property as the centerpiece of the reorganization strategy, while referring only obliquely (if at all) to the plan for the remaining 90-plus percent of the portfolio. This seeming obfuscation cannot be anything but intentional. All parties in interest deserve to know why it was made, and I fear that they will not if the equity is not given the opportunity to have its interests adequately represented.

## DISCUSSION

### I. THE COURT SHOULD APPOINT AN EQUITY COMMITTEE

31. Bankruptcy Code §1102(a)(2) provides:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or equity security holders if necessary to assure adequate representation of creditors or equity security holders. The United States Trustee shall appoint any such committee.

11 U.S.C. §1102(a)(2). The Bankruptcy Code does not define "adequate representation". Rather, the Court "has discretion to appoint an additional committee based on the facts of the case." In re: Spansion, Inc., 421 B.R. 151, 156 (Bankr. D.Del. 2009).

32. The right of adequate representation is rooted in Code §1109(b), which provides that any "party in interest... may raise and may appear and be heard on any issue in a case under [Chapter 11]." 11 U.S.C. §1109(b). As the Third Circuit

9

has held, that Code section "has been construed to create a broad right of participation in Chapter 11 cases". In re: Combustion Eng'g, Inc., 391 F.3d 190, 214 n.21 (3d Cir. 2004); see also In re: Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985) (holding that §1109(b) "continues a pattern of permitting interested parties in bankruptcy cases the absolute right to be heard and to insure their fair representation") (emphasis supplied).

33. In weighing whether to appoint a committee of equity holders to "insure their fair representation", Amatex, 755 F.2d at 1042, the Court may consider a wide range of factors, such as: (1) whether the shares are widely held and publicly traded; (2) the size and complexity of the Chapter 11 case; (3) the delay and additional cost that would result if the Court grants the motion; (4) the likelihood whether the debtors are insolvent; (5) the timing of the motion relative to the status of the Chapter 11 case; and (6) other factors relevant to the adequate representation issue. See In re: Kalvar Microfilm, Inc., 195 B.R. 599, 600 (Bankr. D.Del. 1995). "No one factor is dispositive, and the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case." Id. at 600-601; see also In re: Celcius Network LLC, 645 B.R. 165, 171 (Bankr. S.D.N.Y. 2022) (bankruptcy court has "absolute discretion" to determine whether equity committee is warranted "under the specific facts and circumstances of each case").

34. I seek appointment of an equity committee because without it the equity will be denied its "absolute right" to adequate representation in this case. Amatex, 755 F.2d at 1042. At present, the interests of equity are not adequately represented by any other party, and I am unable to adequately represent them by myself as a pro se litigant. Whereas an independent fiduciary might normally be expected to represent those interests in seeking to maximize the value of the estate, here LaRuna cannot be reasonably expected to do so. Debtors, under her control, have made it abundantly clear that they consider me an adversary from whom the estate may

seek recovery, rather than an interest holder who may share in distributions under a value-maximizing plan. Moreover, as I have described, Lapuma and Lynd have an interest in laying blame for Debtors' circumstances entirely at my feet and in glossing over their own role in any loss of value. Lynd, an insider, also stands to benefit from the plan as presently conceived through its affiliate's purchase of the Kelly Hamilton Property at what appears (to me) to be a generous discount.

35. No other party could be expected to represent the interests of equity, either. The plan as currently conceived would not afford any recovery to equity. See PDS at 6. The only classes of impaired claims senior to equity that are not slated to realize a potential 100% recovery are intercompany claims and interests among debtors and non-debtor affiliates that are all controlled by LaPuma. Thus, no class of creditors or interest holders appears to have any incentive to explore whether value exists for equity, to question the amounts and classifications of intercompany claims and interests, or to raise, appear, and be heard on other matters that bear upon whether equity is fairly treated.

36. Turning to the factors articulated in Kalvar that the Court may consider, the first factor is inapposite. Although the shares of CBRM are not widely held or publicly traded - which would normally cut against appointment of an equity committee - here it is precisely the fact that I am the only equity holder, and that I am persona non grata to the estate and have been effectively shut out of participating in this case to date, that explains why equity's interests are not adequately represented. In effect, the unique combination of circumstances in this case - my conviction and incarceration, the role of LaPuma and Lynd, the speed at which this case has proceeded, the inaccuracies in Debtors' filings - are conspiring to deprive me of my right under §1109(b) to "appear and be heard on any issue". 11 U.S.C. §1109(b). Critically, as noted above, deadlines and decisions are passing me by simply because I lack the access necessary to learn of and respond to them in a timely and thorough manner. I would not face those challenges if a committee

11

were appointed that could hire counsel to assist me.

37. I acknowledge that committees typically have multiple members. But "there is no Code provision or Rule that disallows a one-member committee." In re: Washington Prime Grp., Inc., No. 21-31948, 2022 Bankr.LEXIS 2952 (Bankr. S.D.Tex. Oct. 18, 2022). Nor is it the case that a committee may not represent a class that presently comprises just one holder. C.f., In re: Imerys Talc Am., Inc. v. Cyprus Historical Excess Ins., 38 F.4th 361, ___ (3d Cir. 2021) (analogizing a future claim representative, who acts on behalf of holders of claims not yet asserted, to a "creditors committee of one"); In re: Shelby Motel Grp., Inc., 123 B.R. 99, 101 (Bankr. N.D.Ala. 1990) (permitting a single creditor to pursue a claim on behalf of the estate where creditor is only party available to do so, liking that creditor to a "committee of one").

38. The second Kalvar factor is in my favor. While not massive dollar-wise, this case is complex and has been designated as such by the Court. However, the inaccuracies contained in Debtors' filings, highlighted above, suggest that LaPuma and her advisors do not have, or have chosen not to present, a complete picture of the business she was entrusted to manage and operate as an independent fiduciary. As the founder of that business and someone with intimate knowledge of it, my participation on behalf of equity via a committee is likely to be critical in assisting Debtors' financial advisor and in maximizing the estate's value.

39. The third and fifth Kalvar factors, having to do with the timing of this motion and the potential delay and cost involved in appointing an equity committee, should not deter the Court from granting relief. Thi case has been on an accelerated timetable. The proposed plan was filed within two months of the petition date. The delay for counsel for an equity committee to get up to speed would not be significant, and the cost would likely pale in comparison to the $350,000 per month Debtors have requested for their financial advisor. Moreover, I have not delayed filing this motion. I only learned of the proposed plan last week and have

12

diligently since then to try to make my voice heard.

40. The fourth Kalvar factor, examining whether the estate is solvent, admittedly presents a challenge to this motion. I cannot, at present, prove that the estate is substantially likely to be solvent. How could I? I am incarcerated without access to the evidence and tools I would need to do so as a pro se litigant. My inability to advocate for the value of the business I know so well in the face of inaccuracies and a seemingly rushed plan process is precisely the reason why I have filed this motion.

41. What I can say about the solvency of the estate is this: I know my business. As of when I relinquished control of it to LaPuma, the equity of numerous of CBRM's and/or Crown's property-owning subsidiaries had significant value. The Cap One portfolio, for instance, was particularly valuable. I have not been privy to the operational or financial details of those properties since I handed over the keys to LaPuma, not least because there has been virtually no mention of them in Debtors' filings to date. But if they are still part of the estate (and I have no reason to think they are not), then it is critical they be taken into account in formulating and articulating a plan - something that does not appear to have been done thus far. All parties in interest deserve a thorough and transparent analysis of the value represented by the entire portfolio, not just a single asset.

42. Debtors should not be permitted to rush through a plan that fails to maximize value for all stakeholders while ignoring the interests of equity and mischaracterizing the facts. For the foregoing reasons, I respectfully request that the Court exercise its discretion to direct the United States Trustee to appoint a committee of equity security holders forthwith.

II. IN THE ALTERNATIVE, THE COURT SHOULD APPOINT COUNSEL FOR ME

43. In the alternative, the Court should appoint counsel to represent me in this bankruptcy case. The Court has authority to do so under 28 U.S.C. §1915(e)(1), by virtue of the referral of cases from the district court to this Court. See

13

In re: Schaefer Salt Recovery Inc., 542 F.3d 90, 105 (3d Cir. 2008) (referral order from district court to bankruptcy court in District of New Jersey gives bankruptcy court authority under statutes applicable in a "court of the United States"); Fisher v. CFC Capital Corp., 97 B.R. 437, 438-39 (Bankr. N.D.Ill. 1989) (finding bankruptcy court has authority under 28 U.S.C. §1915(e)(1) to appoint counsel for an indigent); see also Boles v. Collins (In re: Collins), No. 17-10049 (MEW), 2017 Bankr.LEXIS 651 (Bankr. S.D.N.Y. March 10, 2017) (collecting cases recognizing bankruptcy court's authority under 28 U.S.C. §1915).

44. 28 U.S.C. §1915(e)(1) provides that "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. §1915(e)(1). I am such a person. Accordingly, if the Court declines to appoint an equity committee in this case, I respectfully request that it appoint counsel for me so that I may exercise my right under Code §1109(b) to participate in this matter in a meaningful and timely manner.

## CONCLUSION

45. WHEREFORE, for the reasons set forth above, I respectfully request that the Court:

    a. direct the United States Trustee to appoint a committee of equity security holders; or, in the alternative,

    b. appoint counsel to represent me in this bankruptcy case.

Respectfully submitted,

Moshe ("Mark") Silber, pro se
Reg. No. 24293-511
FCI Danbury
Federal Correctional Institution
33½ Pembroke Road
Danbury, CT 06811

14

## CERTIFICATION OF SERVICE

I, Moshe ("Mark") Silber, hereby certify that on July 25, 2025, I served the Motion of Party in Interest Moshe ("Mark") Silber for Appointment of an Equity Security Holders Committee or, in the Alternative, Appointment of Counsel on the Debtors by placing a copy of it in the United States mail addressed to their counsel, White & Case LLP. I further understand that upon its filing on the electronic docket by the Clerk, electronic copies of the motion and accompanying materials will be sent to the Debtors and other parties in interest.

_____
Moshe ("Mark") Silber

July 25, 2025

Clerk of Court
United States Bankruptcy Court for the
District of New Jersey
Clarkson S. Fisher U.S. Courthouse
402 East State Street
Trenton, NJ 08608

    Re: In re: CBRM Realty Inc., et al. (Case No. 25-15343) (MBK))

Dear Sir/Madam,

    Enclosed for filing in the above-referenced matter is the Motion of Party in Interest Moshe ("Mark") Silber for Appointment of an Equity Security Holders Committee or, in the Alternative, Appointment of Counsel. I am filing this motion pro se and, because I am currently incarcerated, have no ability to submit it to the Court electronically. Nor do I have access to the Court's standard forms for a Notice of Motion, Proposed Order, or Certification of Service, so I beg your indulgence as to any errors of form in that respect.

    Kindly enter these documents on the electronic docket and send me a file-stamped copy set at the mailing address below.

                                      Very truly yours,

                                      Moshe ("Mark") Silber, pro se
                                      Reg. No. 24293-511
                                      FCI Danbury
                                      Federal Correctional Institution
                                      33½ Pembroke Road
                                      Danbury, CT 06811

cc: Counsel for Debtors (via U.S. Mail)

                                                      **FILED**
                                      JEANNE A. NAUGHTON, CLERK

                                                JUL 2 5 2025

                                      U.S. BANKRUPTCY COURT
                                      TRENTON, NJ
                                      BY_____DEPUTY