UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com

-and-

Andrew Zatz
Samuel P. Hershey (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: azatz@whitecase.com
sam.hershey@whitecase.com
barrett.lingle@whitecase.com

*Counsel to Debtors and Debtors-in-Possession*

**KEN ROSEN ADVISORS PC**
Kenneth A. Rosen
80 Central Park West
New York, New York 10023
Telephone: (973) 493-4955
Email: ken@kenrosenadvisors.com

*Co-Counsel to Debtors and
Debtors-in-Possession*

| | |
|---|---|
| In re:<br><br>CBRM REALTY INC., *et al.*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-15343 (MBK)<br>(Jointly Administered) |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (9071), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951).  The location of the Debtors' service address in these chapter 11 cases is: In re CBRM Realty Inc., et al., c/o White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020.

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) APPROVING (A) BIDDING
PROCEDURES, THE SALE TIMELINE, AND THE
FORM AND MANNER OF NOTICE THEREOF FOR THE
NOLA PROPERTIES, (B) PROCESS FOR SELECTING A STALKING HORSE
BIDDER AND OFFERING BID PROTECTIONS, AND (C) ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "**Debtors**") state as follows in support of this motion:[2]

**<u>Preliminary Statement</u>**

1.     On July 24, 2025, the Court approved the *Order (I) Approving (A) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof for the Kelly Hamilton Property, (B) the Debtors' Entry into and Performance Under the Stalking Horse Agreement, (C) Bid Protection in Connection with the Stalking Horse Agreement, and (D) Assumption and Assignment Procedures, and (II) Granting Related Relief* [Docket No. 325] (the "**Kelly Hamilton Bidding Procedures Order**").  Pursuant to the Kelly Hamilton Bidding Procedures Order, the Court approved certain bidding and auction procedures for the sale of substantially all of the multi-family housing assets owned by Debtor Kelly Hamilton Apts LLC.

2.     The Debtors now seek entry of an order authorizing analogous relief governing the sale of the multi-family housing assets (the "**NOLA Properties**") owned by Debtors RH Chenault Creek LLC, RH Windrun LLC, RH Copper Creek LLC, and RH Lakewind East LLC (collectively, the "**NOLA Debtors**").  The proposed Bidding Procedures largely mirror the procedures set forth in the Kelly Hamilton Bidding Procedures Order, with the exception of the stalking horse mechanic.  Specifically, to date, the Debtors have not entered into a stalking horse agreement with

---

[2]     Capitalized terms used but not immediately defined are defined later in this motion or the First Day Declaration (as defined below), as applicable.

any potential bidder for the NOLA Properties and have modified the Bidding Procedures accordingly.

3.     In order to preserve flexibility, the Debtors request that the Court approve the Bidding Procedures for the sale of the NOLA Properties, which may be implemented under a chapter 11 plan or as a standalone sale under section 363 of the Bankruptcy Code.  Specifically, the Debtors seek entry of an order (i) approving the Bidding Procedures for the sale of one or more of the NOLA Properties, (ii) authorizing the Debtors to enter into a Stalking Horse Agreement, if any, (iii) authorizing the Debtors to conduct an auction, if necessary, and (iv) scheduling a hearing to approve any resulting sale transaction.  Moreover, in the event that any proposed sale is not consummated under a chapter 11 plan, the Debtors seek entry of an order (the "**Sale Order**") (as modified pursuant to the terms agreed upon with the Successful Bidder pursuant to the Bidding Procedures), approving any proposed sale to the Successful Bidder under section 363 of the Bankruptcy Code.  The Debtors will determine whether to pursue each sale of one or more of the NOLA Properties pursuant to section 363 or under a chapter 11 plan upon the determination of the identity of a Successful Bidder.

4.     Approval of the Bidding Procedures is necessary to maintain and ultimately maximize the value of the NOLA Properties.  The Debtors respectfully request that the Court grant the requested relief to permit the Debtors to complete their value-maximizing sale process for the NOLA Properties owned by the NOLA Debtors.

## Relief Requested

5.     By this motion, the Debtors seek entry of an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as **Exhibit A**, approving among other things, certain dates and procedures that are critical to the Debtors' proposed bidding and sale process, in

substantially the form attached as <u>Exhibit 1</u> to the Bidding Procedures Order, by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or disposition of the NOLA Properties under section 363 of the Bankruptcy Code (an "**Asset Sale**") or pursuant to a chapter 11 plan (any of the foregoing, including the Asset Sale, a "**Sale Transaction**").

6.    The relief sought in the proposed Bidding Procedures Order includes the following:

(a)    setting September 11, 2025, at 4:00 p.m. (prevailing Eastern Time) as the deadline by which parties must submit an offer with respect to the Debtors' proposed sale of the NOLA Properties (the "**Bid Deadline**");

(b)    setting September 15, 2025, as the date on which the Debtors will conduct an auction (the "**Auction**") (if any) with respect to the proposed sale of the NOLA Properties;

(c)    to the extent the proposed sale is consummated under section 363 of the Bankruptcy Code, scheduling a hearing where the Debtors seek entry of the Sale Order (the "**Sale Hearing**") for September 22, 2025 at 11:00 a.m. (prevailing Eastern Time), and to the extent the proposed sale is consummated through a chapter 11 plan, scheduling a hearing to consider approval of the confirmation and sale order (the "**Confirmation and Sale Hearing**") for October 22, 2025 at 11:30 a.m. (prevailing Eastern Time), or as soon thereafter as the Court may be available, and approving the form and manner of notice thereof;

(d)    approving bidding and auction procedures for the sale of the NOLA Properties (the "**Bidding Procedures**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, and the form and manner of notice thereof;

(e)    approving the form and manner of the notice of the Sale Transaction(s) (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>;

(f)    approving procedures for the assumption and assignment of certain Executory Contracts[3] and Unexpired Leases[4] in connection with the sale of the NOLA Properties (each, an "**Assumed Contract**" and collectively, the "**Assumed Contracts**"), and notice of the Debtors' potential assumption and assignment of the Assumed Contracts, substantially in the form attached as <u>Exhibit 3</u> to the Bidding Procedures Order (the "**Assumption Notice**");

---

[3]    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

[4]    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

(g)    approving the payment of the Bid Protections to the Stalking Horse Bidder(s), if any, in accordance with any Stalking Horse Agreement; and

(h)    granting related relief.

7.    Furthermore, to the extent the proposed sale is not consummated through a chapter 11 plan, the Debtors seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit B** (as modified pursuant to the terms agreed upon with the Successful Bidder pursuant to the Bidding Procedures):

(a)    approving the Asset Sale(s) of any or all of the NOLA Properties (in any combination), free and clear of all obligations, liens, claims, encumbrances, and interests of any kind or nature, including rights or claims based on any successor or transferee liability;

(b)    authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Asset Sale(s), as applicable; and

(c)    granting related relief.

## Jurisdiction and Venue

8.    The United States Bankruptcy Court for the District of New Jersey (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  This matter is a core proceeding under 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court entering a final order.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The predicates for the relief requested herein are sections 105(a), 363, 365 and 1123 of the Bankruptcy Code, rules 2002(a)(2), 6004, and 6006 of the Bankruptcy Rules, and rules 6004-1, 6004-2 and 9013-1(a)(3) of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

**Background**

I.        **The Chapter 11 Cases**

11.        On May 19, 2025 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

12.        Additional factual information regarding the Debtors' business, their capital structure, and the circumstances leading to these chapter 11 filings is contained in the *Declaration of Matthew Dundon, Principal of IslandDundon LLC, in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 44] (the "**First Day Declaration**").

13.        Following the Petition Date, the Debtors, with the assistance of their proposed financial advisor, IslandDundon LLC ("**IslandDundon**"), launched a marketing process to solicit proposals for the sale of one or more of the NOLA Properties.  Specifically, the Debtors have retained Hilco Real Estate, LLC ("**Hilco**") as their real estate advisor.  Hilco has assisted the Debtors in structuring the sales process and coordinating marketing efforts, and Hilco's extensive experience in real estate will help to identify potential bidders and facilitate sales of the NOLA Properties that will maximize value.  The Debtors have also retained Larry G. Schedler & Associates, Inc. ("**L&A**") as their exclusive real estate broker with respect to the NOLA Properties. L&A will provide on-the-ground support in connection with the marketing process and will ensure that the NOLA Properties are effectively marketed to the appropriate buyer universe and that value

is maximized for the benefit of the Debtors' estates.  L&A has commenced preliminary outreach and is well-positioned to lead the sale efforts.  For over four decades, L&A has provided advisory services and has been involved in the acquisition and disposition of multifamily properties throughout the Gulf South.  Its depth of market knowledge, valuation expertise, and longstanding relationships with institutional and regional investors uniquely qualify it to lead the marketing and sale of the NOLA Properties.

14.      In order to further a bidding and sale process and preserve the value of the Debtors' estates—and to offer the Debtors a chance to increase the ultimate value provided by the monetization and disposition of the NOLA Properties—the Debtors propose the Bidding Procedures.  The Bidding Procedures provide substantial flexibility with respect to the structure of any Sale Transaction(s).  Furthermore, while the Debtors have not yet selected a stalking horse to serve as a committed buyer for one or more of the NOLA Properties (each, a "**Stalking Horse Bidder**"), the Bidding Procedures provide the Debtors with flexibility to select a Stalking Horse Bidder and grant Bid Protections prior to the Sale Hearing or Confirmation and Sale Hearing, as applicable, after notice and an opportunity to object.  The Debtors will consider all viable options in accordance with the Bidding Procedures before determining if selling the NOLA Properties will, in their business judgment, maximize value for the estate.

**II.      Disclosures Under Local Rule 6004-1**

15.      Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  As set forth in this motion, the Debtors and their professionals are in the midst of marketing the NOLA Properties, the continuation of a process that began prior to the Petition Date.  Because the Debtors continue to have discussions with parties in interest, they cannot, as of yet, identify, with any reasonable specificity, the terms of the sale of

7

some or all of the NOLA Properties.  Accordingly, the Debtors are unable, at this time, to make

the disclosures required under Local Rule 6004-1.  In the event the Debtors secure one or multiple

Stalking Horse Bidder(s), the Debtors will file the applicable Stalking Horse Agreement and make

the requisite disclosures.

### III.        The Proposed Sale Process and Related Timeline

16.        The Debtors request that the Court approve the following dates in connection with

the Bidding Procedures and the proposed sale timeline (the "**Sale Timeline**"):

| Event | Deadline |
|---|---|
| Entry of the Bidding Procedures Order | August 14, 2025 |
| Assumption and Assignment Service Deadline | Seven (7) Days after entry of the Bidding Procedures Order (i.e., August 21, 2025) |
| Cure Objection Deadline | Fourteen (14) Days after service of the Assumption Notice[5] |
| Bid Deadline | September 11, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline for Debtors to Designate Qualifying Bids | September 12, 2025 |
| Auction Date (if any) | September 15, 2025, at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | September 16, 2025 |
| Deadline to Object to Asset Sale Under Section 363 of the Bankruptcy Code (if applicable) | September 19, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| Reply in Support of Asset Sale Under Section 363 of the Bankruptcy Code (if applicable) | September 22, 2025 |
| Sale Hearing Under Section 363 of the Bankruptcy Code (if applicable)[6] | September 22, 2025, at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to Confirmation and the Sale Pursuant to a Chapter 11 Plan (if applicable) | October 10, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| Reply in Support of Confirmation | October 17, 2025 |

---

[5]   For the avoidance of doubt, there are two separate deadlines to object to the proposed assumption and assignment of a potential Assumed Contract: (a) the applicable Cure Objection Deadline, which is the deadline to object to the proposed Cure Payments related to any assumption and assignment of such potential Assumed Contract, and (b) the Sale Objection Deadline, which is the deadline to object to the proposed assumption and assignment of a Potential Assumed Contract to the Successful Bidder, solely on account of the identity of the Successful Bidder and adequate assurance of future performance and the adequate assurance of future performance of the Successful Bidder.  The identity of the Successful Bidder will be determined at a later date and following the Auction (if any).

[6]   To preserve the Debtors' flexibility, the Debtors request that the Court schedule two hearing dates: (i) a standalone Sale Hearing to approve any sale under section 363 of the Bankruptcy Code, and (ii) a combined Confirmation and Sale Hearing to approve the sale if the transaction is consummated pursuant to the chapter 11 plan.

| Confirmation and Sale Hearing (if applicable) | October 22, 2025 at 11:30 a.m. (prevailing Eastern Time) |
| Consummation of Sale Transaction | Within Fifteen (15) Days of Confirmation and Sale Hearing |

17.      The Debtors believe that the sale process and related timeline are reasonable in time and scope and afford parties and creditors with sufficient time to gather information necessary to formulate a competitive bid that should maximize the value of the NOLA Properties for the benefit of the Debtors' estates and their stakeholders. The Debtors and their advisors believe that a fulsome and transparent marketing process will generate significant interest from potential bidders. Accordingly, the Debtors respectfully submit that the proposed sale process and related timeline are in the best interests of the Debtors' estates, will establish whether and to what extent a market exists for the NOLA Properties, will provide interested parties with sufficient opportunity to participate in any sale transaction, and ultimately, will drive a higher and better value for the NOLA Properties under the circumstances.

## IV.      The Proposed Bidding Procedures

18.      The Debtors seek to implement a competitive bidding process to solicit Bids (as defined herein) for one or more proposed transactions.  The proposed Bidding Procedures are designed to maximize value for the Debtors' estates while providing the Debtors with flexibility to conduct the bidding process in a manner they believe will facilitate competitive bidding on an efficient timeline in advance of the Sale Hearing or Confirmation and Sale Hearing, as applicable. Rather than focus solely on one potential path to monetization, the Debtors believe the best way to maximize value for the NOLA Properties within the timeline and budget of these chapter 11 cases is to continue to conduct a broad marketing process and solicit bids for any and all sale and chapter 11 plan transactions, continuing the marketing process started prior to these chapter 11

9

cases.  As such, the Debtors believe the proposed Bidding Procedures are fair and in the best interests of their estates and stakeholders and should be approved.

19.    The Bidding Procedures describe, among other things, (a) the NOLA Properties which are available for sale, (b) the manner in which bids become "qualified," (c) the coordination of diligence efforts among the bidders and the Debtors, (d) the receipt and negotiation of bids received, (e) the conduct of any Auction, and (f) the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder (as defined below).  The Bidding Procedures are attached as Exhibit 1 to the Bidding Procedures Order.

20.    The Bidding Procedures contain the following provisions that are to be highlighted pursuant to Local Rule 6004, which are more fully described in the Bidding Procedures:[7]

---

[7]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

| Summary of Bidding Procedures | |
|---|---|
| **Participation Requirements**<br><br>**D.N.J. LBR 6004-2(b)(1)(A-C)** | To participate in the bidding process and to receive access to due diligence materials, a party must submit to the Debtors (i) documentation identifying the Interested Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction, including the Auction (if any); (ii) an executed confidentiality agreement ("**Confidentiality Agreement**") in form and substance satisfactory to the Debtors; (iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties[8], that the Interested Bidder has a bona fide interest in consummating the Sale Transaction; and (iv) sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the Interested Bidder (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close the Sale Transaction, including, but not limited to, current audited financial statements of the Interested Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Successful Bidder in connection with the Sale Transaction, pursuant to section 365 of the Bankruptcy Code. |
| **Bidding Deadline**<br><br>**D.N.J. LBR 6004-2(b)(2)(B)** | A Bidder that desires to make an irrevocable and binding offer (each, a "**Bid**") shall transmit such irrevocable and binding offer via email (in both .pdf and MS-WORD format) so as to be actually received on or before September 11, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") to each of the Debtors' advisors at the email addresses set forth in the Bidding Procedures. |

---

[8]   "**Consultation Parties**" mean (i) the Ad Hoc Group of Holders of Crown Capital Notes (the "**Ad Hoc Group**"), and (ii) DH1 Holdings LLC, CKD Funding LLC, and CKD Investor Penn LLC (collectively, the "**NOLA DIP Lender**," and the Ad Hoc Group and NOLA DIP Lender shall each be deemed a "**Consultation Party**").

| Bid Requirements<br><br>**D.N.J.    LBR    6004-2(b)(2)(A-C);    6004-2(b)(3)(A-D)** | tential Bidders must provide a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the aggregate Purchase Price provided in the Bid (or such additional amount as may be determined by the Debtors in their reasonable discretion);<br><br>Potential Bidders must provide their Bid accompanied by a purchase agreement, based on a form that the Debtors shall make available to Potential Bidders via the Debtors' electronic data room pursuant to the due diligence process (the "**Form APA**"), duly executed by such bidder, containing only changes to the Form APA that are reasonably necessary to effectuate the Bid;<br><br>Further, Bids submitted by Potential Bidders must adhere to the following requirements:<br><br>a.  be in writing;<br><br>b.  include a clean and duly executed asset purchase agreement based on the Form APA that the Debtors shall make available to Potential Bidders via the Debtors' electronic data room pursuant to the due diligence process containing only changes to the Form APA that are reasonably necessary to effectuate the Bid, along with a redline of such agreement marked to reflect the amendments and modifications made to the Form APA (such modified agreement, the "**Alternative APA**").  The Alternative APA must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable NOLA Property(ies) and any assumption of liabilities (the "**Purchase Price**"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable NOLA Properties (if necessary);<br><br>c.  fully disclose the identity of the Potential Bidder (and to the extent that the Potential Bidder is a newly formed acquisition entity or the like, the identity of the Potential Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder;<br><br>d.  set forth the Purchase Price to be paid by such Potential Bidder. Any Bid for all of the NOLA Properties or a subset thereof must also include a statement as to whether the Bid is conditioned on purchasing all such NOLA Properties or whether the Bid should be viewed as a separate Bid for one or more properties. The Debtors reserve the right to ask any Potential Bidder to allocate the value ascribed to a Bid for any particular NOLA Property and to inquire about any significant assumptions on which such valuations are based; |
| --- | --- |

e.  identify separately any cash and non-cash components, which non-cash components shall be limited only to credit bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities;

f.  state the liabilities proposed to be paid or assumed by such Potential Bidder;

g.  state (a) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (b) any Executory Contract or Unexpired Lease to be received by assignment;

h.  state that such Potential Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale Transaction;

i.  to the extent that a bid is not accompanied by evidence of a Potential Bidder's capacity to consummate the applicable Sale Transaction with cash on hand, the bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, including appropriate contact information for such financing sources, that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the NOLA Properties. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties;

j.  contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Potential Bidder's financial and other capabilities to close the transactions contemplated by the applicable Alternative APA, including, without limitation, such financial and other information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Potential Bidder, in a form that allows the Debtors to serve such information on any counterparties to such contracts or leases in connection with the Sale Transaction within one (1) business day after the Debtors' receipt of such information. To the extent that the Potential Bidder is a newly formed acquisition entity or the

13

like, the financial and other information supporting the Potential Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Potential Bidder's parent company or sponsor;

k.  identify with particularity each and every Executory Contract and Unexpired Lease, the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.  include a statement that the bid does not request or entitle such Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement;

m.  not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

n.  contain a written acknowledgement and representation that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the NOLA Properties, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the NOLA Properties, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale Transaction;

o.  set forth any regulatory and third-party approvals required for the Potential Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Potential Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Potential Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain the Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA;

p.  provide for a binding commitment of the Potential Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Potential Bidder's bid is the next highest or otherwise best bid (the "**Back-Up Bid**") after the Successful Bid;

| Summary of Bidding Procedures | |
|---|---|
| | q.  include written evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;<br><br>r.  provide a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the aggregate Purchase Price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion);<br><br>s.  state or otherwise estimate the types of, and costs or charges for, transition services (if any) the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtors; and<br><br>provide that in the event of the Potential Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estates shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. |

| Summary of Bidding Procedures | |
|---|---|
| **Designation of Qualifying Bidders**<br><br>**D.N.J. LBR 6004-2(b)(1)(A-D)** | The Stalking Horse Bidder, if any, shall at all times be deemed to be a Qualifying Bidder and Stalking Horse Bid, if any, shall at all times be deemed a Qualifying Bid.<br><br>The NOLA DIP Lender shall have the right to credit bid all outstanding obligations under the NOLA DIP Facility (such a credit bid, the "**NOLA DIP Lender Bid**") and to the extent the NOLA DIP Lender elects to credit bid any outstanding obligations under the NOLA DIP Facility, the NOLA DIP Lender shall at all times be deemed to be a Qualifying Bidder, and the NOLA DIP Lender Bid shall at all times be deemed a Qualifying Bid.  To the extent the NOLA DIP Lender credit bids the outstanding obligations under the NOLA DIP Facility or a portion thereof, NOLA DIP Lender shall no longer serve as a Consultation Party.<br><br>Unless otherwise determined by the Debtors, a Bid will be considered a qualifying bid (a "**Qualifying Bid**"), and each Bidder that submits a Qualifying Bid will be considered a qualifying bidder (a "**Qualifying Bidder**") if the Debtors, in consultation with the Consultation Parties, determine that such Bid:<br><br><ul><li>satisfies the Bid Requirements set forth above; and</li><li>is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated by the Closing Date, if selected as the Successful Bid (as defined below).</li></ul><br>No later than September 12, 2025, the Debtors shall: (i) notify all Potential Bidders whether their respective bids have been determined to be Qualifying Bids and those Potential Bidders that have submitted Qualifying Bids will be considered to be Qualifying Bidders and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best Qualifying Bid for purposes of constituting the opening bid of the Auction. To the extent reasonably practicable, counsel for the Debtors shall provide summaries of the material terms of each Qualifying Bid to the Consultation Parties on a professionals' eyes-only basis subject to the terms of the applicable Confidentiality Agreement at least twenty-four (24) hours prior to the Auction (if any). |

| Summary of Bidding Procedures | |
|---|---|
| **Stalking Horse Bidder**<br><br>**D.N.J. LBR 6004-2(b)(3)(A-D)** | ***Designation.*** Pursuant to the Bidding Procedures Order, the Debtors may select one or more Qualifying Bidders to act as stalking horse bidder (such bidder, the "**Stalking Horse Bidder**") in connection with the Auction and enter into a stalking horse asset purchase agreement with each Stalking Horse Bidder (such agreement, the "**Stalking Horse Agreement**").<br><br>In the event that the Debtors enter into a Stalking Horse Agreement with one or more Stalking Horse Bidders, within two (2) business days of entry, the Debtors shall file a notice and proposed form of order with the Court (the "**Stalking Horse Notice**") and serve the Stalking Horse Notice on the Stalking Horse Bidder, the U.S. Trustee, the Consultation Parties, and any other party that has filed a notice of appearance in these chapter 11 cases. The Stalking Horse Notice shall: (i) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) set forth the amount of the bid submitted by the Stalking Horse Bidder (such bid, the "**Stalking Horse Bid**") and what portion (if any) is cash; (iii) state whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (iv) specify any proposed Bid Protections (including the amount and calculation thereof); (v) attach the Stalking Horse Agreement, including all exhibits, schedules and attachments thereto; (vi) specify the NOLA Properties to which the Stalking Horse Bid relates; and (vii) sets forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections. If there are no objections to the Stalking Horse Notice within five (5) days of filing with the Court, (the "**Notice Period**"), the Debtors may submit an order to the Court that incorporates any comments received during the Notice Period that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for further hearing. If a party files an objection to the Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Notice Period and as soon thereafter as the Court is available.<br><br>Upon entry of the order approving the designation of a Stalking Horse Bidder and Stalking Horse Agreement, the Debtors are authorized to incur and pay the Bid Protections to each Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement.<br><br>Except as otherwise set forth herein, no person or entity, other than a Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise. |

| Summary of Bidding Procedures | |
|---|---|
| | ***Payment of the Bid Protection.***    Prior to the Bid Deadline and in accordance with the Bidding Procedures Order, the Debtors may approve the Stalking Horse Bidder to be eligible to receive (i) a break-up fee (the "**Break-Up Fee**") in an aggregate amount not to exceed three (3) percent of the Purchase Price as a Stalking Horse Bidder and/or (ii) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs and expenses of the Stalking Horse Bidder incurred in connection with the Stalking Horse Bid up to an amount as agreed by the Debtors and the Stalking Horse Bidder (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"). <br><br> For the avoidance of doubt, unless otherwise approved by the Debtors in as set forth herein, each Qualifying Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive any payments or amounts analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation. |
| **Auction** <br><br> **D.N.J. LBR 6004-1(a)(3)** | ***Summary.***    If one or more Qualifying Bids are received by the Bid Deadline, the Debtors will conduct the Auction to facilitate the determination of the highest or otherwise best Qualifying Bid. Prior to or at the start of the Auction (if any), the Debtors will notify the Qualifying Bidders participating in the Auction (if any), including the Stalking Horse Bidder(s), if any, of the highest or otherwise best Qualifying Bid received before the Bid Deadline (the "**Baseline Bid**") and provide copies of the documents supporting the Baseline Bid to all Qualifying Bidders. <br><br> If only one Qualifying Bid is received by the Bid Deadline, the Debtors may decide, in their business judgment, and in consultation with the Consultation Parties, to designate such Qualifying Bid as the Successful Bid as to the applicable NOLA Property(ies) and pursue entry of an order approving a Sale Transaction(s) with respect to such NOLA Properties to such Successful Bidder and cancel the Auction with respect to such NOLA Properties. |
| | ***Date, Time, and Place.***  The Auction (if any) shall take place on September 15, 2025 at 10:00 a.m. ET (prevailing Eastern Time) at the offices of White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020 and/or in a virtual room hosted by the Debtors' counsel, or such other place and time as the Debtors shall notify the Qualifying Bidders. In accordance with the Bidding Procedures, the Debtors will provide instructions for accessing the Auction (if any) by videoconference to the Qualifying Bidders prior to the Auction (if any). |

| Summary of Bidding Procedures |
|---|
| ***Auction Participants.*** Except as otherwise determined by the Debtors, only (i) the Debtors, (ii) any Qualifying Bidder, (iii) the U.S. Trustee, (iv) the NOLA DIP Lender, (v) the Ad Hoc Group, and (vi) any other creditor of the Debtors that delivers to Debtors' counsel a written request to attend the Auction (by email to barrett.lingle@whitecase.com) no later than twenty-four (24) hours prior to the commencement of the Auction, in each case, along with their respective representatives and counsel, may attend the Auction; <u>provided</u> that the Debtors may, in their sole discretion, establish a reasonable limit on the number of advisors that may appear on behalf of each party. |
| ***Conducting the Auction.*** The Debtors and their professionals shall direct and preside over the Auction (if any) and the Auction (if any) shall be transcribed. Other than as expressly set forth herein, the Debtors may conduct the Auction (if any) in the manner they determine will result in the best offer. The Debtors may modify the format of the Auction (if any). |
| ***Overbids.***      Auction Bidders may submit successive bids (each, an "**Overbid**") in increments of at least (i) two (2) percent increase in cash, cash equivalents, or other such consideration that the Debtors, in their business judgment deem equivalent over the previous bid *plus* (ii) solely with respect to the first Overbid made by a party in the event that the Debtors have entered into a Stalking Horse Agreement, if any, with respect to the NOLA Properties to which the Overbid relates, the aggregate amount of Bid Protections under such Stalking Horse Agreement (a "**Minimum Overbid**"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtors may, in their business judgment announce increases or reductions to the Minimum Overbid at any time during any Auction. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at any Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their business judgment, deem equivalent and that exceeds the then-existing highest Bid by at least the amount of the Minimum Overbid. The Debtors further retain the right to modify the bid increment requirements at the Auction following consultation with the Consultation Parties. |

19

| Summary of Bidding Procedures | |
|---|---|
| | *Successful Bidder.*  The Auction (if any) shall continue until the Debtors select such Qualifying Bid that is the highest or best Qualifying Bid at the Auction (if any), taking into account any factors the Debtors reasonably deem relevant to the value and certainty of the Qualifying Bid to the Debtors' estates (such Qualifying Bid, the "**Successful Bid**," and the Bidder submitting such Successful Bid, the "**Successful Bidder**") as the winner of the Auction (if any).  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close the proposed transaction and the timing thereof, the number, type and nature of any changes to the Form APA or the applicable Alternative APA, as applicable, requested by each bidder, and the net benefit to the Debtors' estates.<br><br>The Auction (if any) shall close when the Successful Bidder submits fully executed transaction documents memorializing the terms of the Successful Bid. |
| | *Back-Up Bidder.* The Qualifying Bidder with the next highest or otherwise next best Bid at the Auction (if any), as determined by the Debtors, will be designated as the Back-Up Bidder. The identity of the Back-Up Bidder and the amount and material terms of the Back-Up Bid shall be announced by the Debtors at the conclusion of the Auction (if any) at the same time the Debtors announce the Successful Bid. |
| | *Notice.* On September 16, 2025, the Debtors shall file with the Court a notice identifying the Successful Bidder and the Back-Up Bidder. |
| **Reservation of Rights of the Debtors; Modification of Bidding and Auction Procedures** | The Debtors reserve the right as they may reasonably determine in their sole discretion to be in the best interest of the Debtors' estates to: (i) determine which Qualifying Bid at the Auction (if any) is the highest or best proposal; (ii) reject any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (iii) waive terms and conditions set forth herein with respect to all potential bidders and Qualifying Bidders; (iv) impose additional terms and conditions at the Auction (if any) with respect to all Qualifying Bidders; (v) extend the deadlines set forth herein; (vi) continue or cancel the Auction (if any) in open court without further notice; and (vii) modify the Bidding Procedures, if necessary, and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge their fiduciary duties and are not inconsistent with any Court order. |

21.    The Debtors submit that the timeline set forth in the Bidding Procedures, and the

Bidding Procedures themselves, are reasonable and necessary under the circumstances of these

chapter 11 cases. Such timeline provides approximately six (6) weeks between the filing of this

motion and the Bid Deadline, which will allow parties in interest sufficient time to diligence the opportunity presented here, and to formulate bids for the NOLA Properties. The Bidding Procedures were designed with the objective of generating interest in, and driving higher and better value for, the NOLA Properties while allowing the Debtors to close the Sale Transaction(s) in a timely and efficient manner.

22.     To the extent the NOLA DIP Lender elects to credit bid any outstanding obligations under the NOLA DIP Facility, the NOLA DIP Lender will be deemed to be a Qualifying Bidder, and the NOLA DIP Lender Bid will be deemed to be a Qualifying Bid.  The NOLA DIP Lender may credit bid pursuant to section 363(k) of the Bankruptcy Code, and in that event, is not required to make a deposit with the Debtors.  In such a circumstance, the NOLA DIP Lender will no longer be deemed a Consultation Party.

23.     Nothing in the Bidding Procedures will impose any obligation on a Debtor (including the board of directors, board of managers, or similar governing body of a Debtor, including the Independent Fiduciary), after consulting with counsel, to take any action or to refrain from taking any action, with respect to the Bidding Procedures or otherwise related to any potential transaction, to the extent taking or failing to take such action is required to comply or would be inconsistent with applicable law or the Debtors' fiduciary obligations, if any, under applicable law. Therefore, the Bidding Procedures do not hinder the Debtors' ability to consider all Qualifying Bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

## VI.    Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale or Confirmation and Sale Hearing

24.     As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit

2, to be served on (a) all parties listed on the notice block of this motion and (b) any parties that have expressed written interest in pursuing a potential transaction in connection with the marketing and bidding process.  The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, Auction (if any), and Sale Hearing or Confirmation and Sale Hearing, as applicable.  As soon as practicable following the entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be published once in *The New Orleans Advocate* or similar publication in the prudent exercise of the Debtors' business judgment.  In addition, the Debtors will post the Sale Notice on the Debtors' restructuring website: https://www.veritaglobal.net/cbrm.

25.    Following the Auction (if any), on September 16, 2025, the Debtors will promptly file with the Court a notice (the "**Notice of Successful Bidder**") that will identify, among other things, the Successful Bidder and Back-Up Bidder.  The Notice of Successful Bidder will also indicate whether the Sale Transaction will be implemented under section 363 or pursuant to a chapter 11 plan.

**VII.    The Assumption and Assignment Procedures and Related Notice**

26.    The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of Executory Contracts and Unexpired Leases in connection with the Sale Transaction(s) (the "**Assumption and Assignment Procedures**") and the Assumption Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3.  Because the Bidding Procedures Order sets forth the Assumption and Assignment Procedures in detail, they are not restated herein. Generally, however, the Assumption and Assignment Procedures (a) outline the process by which the Debtors may serve notice to certain Executory Contract and Unexpired Lease counterparties regarding the proposed assumption and assignment and related cure amounts, informing such parties of their right and the procedures to

object thereto, and (b) establish objection and other relevant deadlines and the manner for resolving

disputes relating to the assumption and assignment of the Executory Contracts and Unexpired

Leases to the extent necessary.

### Basis for Relief

**I.      The Court Should Approve the Sale Timeline Because It Is in the Best Interests of the Debtors' Estates and Is Reasonable in Time and Scope.**

27.      The Debtors seek entry of the Bidding Procedures Order for purposes of setting the

Sale Timeline and providing parties with as much notice and clarity as possible.  The proposed

Sale Timeline contemplates an efficient sale process, and the Debtors want to ensure that all

interested parties, and any potential bidders, understand the timeline to participate in the sale

process and submit Qualifying Bids.

28.      The Debtors further submit that the Sale Timeline is appropriate.  The Debtors and

their advisors have evaluated a number of qualitative and quantitative factors in designing a

process that they believe will maximize the value of the NOLA Properties and result in a successful

restructuring of their estates. The Debtors and their advisors have negotiated a timeline that

balances the need to provide adequate notice to parties in interest, including to sufficiently market

the NOLA Properties in the context of a postpetition sale process, with the need to quickly and

efficiently consummate the Sale Transaction. The Sale Timeline is a product of good-faith, arm's-

length negotiations and reflects the best option for maximizing the value of the NOLA Properties

under the circumstances of these chapter 11 cases.

29.      The Debtors believe that the Sale Timeline is reasonable in time and scope and

affords parties with sufficient time to gather information necessary to formulate a competitive,

value-maximizing bid. Accordingly, the Debtors believe that the Sale Timeline is in the best

interests of the Debtors' estates, will assist in establishing whether and to what extent a market

exists for the NOLA Properties, and provides interested parties with sufficient opportunity to participate in any sale transaction(s), and ultimately, will result in the highest or otherwise best bid for the NOLA Properties under the circumstances.

30.    Access to the NOLA DIP Facility[9] is critical to the Debtors' ability to operate their businesses through the completion of the Sale Transaction and during the pendency of these chapter 11 cases. Failure to adhere to the milestones included in the NOLA DIP Facility, which are reflected in the Sale Timeline, could jeopardize the Debtors' available borrowing under the NOLA DIP Facility and, in turn, compromise the Debtors' ability to effectuate the proposed Sale Transaction. Given the anticipated cost of administering these chapter 11 cases, the Debtors cannot afford any delay in monetizing the NOLA Properties.  With this in mind, the proposed Sale Timeline provides the Debtors with the ability to maximize value while minimizing administrative expenses.

31.    In view of the foregoing, the Debtors request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, approving the Sale Timeline.

**II.        The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

32.    The Debtors seek authority, after notice as set forth in the proposed Bidding Procedures Order, to offer customary bid protections to Stalking Horse Bidder(s), if any, consisting of (i) the Break-Up Fee in an aggregate amount not to exceed three (3) percent of the Purchase Price as a Stalking Horse Bidder and/or (ii) the Expense Reimbursement from the Debtors of reasonable, documented out of pocket fees, costs and expenses of the Stalking Horse Bidder

---

[9]    As used herein, the "NOLA DIP Facility" has the meaning ascribed to such term in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 251].

incurred in connection with the Stalking Horse Bid up to an amount as agreed by the Debtors and

the Stalking Horse Bidder.  The use of a stalking horse in a public auction process for the sale of

a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is,

in many circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of

Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-

219, *1 (E.D. Wis. July 7, 2011).

33.     Bid protections are a normal and, in many cases, necessary components of sales

conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to
> maximize the value of the debtor's assets .... In fact, because the ...
> corporation ha(s) a duty to encourage bidding, break-up fees can be
> *necessary* to discharge [such] duties to maximize values.

*Integrated Res., Inc.*,, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and

other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the

bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth

Ave., Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted); *See also

Integrated Res., Inc.,* 147 B.R. at 660-61 (break-up fees can prompt bidders to commence

negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.,* 140 B.R.

191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an

initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

who would capitalize on the initial bidder's . . . due diligence").

34.     As a consequence, courts in this jurisdiction routinely approve such bidding

protections in connection with similar transactions.  *See Calpine Corp. v. O'Brien Envtl. Energy,

Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999) ("In other words, the

allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-07 (3d Cir. 2010) (holding that a fee could preserve the value of an estate by assuring that a bidder adhered to its bid rather than abandoning its attempt to purchase in the event that the bankruptcy court required an auction for the sale of the relevant asset); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("The Third Circuit has expressly recognized as an administrative claim a stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such a claim provides a benefit to the estate . . . nor does the benefit to the estate have to be substantial . . . .").

35.    In *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that although bid protections are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) apply to bid protections in bankruptcy cases. Accordingly, to be approved, bid protections must provide postpetition benefit to the Debtor's estate. *See id.* at 533; *see also In re Reliant Energy Channelview LP,* 594 F.3d 200, 206-07 (3d Cir. 2010) (breakup fee must be necessary to preserve the value of the estate).

36.    The *O'Brien* court identified at least two instances in which bid protections may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, when the availability of bid protections induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to

26

the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

37.    The Debtors propose to pay the Bid Protections only in the event they determine, after good faith, arm's-length negotiations that designating a Stalking Horse Bidder would be necessary and beneficial for their estates and after notice and an opportunity to object to such Bid Protections. Courts in this district have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g., In re Invitae Corporation,* No. 24-11362 (MBK) (Bankr. D. N.J. Feb. 13, 2024) (approving bidding procedures and bidding protections including a break-up fee and expense reimbursement payable to the stalking horse bidder); *In re Directbuy Home Improvement, Inc.*, No. 23-19159 (SLM) (Bankr. D.N.J. Nov. 9, 2023) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023) (same); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 25, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) (same).

38.    Without the Bid Protections, a Potential Bidder may elect not to serve as a Stalking Horse Bidder to the detriment of the Debtors' estates. The Bidding Procedures do not require the payment of the Bid Protections. Rather, the Debtors have the option of paying or otherwise incurring such obligations in the event that offering such Bid Protections is necessary to foster a competitive bidding process that will maximize the value of the Debtors' estates. In that instance, the value created for the Debtors' estates will likely greatly outweigh the cost of any Bid Protections. In any case, granting the Debtors authority to offer the Bid Protections sends a strong signal to the market that the Debtors are serious about running a competitive sale process to generate the best result for the Debtors and their estates.

39.     The Bid Protections shall only include (i) the Break-Up Fee in an aggregate amount not to exceed three (3) percent of the Purchase Price as a Stalking Horse Bidder and/or (ii) the Expense Reimbursement from the Debtors for reasonable, documented out of pocket fees, costs and expenses of the Stalking Horse Bidder incurred in connection with the Stalking Horse Bid up to an amount as agreed by the Debtors and the Stalking Horse Bidder.  Such protections are well within market for transactions of this type, and which have been routinely approved by courts in this district.  *See, e.g., In re Directbuy Home Improvement, Inc.*, No. 23-19159 (SLM) (Bankr. D.N.J. Nov. 9, 2023) (approving a break-up fee of up to three percent of the proposed purchase price); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023) (approving break-up fees and expense reimbursements in an aggregate amount not to exceed (a) three and a half (3½) percent of the proposed purchase price with respect to a specific sale transaction and (b) three (3) percent of the proposed purchase price with respect to a retail sale transaction); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) (approving a break-up fee of up to three (3) percent of the proposed purchase price); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 25, 2023) (approving a break-up fee and expense reimbursement in an aggregate amount not to exceed three (3) percent of the proposed purchase price); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. Apr. 19, 2023) (approving a break-up fee of up to three (3) percent of the proposed purchase price).

40.     Accordingly, for the reasons set forth above, the proposed Bid Protections are a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their estates, and all stakeholders.  Accordingly, the Court should approve the Bid Protections.

### III.   Implementing the Bidding Procedures Is an Appropriate Exercise of the Debtors' Business Judgment and in the Best Interests of the Estates.

41.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *see also In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").  Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); s*ee also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

42.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best proposals available on the market.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  The Debtors fully expect that, by testing the marketplace, they will be able to select a potential transaction that is value-maximizing and in the best interests of the Debtors' stakeholders.  The proposed Bidding Procedures are therefore appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy

29

proceedings and are consistent with other procedures previously approved by this District.  *See,*
*e.g.*, *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK) (Bankr. D.N.J. June 11, 2025) [Docket
No. 804]; *In re Careismatic Brands, LLC*, Case No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024)
[Docket No. 339]; *In re DirectBuy Home Improvement, Inc.*, Case No. 23-19159 (SLM) (Bankr.
D.N.J. Nov. 9, 2023) [Docket No. 187]; *In re Bed Bath & Beyond Inc.*, Case No. 23-13359 (VFP)
(Bankr. D.N.J. Apr. 25, 2023) [Docket No. 92]; *In re David's Bridal, LLC*, Case No. 23-13131
(CMG) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 72]; *In re BlockFi Inc.*, Case No. 22-19361
(MBK) (Bankr. D.N.J. Jan. 30, 2023) [Docket No. 441].

## IV.     The Form and Manner of the Sale Notice Should Be Approved.

43.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors
with twenty-one (21) days' notice of a hearing where the Debtors will seek to use, lease, or sell
property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires
any such notice to include the time and place of the auction and the hearing and the deadline for
filing any objections to the relief requested therein.  Notice of this Motion and the related hearing
to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as
provided for herein, is reasonably calculated to provide all interested parties with timely and proper
notice of a potential transaction, including the date, time, and place of the Auction (if one is held)
and the Bidding Procedures and the dates and deadlines related thereto.  Accordingly, the Debtors
request that this Court approve the form and manner of the Sale Notice.

## V.     The Proposed Notices are Appropriate Under Bankruptcy Rule 2002.

44.     The notices contemplated by the Bidding Procedures give notice of the proposed
marketing and bidding process, including a disclosure of the time, place, and methodology of the
Auction (if any), the terms and conditions for being a Qualifying Bidder, the necessary terms to

be included in any potential transaction, and the deadline for filing any objections to the bidding process or any part thereof.  The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bidding Procedures necessary to enable interested bidders to participate in the Auction (if any) and constitute good and adequate notice of the Bidding Procedures and the other components of the marketing and bidding process. Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

**VI.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

45.     As set forth above, the Sale Transaction contemplates the assumption and assignment of Executory Contracts and Unexpired Leases to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish the Assumption and Assignment procedures by which: (a) the Debtors and counterparties to the Executory Contracts or Unexpired Leases (the "**Contract Counterparties**") can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such Contract Counterparties can object to the assumption and assignment of the Executory Contracts and Unexpired Leases and/or related cure payments. As set forth in the Bidding Procedures Order, the Debtors also request that any Contract Counterparty that fails to object to the proposed assumption and assignment of any Executory Contract or Unexpired Lease be deemed to consent to the assumption and assignment of the applicable Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, along with the cure payments identified in the Assumption Notice. *See, e.g.*, *In re Boy Scouts of Am.*, 642 B.R. 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) (same); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, at * 1 (Bankr. D.N.J. May 11, 2007) (same); *Hargrave*

31

*v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same);

*In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

46.     The Debtors believe that the Assumption and Assignment Procedures are fair and

reasonable, provide sufficient notice to parties to the Executory Contracts and Unexpired Leases,

and provide certainty to all parties in interest regarding their obligations and rights in respect

thereof. Accordingly, the Debtors request the Court approve the Assumption and Assignment

Procedures set forth in the Bidding Procedures Order.

**VII.    The Assumption and Assignment of the Executory Contracts and Unexpired
Leases Should be Approved.**

> **a.  The Assumption and Assignment of the Executory Contracts and
> Unexpired Leases Reflects the Debtors' Business Judgment.**

47.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its

executory contracts and unexpired leases, subject to the approval of the court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance

is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease

must only satisfy the "business judgment rule" and will not be subject to review unless such

decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. of Inst'l Invrs. v.

Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act

section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether

executory contract was burdensome in favor of whether rejection is within debtor's business

judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989)

(describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor

to consider whether to reject or assume executory contracts under the Code"); *In re S.A. Holding

Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (applying the business judgment test in

determining whether to approve a contract rejection); *In re Cent. Jersey Airport Servs., LLC*, 282

B.R. 176, 183 (Bankr. D.N.J. 2002) ("Although the [Bankruptcy Code] does not provide the standard to be applied in determining the propriety of the [debtor's] decision [to assume or reject a contract], most Circuits, including the Third Circuit have adopted the business judgment test.").

48.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment. The Assumed Contracts are necessary to operate the NOLA Properties and, as such, they are essential to inducing the best offer for the NOLA Properties. Finally, the Assumed Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### b.  The Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

49.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* (quoting *In re Bon Ton Restaurant & Pastry*

*Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).  Here, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Stalking Horse Agreement, if any, or any alternative agreement with the Successful Bidder will require that the Stalking Horse Bidder or, to the extent the Stalking Horse Bidder is not the Successful Bidder, the Successful Bidder, to cure all defaults associated with, or that are required to properly assume, any Assumed Contracts.

50.     Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure payments or other defaults, if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract Counterparties.

### c.  Contract Counterparties Will Be Adequately Assured of Future Performance.

51.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance." *Carlisle Homes*, 103 B.R. at 538 (internal citations omitted).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Filene's Basement*, 2014 WL 1713416, at *12 (Bankr. D. Del. 2014) (holding that a contract could be assigned because the assignee had the financial ability to perform the contract obligations going forward and would not fail to perform the contract's obligations at risk of losing a significant investment); *In re Bygaph,*

*Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is present where a prospective assignee has the financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

52.     At the Sale Hearing or Confirmation and Sale Hearing, as applicable, the Debtors will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder are satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualifying Bidder and will demonstrate such financial wherewithal, willingness, and ability to perform under any contracts to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the contracts or proposed cure payments.  Thus, the Court should authorize the Debtors to assume and assign the Assumed Contracts to the Successful Bidder pursuant to the Assumption and Assignment Procedures.

**VIII.     To the Extent Applicable, the Court Should Approve the Sale at the Sale Hearing.**

53.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

54.     To the extent the Debtors propose a standalone sale under section 363 of the Bankruptcy Code, the Asset Sale is a sale of the NOLA Properties outside of the ordinary course. Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin*

*(In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts*

*Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound

business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169,

175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test

in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re*

*Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

55.     The demonstration of a valid business justification by the debtor leads to a strong

presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985)).

56.     The Bidding Procedures provide for a public Auction that will foster a competitive

process and ensure the Debtors receive the highest and best bid for the NOLA Properties. The sale

of one or more of the NOLA Properties to a Stalking Horse Bidder, if any, or Successful Bidder is

in the Debtors' best interests and should be approved pending the Sale Hearing, as applicable.

### a.   The Sale Is an Exercise of Sound Business Judgment.

57.     The Debtors have sound business justifications for selling the NOLA Properties

through a competitive bidding process pursuant to the Bidding Procedures.   Indeed, if an

agreement to purchase the NOLA Properties is not approved, the Debtors sustain substantial risk

of not selling the NOLA Properties, which would result in a significant destruction of value for all

of the Debtors' stakeholders. *See In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr.

W.D. Tex. 1989) ("A court in evaluating a proposed sale free and clear of liens must balance the need for flexibility with the competing concern of the affected creditors for adequate protection."). These benefits provide a compelling business justification for an asset sale.

### b.  Adequate and Reasonable Notice of the Sale Will Be Provided.

58.     As discussed above, the Debtors will provide adequate and reasonable notice of the sale to interested parties. The Sale Notice complies with Bankruptcy Rule 2002, providing at least 21 days' notice of the date, time, and location of the Auction, Sale Hearing, and Confirmation and Sale Hearing. Additionally, the Sale Notice informs interested parties of relevant information for the sale and the applicable objection deadlines.

### c.  The Court Should Approve the Proposed Sale of the NOLA Properties Free and Clear of Liens, Claims, Interests, and Encumbrances under Bankruptcy Code Section 363(f).

59.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions is met:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

60.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the NOLA Properties free and clear of any interests.  The Debtors anticipate satisfying one or more of the conditions under section 363(f) and believe that they will be able to demonstrate such satisfaction at the Sale Hearing.

61.     To the extent that the Court finds that any Sale Transaction satisfies section 363(f), the Debtors request that the Court also hold that such Sale Transaction is free and clear of successor liability relating to the Debtors' businesses. The purpose of a free and clear sale under section 363(f) would be frustrated if claimants could thereafter assert claims arising from the Debtors' pre-sale conduct against the eventual purchaser. The absence of such assurance may chill bidding or result in reduced bids.

### d. The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

62.     While the Bankruptcy Code does not define good faith, courts have found that a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  Particularly, in a bankruptcy sale, to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

63.     The Bidding Procedures are designed to ensure that the  terms of any Alternative APA and sale to Successful Bidder will constitute an arms'-length good faith transaction. If the Debtors seek to consummate a sale to the Successful Bidder pursuant to a bid obtained in accordance with the Bidding Procedures, such sale will have been negotiated at arm's length and/or through a fair and open auction process. To that end, the Debtors request that the Court find in the

Sale Order, if any, that the Successful Bidder is a good faith purchaser within the meaning of section 363(m). Providing the Successful Bidder with such protection will ensure that the Debtors receive the maximum price for the NOLA Properties and consummation of the sale will occur promptly.

### Waiver of Memorandum of Law

64.     The Debtors request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and this motion does not raise any novel issues of law.

### No Prior Request

65.     No prior request for the relief sought in this motion has been made to this or any other court.

### Reservation of Rights

66.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion except as otherwise set forth in the motion; (e) except as set forth herein, a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission

as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

### Notice

67.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey; (b) the NOLA DIP Lender; (c) the Kelly Hamilton DIP Lender; (d) Lynd Living; (e) the Ad Hoc Group; (f) the United States Attorney's Office for the District of New Jersey; (g) the Internal Revenue Service; (h) the attorneys general in the states where the Debtors conduct their business operations; (i) the U.S. Department of Housing and Urban Development; (j) the U.S. Department of Justice; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested in this motion and such other and further relief as the Court deems appropriate under the circumstances.

Dated: August 1, 2025

Respectfully submitted,

/s/ *Andrew Zatz*

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com

- and -

Andrew Zatz
Samuel P. Hershey (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: azatz@whitecase.com
        sam.hershey@whitecase.com
        barrett.lingle@whitecase.com

*Counsel to Debtors and*
*Debtors-in-Possession*

**KEN ROSEN ADVISORS PC**
Kenneth A. Rosen
80 Central Park West
New York, New York 10023
Telephone: (973) 493-4955
Email: ken@kenrosenadvisors.com

*Co-Counsel to Debtors and*
*Debtors-in-Possession*