**Exhibit A**

**Kelly Hamilton Purchase Agreement**

*Execution Version*

**PURCHASE AND SALE AGREEMENT**

by and between

**KELLY HAMILTON APTS LLC**,
a Delaware limited liability company

and

**3650 SS1 PITTSBURGH LLC,**
a Delaware limited liability company

Property Name:  Kelly Hamilton Apartments
Location:  Pittsburgh, Pennsylvania

Execution Date:  July 11, 2025

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is executed as of July 11, 2025 (the "**Execution Date**") by and between KELLY HAMILTON APTS LLC, a Delaware limited liability company ("**Debtor**"), and 3650 SS1 PITTSBURGH LLC, a Delaware limited liability company ("**Bidder**") or a nominee designated in accordance with this Agreement. Capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Final DIP Order (as hereinafter defined) or Article 1 hereof, as applicable.

*W I T N E S S E T H :*

**WHEREAS**, Debtor is the owner of the Property;

**WHEREAS**, Debtor is one of the debtors in the Bankruptcy Proceedings;

**WHEREAS**, Bidder is the DIP Lender under the DIP Facility;

**WHEREAS**, the Debtor has determined that it is in its best interest of Debtor to sell the Property to Bidder pursuant to a Kelly Hamilton Restructuring Transaction to be entered into in accordance with the terms and conditions of the Final DIP Order.

**WHEREAS**, the Debtor desires to sell the Property to Bidder, and Bidder desires to purchase the Property from Debtor, pursuant to a Kelly Hamilton Restructuring Transaction to be consummated in accordance with the terms and conditions of this Agreement, subject to a comprehensive auction process, including consideration of only Qualifying Bids, and Debtor's agreement to provide the Breakup Fee in the event that the Debtor shall elect to enter into an Alternative Kelly Hamilton Restructuring Transaction in accordance with the terms and conditions of this Agreement and the entry of the Bidding Procedures Order authorizing the payment of the same.

**NOW THEREFORE**, in consideration of the foregoing premises, the payment of the Independent Consideration, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor and Bidder (collectively, the "**Parties**" and each, individually, a "**Party**") hereby agree as follows:

### ARTICLE 1 - CERTAIN DEFINITIONS

In addition to terms defined elsewhere in this Agreement, as used herein, the following terms shall have the following meanings:

"**Affiliate**" shall mean any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"**Agreement**" shall have the meaning assigned to such term in the Preamble.

1

"**Alternative Agreement**" shall mean any agreement to purchase the Property pursuant to a Kelly Hamilton Restructuring Transaction in accordance with the terms and conditions of the Final DIP Order which shall provide for the Minimum Alternative Purchase Price and is otherwise on terms and conditions no less favorable to the Debtor than the terms and conditions of this Agreement and which the Debtor shall determine is in the best interest of the Debtor to enter in replacement of this Agreement.

"**Alternative Agreement Notice**" shall mean a written notice from Debtor to Bidder indicating Debtor's desire to enter into an Alternative Agreement which notice, as a condition to the effectiveness thereof, shall be accompanied by a true, correct and complete copy of the proposed Alternative Agreement.

"**Alternative Kelly Hamilton Restructuring Transaction**" shall mean any Kelly Hamilton Restructuring Transaction proposed to be consummated in accordance with the terms and conditions of an Alternative Agreement, in which case this Agreement shall be null and void as of the closing of such transaction and the Parties shall be released from any further liability or obligation hereunder other than the payment of the Breakup Fee, without further action of the Parties hereto and without either Party being deemed to be in default under this Agreement.

"**Assignment and Assumption of Contracts**" shall have the meaning assigned to such term in **Section 5.2(a)(iii)** hereof.

"**Assignment and Assumption of HAP Contract**" shall mean an Assignment, Assumption and Amendment of Section 8 Housing Assistance Payments Contract in the form of **Exhibit B** attached hereto and by this reference made a part hereof or such other form as may be required by HUD.

"**Assumed Contract Claims**" shall mean any claims or Causes of Action of the Debtors or their estates against any third party arising under or relating solely to any Assumed Contract.

"**Assumed Contracts**" shall mean all executory contracts and unexpired leases assumed by the Debtor and assigned to the Bidder in the Bankruptcy Proceedings in accordance with the procedures set forth in the Bidding Procedures Order, including the Scheduled Contracts and any executory contracts and leases hereafter entered into by Debtor in the ordinary course of business in connection with the leasing and operation of the Real Property.

"**Assumed Liabilities**" shall mean (i) all Liabilities under the Assumed Contracts arising on or after the Closing, (ii) all Cure Costs related to the Assumed Contracts, (iii) each Senior Claim to the extent such Senior Claim is not paid in full in cash by Bidder or an affiliate thereof as of the Closing Date and (iv) real estate taxes and other normal and customary operating expenses of the Property that are unpaid as of the Closing Date and would typically be prorated in connection with the sale of real property.

"**Available Credit Bid Amount**" shall mean the sum of the DIP Facility Obligations and the Manager Administrative Expense Claim.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of New Jersey.

"**Bankruptcy Proceedings**" shall mean the proceedings pursuant to the Bankruptcy Code in the case styled In re CBRM Realty, Inc., et. al., Case No. 25-15343 (MBK), presently pending before the Bankruptcy Court.

"**Base Amount**" shall mean an amount equal to the sum of (a) the DIP Facility Obligations and (b) the amount of the Manager Administrative Expense Claim.

"**Bidder**" shall have the meaning assigned to such term in the Preamble.

"**Bidding Procedures Order**" shall mean an Order of the Bankruptcy Court approving, among other things, the bidding procedures for an auction process for the Property, approving Bidder as the stalking horse bidder and the Breakup Fee, which Order shall be in form and substance reasonably acceptable to Debtor and Bidder. Such "**Bidding Procedures Order**" shall provide for Bidder to be the winning bidder so long as it agrees to pay an amount that it is not less than the highest other Qualifying Bid, if any.

"**Breakup Fee**" shall mean a payment in the amount of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00), which amount shall be payable from of the Cash proceeds (if any) of an Alternative Kelly Hamilton Restructuring Transaction solely upon (x) the Bankruptcy Court entering a Bidding Procedures Order authorizing the payment of the Breakup Fee, (y) the Bankruptcy Court entering a Final Order authorizing the Debtor to enter into and consummate such Alternative Kelly Hamilton Restructuring Transaction, and (z) the consummation of such Alternative Kelly Hamilton Restructuring Transaction in accordance with its terms.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which banks in Pittsburgh, Pennsylvania are required or permitted to be closed for business in accordance with the requirements of applicable Laws.

"**Casualty/Condemnation Proceeds**" shall mean any awards or proceeds payable by any insurer or Governmental Authority in connection with any casualty with respect to the Real Property or any taking of the Real Property by the power of eminent domain.

"**Causes of Action**" shall have the meaning assigned to such term in the Plan.

"**Closing**" shall mean the closing of the Transaction.

"**Closing Date**" shall mean the date on which the Transaction closes.

"**Closing Documents**" shall mean any and all documents to be executed and delivered by Debtor and Bidder in connection with the Closing in accordance with the terms and conditions of this Agreement.

"**Closing Statement**" shall have the meaning assigned to such term in **Section 6.2(f)** hereof.

"**Common-Interest Communications**" means documents, information, or communications that are subject to the attorney-client privilege, attorney-work product doctrine, joint defense, or other privilege or protection from disclosure, and (a) are in the Debtor's possession, and (b) are shared between or among (i) the Debtor, on the one hand, and (ii) any third-party entity or its representatives that share a common legal interest with the Debtor, on the other hand, including documents that reflect defense strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation.

"**Creditor Recovery Trust**" shall have the meaning assigned to such term in the Plan.

"**Creditor Recovery Trust Amount**" shall have the meaning assigned to such term in the Plan.

"**Cure Costs**" shall mean means the amounts, as determined pursuant to the Bidding Procedures Order, necessary to cure all of the Debtor's monetary defaults, if any, and to pay all actual pecuniary losses that have resulted from such defaults under any executory contracts or unexpired leases and that must be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code to effectuate the assumption of such executory contracts or unexpired leases by the Debtors and the assignment thereof to the Bidder.

"**Cutoff Date**" shall mean the date that is one day prior to the hearing to consider approval of the Sale Order.

"**D&O Liability Insurance Policies**" shall have the meaning assigned to such term in the Plan.

"**Debtor**" shall have the meaning assigned to such term in the Preamble.

"**Deed**" shall have the meaning assigned to such term in **Section 5.2(a)(i)** hereof.

"**DIP Facility**" shall mean the debtor in possession financing facility provided to the Debtors under the DIP Facility Documents.

"**DIP Facility Documents**" shall mean the Senior Secured Super Priority Debtor-In-Possession Credit Agreement by and among the Kelly Hamilton Loan Parties and the DIP Lender dated as of June 23, 2025 and all other documents and instruments executed and delivered in connection therewith which evidence the DIP Facility.

"**DIP Facility Obligations**" shall mean, the sum of the following amounts outstanding as of the Closing Date:

(a)      the Outstanding DIP Facility Principal Amount;

(b)      all accrued and unpaid interest on the Outstanding DIP Facility Principal Amount and any interest capitalized thereunder;

(c)      any attorneys' fees of counsel for the DIP Lender in connection with the Bankruptcy Proceedings, the preparation and negotiation of this Agreement and the consummation of the Transaction; and

(d)      any other sums outstanding under the DIP Facility Documents as of the Closing Date.

"**DIP Lender Litigation Claims**" shall have the meaning assigned to such term in the Final DIP Order.

"**Escrow Agent**" shall mean the Title Company in its capacity as escrow agent.

"**Execution Date**" shall have the meaning assigned to such term in the Preamble.

"**Excluded Liabilities**" shall mean any Liabilities, claims and Causes of Action that are not included within the definition of Assumed Liabilities.

"**Fee Escrow Amount**" shall have the meaning assigned to such term in the Plan.

"**Final DIP Order**" shall mean that certain *Final Order (i) Authorizing the Kelly Hamilton Loan Parties to Obtain Senior Secured Priming Superpriority Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Modifying the Automatic Stay and (iv) Granting Related Relief* [Docket No. 178] entered by the Bankruptcy Court on June 19, 2025.

"**Final Order**" shall mean (a) an Order of the Bankruptcy Court or (b) an Order of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any Order of the Bankruptcy Court, in each case as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or local rules of the Bankruptcy Court, may be filed relating to such Order shall not prevent such Order from being a Final Order.

"**Financial Records**" shall mean the financial records of Debtor in connection with the leasing, management, operation and ownership of the Real Property, including, without limitation, all operating statements, rent rolls, budgets, statements of accounts receivable and accounts payable, delinquency reports, and information regarding Tenant Deposits; *provided* such materials shall exclude information protected or purportedly protected by the attorney-client privilege or attorney work product doctrine, including information shared pursuant to any joint defense, common interest, or confidentiality agreement among the Debtors and any Affiliate or Insider, and any Common-Interest Communications, appraisals, and internal Debtor memorandums.

"**General Administrative Claims**" shall have the meaning assigned to such term in the Plan.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, including, without limitation, the Bankruptcy Court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**HAP Contract**" shall mean that certain Housing Assistance Payments Contract dated as of October 1, 1982 between Debtor, U.S. Department of Housing and Urban Development and Pennsylvania Housing Finance Agency, as renewed and amended pursuant to that certain Renewal HAP Contract for Section 8 Mark-Up-To-Market Project entered into as of September 1, 2023.

"**HAP Contract Assignment and Assumption**" shall mean the assumption and assignment of the HAP Contract to the Bidder or its designated nominee.

"**HUD**" shall mean the U.S. Department of Housing and Urban Development.

"**Independent Consideration**" shall have the meaning assigned to such term in Section 2.3 hereof.

"**Insider**" shall mean an "insider" as defined in section 101(31) of the Bankruptcy Code.

"**Insurance Causes of Action**" shall have the meaning assigned to such term in the Plan.

"**Insurance Policies**" shall have the meaning assigned to such term in the Plan.

"**Intangible Personal Property**" shall mean all of that certain intangible property owned by Debtor relating to the leasing, management, operation and ownership of the Real Property, including, without limitation, all of Debtor's right, title and interest in, to and under the Property Documents and Materials, any tradenames used in connection with the leasing, management, operation and ownership of the Real Property, including, without limitation, the name "Kelly Hamilton" and any internet websites or domain names used in connection with the operation of the Real Property.

"**Kelly Hamilton Go-Forward Trade Claims**" shall have the meaning assigned to such term in the Plan.

"**Laws**" shall mean any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, authorization, covenant, condition, restriction or agreement, or other direction or requirement of any Governmental Authority.

"**Leases**" shall mean all unexpired leases, occupancy agreements, and any other agreements for the use, possession, or occupancy of any portions of the Real Property as of the Closing Date.

"**Liabilities**" shall mean, as to any Person, any claim (as defined by section 101(5) of the Bankruptcy Code), debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.  For purposes hereof, the term "**Liabilities**" shall specifically exclude any legal fees and expenses of Debtor's counsel.

"**Losses**" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"**Major Casualty/Condemnation**" shall mean any casualty, condemnation proceedings, or eminent domain proceedings to the extent that (i) the portion of the Property that is the subject of such casualty or such condemnation or eminent domain proceedings has a value in excess of SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($750,000.00), or (ii) such casualty is an uninsured casualty.

"**Manager**" shall mean, together, LAGSP LLC and Lynd Management Group.

"**Manager Administrative Expense Claim**" shall mean the Manager Administrative Expense Claim as defined in the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Certain Amended and Restated Property Management and Asset Management Agreements* [Docket No. 128].

"**Mineral Rights**" shall mean all of Bidder's right, title and interest, if any, in and to all oil, gas, coal and other minerals within and underlying the real property to be conveyed pursuant hereto, together with appurtenant mining, drilling and extraction rights and all other rights and privileges appurtenant thereto, if any.

"**Minimum Alternative Base Amount**" shall mean an amount equal to one hundred five percent (105%) of the sum of (a) the Base Amount and (b) the Breakup Fee.

"**Minimum Alternative Purchase Price**" shall mean the sum of (a) the Minimum Alternative Base Amount and (b) the Assumed Liabilities; *provided* that the Manager Administrative Expense Payment shall be deemed satisfied by the Minimum Alternative Base Amount.

"**New Bidder**" shall mean any bidder submitting a bid for the purchase of the Property pursuant to an Alternative Agreement.

"**Order**" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceedings (including the Sale Order).

"**Original DIP Facility Principal Amount**" shall mean NINE MILLION SEVEN HUNDRED FIVE THOUSAND ONE HUNDRED SIXTY-TWO AND NO/100 DOLLARS ($9,705,162.00).

"**Other Priority Claims**" shall have the meaning assigned to such term in the Plan.

"**Other Secured Claims**" shall have the meaning assigned to such term in the Plan.

"**Outside Closing Date**" shall mean September 30, 2025, subject to extension as provided in Section 6.4.

"**Outstanding DIP Facility Principal Amount**" shall mean the sum of the Original DIP Facility Principal Amount and any sums added to the Original DIP Facility Principal Amount as principal pursuant to the DIP Facility Documents, whether as capitalized interest, protective advances or otherwise.

"**Owner's Title Policy**" shall mean an ALTA owner's title insurance policy to be issued by the Title Company to Bidder in the form of the Proforma Title Policy insuring Bidder as the owner of the Real Property in an amount equal to the Purchase Price.

"**Parties**" shall have the meaning assigned to such term in the Recitals.

"**Party**" shall have the meaning assigned to such term in the Recitals.

"**Permitted Exceptions**" shall mean those matters set forth in Schedule B of the Proforma Title Policy.

"**Person**" shall mean any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Personal Property**" shall mean, collectively, the Tangible Personal Property and the Intangible Personal Property to the extent owned by Debtor.

"**Plan**" shall mean the *Joint Chapter 11 Plan of CBRM Realty Inc. and Certain of Its Debtor Affiliates*, dated as of June 30, 2025, as amended, amended and restated, supplement or other modified from time to time.

"**Preamble**" shall mean the preamble to this Agreement on Page 1 hereof.

"**Priority Tax Claims**" shall have the meaning assigned to such term in the Plan.

"**Proforma Title Policy**" shall mean the Proforma Owner's Policy attached hereto as **Exhibit C** and by this reference made a part hereof.

"**Property**" shall mean, collectively, (a) the Real Property, (b) the Personal Property, (c) the Assumed Contracts, (d) the Tenant Deposits, (e) all cash on hand, in bank accounts, or in escrow or reserve accounts established pursuant to the DIP Facility Documents, (f) all books and records of Debtor, subject to the right of Debtor to retain copies of such books and records to the extent necessary for the administration of the Creditor Recovery Trust or the Wind-Down; (g) the Assumed Contract Claims; and (h) the DIP Lender Litigation Claims.  Notwithstanding anything to the contrary contained herein, the term "**Property**" shall specifically exclude (i) the Creditor Recovery Trust Amount, or any other amounts held or designated for the benefit of the Creditor Recovery Trust; (ii) all Insurance Policies and any Insurance Causes of Action, including the D&O Liability Insurance Policies, and any rights or claims thereunder; (iii) any claims or Causes of Action of the Debtor or Debtor's estate against any third party other than the Assumed Contract Claims and the DIP Lender Litigation Claims; and (iv) the Fee Escrow Amount.

"**Property Documents and Materials**" shall mean all documents and materials relating to the leasing, management, operation and ownership of the Real Property in Debtor's possession or control, including, without limitation, (a) the Leases and any files relating to the leasing of the Real Property, (b) the Financial Records, (c) service contracts, (d) operating manuals, (e) warranties, (f) property management agreements to the extent remaining in force after Closing, (g) the HAP Contract and any documentation relating to the compliance or non-compliance of the Real Property relating thereto, (h) real estate tax bills and notices, (i) utility tax bills and notices, (j) plans and specifications, (k) licenses, permits and approvals, (l) certificates of use and occupancy and (m) notices from and correspondence with Governmental Authorities; *provided* such documents and materials shall exclude appraisals, internal Debtor memorandums and correspondence and materials covered by an attorney client privilege.

"**Purchase Price**" shall mean the sum of (a) the Base Amount and (b) the Assumed Liabilities; *provided* that the Manager Administrative Expense Payment shall be deemed satisfied by the Base Amount.

"**Qualifying Bid**" shall have the meaning assigned to such term in the Bidding Procedures Order, provided that such bid must provide for a payment in an amount equal to the Minimum Alternative Purchase Price.

"**Real Property**" shall mean the real property legally described in **Exhibit A** attached hereto and by this reference made a part hereof, together with all improvements and fixtures located thereon, and any rights, privileges and appurtenances pertaining thereto, including without limitation all of Seller's right, title and interest, if any, in and to any Mineral Rights.

"**Recitals**" shall mean the recitals to this Agreement on Page 1 hereof.

"**Rents**" shall mean and include all rents, administrative charges, utility charges and other sums and charges payable by Tenants under the Leases.

"**Representatives**" shall mean, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"**Sale Order**" shall mean an Order of the Bankruptcy Court confirming the Plan and authorizing the sale of the Property by Debtor to Bidder pursuant to this Agreement and the Plan in accordance with the provisions of section 1123 of the Bankruptcy Code, free and clear of any claims, liens or interests against the Debtor or any parties claiming by, through or under the Debtor, including, without limitation, (i) any claims of the United States seeking forfeiture of the Property or any portion thereof,  and (ii) any other claim, lien, or interest, whether or not that claim, lien, or interest is junior to the liens granted under the Final DIP Order, of any person or entity that was provided notice of entry of the Final DIP Order and failed to object to or consented to entry of the Final DIP Order, which Order shall be in form and substance reasonably acceptable to the Parties.

"**Scheduled Closing Date**" shall mean the date ten (10) Business Days following the issuance of the Sale Order, subject to extension as provided in Section 6.4.

"**Scheduled Contracts**" shall mean those executory contracts and unexpired leases identified in **Exhibit D** attached hereto and by this reference made a part hereof.

"**Senior Claims**" shall mean, collectively: (a) General Administrative Claims allowed against the Debtor; (b) Priority Tax Claims allowed against Debtor; (c) Other Priority Claims allowed against Debtor; (d) Other Secured Claims allowed against Debtor; and (e) Kelly Hamilton Go-Forward Trade Claims allowed against Debtor, but in each case solely to the extent that the same relate to the Property.  For the avoidance of any doubt, the Manager Administrative Expense Claim shall constitute a General Administrative Claim; *provided* that the extent to which the Manager Administrative Expense Claim is satisfied in cash by Bidder following the Closing Date shall be subject to the mutual consent of Bidder and the Manager.

"**Surviving Obligations**" shall mean any liabilities and obligations that this Agreement expressly provides shall survive the termination hereof.

"**Tangible Personal Property**" shall mean any tangible personal property owned by Debtor which is located at and used in connection with the operation of the Real Property as of the Closing Date.

"**Tenant Deposits**" shall mean all refundable deposits (whether cash or non-cash) paid or deposited by the Tenants with Debtor, as landlord, or any other person on Debtor's behalf pursuant to the Leases (together with any interest which has accrued thereon as required by the terms of such Lease, but only to the extent such interest has accrued for the account of the

respective Tenants or as required by Law), to the extent the same have not been advanced or paid to DIP Lender on or prior to the Closing Date.

"**Tenants**" shall mean the tenants under the Leases.

"**Title Company**" shall mean Chicago Title Insurance Company.

"**Transaction**" shall mean the transactions contemplated by this Agreement.

"**Wind-Down**" shall have the meaning assigned to such term in the Plan.


### ARTICLE 2 - PURCHASE AND SALE OF PROPERTY

2.1    Agreement for Purchase and Sale.

(a)    Subject to the provisions of **Section 2.1(b)** herein below, Debtor agrees to sell to Bidder, and Bidder, or its nominee by way of an assignment of this Agreement and all of the duties and obligations hereunder, agrees to purchase from Debtor, all of Debtor's right, title and interest in and to the Property.

(b)    In the event that the Debtor shall determine that it is in the best interest of the Debtor to sell the Property to a New Bidder pursuant to an Alternative Agreement and (i) Debtor shall deliver an Alternative Agreement Notice to Bidder  on or before the Cutoff Date and (ii) Debtor shall make payment of the Breakup Fee to Bidder by wire transfer to the account identified in **Exhibit E** attached hereto and by this reference made a part hereof solely upon (x) the Bankruptcy Court entering a Bidding Procedures Order authorizing the payment of the Breakup Fee, (y) the Bankruptcy Court entering a Final Order authorizing the Debtor to enter into and consummate such Alternative Kelly Hamilton Restructuring Transaction, and (z) the consummation of such Alternative Kelly Hamilton Restructuring Transaction in accordance with its terms. Upon the closing of the Alternative Kelly Hamilton Restructuring Transaction, this Agreement shall automatically terminate, whereupon the Parties shall be released from any further liability or obligation hereunder.  Notwithstanding anything to the contrary contained herein, no Alternative Agreement shall be permitted to adversely affect the rights of the DIP Lender under the DIP Facility Documents.

2.2    Purchase Price.  In consideration of the sale of the Property by Debtor to Bidder in accordance with the terms and conditions of this Agreement, Bidder shall pay or be deemed to pay the Purchase Price to Debtor on the Closing Date by (a) credit bidding the Available Credit Bid Amount and (b) assuming the Assumed Liabilities, provided that the Manager Administrative Expense Payment shall be deemed satisfied by the Base Amount.  To the extent that any sums shall be required to pay the obligations of Bidder described in clause (b) of the preceding sentence due as of the Closing Date or pay closing costs for which Bidder is responsible

hereunder, Bidder shall deliver such a cash payment to Escrow Agent as may be required for purposes of paying such sums.

2.3    <u>Independent Consideration</u>.    Simultaneously with the execution of this Agreement, Bidder shall make a nonrefundable payment to Debtor in the amount of ONE HUNDRED AND NO/100 DOLLARS ($100.00) (the "**Independent Consideration**").    Debtor acknowledges and agrees that Debtor's receipt of the Independent Consideration constitutes adequate and agreed upon consideration for Debtor entering into this Agreement notwithstanding the limitations on Debtor's remedies in the event of a default by Bidder pursuant to Section 9.1 hereof.    Without limiting the generality of the foregoing, the Parties hereby waive any defense to the enforcement of this Agreement on the grounds that the same is an illusory contract.

## ARTICLE 3 - TITLE MATTERS

3.1    <u>Title</u>. At Closing, Debtor shall convey good and marketable title to the Real Property to Bidder or its nominee pursuant to the Deed, subject only to the Permitted Exceptions.

3.2    <u>Title Insurance</u>.    At Closing, the Title Company shall issue (or be irrevocably committed to issuing) the Owner's Title Policy to Bidder.

## ARTICLE 4 - AS-IS SALE

4.1    <u>AS-IS SALE</u>. BIDDER ACKNOWLEDGES AND AGREES THAT, AT THE TIME OF CLOSING, DEBTOR SHALL SELL AND CONVEY TO BIDDER, AND BIDDER SHALL ACCEPT AND PURCHASE FROM DEBTOR, THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS," EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT.  EXCEPT FOR REPRESENTATIONS AND WARRANTIES, IF ANY, EXPRESSLY SET FORTH IN THIS AGREEMENT, BIDDER HAS NOT RELIED AND WILL NOT RELY ON, AND DEBTOR HAS NOT MADE AND IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO, WHETHER PROVIDED TO BIDDER BY DEBTOR OR ANY AGENT OR REPRESENTATIVE OF DEBTOR.  BIDDER REPRESENTS THAT IT IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED REAL ESTATE INVESTOR AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF BIDDER'S CONSULTANTS IN PURCHASING THE PROPERTY AND BIDDER SHALL MAKE, AND HAS HAD THE OPPORTUNITY TO MAKE,  AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ANY DOCUMENTS AND INFORMATION PROVIDED TO BIDDER BY OR ON BEHALF OF DEBTOR.  BIDDER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BIDDER DEEMS NECESSARY, INCLUDING, BUT NOT LIMITED TO, SUCH INSPECTIONS WITH RESPECT TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BIDDER SHALL DETERMINE APPROPRIATE.

4.2    <u>RELEASE</u>.  EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, EFFECTIVE AS OF THE CLOSING DATE, BIDDER HEREBY FOREVER RELEASES AND DISCHARGES DEBTOR FROM ALL RESPONSIBILITY AND LIABILITY, WHETHER ARISING BEFORE OR

AFTER THE CLOSING DATE, RELATING TO THE CONDITION, VALUATION, SALABILITY OR UTILITY OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PURPOSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, WITH RESPECT TO CONDITIONS RELATING TO THE PRESENCE IN THE SOIL, AIR, STRUCTURES AND SURFACE AND SUBSURFACE WATERS, OF HAZARDOUS MATERIALS OR OTHER MATERIALS OR SUBSTANCES THAT HAVE BEEN OR MAY IN THE FUTURE BE DETERMINED TO BE TOXIC, HAZARDOUS, UNDESIRABLE OR SUBJECT TO REGULATION AND THAT MAY NEED TO BE SPECIALLY TREATED, HANDLED AND/OR REMOVED FROM THE PROPERTY UNDER CURRENT OR FUTURE LAWS, AND ANY STRUCTURAL AND GEOLOGIC CONDITIONS, SUBSURFACE SOIL AND WATER CONDITIONS AND SOLID AND HAZARDOUS WASTE AND HAZARDOUS MATERIALS ON, UNDER, ADJACENT TO OR OTHERWISE AFFECTING THE PROPERTY) AND WAIVES ANY CLAIM BIDDER MAY HAVE AGAINST DEBTOR WITH RESPECT THERETO UNDER THE DIP FACILITY DOCUMENTS AS OF SUCH CLOSING DATE.  BIDDER FURTHER HEREBY WAIVES (AND BY CLOSING THIS TRANSACTION WILL BE DEEMED TO HAVE WAIVED) ANY AND ALL OBJECTIONS AND COMPLAINTS (INCLUDING, BUT NOT LIMITED TO, FEDERAL, STATE AND LOCAL STATUTORY AND COMMON LAW BASED ACTIONS, AND ANY PRIVATE RIGHT OF ACTION UNDER ANY FEDERAL, STATE OR LOCAL LAWS, REGULATIONS OR GUIDELINES TO WHICH THE REAL PROPERTY IS OR MAY BE SUBJECT) CONCERNING THE PHYSICAL CHARACTERISTICS AND ANY EXISTING CONDITIONS OF THE REAL PROPERTY.  BIDDER FURTHER HEREBY ASSUMES THE RISK OF CHANGES IN APPLICABLE LAWS AND REGULATIONS RELATING TO PAST, PRESENT AND FUTURE ENVIRONMENTAL CONDITIONS ON THE REAL PROPERTY AND THE RISK THAT ADVERSE PHYSICAL CHARACTERISTICS AND CONDITIONS.

4.3    <u>EXCLUDED CLAIMS</u>.   NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ASSUMPTION BY BIDDER OF ANY EXCLUDED LIABILITIES.

4.4    <u>SURVIVAL</u>.  THE PROVISIONS OF THIS **ARTICLE 4** SHALL SURVIVE THE CLOSING.

**ARTICLE 5 - CLOSING**

5.1    <u>Escrow Closing</u>.

(a)    Subject to the satisfaction of the conditions precedent to the obligations of Bidder and Debtor set forth in **Section 6.1** and **Section 6.2** hereof, the Parties shall conduct the Closing on the Scheduled Closing Date, or such other earlier or later date as may be agreed upon by the Parties, as an escrow-style closing through the Title Company as escrow agent pursuant to escrow closing instructions to be delivered to the Title Company consistent with the terms and conditions of this Agreement so that it will not be necessary for any Party to attend the Closing. In the event of any conflict between this Agreement and the escrow instructions, the terms and conditions of this Agreement shall prevail.

(b)    Provided all conditions precedent to Debtor's obligations hereunder have been satisfied, Debtor agrees to convey the Property to Bidder upon delivery of the items to be delivered by Bidder to Debtor pursuant to **Section 5.3**.

(c)    The items to be delivered by Debtor or Bidder in accordance with the terms of **Section 5.2** and **Section 5.3** shall be delivered to the Title Company no later than 5:00 p.m. Eastern Time on the last Business Day prior to the Closing Date.

5.2    <u>Debtor's Closing Deliveries</u>.

(a)    At the Closing, Debtor shall deliver the following items to the Title Company:

(i)    <u>Deed</u>.  A special warranty deed for the Property other than the Mineral Rights in the form of **Exhibit F** attached hereto and by this reference made a part hereof ("**Deed**"), executed and acknowledged by Debtor in recordable form, subject to the Permitted Exceptions, and (y) a quitclaim deed for the Mineral Rights in the form of **Exhibit F-1** attached hereto and by this reference made a part hereof executed and acknowledged by Debtor in recordable form;

(ii)    <u>Bill of Sale and General Assignment</u>.  A quitclaim bill of sale in the form of **Exhibit G** attached hereto and by this reference made a part hereof, executed by Debtor;

(iii)    <u>Assignment and Assumption of Contracts</u>. An assignment and assumption of the Assumed Contracts in the form of **Exhibit H** attached hereto and by this reference made a part hereof ("**Assignment and Assumption of Contracts**") executed by Debtor;

(iv)    <u>Assignment and Assumption of HAP Contract</u>. An Assignment and Assumption of the HAP Contract executed by Bidder, together with such additional documents as HUD may require be furnished by Debtor in connection with HUD's approval of the Assignment and Assumption of HAP Contract;

(v)    <u>Certified Rent Roll</u>.  A rent roll for the Real Property reflecting the name of each Tenant, the apartment occupied by such Tenant, the then current Rent payable by such Tenant under its Lease, any due and unpaid Rent owed by such Tenant as of the Closing Date and the Tenant Deposits made by such Tenant pursuant to its Lease certified by Debtor as true and correct as of the Closing Date;

(vi)    <u>Notice to Tenants</u>.  A single form letter in the form of **Exhibit I** attached hereto and by this reference made a part hereof, executed by Debtor, duplicate copies of which shall be sent by Bidder after Closing to the Tenants under the Lease;

(vii)    <u>Non-Foreign Status Affidavit</u>.  A non-foreign status affidavit in the form of **Exhibit J** attached hereto and by this reference made a part hereof, as required by Section 1445 of the Internal Revenue Code, executed by Debtor or, if

Debtor is a disregarded entity for United States federal income tax purposes, the appropriate non-<u>disregarded</u> entity owning an interest in Debtor;

(viii)    <u>Title Affidavit</u>.  A title affidavit and gap indemnity in such form as may be required by the Title Company and form reasonably acceptable to Debtor;

(ix)    <u>Closing Statement</u>.  A mutually acceptable form of a joint closing statement setting forth the sums to be disbursed by the Escrow Agent at Closing (the "**Closing Statement**"), executed by Debtor;

(x)    <u>Other Documents</u>. Applicable transfer or sales tax filings and such other documents as may be reasonably required by the Title Company or may be agreed upon by Debtor and Bidder to consummate the Transaction to the extent required and not exempt; and

(b)    On the Closing Date, Debtor shall deliver to Bidder, which may occur by leaving the same at the Real Estate, any Property Documents and Materials to the extent not previously furnished to Bidder.

5.3    <u>Bidder's Closing Deliveries</u>.  At the Closing, Bidder shall deliver the following items to the Title Company:

(a)    <u>Release and Satisfaction</u>.  An instrument in form and substance reasonably acceptable to Debtor confirming the release of Debtor from liability under the DIP Facility Documents.

(b)    <u>Assignment and Assumption of Contracts</u>. An Assignment and Assumption of Contracts executed by Bidder;

(c)    <u>Assignment and Assumption of HAP Contract</u>. An Assignment and Assumption of the HAP Contract executed by Bidder, together with such additional documents as HUD may require be furnished by Bidder in connection with HUD's approval of the Assignment and Assumption of HAP Contract, together with such additional documents as HUD may require be furnished by Bidder in connection with HUD's approval of the Assignment and Assumption of HAP Contract;

(d)    <u>Closing Statement</u>.  The Closing Statement, executed by Bidder;

(e)    <u>Other Documents</u>.  Applicable transfer or sales tax filings and such other documents as may be reasonably required by the Title Company or may be agreed upon by Debtor and Bidder to consummate the Transaction to the extent required and not exempt; and

(f)    <u>Cash Payment</u>.  Any sums required to pay (i) the obligations of Bidder described with respect to any Assumed Liabilities due as of the Closing Date other than

15

the Manager Administrative Expense Claim and (ii) closing costs for which Bidder is responsible hereunder (if any) shall be paid by wire transfer to the Escrow Agent.

5.4     Underline No Proration of Income and Expenses.  In consideration of the transfer of all cash on hand, in bank accounts, or in escrow or reserve accounts established pursuant to the DIP Facility Documents, exclusive of the Credit Recovery Trust Amount and the Fee Escrow Amount, and Bidder's assumption of all of the Assumed Liabilities, there shall be no proration of income or expenses with respect to the Property as of the Closing Date.  Accordingly, at the time of Closing, (a) Bidder shall become entitled to the receipt of all income from the Property collected from and after the Closing Date regardless of whether the amount thereof is attributable to the period prior to or after the Closing Date, and (b) Bidder shall become responsible for the payment of all expenses with respect to the Property that would normally and customarily be prorated at the time of Closing regardless of whether the amount thereof is attributable to the period prior to or after the Closing Date.  The provisions of this **Section 5.4** shall survive the Closing.

5.5     Tenant Deposits.  On the Closing Date, Debtor shall, to the extent in its possession, turnover all of the Tenant Deposits to Bidder or wire transfer the amount thereof to the Title Company for payment to Bidder at the time of Closing.

5.6     Closing Costs.

(a)     Bidder shall pay all normal and customary closing costs in connection with the sale of the Property, including, without limitation:  (i) unless otherwise exempt from payment by reason of the Bankruptcy Proceedings, all transfer taxes, sales taxes and similar charges, if any, applicable to the transfer of the Property to Bidder, (ii) all premiums and charges of the Title Company for the title commitment and the Owner's Title Policy (including any endorsements requested by Bidder), (iii) the cost of any update of the Survey, (iv) all recording and filing charges in connection with the instruments by which Debtor conveys the Property to Bidder properly paid by the Bidder in commercial real estate transactions in Allegheny County, Pennsylvania (v) all escrow or closing charges, (vi) all fees due to Bidder's attorneys in connection with this Agreement; and (vii) to the extent due as of the Closing Date, all Cure Costs for all Assumed Contracts pursuant to section 365 of the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein, Bidder shall have no liability or obligation with respect to the payment of the attorneys' fees and expenses of Debtor or any sums due to any other Representatives of Debtor.

(b)     The obligations of Bidder under this **Section 5.6** shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

**ARTICLE 6 - CONDITIONS PRECEDENT**

6.1     Conditions Precedent to Bidder's Obligations.  Bidder's obligation to close the Transaction is conditioned on all of the following:

(a)       <u>Accuracy of Representations and Warranties</u>.  All of the representations and warranties of Debtor contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if the same had been made as of the Closing Date;

(b)       <u>Legal Proceedings</u>.  No court order, injunction, legal action, suit or other legal proceeding shall be pending against Debtor as of the Closing Date (i) seeking to restrain or prohibit the purchase and sale of the Property or the consummation of the Transaction or (ii) seeking damages with respect to such purchase and sale or the consummation of the Transaction;

(c)       <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order no later than September 15, 2025, in a form reasonably acceptable to Debtor and Bidder and such Order shall not have been stayed, reversed, revoked, modified or vacated;

(d)       <u>HAP Approval</u>.  HUD shall have executed and delivered the Assignment and Assumption of the HAP Contract to Escrow Agent and authorized Escrow Agent to release the same upon the completion of the Closing;

(e)       <u>Debtor's Performance</u>.  Debtor shall have delivered all of the documents and other items required pursuant to **<u>Section 5.2</u>** hereof and shall have performed all other obligations to be performed by Debtor pursuant to this Agreement prior to Closing in all material respects.

6.2       <u>Conditions Precedent to Debtor's Obligations</u>.  Debtor's obligation to close the Transaction is conditioned on all of the following:

(a)       <u>Accuracy of Representations and Warranties</u>.  All of the representations and warranties of Bidder contained in this Agreement shall be true and correct as of the Closing Date with the same force and effect as if the same had been made as of the Closing Date;

(b)       <u>Legal Proceedings</u>.  No court order, injunction, legal action, suit or other legal proceeding shall be pending against Bidder as of the Closing Date (i) seeking to restrain or prohibit in the purchase and sale of the Property or the consummation of the Transaction, or (ii) seeking damages with respect to such purchase and sale or the consummation of the Transaction;

(c)       <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order no later than September 15, 2025 and such Order shall not have been stayed, reversed, revoked, modified or vacated;

(d)       <u>Title Conditions Satisfied</u>. At Closing, the Title Company shall issue (or be irrevocably committed to issuing) the Owner's Title Policy to Bidder; and

(e)    <u>Bidder's Performance</u>.  Bidder shall have delivered all of the documents and other items required pursuant to **<u>Section 5.3</u>** hereof and shall have performed all other obligations to be performed by Bidder pursuant to this Agreement prior to Closing.

6.3    <u>Waiver of Failure of Conditions Precedent</u>.  At any time on or before the date specified for the satisfaction of any condition, Debtor or Bidder may elect in writing to waive the benefit of any condition precedent to its obligations hereunder other than the entry of the Sale Order.  By closing the Transaction, Debtor and Bidder shall be conclusively deemed to have waived the benefit of any remaining unfulfilled conditions set forth in this <u>Article 6</u>, except to the extent that the same expressly survive Closing.  In the event any of the conditions set forth in this <u>Article 6</u> are neither waived nor fulfilled on or before the Outside Closing Date, as the same may be extended in accordance with the provisions of this Agreement, the Party for whose benefit the applicable condition exists may terminate this Agreement and exercise such rights and remedies, if any, that such Party may have in the event such termination is the result of a default hereunder by the other Party pursuant to the terms of <u>Article 9</u>.  If this Agreement is terminated as a result of the failure of any condition set forth in this <u>Article 6</u> that is not also a default hereunder, then neither Party shall have any further rights or obligations hereunder except for the Surviving Obligations.

6.4    <u>Execution of Assignment and Assumption of HAP Contract</u>.  The Parties shall execute and deliver the Assignment and Assumption of HAP Contract to HUD as soon as practicable following the entry of the Sale Order.  The Scheduled Closing Date and the Outside Closing Date shall be subject to extension for up to ten (10) Business Days in the event that the same is delayed by reason of the failure of HUD to execute and deliver the Assignment and Assumption of HAP Contract.

## ARTICLE 7 - REPRESENTATIONS AND WARRANTIES

7.1    <u>Bidder's Representations and Warranties</u>.  Bidder represents and warrants to Debtor as follows:

(a)    <u>Bidder's Authorization</u>.  Bidder is duly organized, validly existing and in good standing under the laws of the State of Delaware and authorized to execute this Agreement, consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Bidder. The execution and delivery of this Agreement and all Closing Documents to be executed and delivered by Bidder pursuant to this Agreement and the performance by Bidder of the obligations of Bidder hereunder and under such Closing Documents have been authorized by all requisite company action of Bidder.  The obligations of Bidder under this Agreement constitute and, as of the Closing Date, the obligations of Bidder under the Closing Documents to be executed and delivered by Bidder pursuant to this Agreement shall constitute, the valid and binding obligations of Bidder enforceable in accordance with their respective terms.  Without limiting the generality of the foregoing, neither the execution and delivery of this Agreement and Closing Documents to be executed and delivered by Bidder pursuant to this Agreement nor the performance by Bidder of the obligations of Bidder hereunder

under such Closing Documents will (i) result in the violation of any applicable Laws or any provision of Bidder's organizational documents, (ii) conflict with any order of any Governmental Authority binding upon Bidder, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment by which Bidder is bound.

(b)    <u>Patriot Act Compliance</u>.  Bidder is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, group, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control, and Bidder is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Bidder is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Bidder have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Bidder is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law.   Bidder has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.  Notwithstanding the foregoing, in no event shall Bidder's representations and warranties under this **<u>Section 7.1(b)</u>** apply to any person or entity which owns, has owned, or may hereafter own any publicly traded stock or other publicly traded securities of (i) Bidder (if any), or (ii) any Person which directly or indirectly owns an interest in Bidder.

Bidder's representations and warranties contained in this **<u>Section 7.1</u>** shall survive the Closing and not be merged therein.

7.2    <u>Debtor's Representations and Warranties</u>.  Debtor represents and warrants to Bidder as follows:

(a)    <u>Debtor's Authorization</u>.  Debtor is duly organized, validly existing and in good standing under the Laws of the State of Delaware and qualified to do business under the Laws of the Commonwealth of Pennsylvania and authorized to execute this Agreement and, subject to the entry of the Sale Order, consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Debtor in connection herewith. The execution and delivery of this Agreement and all Closing Documents to be executed and delivered by Debtor pursuant to this Agreement and the performance by Debtor of the obligations of Debtor hereunder under such Closing Documents have been authorized by all requisite company action of Debtor.  The obligations of Debtor under this Agreement constitute and, as of the Closing Date, the

obligations of Debtor under the Closing Documents to be executed and delivered by Debtor pursuant to this Agreement shall constitute, the valid and binding obligations of Debtor enforceable in accordance with their respective terms, subject to entry of the Sale Order.  Without limiting the generality of the foregoing, but subject to entry of the Sale Order, neither the execution and delivery of this Agreement and Closing Documents to be executed and delivered by Debtor pursuant to this Agreement nor the performance by Debtor of the obligations of Debtor hereunder or under such Closing Documents will (i) result in the violation of any applicable Laws or any provision of Debtor's organizational documents, (ii) conflict with any order of any Governmental Authority binding upon Debtor, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment by which Debtor is bound.

(b)     <u>Patriot Act Compliance</u>.  Debtor is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, group, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control and Debtor is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Debtor is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Debtor have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Debtor is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law.  Debtor has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.  Notwithstanding the foregoing, in no event shall Debtor's representations and warranties under this **<u>Section 7.2(b)</u>** apply to any person or entity which owns, has owned, or may hereafter own any publicly traded stock or other publicly traded securities of (a) Debtor (if any), or (b) any entity which directly or indirectly owns an interest in Debtor.

7.2.2   <u>Personal Property</u>.  Except for the liens and security interests created in favor of the DIP Lender under the DIP Facility Documents and as provided in the Sale Order, the Personal Property to be transferred to Bidder is free and clear of liens, security interests and other encumbrances.

7.2.3   <u>Rents</u>.  Except for the assignments of the interest of Debtor in the Leases and Rents to the DIP Lender pursuant to the DIP Facility Documents, Debtor has not assigned, transferred or hypothecated its interest in the Leases and Rents.

7.2.4    Third-Party Rights.  Debtor has not entered into any agreements currently in effect pursuant to which Debtor has granted any Person any option to purchase, right of first refusal to purchase, right of first option to purchase or other preferential right to purchase all or any part of the Property.

7.2.5    Litigation.  Except for the Bankruptcy Proceedings and those matters listed in **Exhibit K** attached hereto and by this reference made a part hereof, there is not currently or threatened in writing any pending action, claim, suit, litigation or other proceeding to which Debtor is a party or which otherwise relates to the Property (including, without limitation, any condemnation proceedings).

7.2.6    Contracts.  As of the Execution Date, Debtor has not entered into or assumed any leases or other executory contracts affecting the Property which will be binding upon Bidder after the Closing other than Scheduled Contracts.

Debtor's representations and warranties in this **Section 7.2** shall survive the Closing for a period of three (3) months and not be merged therein.

## ARTICLE 8 - COVENANTS

8.1    Compliance with DIP Facility Documents. Debtor shall at all times comply with the requirements of the DIP Facility Documents until Closing and nothing contained herein shall be deemed to limit or otherwise affect the rights or obligations of the Parties under the DIP Facility Documents prior to Closing.

8.2    Compliance with Requirements of Orders. Debtor shall comply with the requirements of all Orders.

## ARTICLE 9 - DEFAULTS

9.1    DEBTOR'S REMEDIES FOR BIDDER DEFAULTS.  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO ANY DEFAULT BY BIDDER HEREUNDER, THEN DEBTOR SHALL BE ENTITLED, AS ITS SOLE REMEDY TO TERMINATE THIS AGREEMENT BY DELIVERY OF WRITTEN NOTICE TO BIDDER, WHEREUPON NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER HEREUNDER EXCEPT WITH RESPECT TO SURVIVING OBLIGATIONS.

9.2    BIDDER'S REMEDIES FOR DEBTOR DEFAULTS.  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO DEBTOR'S DEFAULT HEREUNDER, BIDDER SHALL BE ENTITLED, AS ITS SOLE REMEDY, TO (A) TERMINATE THIS AGREEMENT BY DELIVERY OF WRITTEN NOTICE TO DEBTOR, WHEREUPON NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER EXCEPT WITH RESPECT TO SURVIVING OBLIGATIONS OR (B)  ENFORCE THIS AGREEMENT BY SPECIFIC PERFORMANCE PROVIDED ANY SUCH PROCEEDING IS COMMENCED WITHIN FORTY-FIVE (45) DAYS AFTER THE DEBTOR DEFAULT OCCURS GIVING RIGHT TO SUCH ENFORCEMENT.

**ARTICLE 10 - CASUALTY/CONDEMNATION**

10.1    <u>Right to Terminate</u>.  If, after the Execution Date, (a) any portion of the Property is taken by condemnation or eminent domain (or is the subject of a pending taking), or (b) any portion of the Property is damaged or destroyed (excluding routine wear and tear and damage caused by any of Bidder's Representatives), Debtor shall notify Bidder in writing of such fact promptly after obtaining knowledge thereof.  If the Property is the subject of a Major Casualty/Condemnation that occurs after the Execution Date, Bidder shall have the right to terminate this Agreement by giving written notice to Debtor no later than ten (10) Business Days after the giving of Debtor's notice, and the Closing Date shall be extended, if necessary, to provide sufficient time for Bidder to make such election.  The failure by Bidder to terminate this Agreement within such ten (10) Business Day period shall be deemed an election by Bidder not to terminate this Agreement.

10.2    <u>Allocation of Proceeds and Awards</u>.  If a condemnation or casualty occurs after the Execution Date and this Agreement is not terminated as permitted pursuant to the terms of **<u>Section 10.1</u>** hereof, then this Agreement shall remain in full force and effect and Bidder shall acquire the Property or, if applicable, the remainder thereof, upon the terms and conditions set forth herein.  Any Casualty/Condemnation Proceeds shall be allocated between Bidder and Debtor as follows in respect of a Closing hereunder:

(a)    Debtor shall be entitled to be reimbursed from the Casualty/Condemnation Proceeds for proceeds of any rental loss, business interruption or similar insurance, or other compensation for loss of use or income, that are allocable to the period prior to the Closing Date, such sums to be applied in accordance with the requirements of the DIP Facility Documents; and

(b)    Bidder shall be entitled to the balance of the Casualty/Condemnation Proceeds.

10.3    <u>Insurance</u>.  Debtor shall maintain the property insurance coverage required under the DIP Facility Documents in place through the Closing Date.

**ARTICLE 11 - MISCELLANEOUS**

11.1    <u>Brokers</u>.  Each of the Parties hereby warrants and represents to the other that it did not employ or use any broker or finder to arrange or bring about this transaction.  If any Person brings a claim for a commission or finder's fee based upon any contact, dealings, or communication with either Party in connection with the Transaction, then the Party allegedly authorizing such commission or fee shall defend the other Party and hold the other Party harmless from any and all costs, damages, claims, liabilities, or expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by the other Party with respect to the claim.  The provisions of this **<u>Section 11.1</u>** shall survive the Closing or, if the purchase and sale is not consummated, any termination of this Agreement.

11.2    <u>Survival/Merger</u>.  Except for the provisions of this Agreement which are explicitly stated to survive the Closing, (a) none of the terms of this Agreement shall survive the Closing, and (b) the delivery of the Purchase Price, the Deed and the other Closing Documents and the acceptance thereof shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Bidder and Debtor to be performed hereunder.

11.3    <u>Integration; Waiver</u>.  This Agreement and the Sale Order embody and constitute the entire understanding between the Parties with respect to the Transaction and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.  No waiver by either Party hereto of any failure or refusal by the other Party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

11.4    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the Laws of the Commonwealth of Pennsylvania, without application of its choice of laws.

11.5    <u>Captions Not Binding; Exhibits</u>.  The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof.  All Exhibits attached hereto shall be incorporated by reference as if set out herein in full.

11.6    <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

11.7    <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

11.8    <u>Notices</u>.  All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the following addresses:

If to Debtor, to:                    CBRM Realty Inc.
                                     c/o White & Case LLP
                                     1221 Avenue of the Americas
                                     New York, New York 10020
                                     Attention: Elizabeth A. LaPuma
                                     Email: elapuma.crowncapital@gmail.com

| | |
|---|---|
| with a copy to: | White & Case LLP |
| | 111 South Wacker Dr, Suite 5100 |
| | Chicago, IL 60606-4302 |
| | Attention: Gregory F. Pesce |
| | Email: gregory.pesce@whitecase.com |
| | |
| If to Bidder, to: | 3650 Capital |
| | 2977 McFarlane Road, Suite 300 |
| | Miami, FL 33133 |
| | Attention: Myles Burstein, Esq. |
| | Email: mburstein@3650capital.com |
| | |
| with a copy to: | Lynd Management Group |
| | 4499 Pond Hill Rd. |
| | San Antonio, TX 78231 |
| | Attention: Justin Utz, CFO |
| | Email: jutz@lynd.com |
| | |
| with a copy to: | Lippes Mathias LLP |
| | 54 State Street, Suite 1001 |
| | Albany, New York 12207-2527 |
| | Attention: Leigh A. Hoffman, Esq. |
| | Email: lhoffman@lippes.com |
| | |
| with a copy to: | McCarter & English, LLP |
| | Four Gateway Center |
| | 100 Mulberry Street |
| | Newark, NJ 07102 |
| | Attention: Joseph Lubertazzi, Jr., Esq. |
| | Email: jlubertazzi@mccarter.com |

Any such notices may be sent by (a) certified mail, return receipt requested, postage prepaid in the U.S. mail, or (b) a nationally recognized overnight courier, or (c) sent by electronic transmission (i.e., e mail).  Notices shall be deemed delivered upon actual delivery or refusal of delivery one (1) Business Day after deposit in the case of overnight courier and three (3) Business Days after deposit in the case of certified mail, and notices delivered by electronic transmission shall be deemed delivered on the same day of such successful transmission.  The above addresses may be changed by written notice to the other Party; provided that no notice of a change of address shall be effective until actual receipt of such notice.

11.9    _Counterparts; Electronic Signatures_.   This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.  Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the Party so signing.  Each Party agrees to promptly

deliver an execution original to this Agreement with its actual signature to the other Party, but a failure to do so shall not affect the enforceability of this Agreement.

11.10    <u>Additional Agreements; Further Assurances</u>.  Each Party hereto shall execute and deliver such documents as the other Party shall reasonably request in order to consummate and make effective the Transaction; <u>provided</u>, <u>however</u>, the execution and delivery of such documents shall not result in any additional liability or cost to the executing Party.

11.11    <u>Construction</u>.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, any modification hereof or any of the Closing Documents.

11.12    **<u>Time of Essence</u>.  Time is of the essence with respect to the Closing and all of the provisions of this Agreement.**

11.13    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY THE OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE TRANSACTION, THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF BIDDER AND DEBTOR HEREUNDER.  THE PROVISIONS OF THIS **<u>SECTION 11.13</u>** SHALL SURVIVE THE CLOSING (AND NOT BE MERGED THEREIN) OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

11.14    <u>RELEASES</u>.  WITH RESPECT TO ANY RELEASE SET FORTH IN THIS AGREEMENT RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT SUCH WAIVER AND RELEASE IS MADE WITH THE ADVICE OF COUNSEL AND WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CONSEQUENCES AND EFFECTS OF SUCH RELEASE.

11.15    <u>Nominee.</u>  Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that Bidder does not intend to acquire title to the Property in its own name.   Instead, Bidder is executing this Agreement on behalf of a special purpose entity controlled by Bidder or under common control with Bidder which Bidder shall designate to acquire the Property at least three days prior to the Auction (as defined in the Bidding Procedures Order).  Such designation shall not be deemed to constitute a taxable assignment under the laws relating to the Realty Transfer Tax payable under the laws of the Commonwealth of Pennsylvania in connection with the transfer of real estate interests.

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be duly executed to be effective as of the day and year first above written.

**DEBTOR:**

**KELLY HAMILTON APTS LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth A. LaPuma
    Title:   Independent Fiduciary and
            Authorized Representative
            of Debtor

**BIDDER:**

**3650 SS1 PITTSBURGH LLC**,
a Delaware limited liability company

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be duly executed to be effective as of the day and year first above written.

**DEBTOR:**

**KELLY HAMILTON APTS LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth A. LaPuma
    Title:   Independent Fiduciary and Authorized Representative of Debtor

**BIDDER:**

**3650 SS1 PITTSBURGH LLC**,
a Delaware limited liability company

By:_____
    Name: Peter LaPointe
    Title:   Authorized Representative of Bidder

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT BY
AND BETWEEN KELLY HAMILTON APTS LLC AND 3650 SS1 PITTSBURGH LLC