UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Anne Puluka[1]
Kevin Quisenberry[2]
**COMMUNITY JUSTICE PROJECT**
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
Tel: 412-434-6002
Fax: 412-434-5706
E-mail:  apuluka@cjplaw.org
        kquisenberry@cjplaw.org

    -and-

Douglas G. Leney
**ARCHER & GREINER, P.C.**
1025 Laurel Oak Road
Voorhees, NJ 08043
Tel: 215-963-3300
Fax: 215-963-9999
E-mail: dleney@archerlaw.com

*Counsel for Creditor, Chardell Bacon*

In re:

CBRM REALTY INC.,

                Debtors.[3]

Chapter 11

Case Number: 25-15343 (MBK)
(Jointly Administered)

### (I) OBJECTION OF CHARDELL BACON—ON HER OWN BEHALF AND ON BEHALF OF THOSE SIMILARLY-SITUATED—TO JOINT CHAPTER 11 PLAN OF CBRM REALTY INC. AND CERTAIN OF ITS DEBTOR AFFILIATES AND TO APPROVAL OF THE KELLY HAMILTON SALE TRANSACTION; AND (II) MOTION TO CERTIFY CLASS OF OBJECTORS PURSUANT TO BANKRUPTCY RULES 9014 AND 7023

---

[1] *Pro Hac Vice* admission pending.

[2] *Pro Hac Vice* admission pending.

[3] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (1115), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951). The location of the Debtors' service address in these chapter 11 cases is: In re CBRM Realty Inc., et al., c/o White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020.

230923269 v2

Chardell Bacon, claimant herein on her own behalf and on behalf of those similarly-situated, by and through undersigned counsel, hereby submits this objection ("Objection") to the Joint Chapter 11 Plan of CBRM Realty Inc. and Certain of its Debtor Affiliates ("the Joint Plan") and to Approval of the Kelly Hamilton Sale Transaction ("the Sale Transaction"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1. Ms. Bacon has resided at one of the homes in the Kelly Hamilton portfolio since 2018, prior to Debtors' purchase of the properties. Since Debtors' purchase of the properties, and as a result of their continued and severe neglect of the portfolio, Ms. Bacon's unit has deteriorated in condition substantially, and it presents health and safety risks to Ms. Bacon and her three children. Ms. Bacon filed a claim on July 28, 2025 in this matter, based on Debtors' breach of her lease and violation of the implied warranty of habitability.

2. The habitability issues undoubtedly arose during Debtors' ownership of the property. More importantly, however, those issues have persisted to the present day, while the Kelly Hamilton portfolio is under control of Lynd Management ("Lynd"). Despite the work of an independent fiduciary and Lynd's management takeover in March of 2024, Ms. Bacon, and many other residents of the Kelly Hamilton portfolio (together, "the Tenants"), continue to live in uninhabitable conditions. (ECF 360 at 31.)

3. For this reason, the Tenants file this Objection to the confirmation of the Joint Plan (ECF 338-1) and Stalking Horse Agreement (ECF 325 at 57-84) ("the Confirmation and Sale Transaction") which transfer the Kelly Hamilton portfolio to 3650 SS1 Pittsburgh LLC, an affiliate of Lynd. Based on Lynd's failure thus far to bring the portfolio into decent, safe, and sanitary condition for current residents and failure to maintain compliance with HUD

2

requirements and regulations, the Tenants oppose the presently proposed Joint Plan and Sale Transaction, and they request that this Honorable Court postpone any approval of the Plan and Transaction for at least ninety (90) days, to determine whether Lynd can bring property conditions and other operational aspects of its management of the property into compliance with applicable standards *and* obtain HUD's approval to take over the Housing Assistance Payments ("HAP") contract at the property.

4.      In addition, Tenants request this 90-day postponement to permit them and local governmental and philanthropic stakeholders to bring to the Court and the Parties an alternative plan and sale transaction whereby interested local stakeholders, who are actively meeting on this issue, may present a feasible, alternative acquisition, ownership and management plan for preserving and recapitalizing the portfolio as HUD-assisted housing.

## FACTUAL BACKGROUND

5.      Debtors own the Kelly Hamilton portfolio, consisting of approximately 110 family-sized units of scattered-site, multifamily HUD-assisted housing, in Pittsburgh, Pennsylvania.

6.      The Kelly Hamilton portfolio has been the subject of a HAP contract with the United States Department of Housing and Urban Development ("HUD") since on or about October 1982. The HAP contract was assigned to Debtor Kelly Hamilton Apts LLC on or about February of 2023. A true and correct copy of the HAP contract is attached as Exhibit A.

7.      All households in the Kelly Hamilton portfolio are "low-income," "very low-income," or "extremely low-income" within the meaning of the U.S. Housing Act, 42 U.S.C. 1437f, and implementing regulations. These households are leaseholders and are protected by

statutory and regulatory provisions which require leases to be renewed and prohibit termination as long as the household remains income-eligible and compliant with specific obligations.

8. Under the HAP contract, the property owner is obligated to comply with HUD's Physical Condition Standards and Inspection Requirements of 24 CFR part 5, subpart G, and HUD's Physical Condition Standards of Multifamily Properties of 24 CFR part 200, subpart P. *See* Exhibit A at 2, 20, 49; 24 C.F.R. § 280.85024; C.F.R. § 5.701 et seq.

9. If HUD determines that the property owner is in default of these obligations, then the default triggers an enforcement process which, if the default is not remedied to HUD's satisfaction within a specified timeframe, will result in the displacement of residents from the property and the suspension or termination of the HAP contract. *See* Exhibit A, HAP Renewal Contract, Sections 4.d.(2) and 7.b., and HAP Contract, Section 2.5(a) – (e), and 2.21(b); 24 C.F.R. § 5.701 et seq.

10. Ms. Bacon has resided in her unit at Kelly Hamilton since 2018. A true and correct copy of her lease is attached as Exhibit B. All tenants of the Kelly Hamilton portfolio have substantially identical leases.

11. Debtors acknowledge that "[p]rior to the Petition Date, limited liquidity, capital needs, and the legacy deferred maintenance burden impaired the Debtors' ability to stabilize operations and maintain compliance with regulatory standards." *Id.*

12. The deterioration of the Kelly Hamilton portfolio largely results from the alleged misconduct and neglect of Moshe "Mark" Silber, the principal of CBRM Realty, Inc., and certain of his associates.

13. Mr. Silber, acting on behalf of a subsidiary of debtor Crown Capital, purchased the Kelly Hamilton portfolio as part of a larger transaction that included about a dozen other

4

properties in the Pittsburgh region, from the Nancy D. Washington Irrevocable Trust, exclusive of the rights of tenants under residential leases, for $57,500.00 by Special Warranty Deed dated December 12, 2022. Around the same time, Mr. Silber, acting on behalf of other corporate entities, purchased over a dozen other HUD-subsidized properties from the same seller, and it is likely that the Kelly Hamilton purchase price reflected negotiations for the entire portfolio. A true and correct copy of the deed obtained from the Allegheny County Department of Real Estate is attached as Exhibit C.

14. Mr. Silber pled guilty to financial crimes in the United States Court for the District of New Jersey on April 17, 2024, for misconduct related to a different affordable housing project. *Id.* at 31.

15. Shortly before his guilty plea, Silber engaged Lynd to manage the Kelly Hamilton portfolio and approximately fifty (50) other HUD-assisted properties within the larger Crown Capital portfolio Mr. Silber had assembled.

16. Lynd has been engaged as the property management company for the Kelly Hamilton portfolio since on or about March 2024. (ECF 360 at 31.) In that role, Lynd "provides on-site personnel and oversees all day-to-day property-level functions, including leasing, maintenance, compliance with regulatory obligations, and the coordination of services for residents." *Id.*

17. LAGSP, an affiliate of Lynd, was engaged around the same time as asset manager of the portfolio. In that role, LAGSP "provides strategic oversight of the Kelly Hamilton Property's operations, ensures compliance with financing and regulatory obligations, and assists in capital planning and financial reporting." *Id.*

5

18. After Mr. Silber pled guilty, on September 20, 2024, he entered, on behalf of Kelly Hamilton Apts LLC, into a $3.5 million loan agreement with Kelly Hamilton Lender LLC, another affiliate of Lynd. *Id.* at 30-31.

19. Lynd used this $3.5 million loan not only for expenses at the Kelly Hamilton portfolio, but to pay bills throughout the approximately 49 other properties nationwide that Lynd had agreed to manage for Mr. Silber.

20. Shortly thereafter, bondholders of certain notes in Debtor Crown Capital's portfolio, as well as Mr. Silber himself, consented to the appointment of Independent Fiduciary Elizabeth A. LaPuma as sole director of Crown Capital and CBRM. (ECF 339-1 at 29.) Upon her appointment on September 26, 2024, "the Independent Fiduciary, with the assistance of entities within Lynd Management, began the process of ensuring that each property owned by the portfolio had sufficient staffing and other resources, with the goal of ensuring that residents had safe, clean homes." *Id.*

21. Ms. Bacon's experience, detailed in a sworn affidavit attached as Exhibit D and her claims regarding the management of the Kelly Hamilton portfolio in this matter, attached hereto as Exhibit E, bely the success of these efforts. The properties under Ms. Bacon's oversight and Lynd's management have fallen and remain well below the threshold of decent, safe, and sanitary housing required by the HAP contact and other applicable law, including local housing codes, and their management to date has failed to fulfill the implied warranty of habitability implicit in every residential lease agreement under Pennsylvania law. For example, with regard to Ms. Bacon's dwelling:

> (a) The ceiling in her dining room has slowly collapsed, and due to the growing hole, she is unable to safely use the room.

  (b)  The unit has frequent pest infiltrations, including mice and roaches, despite her best efforts to keep the pests out of her home.

  (c)  The floor in dining room is uneven and unsound in areas, causing danger to Ms. Bacon and her children as well as the tenants in the unit below.

  (d)  A leak under her bathroom sink caused flooding to such an extreme degree in the unit below that a maintenance technician turned off the water supply to the sink entirely. The condition has been ongoing for approximately one year.

  (e)  Over Debtors' ownership of the property, Ms. Bacon has had mold, a broken window, and flaking paint in her unit.

  (f)  Ms. Bacon has repeatedly requested maintenance for these issues during the course of Debtors' ownership and Lynd's management of the Kelly Hamilton portfolio. At times, the phone line for the management office has been disconnected. When she approached maintenance technicians directly, she was told there was no funding for repairs.

  (g)  Ms. Bacon has visited neighbors' buildings within the Kelly Hamilton portfolio and observed similar levels of disrepair and uninhabitability.

  (h)  Pursuant to the United States Housing Act and implementing regulations, Ms. Bacon is entitled to monthly utility reimbursements to help cover the utility costs of her tenancy. *See* 24 C.F.R. § 965.502 *et seq.* She has not received utility checks in 2025, apart from the month of May. Ms. Bacon was informed by a member of the management office that utility checks would not be distributed until September of 2025, at the earliest.

7

(i) Under the United States Housing Act and implementing regulations, Ms. Bacon is required to report any changes to her income to the management office for recertification of her rent obligation. Additionally, Debtor is required to perform annual recertifications and interim recertifications of all residents' income to properly calculate residents' share of the rent and utility costs and inform them of their rent obligations accordingly. *See* 24 C.F.R. § 5.230 *et seq.* Ms. Bacon reported new employment to Lynd in or about October or November of 2024, but Lynd took no steps to recertify her income. Ms. Bacon again approached Lynd in January of 2025 to complete her annual recertification, but again, Lynd did not timely complete the paperwork. Lynd did not inform Ms. Bacon of her new rent obligation until July of 2025, despite her repeated inquiries.

(j) Furthermore, Lynd provided Ms. Bacon with a rent ledger, attached as Exhibit F, that set her rent at $723 for the months of December 2024 through February 2025, $499 for the month of March 2025, and $350 for April 2025 onward. Lynd provided no explanation as to why the rent calculation changed this drastically throughout the year.

(k) In July of 2025, Lynd sent Ms. Bacon a notice of termination of her assistance alleging a rental arrearage of over $7000 to be due. The amount, which is far from accurate, appeared to be based in part on applying the market rent to her unit from February of 2025 onward, as Lynd had not recertified her income prior to that date. Moreover, the alleged arrearage does not account for rent abatement to which Ms. Bacon is entitled due to

8

     the significant, long-unremedied habitability issues in her home. When Lynd finally recalculated Ms. Bacon's rent based on her income recertification in July, it nonetheless alleged that she owed over $4000 in arrears, the accuracy of which Ms. Bacon, again, disputes.

  (l) Feeling she had no other option at that time, Ms. Bacon entered a payment plan for the alleged arrearage, in order to avoid an eviction filing against her.

  (m) Ms. Bacon has observed a management agent viewing units in the Kelly Hamilton portfolio and allowed the agent to view and take notes of the deficiencies in her unit. Nevertheless, no repairs have been made to her unit.

22. Additionally, Debtor Kelly Hamilton Apts LLC has been cited for violations of local ordinances relating to property maintenance on numerous occasions, including as recently as August 22, 2025. All of the citations occurred after Lynd took over management of the property in March of 2024. True and correct copies of the dockets for these citations are attached as Exhibit G.

23. Further, the Claims Register in this matter reflects that the Allegheny County Health Department has filed two claims, for $23,552.25 and $117,888.75, against Debtor Kelly Hamilton Apts LLC.

24. Despite its involvement with the Kelly Hamilton portfolio since March of 2024, Lynd has not been approved by HUD as the management company for the property as of at least August 18, 2025. Exhibit H. Such approval is a regulatory requirement for HUD-subsidized

9

housing. *See* 24 C.F.R. §§ 200.210; 200.216. This failure has exacerbated the conditions and problems present in the properties.

25. Debtors, through the Independent Fiduciary, filed the instant cases in May of 2025 and continue to operate their businesses as debtors in possession. (ECF 1, 7, 136, 226.)

26. Shortly thereafter, Debtors sought court approval for a superpriority debtor-in-possession financing facility for the continued operation of the Kelly Hamilton portfolio ("Kelly Hamilton DIP Facility"), which was granted by this Honorable Court. (ECF 61; ECF 178.) The Lender for the Kelly Hamilton DIP Facility is 3650 SS1 Pittsburgh LLC ("DIP Lender"), an entity formed by Lynd and 3650 REIT Investment Management LLC.

27. Of the $9.7 million in funding available from the Kelly Hamilton DIP Facility, only $1.3 million was budgeted for capital expenditures and $313,021 for working capital. (ECF 178 at 72.) However, the budget allocated $3.575 million to repay the existing loan on the property, which had been issued by Lynd's affiliate and used by Lynd to pay bills throughout the Silber portfolio after his guilty plea. *Id.*

28. In conjunction with the Kelly Hamilton DIP Facility, Debtors negotiated a Stalking Horse Agreement with the DIP Lender. (ECF 61, 95.) The Stalking Horse Agreement allows the DIP Lender to credit-bid the balance of the Kelly Hamilton DIP Facility to purchase the portfolio and includes bid protections if another entity were to outbid DIP Lender.

29. A condition precedent to ratification of the Sale Transaction is HUD's approval of an assignment of the HAP contract to the Stalking Horse Bidder, which will then commence operations of the portfolio pursuant to that contract. (ECF 360 at 51.)

30. Presumably due to the size of the super-priority line (and potential credit bid and bid protections), Debtors received no other qualifying bids for the portfolio and the Stalking Horse bid was designated as the successful bid. (ECF 383.)

31. Ms. Bacon's counsel, the Community Justice Project, has been meeting with local stakeholders in Allegheny County for approximately 10 months to develop a preservation plan for the Kelly Hamilton property, as well as the rest of the portfolio obtained by Mr. Silber. Individuals from the City of Pittsburgh Mayor's Office, the Allegheny County Executive's Office, the office of Congresswoman Summer Lee, local housing non-profit groups, affordable housing developers, and philanthropic organizations are coordinating to develop a feasible preservation plan to acquire the property for market value following due diligence. The effort to develop a plan for the Kelly Hamilton portfolio has been hampered by late notice of this bankruptcy case, the accelerated timeline for a sale to the Stalking Horse Bidder, and the inflated super-priority lien on the property. Accordingly, Ms. Bacon respectfully requests this Honorable Court continue the confirmation hearing and grant an additional ninety (90) days for these locally invested parties to develop an alternative plan to for presentation to this Court and the parties.

## MOTION FOR CLASS CERTIFICATION

32. All previous paragraphs are incorporated as if fully set forth within.

33. Ms. Bacon, as a creditor in this matter, has standing to file this Objection to the Joint Proposed Chapter 11 Plan and Sale Transaction. 11 U.S.C. § 1109(b).

34. Moreover, the Tenants of Kelly Hamilton are parties-in-interest with standing to object to the Plan and Sale Transaction based on their lease agreements with Debtors, which are themselves inextricably linked to the HAP contract. *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210-11 (3d Cir. 2011) (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992))

(defining a party in interest as "'anyone who has a legally protected interest that could be affected by a bankruptcy proceeding'").

35. As statutorily qualified leaseholders and recipients of HUD-funded project-based rental assistance, the Tenants reside at Kelly Hamilton under indefinite leases that may only be terminated for material noncompliance with leases requirements or state landlord tenant law, certain criminal activity, or "[o]ther good cause" as defined in applicable HUD regulations. 24 C.F.R. § 247.3.

36. In an already-heavily-strained local affordable housing market, the Tenants cannot easily move to new subsidized homes, as there are long waiting lists at virtually every such property, nor can they afford market-rate housing.

37. As a result, Ms. Bacon and similarly-situated Tenants have weighty, significant interests in ensuring that the next buyer / operator of the Kelly Hamilton portfolio is a proven, responsible, long-term, preservation-oriented buyer who is dedicated to improving and maintaining the property in compliance with applicable statutory and regulatory requirements and who is capable of obtaining and maintaining HUD approval to own and operate the property under the HAP contract.

38. Ms. Bacon and similarly-situated Tenants of the Kelly Hamilton portfolio satisfy the class certification requirements of Federal Rule of Civil Procedure 23, applicable to these proceedings via Federal Rules of Bankruptcy Procedure 9014(c) and 7023. This Honorable Court should exercise its discretion to allow the within Objection to proceed as a class Objection on behalf of a class defined as follows: "All occupants of the Kelly Hamilton properties owned by Debtors Kelly Hamilton Apts LLC and Kelly Hamilton Apts MM LLC who currently reside, or

will reside following approval of the Sale Transaction, at the properties pursuant to a lease agreement subject to the HAP contract attached to the properties."

    (a)    The class is so numerous that joinder of all members is impractical. F.R.C.P. 23(a)(1). The Kelly Hamilton portfolio consists of 110 units of subsidized, multi-family housing. Even at less than 100% occupancy of the units, well over 100 tenants reside at the properties under Debtors' ownership and management by Lynd.

    (b)    Common questions of law and fact between Ms. Bacon, as class representative, and the members of the class she seeks to represent predominate over any individual claims or questions affecting only individual class members. F.R.C.P. 23(a)(2). The Objection to the Confirmation and Sale Transaction rests upon Lynd's ongoing failure to maintain the portfolio in compliance with the law, the terms of the HAP contract, and HUD regulations, which effects all class members.

    (c)    Ms. Bacon's Objection to the Confirmation and Sale Transaction is typical of the objections of other class members because, based on her conversations with her neighbors in the portfolio and knowledge of current management practices, Lynd's shortcomings have affected the habitability of most of the portfolio and have created health, safety, and administrative problems for all class members. F.R.C.P. 23(a)(3).

    (d)    Ms. Bacon will fairly and adequately protect the interests of the class. F.R.C.P. 23(a)(4). She has no interests antagonistic to those of the class. Class counsel, the Community Justice Project, has extensive experience in

13

    housing and class action litigation and will adequately and zealously prosecute this action, and Ms. Bacon, through class counsel, has sufficient financial resources to assure the interests of the class will not be harmed.

  (e) Debtors and current management agent Lynd have acted or refused to act on grounds generally applicable to the class, such that the requested relief is appropriate respecting the class as a whole. F.R.C.P. 23(b)(2).

39. According, Ms. Bacon respectfully requests this Honorable Court allow the within Objection to proceed as a class objection on behalf of herself and similarly-situated Tenants.

## **OBJECTION**

40. All previous paragraphs are incorporated as if fully set forth within.

41. The Joint Plan and Sale Transaction are not feasible means, pursuant to 11 U.S.C. § 1129(a)(11), to continue the business of the Kelly Hamilton Debtors, which requires preserving the HAP contract, stabilizing the portfolio, and returning the properties to decent, safe, sanitary, and habitable condition. The Joint Plan and Sale Transaction do not assure that the DIP Lender has the necessary financing, experience, and regulatory approval to continue operating the portfolio as affordable, subsidized housing, to the benefit of the current Tenants.

42. The Joint Plan mandates that "[n]either the Kelly Hamilton Purchaser nor any of its Affiliates shall be deemed to be a successor to the Debtors." (ECF 338-1 at 25.) This provision flies in the face of the reality that the Stalking Horse Bidder will act, in all respects, as successor to the Kelly Hamilton Debtors for the purposes of assuming the HAP contract and managing the portfolio.

43. A debtor must prove the feasibility of a Chapter 11 reorganization plan by a preponderance of the evidence. 11 U.S.C. § 1129(a)(11) (a plan may only be confirmed if

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.").

44. At the very minimum, "[t]o ensure that all residents live in safe, habitable dwellings, the items and components located inside the building, outside the building, and within the units of HUD housing must be functionally adequate, operable, and free of health and safety hazards." 24 C.F.R. § 5.703(a). Ms. Bacon's home, and the homes of similarly-situated tenants, have failed to meet this baseline for many months.

45. Based on her experiences under current management, Ms. Bacon has serious doubts whether the Stalking Horse Bidder will adequately protect and prioritize resident health and safety when managing the portfolio. Moreover, the abbreviated timeframe and significant, super-priority debt attached to the portfolio through the DIP Facility prevented other potential buyers from making fair market value bids for the portfolio following due diligence, including the local governmental and nongovernmental stakeholders with whom Ms. Bacon and her counsel have been working for this purpose.

46. While the DIP Facility totaled $9.7 million, only a small portion was actually allocated to capital expenditures to stabilize the properties, with the bulk of the funding actually spent was directed toward repaying debt spent to cover bills at properties other than Kelly Hamilton and for various professional fees. (ECF 178 at 72.)

47. Ms. Bacon and her neighbors continue to live in deplorable conditions almost a year and a half after Lynd did its due diligence and signed its contract to manage the properties. In that time, the conditions of Ms. Bacon's unit have worsened, and she has had little success

obtaining maintenance or communicating with the management office regarding income recertifications, utility checks, and work orders.

48. Based on the conditions of her unit, her observations of her neighbors' units, the pending code violation citations against the property, and the 2022 sale price of the portfolio, Ms. Bacon does not believe the Kelly Hamilton portfolio could currently be valued anywhere near $9.7 million of the DIP Facility, and is likely valued at far less.

49. Nevertheless, any competing bid for the portfolio would have had to exceed the value of the funds drawn from the DIP Facility, combined with a Bid Protection fee of $250,000 and other fees. (ECF 338-1 at 19; ECF 360 at 38.)

50. Upon information and belief, this significant price tag, in light of the necessary investment to return the portfolio to decent, safe, sanitary, and habitable condition, along with the abbreviated timeframe for the sale set forth the Joint Plan, prevented any competing bids from being entered in the auction.

51. Debtors have produced no evidence of the fair market value of the portfolio or the future earning power of the business should the sale and assignment of the HAP contract be approved. As a result, there is no evidence of record that the Stalking Horse Bidder can remedy the defaults in the HAP contract to HUD's satisfaction in a timely manner while also funding the operating expenses and rehabilitation of the portfolio.

52. To the contrary, Lynd's failure to maintain the portfolio in compliance with HUD regulations since March of 2024 demonstrates that it has been and may be unsuited to the task of stabilizing and rehabilitating the properties.

53. Kelly Hamilton Apts LLC and Kelly Hamilton Apts MM LLC exist for the sole business purpose of operating the Kelly Hamilton portfolio as HUD-subsidized housing pursuant

230923269 v2

to the HAP contract. The Stalking Horse Bidder, as proposed successor to the Kelly Hamilton Debtors, has not demonstrated that it will be able to successfully assume that contract and fulfill its obligations thereunder to the benefit of the tenants.

54. Accordingly, the Joint Chapter 11 Plan and Sale Transaction should be rejected, as they do not feasibly assure that the HAP contract will continue unabated.

55. In the alternative, if confirmation of the plan is not denied, Ms. Bacon respectfully requests this Honorable Court continue the confirmation hearing to December 10, 2025, and grant 90 days, until December 3, 2025, to allow local stakeholders to develop and submit a competing plan.

WHEREFORE, Ms. Bacon, on behalf of herself and those similarly-situated, respectfully requests this Honorable Court grant the relief requested in this motion and such other and further relief as the Court deems appropriate under the circumstances.

Date:  August 26, 2025

*/s/ Douglas G. Leney*
Douglas G. Leney
ARCHER & GREINER, P.C.
1025 Laurel Oak Road
Voorhees, NJ  08043-3506
(856) 795-2121
(856) 795-0574 (fax)
E-mail:  dleney@archerlaw.com

Anne Puluka[4]
Kevin Quisenberry[5]
**COMMUNITY JUSTICE PROJECT**
100 Fifth Avenue, Suite 900
Pittsburgh, PA 15222
Tel:  412-434-6002
Fax:  412-434-5706
E-mail:apuluka@cjplaw.org
         kquisenberry@cjplaw.org

*Counsel for Creditor, Chardell Bacon*

---

[4] *Pro Hac Vice* admission pending.

[5] *Pro Hac Vice* admission pending.

17

230923269 v2