UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**BUCHANAN INGERSOLL & ROONEY PC**
**Mark Pfeiffer, Esq.**
700 Alexander Park, Suite 300
Princeton, NJ 08540-6347
Telephone: (215) 665-3921
Fax: (215) 665-8760
Email: mark.pfeiffer@bipc.com
Attorneys for the City of Pittsburgh

IN RE:

CBRM REALTY. INC., *et al.*[1]

        Debtors**.**

Chapter 11

Case No. 25-15343 (MBK)

(Jointly Administered)

Related Docket Nos.: 281 and 338

---

**OBJECTION OF THE CITY OF PITTSBURGH**
**TO: (A) THE DEBTORS' SALE MOTION FOR THE KELLY HAMILTON PROPERTY**
**AND (B) CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION AND**
**REQUEST FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C. §**
**1104(c)(1)**

---

The City of Pittsburgh, Pennsylvania (the "City") respectfully submits this objection with

respect to: a) the above referenced motion (the "Motion")[2] for the sale of property owned by Kelly

Hamilton Apts LLC (the "Kelly Hamilton Debtor"); and (b) confirmation of the Debtors' plan of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (9071), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951).

[2]     ECF No. 281

reorganization (the "Plan") related to the Kelly Hamilton Debtor.[3] The City also respectfully

requests the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(1).

## I.      INTRODUCTION

1.      The City respectfully requests the Court deny approval of the sale Motion and

confirmation of the Debtors' Plan at least until a committee of creditors and/or an examiner is

appointed to address apparent misuse of the bankruptcy system including the use of the proceeds

of a debtor-in-possession loan to pay pre-petition debts related to non-debtor entities. This payment

directly impacts the propriety of the successful credit bid submitted by the stalking horse.

2.      In particular, debtor-in-possession financing was used to pay off a mortgage in the

original amount of $3.5 million to the Kelly Hamilton Debtor's property manager (which is

affiliated with the stalking horse buyer and may exercise sufficient control over the debtors to be

considered an insider) relating to the property manager's fees for non-debtor projects owned or

controlled by the Debtor's principal, Moshe "Mark" Silber ("Silber"). Silber plead guilty to crimes

related to fraudulent loan transactions.

3.      The Kelly Hamilton Debtor did not receive reasonably equivalent value when it

became obligated for the management fees of the other projects in the Silber portfolio. It is the

City's understanding that the Kelly Hamilton Debtor was chosen by the property manager and

Silber as the mortgagor because all other entities in the Silber portfolio were fully encumbered.

The Kelly Hamilton Debtor was apparently the only entity with equity available to secure, in whole

or in part, the property manager's fees related to non-debtors in the Silber portfolio.

---

[3]      ECF No. 338-1

4.       An affiliate of the property manager provided the debtor-in-possession financing to the Kelly Hamilton Debtor which effectively rolled up the property manager's pre-petition claims relating to the non-debtors in the Silber portfolio without adequate disclosure to the Court as required by the local rules.

5.       The roll up of the potentially fraudulent debt was included in the stalking horse bid of the property manager and its capital partner and may have chilled the bidding for the property. The stalking horse was the winning bidder with a credit bid of a little more than $9.7 million.

6.       The property manager was retained, and the mortgage was signed by Silber, prior to the appointment of the independent fiduciary. As a result, there is reason for skepticism and a creditors' committee or examiner should be appointed to investigate these matters before the sale is approved and the Plan is confirmed.

7.       The City is also interested in preserving affordable housing for the residents but is very concerned with the performance of the property manager on the Kelly Hamilton project and on other Silber portfolio projects in the City. The Kelly Hamilton property remains in disrepair and is subject to multiple code violations which are apparent from the outside of the property. Due to limitations in the City's inspection rights, the City has not been able to inspect the inside of the property at this point. To the extent that the sale is approved, the City respectfully requests that it be conditioned upon the Debtors and the property manager correcting the problems at the property and permitting the City to inspect the interiors and exterior prior to closing. The debtor-in-possession financing allocated $1.3 million for capital expenditures. To the City's dismay, it does not appear that these funds have been used for repairs of occupied units at the property.

## II.    BACKGROUND

### The Bankruptcy Cases

8.    The Debtors commenced these cases on May 19, 2025 (the "Petition Date").

9.    The bankruptcy cases are jointly administered but are not substantively consolidated.

10.    No creditors' committee, trustee or examiner has been appointed.

### The Affordable Housing Project

11.    The Kelly Hamilton Debtor owns approximately twenty-one (21) properties with 110 residential units (collectively, the "Property") which are located within City and are operated as affordable housing pursuant to one or more Housing Assistance Payments Contracts (also known as "HAP Contracts") between the Kelly Hamilton Debtor and the United States Department of Housing and Urban Development ("HUD"). The proposed sale requires the assignment of the HAP Contract which cannot occur without HUD's approval.

### The City's Standing

12.    The City is a creditor of the Kelly Hamilton Debtor in connection with certain code violations, municipal claims and tax claims. The City also has an interest in maintaining clean, safe, habitable and affordable housing for residents of the City including those who reside in the Property.

### The Silber Portfolio of Properties

13.    The Kelly Hamilton Debtor and the other Debtors in this case are part of an affiliated group of entities owned or controlled by Silber. Most of the entities in the Silber portfolio are not debtors in this case.

**Silber's Guilty Plea**

14.     According to the United States Department of Justice, on or about August 1, 2024, Silber pled guilty to crimes relating to "an extensive, multi-year conspiracy to fraudulently obtain multimillion-dollar loans on commercial and multifamily properties."[4]

**The Mortgage without Reasonably Equivalent
Value in Favor of the Property Manager**

15.     On September 20, 2024, shortly after Silber's guilty plea but before sentencing, Silber executed a $3.5 million mortgage (the "Mortgage") on behalf of the Kelly Hamilton Debtor in favor of Kelly Hamilton Lender, LLC (the "Lynd Pre-Petition Mortgagee"). The Lynd Pre-Petition Mortgagee is an affiliate of The Lynd Company and its related entities (collectively, "Lynd"). At the time, one or more Lynd affiliates were acting as the management companies for approximately 50 projects in the Silber portfolio including the Kelly Hamilton Property.

16.     Prior to the recording of the Mortgage on October 16, 2024 (nearly a month after it was executed), there was no recorded mortgage debt encumbering the Property.

17.     The City understands that the Mortgage relates to Lynd's management fees the numerous properties owned or controlled by Silber. The City understands the Mortgage was placed on the Property because the other properties owned by Silber lacked equity and the Kelly Hamilton Property was the only property, or one of the only, which was not fully encumbered.

18.     In other words, the $3.5 million Mortgage was potentially a fraudulent transfer which loaded the Kelly Hamilton Debtor with debt attributable to other non-debtor entities in the Silber portfolio. The Kelly Hamilton Debtor received little, if anything, in return.

---

[4]     https://www.justice.gov/opa/pr/four-real-estate-investors-sentenced-multimillion-dollar-loan-scheme (Retrieved August 25, 2025)

**Lynd's Potential Insider Status**

19.     Lynd is a potential insider of the Debtors as there is an indication that Lynd exerted at least some degree of control and influence over the Debtors and their operations. For example, it appears Lynd ran the day-to-day operations of the Debtors' properties as Lynd was the property manager. In addition, after the independent fiduciary was appointed for the Debtors on September 26, 2024 (after Silber executed the Mortgage in favor of the Lynd Pre-Petition Mortgagee), the independent fiduciary worked with Lynd on issues related to staffing and resources related to the Silber portfolio of properties.

20.     Lynd also assisted in attempts to obtain external financing for the Debtors. However, it is not clear that Lynd, or anyone affiliated with the Debtors, contacted public finance agencies to inquire about available funding.

**Lynd's Efforts to Obtain Financing for the Debtors Fail**

21.     Lynd's efforts to obtain external financing (whether good faith efforts or not) were not successful and the Debtors determined that financing outside of a court-supervised restructuring process was not feasible.

**The Lynd DIP Loan**

22.     After the Debtors (working with Lynd) failed to obtain external financing, the Debtors turned to Lynd and a capital partner, 3650 REIT, for debtor-in-possession financing facility secured by the Kelly Hamilton Debtor's assets (the "Original Kelly Hamilton DIP Proposal"). At the same time, the Debtors also began to engage with another noteholder regarding a potential financing facility secured by the assets of both the Kelly Hamilton Debtor and the New Orleans debtors (the "Noteholder DIP Proposal") which the Debtors thought was superior to the Original Kelly Hamilton DIP Proposal.

23.     As the Debtors sought to finish documenting the Noteholder DIP Proposal, the Debtors also recommenced discussions with Lynd and 3650 REIT regarding a revised financing proposal for the Kelly Hamilton Debtor.

24.     Ultimately, the Debtors obtained a lending commitment from Lynd and 3650 REIT for a secured debtor-in-possession credit facility (the "Kelly Hamilton DIP Facility") in a principal amount of up to $9,830,162 which was approved by the Court. The Debtors also obtained a separate debtor-in-possession credit facility (the "NOLA DIP Facility") for the New Orleans properties.

25.     According to the Debtors, the proceeds of the Kelly Hamilton DIP Facility were to be used as follows:

| | |
|---|---|
| Repayment of the Lynd Mortgage | $3,575,000 |
| Working Capital | $313,021 |
| Capital Expenditures | $1,300,000 |
| Professional Fees | $2,450,000[5] |
| Litigation Trust | $453,734 |
| Asset Management Fees (Lynd) | $400,000[6] |
| Kelly Hamilton Tax Payments | $47,000 |
| DIP Lender Professional Fees / | |

---

[5]     It appears the full amount of professional fees were a component of the stalking horse bid even though some of the fees are likely attributable to Debtors other than the Kelly Hamilton Debtor.  The Court should deny the sale Motion and confirmation of the Plan until an examiner or creditors' committee investigates whether any inclusion of professional fees unrelated to the Kelly Hamilton Debtor chilled the bidding for the Kelly Hamilton Debtor's Property.

[6]     The Asset Management Fee paid to Lynd appears excessive. The management fee represents approximately eighteen percent (18%) of the Kelly Hamilton Debtor's 2024 revenue of $2,213,709.97 [ECF No. 91-1]. According to HUD, the 80th percentile of management fees charged in Pittsburgh for HUD's multi-family housing programs is $73.36 per unit month. See, https://www.hud.gov/sites/dfiles/PIH/documents/2025_Schedule_Management_Fees.pdf.     This 80th percentile, as applied to the 110 units owned by the Kelly Hamilton Debtor is $8,069.60 per month or $96,835.20 annually.  There is no explanation why Lynd is taking four (4) times this amount as a management fee during the interim period covered by the Kelly Hamilton DIP Facility budget. The City respectfully submits this excessive management fee is one of the many reasons why the Court should view Lynd's involvement in this case with skepticism.

| Contingency | $460,000 |
| Origination Fee | $291,155 |
| Interest Reserve | $370,252 |
| Servicing Fee Reserve | $45,000 |
| Total: | $9,705,162 |

26.     At best, only about 16.6% of the Kelly Hamilton DIP Facility was used on the Property. The bulk of the remainder went to professionals and Lynd. In reality though, it is not clear the funds earmarked for the Property were ever used on the Property which, for the most part, remains in poor condition.

27.     To the City's knowledge, the Debtors and Lynd did not inform the Court that the Mortgage repayment related to Lynd's management fees for non-debtor entities in the Silber portfolio.

28.     By including the repayment of the Lynd Mortgage as part of the Kelly Hamilton DIP Facility, the Debtors: a) paid a debt which was potentially fraudulently incurred; and b) substantially increased the eventual stalking horse bid of Lynd and its capital partner.

### III.    OBJECTIONS TO SALE

### A.    Lynd may be an insider and the Court should closely scrutinize the proposed sale transaction.

29.     There are indications that Lynd, as property manager, consultant and DIP Lender, exercises, or has exercised, sufficient control or influence over the Debtors to warrant the Court closely scrutinizing the sale transaction especially in light of the non-disclosure of the nature of the Lynd claims which were repaid, and rolled up, by the Kelly Hamilton Debtor Financing. See, *Schubert v. Lucent Technologies, Inc.*, 554 F.3d 382 (3rd Cir. 2009).

30.     Accordingly, the City objects to the proposed sale to the extent it does not withstand close scrutiny by the Court.

**B.      The sale process may not withstand any level of scrutiny.**

31.      The sale process may not withstand any level of scrutiny. For example, the bidding

and auction process may have been chilled by the buyer's credit bid which included: a) amounts

attributable to the satisfaction of the Mortgage which covered non-debtor expenses which were

inadequately disclosed and rolled up in violation D.N.J. LBR 4001-3(b)(2)(requiring disclosure of

rollups); and b) professional fees which may not be attributable to the Kelly Hamilton Debtor or

the Property. Accordingly, the City objects to the extent the evidence adduced during the hearing

on this matter does not withstand scrutiny.

**C.      The sale should not absolve the Debtors or buyer from
complying with applicable law including codes and ordinances
of the City with respect to the Property and the sale should not
divest the City's first priority liens.**

32.      The City objects to the extent the sale, or the proposed sale order, modifies or

absolves, in any way, the obligations of the Debtors or buyer from complying with applicable laws

including codes and ordinances of the City with respect to the Property. The sale should also not

divest any of the City's tax or municipal liens which are of first priority under applicable law.

**D.      The sale should be conditioned upon the Debtors and property
manager correcting health, safety and habitability problems at
the Property prior to closing.**

33.      To the extent that the sale is approved, the City respectfully requests that it be

conditioned upon the Debtors and the property manager correcting the problems at the property

prior to closing and subject to the satisfaction of the City following appropriate inspection of the

interior and exterior of the Property.

34.      The debtor-in-possession financing allocated $1.3 million for capital expenditures

which does not appear to have been used to repair occupied units at the property.

### IV.    OBJECTIONS TO CONFIRMATION OF THE PLAN

35.    The City objects to confirmation of the Plan for the following reasons:

a.    the Plan may not have been proposed in good faith as required by 11 U.S.C. § 1129(a)(3) because it includes the proposed sale of the Property which may have been the product of impermissible bid chilling as described in this objection; and

b.    the Debtors may not have complied with applicable provisions of the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(2) in that the Debtors may have made an unauthorized post-petition transaction in violation of 11 U.S.C. § 549 when it paid off the Mortgage without disclosing the true nature of the Mortgage to the Court.

### V.    REQUEST FOR THE APPOINTMENT OF AN EXAMINER

36.    Because no trustee or creditors' committee has been appointed in these cases and because the issues described herein warrant further examination, the City respectfully requests the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(1) to investigate the Debtors as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor and further including without limitation an investigation of: a) the matters raised herein; b) the relationship between Lynd and the Debtors and/or Silber; c) whether there was any misconduct or malfeasance which would be grounds to vacate, amend or annul the Court's orders approving the Kelly Hamilton DIP Financing; d) the

sale process for the Property including whether there was any impermissible bid chilling or collusion.

37.    The appointment of an examiner is in the interests of creditors, any equity security holders, and other interests of the estate.

WHEREFORE, the City respectfully requests the Court deny or condition the sale and confirmation of the Plan as set forth herein. The City also respectfully request that an examiner be appointed pursuant to 11 U.S.C. § 1104(c)(1).

Respectfully submitted,

Dated: August 26, 2025                    **BUCHANAN INGERSOLL & ROONEY PC**


By: */S/ Mark Pfeiffer*
Mark Pfeiffer, Esquire
700 Alexander Park, Suite 300
Princeton, NJ 08540-6347
(T): 215-665-8700
(F): 215-665-8760
mark.pfeiffer@bipc.com
*Counsel for The City of Pittsburgh*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**BUCHANAN INGERSOLL & ROONEY PC**
**Mark Pfeiffer, Esq.**
700 Alexander Park, Suite 300
Princeton, NJ 08540-6347
Telephone: (215) 665-3921
Fax: (215) 665-8760
Email: mark.pfeiffer@bipc.com
*Attorneys for the City of Pittsburgh*

In Re:

CBRM REALTY. INC., *et al.* [1],

Debtors.

Chapter 11

Case No. 25-15343 (MBK)

(Jointly Administered)

## CERTIFICATION OF SERVICE

I, Mark Pfeiffer, hereby certify that on August 26, 2025, I caused to be served the

OBJECTION OF THE CITY OF PITTSBURGH TO: (A) THE DEBTORS' SALE MOTION FOR

THE KELLY HAMILTON PROPERTY AND (B) CONFIRMATION OF DEBTOR'S PLAN OF

REORGANIZATION AND REQUEST FOR THE APPOINTMENT OF AN EXAMINER

PURSUANT TO 11 U.S.C. § 1104(c)(1) upon all parties via ECF notification.

Dated: August 26, 2025

**BUCHANAN INGERSOLL & ROONEY PC**

By: */s/ Mark Pfeiffer*
700 Alexander Park, Suite 300
Princeton, NJ 08540-6347

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (9071), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), and RH New Orleans Holdings MM LLC (1951).

Telephone: (215) 665-3921
Facsimile: (215) 665-8760
Email: mark.pfeiffer@bipc.com\
*Counsel to the City of Pittsburgh*

2