## Exhibit A

**NOLA Purchase Agreement**

*Execution Version*

**PURCHASE AND SALE AGREEMENT**

by and between

THE ENTITIES SET FORTH ON <u>SCHEDULE A</u> ATTACHED HERETO,
each a Delaware limited liability company

and

LYND ACQUISITIONS GROUP LLC**,**
a Delaware Limited Liability Company

WITH RESPECT TO THE PROPERTIES SET FORTH ON <u>SCHEDULE A</u> ATTACHED HERETO

Execution Date:  September 12, 2025

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is executed as of September 12, 2025 (the "**Execution Date**") by and between THE ENTITIES SET FORTH ON SCHEDULE A ATTACHED HERETO, each a Delaware limited liability company (collectively referred to herein as the "**Seller**"), and LYND ACQUISITIONS GROUP LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Final DIP Order (as hereinafter defined), the Plan (as hereinafter defined), or Article 1 hereof, as applicable.

### W I T N E S S E T H :

**WHEREAS**, Seller is the owner of the Property;

**WHEREAS**, Seller is one of the debtors in the Bankruptcy Proceedings;

**WHEREAS**, the Seller has determined that it is in the best interests of Seller to sell the Property to Buyer pursuant to a "NOLA Restructuring Transaction" as defined in and to be entered into in accordance with the terms and conditions of the Final DIP Order; and

**WHEREAS**, the Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Property from Seller, pursuant to the NOLA Restructuring Transaction to be consummated in accordance with the terms and conditions of this Agreement, subject to a comprehensive auction process, including consideration of only Qualifying Bids, in accordance with the terms and conditions of this Agreement and the entry of the Bidding Procedures Order authorizing the payment of the same; and

**WHEREAS**, Seller seeks to designate Buyer as the stalking horse bidder and Buyer agrees to serve as the stalking horse bidder.

**NOW THEREFORE**, in consideration of the foregoing premises, the payment of the Independent Consideration and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer (collectively, the "**Parties**" and each, individually, a "**Party**") hereby agree as follows:

### ARTICLE 1 - CERTAIN DEFINITIONS

In addition to terms defined elsewhere in this Agreement, as used herein, the following terms shall have the following meanings:

"**Affiliate**" shall mean any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

"**Agreement**" shall have the meaning assigned to such term in the Preamble.

"**Assignment and Assumption of Contracts**" shall have the meaning assigned to such term in **Section 5.2(a)(iii)** hereof.

"**Assumed Contract Claims**" shall mean any claims or Causes of Action of the Seller or their estates against any third party arising under or relating solely to any Assumed Contract.

"**Assumed Contracts**" shall mean all executory contracts and unexpired leases assumed by the Seller and assigned to the Buyer in the Bankruptcy Proceedings in accordance with the procedures set forth in the Bidding Procedures Order, including the Scheduled Contracts and any executory contracts and leases hereafter entered into by Seller in the ordinary course of business in connection with the leasing and operation of the Real Property.

"**Assumed Liabilities**" shall mean  all Liabilities under the Assumed Contracts arising on or after the Closing.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of New Jersey.

"**Bankruptcy Proceedings**" shall mean the proceedings pursuant to the Bankruptcy Code in the case styled In re CBRM Realty, Inc., et. al., Case No. 25-15343 (MBK), presently pending before the Bankruptcy Court.

"**Bidding Procedures Order**" shall mean an Order of the Bankruptcy Court approving, among other things, the bidding procedures for an auction process for the Property, the process for selecting a stalking horse bidder (if any) and offering bid protections (if any), which Order shall be in form and substance reasonably acceptable to Seller and Buyer.

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which banks in New Orleans, Louisiana are required or permitted to be closed for business in accordance with the requirements of applicable Laws.

"**Buyer**" shall have the meaning assigned to such term in the Preamble.

"**Casualty/Condemnation Proceeds**" shall mean any awards or proceeds payable by any insurer or Governmental Authority in connection with any casualty with respect to the Real Property or any taking of the Real Property by the power of eminent domain.

"**Causes of Action**" shall have the meaning assigned to such term in the Plan.

"**CIF Claim**" shall mean any Claim against Debtors Laguna Reserve Apts Investor LLC and RH Lakewind East LLC arising under or related to the CIF Credit Agreement and the CIF Lakewind Mortgage, including on account of any accrued but unpaid interest or fees and ancillary expenses, which CIF Claim shall be deemed to equal Four Million Five Hundred Thousand and 00/100 Dollars ($4,500,000).

"**CIF Credit Agreement**" shall mean that certain Credit Agreement, dated as of April 23, 2023, between Cleveland International Fund – NRP West Edge, Ltd. and Laguna Reserve Apts

Investor LLC, as subsequently modified, amended, or supplemented from time to time, together with all instruments and agreements related thereto.

"**CIF Lakewind Mortgage**" shall mean the mortgage granted by RH Lakewind East LLC on the Laguna Reserve Apartments to secure Laguna Reserve Apts Investor LLC's obligations under the CIF Credit Agreement, which was recorded on December 13, 2024.

"**Claim**" shall have the meaning assigned to such term in the Plan.

"**Closing**" shall mean the closing of the Transaction.

"**Closing Date**" shall mean the date fourteen (14) days following the issuance of the Sale Order.

"**Closing Documents**" shall mean any and all documents to be executed and delivered by Seller and Buyer in connection with the Closing in accordance with the terms and conditions of this Agreement.

"**Closing Statement**" shall have the meaning assigned to such term in **Section 5.2(a)(ix)** hereof.

"**Common-Interest Communications**" means documents, information, or communications that are subject to the attorney-client privilege, attorney-work product doctrine, joint defense, or other privilege or protection from disclosure, and (a) are in the Seller's possession, and (b) are shared between or among (i) the Seller, on the one hand, and (ii) any third-party entity or its representatives that share a common legal interest with the Seller, on the other hand, including documents that reflect defense strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation.

"**Creditor Recovery Trust**" shall have the meaning assigned to such term in the Plan.

"**Creditor Recovery Trust Amount**" shall have the meaning assigned to such term in the Plan.

"**D&O Liability Insurance Policies**" shall have the meaning assigned to such term in the Plan.

"**Deed**" shall have the meaning assigned to such term in **Section 5.2(a)(i)** hereof.

"**Deposit**" shall mean an amount equal to the Post-Petition Manager Expense Claim (as defined below).

"**DIP Facility**" shall mean the debtor in possession financing facility provided to the Seller under the DIP Facility Documents.

"**DIP Facility Documents**" shall mean the Superpriority Secured Promissory Note and Security Agreement by and among the Seller and the NOLA DIP Lender dated as of July 1, 2025

and all other documents and instruments executed and delivered in connection therewith which evidence the DIP Facility.

"**DIP Facility Obligations**" shall mean, the sum of the following amounts outstanding as of the Closing Date:

(a)     the Outstanding DIP Facility Principal Amount;

(b)     all accrued and unpaid interest on the Outstanding DIP Facility Principal Amount and any interest capitalized thereunder;

(c)     any attorneys' fees of counsel for the NOLA DIP Lender in connection with the Bankruptcy Proceedings, the preparation and negotiation of this Agreement and the consummation of the Transaction; and

(d)     any other sums outstanding under the DIP Facility Documents as of the Closing Date.

"**Escrow Agent**" shall mean the Title Company in its capacity as escrow agent.

"**Execution Date**" shall have the meaning assigned to such term in the Preamble.

"**Excluded Liabilities**" shall mean any Liabilities, claims and Causes of Action that are not included within the definition of Assumed Liabilities.

"**Fee Escrow Amount**" shall have the meaning assigned to such term in the Plan.

"**Final DIP Order**" shall mean that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 251].

"**Final Order**" shall mean (a) an Order of the Bankruptcy Court or (b) an Order of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any Order of the Bankruptcy Court, in each case as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or local rules of the Bankruptcy Court, may be filed relating to such Order shall not prevent such Order from being a Final Order.

"**Financial Records**" shall mean the financial records of Seller in connection with the leasing, management, operation and ownership of the Real Property, including all operating statements, rent rolls, budgets, statements of accounts receivable and accounts payable, delinquency reports, and information regarding Tenant Deposits; *provided* such materials shall exclude information protected or purportedly protected by the attorney-client privilege or attorney work product doctrine, including information shared pursuant to any joint defense,

common interest, or confidentiality agreement among the Seller and any Affiliate or Insider, and any Common-Interest Communications, appraisals, and internal Seller memorandums.

"**General Administrative Claims**" shall have the meaning assigned to such term in the Plan.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, including the Bankruptcy Court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, in each case having jurisdiction over the Property.

"**Independent Consideration**" shall have the meaning assigned to such term in Section 2.4 hereof.

"**Insider**" shall mean an "insider" as defined in section 101(31) of the Bankruptcy Code.

"**Insurance Causes of Action**" shall have the meaning assigned to such term in the Plan.

"**Insurance Policies**" shall have the meaning assigned to such term in the Plan.

"**Intangible Personal Property**" shall mean all of that certain intangible property owned by Seller relating to the leasing, management, operation and ownership of the Real Property, including all of Seller's right, title and interest in, to and under the Property Documents and Materials, any tradenames used in connection with the leasing, management, operation and ownership of the Real Property, including the names of the Property set forth on **Schedule A** and any internet websites or domain names used in connection with the operation of the Real Property.

"**Laws**" shall mean any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, authorization, covenant, condition, restriction or agreement, executive order or other direction or requirement of any Governmental Authority which are applicable to the Property or any part thereof, the owner of the Property, the owner's use or manner of use thereof or the business activities within the Property.

"**Leases**" shall mean all unexpired leases, occupancy agreements, and any other agreements for the use, possession, or occupancy of any portions of the Real Property as of the Closing Date.

"**Liabilities**" shall mean, as to any Person, any claim (as defined by section 101(5) of the Bankruptcy Code), debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted

or when the relevant events occurred or circumstances existed.  For purposes hereof, the term "**Liabilities**" shall specifically exclude any legal fees and expenses of Seller's counsel.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"**Major Casualty/Condemnation**" shall mean any casualty, condemnation proceedings, or eminent domain proceedings to the extent that (i) the portion of the Property that is the subject of such casualty or such condemnation or eminent domain proceedings has a value in excess of Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00), or (ii) such casualty is an uninsured casualty.

"**Manager**" shall mean, together, LAGSP LLC and Lynd Management Group LLC.

"**Noteholder Recovery**" shall mean an amount equal to thirty percent (30%) of the Net Proceeds realized from any sale, refinancing, or other capital transaction with respect to the Property to the Holders of Crown Capital Unsecured Claims, as defined in the Plan. For purposes of this provision, "**Net Proceeds**" shall mean the distributable cash proceeds remaining after (i) payment of all costs and expenses of such transaction, (ii) repayment of all debt, and (iii) payment in full of all equity capital and accrued equity returns. The Noteholder Recovery shall be non-recourse to Purchaser and payable solely from such Net Proceeds, if any, as and when distributed.

"**Order**" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceedings (including the Sale Order).

"**Original DIP Facility Principal Amount**" shall mean Seventeen Million Four Hundred Twenty-Two Thousand Seven Hundred Twenty-Eight and 00/100 Dollars ($17,422,728), less any amounts received and applied to the DIP Facility on or prior to the Closing Date.

"**Other Priority Claims**" shall have the meaning assigned to such term in the Plan.

"**Other Secured Claims**" shall have the meaning assigned to such term in the Plan.

"**Outstanding DIP Facility Principal Amount**" shall mean the sum of the Original DIP Facility Principal Amount and any sums added to the Original DIP Facility Principal Amount as principal pursuant to the DIP Facility Documents, whether as capitalized interest, protective advances or otherwise.

"**Owner's Title Policy**" shall mean an ALTA owner's title insurance policy to be issued by the Title Company to Buyer in the form of the Proforma Title Policy insuring Buyer as the owner of the Real Property in an amount equal to the Purchase Price.

"**Parties**" shall have the meaning assigned to such term in the Recitals.

"**Party**" shall have the meaning assigned to such term in the Recitals.

"**Permitted Exceptions**" shall mean those matters set forth in Schedule B of the Proforma Title Policy, which shall not include the DIP Facility or the CIF Claim which shall be paid in full at Closing and which shall not be shown as an exception to the Buyer's title insurance policy at Closing.

"**Person**" shall mean any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Personal Property**" shall mean, collectively, the Tangible Personal Property and the Intangible Personal Property to the extent owned by Seller.

"**Plan**" shall mean the *Modified Joint Chapter 11 Plan of Crown Capital Holdings LLC and Certain of Its Debtor Affiliates* [Docket No. 501], as amended, amended and restated, supplement or other modified from time to time.

"**Post-Petition Manager Expense Claim**" shall mean the Manager's post-petition Administrative Expense Claim.

"**Preamble**" shall mean the preamble to this Agreement on Page 1 hereof.

"**Priority Tax Claims**" shall have the meaning assigned to such term in the Plan.

"**Proforma Title Policy**" shall mean the Proforma Owner's Policy attached hereto as **Exhibit B-1 through B-4** and by this reference made a part hereof.

"**Property**" shall mean, collectively, (a) the Real Property, (b) the Personal Property, (c) the Assumed Contracts, (d) the Tenant Deposits, (e) all cash on hand, in bank accounts, or in escrow or reserve accounts established pursuant to the DIP Facility Documents, (f) all books and records of Seller, subject to the right of Seller to retain copies of such books and records to the extent necessary for the administration of the Creditor Recovery Trust or the Wind-Down; and (f) the Assumed Contract Claims.  Notwithstanding anything to the contrary contained herein, the term "**Property**" shall specifically exclude (i) the Creditor Recovery Trust Amount, or any other amounts held or designated for the benefit of the Creditor Recovery Trust; (ii) all Insurance Policies and any Insurance Causes of Action and any rights or claims thereunder; (iii) the D&O Liability Insurance Policies and any rights or claims thereunder; (iv) any claims or Causes of Action of the Seller or Seller's estate against any third party other than the Assumed Contract Claims; and (v) the Fee Escrow Amount.

"**Property Documents and Materials**" shall mean all documents and materials relating to the leasing, management, operation and ownership of the Real Property in Seller's possession or control, including (a) the Leases and any files relating to the leasing of the Real

Property, (b) the Financial Records, (c) service contracts, (d) operating manuals, (e) warranties, (f) property management agreements to the extent remaining in force after Closing, (g) real estate tax bills and notices, (h) utility tax bills and notices, (i) plans and specifications, (j) licenses, permits and approvals, (k) certificates of use and occupancy and (l) notices from and correspondence with Governmental Authorities; *provided* such documents and materials shall exclude appraisals, internal Seller memorandums and correspondence and materials covered by an attorney client privilege.

"**Purchase Price**" shall mean Twenty-Six Million One Hundred and Twenty-Five and 00/100 Dollars ($26,125,000).

"**Qualifying Bid**" shall have the meaning assigned to such term in the Bidding Procedures Order.

"**Real Property**" shall mean the real property set forth on **Schedule A** attached hereto and legally described in **Exhibit A-1 through A-4** attached hereto and by this reference made a part hereof, together with all improvements and fixtures located thereon, and any rights, privileges and appurtenances pertaining thereto.

"**Recitals**" shall mean the recitals to this Agreement on Page 1 hereof.

"**Rents**" shall mean and include all rents, administrative charges, utility charges and other sums and charges payable by Tenants under the Leases.

"**Representatives**" shall mean, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"**Sale Order**" shall mean an Order of the Bankruptcy Court either authorizing the sale of the Property by Seller to Buyer pursuant to this Agreement under section 363 of the Bankruptcy Code, including, without limitation that the sale of the Property is free and clear of all claims or liens pursuant to section 363(f) of the Bankruptcy Code or confirming the Plan and authorizing the sale of the Property by Seller to Buyer pursuant to this Agreement in accordance with the provisions of section 1123 of the Bankruptcy Code, free and clear of any claims against the Seller or any parties claiming by, through or under the Seller, which order shall be in form and substance reasonably acceptable to Seller and Buyer.

"**Scheduled Contracts**" shall mean those executory contracts and unexpired leases identified in **Exhibit C** attached hereto and by this reference made a part hereof].

"**Seller**" shall have the meaning assigned to such term in the Preamble.

"**Surviving Obligations**" shall mean any liabilities and obligations that this Agreement expressly provides shall survive the termination hereof.

"**Tangible Personal Property**" shall mean any tangible personal property owned by Seller which is located at and used in connection with the operation of the Real Property as of the Closing Date.

"**Tenant Deposits**" shall mean all refundable deposits (whether cash or non-cash) paid or deposited by the Tenants with Seller, as landlord, or any other person on Seller's behalf pursuant to the Leases (together with any interest which has accrued thereon as required by the terms of such Lease, but only to the extent such interest has accrued for the account of the respective Tenants or as required by Law), to the extent the same have not been advanced or paid to NOLA DIP Lender on or prior to the Closing Date.

"**Tenants**" shall mean the tenants under the Leases.

"**Title Company**" shall mean Fidelity National Title Insurance Company.

"**Transaction**" shall mean the transactions contemplated by this Agreement.

"**Wind-Down**" shall have the meaning assigned to such term in the Plan.

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation" when such phrase does not otherwise appear. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. The article and section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All article, section, paragraph, clause, exhibit or schedule references not attributed to a particular document shall be references to such parts of this Agreement.

## ARTICLE 2 - PURCHASE AND SALE OF PROPERTY

2.1    <u>Agreement for Purchase and Sale</u>. Seller agrees to sell to Buyer, and Buyer, or its nominee by way of an assignment of this Agreement and all of the duties and obligations hereunder to an Affiliate(s) or title holding nominee(s) of Buyer, agrees to purchase from Seller, all of Seller's right, title and interest in and to the Property. Buyer and Seller agree that the transactions contemplated under this Agreement are intended as an all-or-nothing transaction pursuant to which the Closing shall occur with respect to each property, and all of the properties constituting the Property simultaneously, and that all, or none, of the Property shall be conveyed. In no event shall Buyer have the right to terminate this Agreement separately with respect to any of the property constituting the Property.

2.2    <u>Purchase Price</u>. In consideration of the sale of the Property by Seller to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall pay or be deemed to pay the Purchase Price to Seller on the Closing Date by (a) paying the Purchase Price in cash and (b) assuming the Assumed Liabilities as of the Closing Date and (c) agreeing to fund the Noteholder Recovery in accordance with this Agreement, as the same shall be reflected in a modified version of the Plan.

2.3    <u>Deposit</u>. In accordance with the Bidding Procedures Order, Buyer shall credit bid the Post-Petition Manager Expense Claim as the Deposit. At the Closing, the entire Deposit shall be applied to the Purchase Price.

2.4    <u>Independent Consideration</u>.    Simultaneously with the execution of this Agreement, Buyer shall make a nonrefundable payment to Seller in the amount of One Hundred and 00/100 Dollars ($100.00) (the "**Independent Consideration**").    Seller acknowledges and agrees that Seller's receipt of the Independent Consideration constitutes adequate and agreed upon consideration for Seller entering into this Agreement notwithstanding the limitations on Seller's remedies in the event of a default by Buyer pursuant to Section 9.1 hereof.    Without limiting the generality of the foregoing, the Parties hereby waive any defense to the enforcement of this Agreement on the grounds that the same is an illusory contract.

### ARTICLE 3 - TITLE MATTERS

3.1    <u>Title</u>. At Closing, Seller shall convey good and marketable title to the Real Property to Buyer or its nominee pursuant to the Deed, subject only to the Permitted Exceptions.

### ARTICLE 4 - AS-IS SALE

4.1    <u>AS-IS SALE</u>. BUYER ACKNOWLEDGES AND AGREES THAT, AT THE TIME OF CLOSING, SELLER SHALL SELL AND CONVEY TO BUYER, AND BUYER SHALL ACCEPT AND PURCHASE FROM SELLER, THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS," EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT. EXCEPT FOR REPRESENTATIONS AND WARRANTIES, IF ANY, EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER HAS NOT MADE AND IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO, WHETHER PROVIDED TO BUYER BY SELLER OR ANY AGENT OR REPRESENTATIVE OF SELLER.  BUYER REPRESENTS THAT IT IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED REAL ESTATE INVESTOR AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF BUYER'S CONSULTANTS IN PURCHASING THE PROPERTY AND BUYER SHALL MAKE, AND HAS HAD THE OPPORTUNITY TO MAKE, AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ANY DOCUMENTS AND INFORMATION PROVIDED TO BUYER BY OR ON BEHALF OF SELLER AND HAS HAD THE OPPORTUNITY TO CONDUCT, AND HAS CONDUCTED, ANY AND ALL DUE DILIGENCE REGARDING THE PROPERTY.  BUYER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS NECESSARY, INCLUDING, BUT NOT LIMITED TO, SUCH INSPECTIONS WITH RESPECT TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER SHALL DETERMINE APPROPRIATE. TO THE EXTENT THAT BUYER IS DEEMED TO KNOW PRIOR TO THE CLOSING THAT ANY OF SELLER'S WARRANTIES ARE INACCURATE, UNTRUE OR INCORRECT IN ANY WAY, SUCH SELLER'S WARRANTIES SHALL BE DEEMED MODIFIED TO REFLECT BUYER'S DEEMED KNOWLEDGE.

4.2    <u>RELEASE</u>.  EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, EFFECTIVE AS OF THE CLOSING DATE, BUYER HEREBY FOREVER RELEASES AND DISCHARGES SELLER FROM ALL RESPONSIBILITY AND LIABILITY, WHETHER ARISING BEFORE OR AFTER THE CLOSING DATE, RELATING TO THE CONDITION, VALUATION, SALABILITY OR UTILITY OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PURPOSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, WITH RESPECT TO CONDITIONS RELATING TO THE PRESENCE IN THE SOIL, AIR, STRUCTURES AND SURFACE AND SUBSURFACE WATERS, OF HAZARDOUS MATERIALS OR OTHER MATERIALS OR SUBSTANCES THAT HAVE BEEN OR MAY IN THE FUTURE BE DETERMINED TO BE TOXIC, HAZARDOUS, UNDESIRABLE OR SUBJECT TO REGULATION AND THAT MAY NEED TO BE SPECIALLY TREATED, HANDLED AND/OR REMOVED FROM THE PROPERTY UNDER CURRENT OR FUTURE LAWS, AND ANY STRUCTURAL AND GEOLOGIC CONDITIONS, SUBSURFACE SOIL AND WATER CONDITIONS AND SOLID AND HAZARDOUS WASTE AND HAZARDOUS MATERIALS ON, UNDER, ADJACENT TO OR OTHERWISE AFFECTING THE PROPERTY) AND WAIVES ANY CLAIM BUYER MAY HAVE AGAINST SELLER WITH RESPECT THERETO UNDER THE DIP FACILITY DOCUMENTS AS OF SUCH CLOSING DATE.  BUYER FURTHER HEREBY WAIVES (AND BY CLOSING THIS TRANSACTION WILL BE DEEMED TO HAVE WAIVED) ANY AND ALL OBJECTIONS AND COMPLAINTS (INCLUDING, BUT NOT LIMITED TO, FEDERAL, STATE AND LOCAL STATUTORY AND COMMON LAW BASED ACTIONS, AND ANY PRIVATE RIGHT OF ACTION UNDER ANY FEDERAL, STATE OR LOCAL LAWS, REGULATIONS OR GUIDELINES TO WHICH THE REAL PROPERTY IS OR MAY BE SUBJECT) CONCERNING THE PHYSICAL CHARACTERISTICS AND ANY EXISTING CONDITIONS OF THE REAL PROPERTY.  BUYER FURTHER HEREBY ASSUMES THE RISK OF CHANGES IN APPLICABLE LAWS AND REGULATIONS RELATING TO PAST, PRESENT AND FUTURE ENVIRONMENTAL CONDITIONS ON THE REAL PROPERTY AND THE RISK THAT ADVERSE PHYSICAL CHARACTERISTICS AND CONDITIONS.

4.3    <u>EXCLUDED CLAIMS</u>.  NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ASSUMPTION BY BUYER OF ANY EXCLUDED LIABILITIES.

4.4    <u>SURVIVAL</u>.  THE PROVISIONS OF THIS **ARTICLE 4** SHALL SURVIVE THE CLOSING.

**ARTICLE 5 - CLOSING**

5.1    <u>Escrow Closing</u>.

(a)    Subject to the satisfaction of the conditions precedent to the obligations of Buyer and Seller set forth in **Section 6.1** and **Section 6.2** hereof, the Parties shall conduct the Closing on the Closing Date as an escrow-style closing through the Title Company as escrow agent pursuant to escrow closing instructions to be delivered to the Title Company consistent with the terms and conditions of this Agreement so that it will not be necessary for any Party to attend the Closing. In the event of any conflict between this Agreement and the escrow instructions, the terms and conditions of this Agreement shall prevail.

(b)     Provided all conditions precedent to Seller's obligations hereunder have been satisfied, Seller agrees to convey the Property to Buyer upon delivery of the items to be delivered by Buyer to Seller pursuant to **Section 5.3**.

(c)     The items to be delivered by Seller or Buyer in accordance with the terms of **Section 5.2** and **Section 5.3** shall be delivered to the Title Company no later than 5:00 p.m. Eastern Time on the last Business Day prior to the Closing Date.

5.2     <u>Seller's Closing Deliveries</u>.

(a)     At the Closing, Seller shall deliver the following items to the Title Company:

(i)     <u>Release and Satisfaction</u>.  An instrument in form and substance reasonably acceptable to Seller confirming the release of Seller from liability under the DIP Facility Documents and the CIF Credit Agreement and CIF Lakewind Mortgage;

(ii)     <u>Deed</u>.  A special warranty deed (act of sale) in the form of **Exhibit D** attached hereto and by this reference made a part hereof ("**Deed**"), executed and acknowledged by Seller in recordable form, subject to the Permitted Exceptions;

(iii)     <u>Bill of Sale and General Assignment</u>.  A quitclaim bill of sale in the form of **Exhibit E** attached hereto and by this reference made a part hereof, executed by Seller;

(iv)     <u>Assignment and Assumption of Contracts and Leases</u>.  An assignment and assumption of the Assumed Contracts, including all Leases in the form of **Exhibit F** attached hereto and by this reference made a part hereof ("**Assignment and Assumption of Contracts**") executed by Seller;

(v)     <u>Certified Rent Roll</u>.  A rent roll for the Real Property reflecting the name of each Tenant, the apartment occupied by such Tenant, the then current Rent payable by such Tenant under its Lease, any due and unpaid Rent owed by such Tenant as of the Closing Date and the Tenant Deposits made by such Tenant pursuant to its Lease certified by Seller as true and correct as of the Closing Date;

(vi)     <u>Notice to Tenants</u>.  A single form letter in the form of **Exhibit G** attached hereto and by this reference made a part hereof, executed by Seller, duplicate copies of which shall be sent by Buyer after Closing to the Tenants under the Lease;

(vii)     <u>Non-Foreign Status Affidavit</u>.  A non-foreign status affidavit in the form of **Exhibit H** attached hereto and by this reference made a part hereof, as

required by Section 1445 of the Internal Revenue Code, executed by Seller or, if Seller is a disregarded entity for United States federal income tax purposes, the appropriate non-disregarded entity owning an interest in Seller;

(viii)    <u>Title Affidavit</u>.  A title affidavit and gap indemnity in such form as may be required by the Title Company and form reasonably acceptable to Seller;

(ix)    <u>Closing Statement</u>.  A mutually acceptable form of a joint closing statement setting forth the sums to be disbursed by the Escrow Agent at Closing (the "**Closing Statement**"), executed by Seller;

(x)    <u>Other Documents</u>. Applicable transfer or sales tax filings and such other documents as may be reasonably required by the Title Company or may be agreed upon by Seller and Buyer to consummate the Transaction to the extent required and not exempt; and

(b)    On the Closing Date, Seller shall deliver to Buyer, which may occur by leaving the same at the Real Estate, any Property Documents and Materials to the extent not previously furnished to Buyer.

5.3    <u>Buyer's Closing Deliveries</u>.  At the Closing, Buyer shall deliver the following items to the Title Company:

(a)    <u>Assignment and Assumption of Contracts</u>.  An Assignment and Assumption of Contracts executed by Buyer;

(b)    <u>Closing Statement</u>.  The Closing Statement, executed by Buyer;

(c)    <u>Other Documents</u>.  Applicable transfer or sales tax filings and such other documents as may be reasonably required by the Title Company or may be agreed upon by Seller and Buyer to consummate the Transaction to the extent required and not exempt; and

(d)    <u>Cash Payment</u>.  Any sums required to pay (i) the obligations of Buyer described in Section 2.2 or (ii) closing costs for which Buyer is responsible hereunder (if any) shall be paid by wire transfer to the Escrow Agent.

(e)    A release from the Manager of any Claim it may have for any amounts due from the Seller or the Property at or prior to Closing upon receipt of payment of $125,000 on account of the Post-Petition Manager Expense Claim and an agreement to subordinate any amounts in excess of $125,000 payable under the Post-Petition Manager Expense Claim to the payment in full in cash of any Administrative Claim in this Transaction only (other than any Administrative Claim on account of the Post-Petition Manager Expense Claim).

5.4    <u>Proration</u>.

(1)    <u>Items to be Prorated</u>.  The following shall be prorated between Seller and Buyer as of the Closing Date:

(a)    <u>Taxes and Assessments</u>.

(i)    Taxes and assessments (collectively, "**Taxes**") applicable to the Property for the calendar year of Closing will be prorated on a calendar year basis.  If the Taxes for the year in which Closing occurs have not been determined by Closing, then the proration shall be based on the previous year's Taxes, without reproration.  If Taxes are due and payable at Closing, then those Taxes shall be paid at Closing.  If Taxes are not due and payable at Closing, then, at Closing, Buyer shall receive a credit from Seller for Seller's share of the Taxes for the period prior to the Closing Date.  If Taxes are not due and payable at Closing because they have been paid, then, at Closing, Seller shall receive a credit from Buyer for Buyer's share of the Taxes for the period from and after the Closing Date.

(ii)    In no event shall Seller be charged with or be responsible for any increase in the taxes or assessments on the Property resulting from the sale of the Property or from any improvements made or leases entered into at any time after the Closing Date or for any reason.  All tax refunds and credits attributable to any period prior to the Closing Date which Seller has paid or for which Seller has given a credit to Buyer shall belong to and be the property of Seller regardless of when received by Seller or Buyer, and Buyer shall promptly pay the same to Seller upon receipt thereof.  All tax refunds and credits attributable to any period from and after the Closing Date shall belong to and be the property of Buyer.

(b)    <u>Rents</u>.  Except for delinquent rents, all rents under the Leases (except as hereinafter provided) shall be prorated between Buyer and Seller, Seller being charged and credited for all of the same allocable to the period up to the Closing Date and Buyer being charged and credited for all of the same allocable to the period from and after the Closing Date.  Seller shall be entitled to retain all paid rent and other items allocable to the period prior to the Closing. Seller shall deliver or provide a credit in an amount equal to all prepaid rentals and other items paid by Tenants for periods from and after the Closing Date to Buyer on the Closing Date to the extent the same are in Seller's possession.  Rents which are delinquent as of the Closing Date shall not be prorated on the Closing Date.  Buyer shall include such delinquencies in its normal billing and shall diligently pursue the collection thereof in good faith for a period of ninety (90) days after the Closing Date (but Buyer shall not be required to litigate or declare a default under any Lease).  To the extent Buyer receives rents on or after the Closing Date, upon receipt by Buyer, such payments shall be applied first toward the rent for the month in which the Closing occurs, then to any delinquent rents owed to Seller, with Seller's share thereof being promptly delivered to Seller, and then to the rent owed to Buyer in connection with the Tenant Leases for which such payments are received.  Buyer may not waive any delinquent rents nor modify the Leases so as to reduce or otherwise affect amounts owed thereunder for any period in which Seller is entitled to receive a share of such amounts without

first obtaining Seller's written consent.  Seller hereby waives the right to pursue any remedy against any Tenant owing delinquent rents and any other amounts owing to Seller for which Seller did not receive a credit at Closing.  Buyer shall reasonably cooperate with Seller in any collection efforts hereunder for a period of ninety (90) days (but shall not be required to litigate or declare a default under any Lease).  With respect to delinquent rents and any other amounts or other rights of any kind respecting Tenants who are no longer Tenants of Property as of the Closing Date, Seller shall retain all rights relating thereto.

(c)    Operating Expenses; Utilities.  All amounts payable under any Assumed Contracts and any annual permits and/or inspection fees (calculated on the basis of the period covered), and any other expenses of the operation and maintenance of the Property, shall be prorated between Buyer and Seller, Seller being charged and credited for all of the same allocable to the period up to the Closing Date and Buyer being charged and credited for all of the same allocable to the period from and after the Closing Date.

(2)    Calculation; No-Reproration.  The prorations and payments shall be made on the basis of a written statement submitted to Buyer and Seller by Title Company (based on information provided to Title Company by Buyer and Seller) at least two (2) Business Days prior to the Closing and approved by Buyer and Seller.  Seller shall endeavor to provide a draft of the prorations to Buyer at least five (5) business days prior to the Closing, but no later than two (2) Business Days prior to the Closing.  Except as provided above as to delinquent rents and real estate taxes, all prorations are final.

(3)    Items Not Prorated.  Seller and Buyer agree that (a) none of the insurance policies relating to the Property will be assigned to Buyer and Buyer shall be responsible for arranging for its own insurance as of the Closing Date; (b) to the extent the same are in the name of Seller, utilities, including telephone, electricity, water and gas, shall be read on the Closing Date and Buyer shall be responsible for all the necessary actions needed to arrange for utilities in the name of Seller to be transferred to the name of Buyer on the Closing Date, including the posting of any required deposits (it being understood, however, that Seller shall be entitled to a credit at the Closing in the amount of any utility deposits which it or its predecessors have made prior to the Closing Date, to the extent the same are transferred to Buyer, and Seller shall be entitled to recover and retain from the providers of such utilities any refunds or overpayments to the extent applicable to the period prior to the Closing Date, and any utility deposits for which it does not receive a credit hereunder); and (c) (i) Seller may have received certain front-end concessions and benefits in the form of cash payments or construction contributions or allowances from the persons to whom laundry room, cable television, internet system, security system and/or telephone system concessions have been granted with respect to the Property, and (ii) such concessions and benefits shall belong solely to Seller and shall not be the subject of any prorations or other adjustments between Seller and Buyer.  Accordingly, there will be no prorations for insurance, utilities (except to the extent provided herein for utility deposits), front-end concessions, decorating or up-front pet fees. Notwithstanding the foregoing, in the event a meter reading is unavailable for any particular utility, such utility shall be prorated in the manner provided in Section 5.4(1)(c) hereof.

(4)    Buyer Indemnification.    Buyer shall indemnify, protect, defend and hold Seller harmless from and against any Claim in any way arising from the matters for which Buyer receives a credit or otherwise assumes responsibility pursuant to this Section 5.4, or relates to the period after the Closing Date.    Notwithstanding anything to the contrary contained in this Section 5.4, for any item for which Buyer receives a credit or otherwise assumes responsibility pursuant to this Section 5.4 and which is payable after Closing, Buyer shall pay for such item when due and shall be responsible for any fees, charges, interest and penalties which may become due on account of Buyer's failure to do so.

(5)    Survival.    The provisions of this Section 5.4 shall survive the Closing Date.

5.5    Tenant Deposits.    On the Closing Date, Seller shall, to the extent in its possession, turnover all of the Tenant Deposits to Buyer or wire transfer the amount thereof to the Title Company for payment to Buyer at the time of Closing.

5.6    Closing Costs.

(a)    Buyer shall pay all normal and customary closing costs in connection with the sale of the Property, including:  (i) unless otherwise exempt from payment by reason of the Bankruptcy Proceedings, all transfer taxes, documentary stamp taxes, sales taxes and similar charges, if any, applicable to the transfer of the Property to Buyer, (ii) all premiums and charges of the Title Company for the title commitment and the Owner's Title Policy (including any endorsements requested by Buyer), (iii) the cost of any update of the Survey, (iv) all recording and filing charges in connection with the instruments by which Seller conveys the Property to Buyer properly paid by the Buyer in commercial real estate transactions in Orleans Parish, (v) all escrow or closing charges, and (vi) all fees due to Buyer's attorneys in connection with this Agreement.    Notwithstanding anything to the contrary contained herein, Buyer shall have no liability or obligation with respect to the payment of the attorneys' fees and expenses of Seller or any sums due to any other Representatives of Seller.

(b)    The obligations of Buyer under this **Section 5.6** shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

**ARTICLE 6 - CONDITIONS PRECEDENT**

6.1    Conditions Precedent to Buyer's Obligations.    Buyer's obligation to close the Transaction is conditioned on all of the following:

(a)    Accuracy of Representations and Warranties.    All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if the same had been made as of the Closing Date;

(b)     Legal Proceedings.  No court order, injunction, legal action, suit or other legal proceeding shall be pending against Seller as of the Closing Date (i) seeking to restrain or prohibit the purchase and sale of the Property or the consummation of the Transaction or (ii) seeking damages with respect to such purchase and sale or the consummation of the Transaction;

(c)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, unless otherwise agreed, no later than October 22, 2025 and  the Transaction must be consummated through the Plan; and

(d)     No Financing Contingency.  Buyer shall have no financing contingency in connection with the purchase of the Property.

(e)     Satisfaction in Full of DIP Facility and CIF Claim.  Seller shall obtain payoffs for the DIP Facility and the CIF Claim and shall make arrangements for payment in full of the same at or prior to Closing in order for the same to be released against the Property. For the avoidance of doubt, such payoffs may be in the form of a modified version of the Plan.

(f)     Payment of the Post-Petition Manager Expense Claim.  Seller shall pay Manager $125,000 on account of the Post-Petition Manager Expense Claim at or prior to Closing.  Any amounts in excess of $125,000 payable under the Post-Petition Manager Expense Claim shall be subordinated to the payment in full in cash of any Administrative Claim in this Transaction Only (other than any Administrative Claim on account of the Post-Petition Manager Expense Claim).

(g)     Seller's Performance.  Seller shall have delivered all of the documents and other items required pursuant to **Section 5.2** hereof and shall have performed all other obligations to be performed by Seller pursuant to this Agreement prior to Closing in all material respects.

6.2    Conditions Precedent to Seller's Obligations.  Seller's obligation to close the Transaction is conditioned on all of the following:

(a)     Accuracy of Representations and Warranties.  All of the representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Closing Date with the same force and effect as if the same had been made as of the Closing Date;

(b)     Legal Proceedings.  No court order, injunction, legal action, suit or other legal proceeding shall be pending against Buyer as of the Closing Date (i) seeking to restrain or prohibit in the purchase and sale of the Property or the consummation of the Transaction, or (ii) seeking damages with respect to such purchase and sale or the consummation of the Transaction;

(c)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, unless otherwise agreed, no later than October 22, 2025 and  the Transaction must be consummated  through the Plan; and

(d)    Buyer's Performance.  Buyer shall have delivered all of the documents and other items required pursuant to **Section 5.3** hereof and shall have performed all other obligations to be performed by Buyer pursuant to this Agreement prior to Closing.

6.3    Waiver of Failure of Conditions Precedent.  At any time on or before the date specified for the satisfaction of any condition, Seller or Buyer may elect in writing to waive the benefit of any condition precedent to its obligations hereunder other than the entry of the Sale Order.  By closing the Transaction, Seller and Buyer shall be conclusively deemed to have waived the benefit of any remaining unfulfilled conditions set forth in this Article 6, except to the extent that the same expressly survive Closing.  In the event any of the conditions set forth in this Article 6 are neither waived nor fulfilled, the Party for whose benefit the applicable condition exists may terminate this Agreement and exercise such rights and remedies, if any, that such Party may have in the event such termination is the result of a default hereunder by the other Party pursuant to the terms of Article 9.  If this Agreement is terminated as a result of the failure of any condition set forth in this Article 6 that is not also a default hereunder, then neither Party shall have any further rights or obligations hereunder except for the Surviving Obligations.

## ARTICLE 7 - REPRESENTATIONS AND WARRANTIES

7.1    Buyer's Representations and Warranties.  Buyer represents and warrants to Seller as follows:

(a)    Buyer's Authorization.  Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware and authorized to execute this Agreement, consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Buyer. The execution and delivery of this Agreement and all Closing Documents to be executed and delivered by Buyer pursuant to this Agreement and the performance by Buyer of the obligations of Buyer hereunder and under such Closing Documents have been authorized by all requisite company action of Buyer.  The obligations of Buyer under this Agreement constitute and, as of the Closing Date, the obligations of Buyer under the Closing Documents to be executed and delivered by Buyer pursuant to this Agreement shall constitute, the valid and binding obligations of Buyer enforceable in accordance with their respective terms. Without limiting the generality of the foregoing, neither the execution and delivery of this Agreement and Closing Documents to be executed and delivered by Buyer pursuant to this Agreement nor the performance by Buyer of the obligations of Buyer hereunder under such Closing Documents will (i) result in the violation of any applicable Laws or any provision of Buyer's organizational documents, (ii) conflict with any order of any Governmental Authority binding upon Buyer, or (iii) conflict or be

inconsistent with, or result in any default under, any contract, agreement or commitment by which Buyer is bound.

(b)    Patriot Act Compliance.  Buyer is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, group, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control, and Buyer is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Buyer is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Buyer have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Buyer is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law.  Buyer has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.  Notwithstanding the foregoing, in no event shall Buyer's representations and warranties under this **Section 7.1(b)** apply to any person or entity which owns, has owned, or may hereafter own any publicly traded stock or other publicly traded securities of (i) Buyer (if any), or (ii) any Person which directly or indirectly owns an interest in Buyer.

Buyer's representations and warranties contained in this **Section 7.1** shall survive the Closing and not be merged therein.

7.2    Seller's Representations and Warranties.    Seller represents and warrants to Buyer as follows:

(a)    Seller's Authorization.  Seller is duly organized, validly existing and in good standing under the Laws of the State of Delaware and qualified to do business under the Laws of the State of Louisiana and authorized to execute this Agreement and, subject to the entry of the Sale Order, consummate the Transaction and fulfill all of its obligations hereunder and under all Closing Documents to be executed by Seller in connection herewith. The execution and delivery of this Agreement and all Closing Documents to be executed and delivered by Seller pursuant to this Agreement and the performance by Seller of the obligations of Seller hereunder under such Closing Documents have been authorized by all requisite company action of Seller.  The obligations of Seller under this Agreement constitute and, as of the Closing Date, the obligations of Seller under the Closing Documents to be executed and delivered by Seller pursuant to this Agreement shall constitute, the valid and binding obligations of Seller enforceable in accordance with their respective terms, subject to entry of the

Sale Order.  Without limiting the generality of the foregoing, but subject to entry of the Sale Order, neither the execution and delivery of this Agreement and Closing Documents to be executed and delivered by Seller pursuant to this Agreement nor the performance by Seller of the obligations of Seller hereunder or under such Closing Documents will (i) result in the violation of any applicable Laws or any provision of Seller's organizational documents, (ii) conflict with any order of any Governmental Authority binding upon Seller, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment by which Seller is bound.

(b)    Patriot Act Compliance.  Seller is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, group, entity, or nation pursuant to any Law that is enforced or administered by the Office of Foreign Assets Control and Seller is not engaging in this Transaction, directly or indirectly, on behalf of, or instigating or facilitating this Transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Seller is not engaging in this Transaction, directly or indirectly, in violation of any Laws relating to drug trafficking, money laundering or predicate crimes to money laundering.  None of the funds of Seller have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Seller is prohibited by Law or that the Transaction or this Agreement is or will be in violation of Law.  Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to Closing.  Notwithstanding the foregoing, in no event shall Seller's representations and warranties under this **Section 7.2(b)** apply to any person or entity which owns, has owned, or may hereafter own any publicly traded stock or other publicly traded securities of (a) Seller (if any), or (b) any entity which directly or indirectly owns an interest in Seller.

7.2.2    Personal Property.  Except for the liens and security interests created in favor of the NOLA DIP Lender under the DIP Facility Documents and as provided in the Sale Order, the Personal Property to be transferred to Buyer is free and clear of liens, security interests and other encumbrances.

7.2.3    Rents.  Except for the assignments of the interest of Seller in the Leases and Rents to the NOLA DIP Lender pursuant to the DIP Facility Documents, Seller has not assigned, transferred or hypothecated its interest in the Leases and Rents.

7.2.4    Third-Party Rights.  Seller has not entered into any agreements currently in effect pursuant to which Seller has granted any Person any option to purchase, right of first refusal to purchase, right of first option to purchase or other preferential right to purchase all or any part of the Property.

7.2.5    Litigation.  Except for the Bankruptcy Proceedings and those matters listed in Exhibit K attached hereto and by this reference made a part hereof, there is not currently or threatened in writing any pending action, claim, suit, litigation or other proceeding to which Seller is a party or which otherwise relates to the Property (including any condemnation proceedings).

7.2.6    Contracts.  As of the Execution Date, Seller has not entered into or assumed any leases or other executory contracts affecting the Property which will be binding upon Buyer after the Closing other than Scheduled Contracts.

Seller's representations and warranties in this **Section 7.2** shall not survive the Closing.

## ARTICLE 8 - COVENANTS

8.1    Compliance with DIP Facility Documents. Seller shall at all times comply with the requirements of the DIP Facility Documents until Closing and nothing contained herein shall be deemed to limit or otherwise affect the rights or obligations of the Parties under the DIP Facility Documents prior to Closing.

8.2    Compliance with Requirements of Orders. Seller shall comply with the requirements of all Orders.

## ARTICLE 9 - DEFAULTS

9.1    SELLER'S REMEDIES FOR BUYER DEFAULTS.  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO ANY DEFAULT BY BUYER HEREUNDER, THEN SELLER SHALL BE ENTITLED, AS ITS SOLE REMEDY TO TERMINATE THIS AGREEMENT BY DELIVERY OF WRITTEN NOTICE TO BUYER AND OBTAIN AND RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES, WHEREUPON NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER HEREUNDER EXCEPT WITH RESPECT TO SURVIVING OBLIGATIONS. THE PARTIES AGREE THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT OF A DEFAULT BY BUYER ARE DIFFICULT TO DETERMINE AND THAT THE FOREGOING LIQUIDATED DAMAGES ARE REASONABLE. IN ADDITION, UPON SUCH TERMINATION, SELLER SHALL BE ENTITLED TO SELL THE PROPERTY TO ANY OTHER BIDDER.

9.2    BUYER'S REMEDIES FOR SELLER DEFAULTS.  IF THE SALE OF THE PROPERTY IS NOT CONSUMMATED DUE TO SELLER'S DEFAULT HEREUNDER, BUYER SHALL BE ENTITLED, AS ITS SOLE REMEDY, TO TERMINATE THIS AGREEMENT BY DELIVERY OF WRITTEN NOTICE TO SELLER AND THE RETURN OF THE DEPOSIT, WHEREUPON NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER EXCEPT WITH RESPECT TO SURVIVING OBLIGATIONS. BUYER SHALL HAVE NO RIGHT TO SPECIFIC PERFORMANCE TO THE EXTENT THAT ANY OTHER BIDDER IS AVAILABLE TO PURCHASE THE PROPERTY.

## ARTICLE 10 - CASUALTY/CONDEMNATION

10.1    <u>Right to Terminate</u>.  If, after the Execution Date, (a) any portion of the Property is taken by condemnation or eminent domain (or is the subject of a pending taking), or (b) any portion of the Property is damaged or destroyed (excluding routine wear and tear and damage caused by any of Buyer's Representatives), Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  If the Property is the subject of a Major Casualty/Condemnation that occurs after the Execution Date, Buyer shall have the right to terminate this Agreement by giving written notice to Seller no later than ten (10) Business Days after the giving of Seller's notice, and the Closing Date shall be extended, if necessary, to provide sufficient time for Buyer to make such election.  The failure by Buyer to terminate this Agreement within such ten (10) Business Day period shall be deemed an election by Buyer not to terminate this Agreement.

10.2    <u>Allocation of Proceeds and Awards</u>.  If a condemnation or casualty occurs after the Execution Date and this Agreement is not terminated as permitted pursuant to the terms of **<u>Section 10.1</u>** hereof, then this Agreement shall remain in full force and effect and Buyer shall acquire the Property or, if applicable, the remainder thereof, upon the terms and conditions set forth herein.   Any Casualty/Condemnation Proceeds shall be allocated between Buyer and Seller as follows in respect of a Closing hereunder:

(a)    Seller shall be entitled to be reimbursed from the Casualty/Condemnation Proceeds for proceeds of any rental loss, business interruption or similar insurance, or other compensation for loss of use or income, that are allocable to the period prior to the Closing Date, such sums to be applied in accordance with the requirements of the DIP Facility Documents; and

(b)    Buyer shall be entitled to the balance of the Casualty/Condemnation Proceeds.

10.3    <u>Insurance</u>.  Seller shall maintain the property insurance coverage required under the DIP Facility Documents in place through the Closing Date.

## ARTICLE 11 - MISCELLANEOUS

11.1    <u>Survival/Merger</u>.  Except for the provisions of this Agreement which are explicitly stated to survive the Closing, (a) none of the terms of this Agreement shall survive the Closing, and (b) the delivery of the Purchase Price, the Deed and the other Closing Documents and the acceptance thereof shall effect a merger, and be deemed the full performance and discharge of every obligation on the part of Buyer and Seller to be performed hereunder.

11.2    <u>Integration; Waiver</u>.  This Agreement and the Sale Order embody and constitute the entire understanding between the Parties with respect to the Transaction and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the Party against whom

the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.  No waiver by either Party hereto of any failure or refusal by the other Party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

     11.3   <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Louisiana, without application of its choice of laws.

     11.4   <u>Captions Not Binding; Exhibits</u>.  The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof.  All Exhibits attached hereto shall be incorporated by reference as if set out herein in full.

     11.5   <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

     11.6   <u>Severability</u>.  If any term or provision of this Agreement or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

     11.7   <u>Notices</u>.  All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the following addresses:

If to Seller, to:

> CBRM Realty Inc.
> c/o White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attention: Elizabeth A. LaPuma
> Email: elapuma.crowncapital@gmail.com

with a copy to:

> White & Case LLP
> 111 South Wacker Dr, Suite 5100
> Chicago, IL 60606-4302
> Attention: Gregory F. Pesce
> Email: gregory.pesce@whitecase.com

If to Buyer, to:

> Lynd Acquisitions Group LLC
> 4499 Pond Hill Road
> San Antonio, TX 78231
> Attention:  Justin Utz
> Email: Jutz@lynd.com

with a copy to:                    Lippes Mathias LLP
                                   54 State Street, Suite 1001
                                   Albany, NY 12207-2527
                                   Attention: Leigh A. Hoffman. Esq.
                                   Email: lhoffman@lippes.com

Any such notices may be sent by (a) certified mail, return receipt requested, postage prepaid in the U.S. mail, or (b) a nationally recognized overnight courier, or (c) sent by electronic transmission (i.e., e mail).  Notices shall be deemed delivered upon actual delivery or refusal of delivery one (1) Business Day after deposit in the case of overnight courier and three (3) Business Days after deposit in the case of certified mail, and notices delivered by electronic transmission shall be deemed delivered on the same day of such successful transmission.  The above addresses may be changed by written notice to the other Party; provided that no notice of a change of address shall be effective until actual receipt of such notice.

     11.8    Counterparts; Electronic Signatures.  This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.  Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the Party so signing.  Each Party agrees to promptly deliver an execution original to this Agreement with its actual signature to the other Party, but a failure to do so shall not affect the enforceability of this Agreement.

     11.9    Additional Agreements; Further Assurances.  Each Party hereto shall execute and deliver such documents as the other Party shall reasonably request in order to consummate and make effective the Transaction; provided, however, the execution and delivery of such documents shall not result in any additional liability or cost to the executing Party.

     11.10    Construction.  The Parties acknowledge that each Party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, any modification hereof or any of the Closing Documents.

     **11.11    Time of Essence.  Time is of the essence with respect to the Closing and all of the provisions of this Agreement.**

     11.12    WAIVER OF JURY TRIAL.  EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY PROCEEDINGS BROUGHT BY THE OTHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE TRANSACTION, THIS AGREEMENT, THE PROPERTY OR THE RELATIONSHIP OF BUYER AND SELLER HEREUNDER.  THE PROVISIONS OF THIS **SECTION 11.12** SHALL SURVIVE THE CLOSING (AND NOT BE MERGED THEREIN) OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

     11.13    RELEASES.  WITH RESPECT TO ANY RELEASE SET FORTH IN THIS AGREEMENT RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT SUCH WAIVER AND RELEASE IS MADE WITH THE ADVICE OF COUNSEL

AND WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CONSEQUENCES AND EFFECTS OF SUCH RELEASE.

11.14   Prevailing Party.  If Buyer or Seller brings an action at law or equity against the other in order to enforce the provisions of this Agreement or as a result of an alleged default under this Agreement, the prevailing Party in such action will be entitled to recover from the non-prevailing Party court costs and reasonable attorneys' fees actually incurred by the prevailing Party in connection with such dispute, it being understood and agreed that the determination of the prevailing Party shall be included in the matters which are the subject of such action or suit.  The provisions of this **Section 11.14** shall survive the Closing.

11.15   No Third Party Beneficiary.   The parties hereto do not intend to confer any benefit hereunder on any person, firm, corporation or other entity other than the parties hereto and their permitted assigns.

11.16   No Recording; Confidentiality; Press Release. The parties agree that neither this Agreement nor any memorandum or notice hereof shall be recorded or filed in any public records.

11.17   Assignment.  Buyer shall have the right to assign this Agreement and its rights hereunder, to any Affiliate of Buyer, provided advance notice of such assignment is provided to Seller so that Seller may timely disclose the name of the Affiliate and its financial wherewithal to close the Transaction to the Court and others for any required approvals.

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be duly executed to be effective as of the day and year first above written.

**SELLER:**

**RH CHENAULT CREEK LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth LaPuma
    Title: Independent Fiduciary

**RH WINDRUN LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth LaPuma
    Title: Independent Fiduciary

**RH LAKEWIND EAST LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth LaPuma
    Title: Independent Fiduciary

**RH COPPER CREEK LLC**,
a Delaware limited liability company

By:_____
    Name: Elizabeth LaPuma
    Title: Independent Fiduciary

**BUYER:**

**LYND ACQUISITIONS GROUP LLC**,
a Delaware limited liability company

By:   /s/ Justin Utz_____
    Name: Justin Utz
    Title:  Authorized Signatory

## SCHEDULE A

**List of Seller Entities and Properties**

RH Chenault Creek LLC             Carmel Brook Apartments, 12345 I-10 Service Road,
                                  New Orleans, LA 70128

RH Windrun LLC                    Carmel Spring Apartments, 12151 I-10 Service Road,
                                  New Orleans, LA 70128

RH Lakewind East LLC              Laguna Reserve Apartments, 5131 Bundy Road,
                                  New Orleans, LA 70127

RH Copper Creek LLC               Laguna Creek Apartments, 6881 Parc Brittany Boulevard
                                  New Orleans, LA 70126