UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  gregory.pesce@whitecase.com

-and-

Andrew Zatz
Samuel P. Hershey (admitted *pro hac vice*)
Barrett Lingle (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email:  azatz@whitecase.com
         sam.hershey@whitecase.com
         barrett.lingle@whitecase.com

*Counsel to Debtors and Debtors-in-Possession*

**KEN ROSEN ADVISORS PC**
Kenneth A. Rosen
80 Central Park West
New York, New York 10023
Telephone: (973) 493-4955
Email: ken@kenrosenadvisors.com

*Co-Counsel to Debtors and Debtors-in-Possession*

| | |
|---|---|
| In re:<br><br>CBRM REALTY INC., *et al.*,<br><br>                              Debtors.[1] | Chapter 11<br><br>Case No. 25-15343 (MBK)<br>(Jointly Administered) |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CBRM Realty Inc. (2420), Crown Capital Holdings LLC (1411), Kelly Hamilton Apts LLC (9071), Kelly Hamilton Apts MM LLC (0765), RH Chenault Creek LLC (8987), RH Copper Creek LLC (0874), RH Lakewind East LLC (6963), RH Windrun LLC (0122), RH New Orleans Holdings LLC (7528), RH New Orleans Holdings MM LLC (1951), and Laguna Reserve Apts Investor LLC (N/A).  The location of the Debtors' service address in these chapter 11 cases is: In re CBRM Realty Inc., et al., c/o White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020.

**DECLARATION OF MATTHEW DUNDON,
PRINCIPAL OF ISLANDDUNDON LLC, IN SUPPORT OF
FINAL APPROVAL OF THE DISCLOSURE STATEMENT
AND CONFIRMATION OF THE MODIFIED JOINT CHAPTER 11 PLAN
OF CROWN CAPITAL HOLDINGS LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

I, Matthew Dundon, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Principal of Dundon Advisers LLC ("**Dundon**") and its real estate restructuring affiliate IslandDundon LLC ("**IslandDundon**"), the proposed financial advisor for the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**").  Based on my work with the Debtors, my review of relevant documents, and my discussions with members of the Debtors' management team and other professionals, including the Independent Fiduciary,[2] I am familiar with the Debtors' day-to-day operations, business affairs, capital structure, and the claims filed against the estates.  I submit this declaration (this "**Declaration**") in support of final approval of the Disclosure Statement and confirmation of the Plan for Crown Capital Holdings LLC, RH New Orleans Holdings LLC, RH New Orleans Holdings MM LLC, Laguna Reserve

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Modified Joint Chapter 11 Plan of Crown Capital Holdings LLC and Certain of its Debtor Affiliates* [Docket No. 501] (including all exhibits and supplements thereto and as may be modified, amended, or supplemented from time to time, the "**Plan**"), *Disclosure Statement for the Modified Joint Chapter 11 Plan of Crown Capital Holdings LLC and Certain of its Debtor Affiliates* [Docket No. 503, Ex. A] (including all exhibits thereto and as may be modified, amended, or supplemented from time to time, the "**Disclosure Statement**"), the *Order (I) Conditionally Approving the Adequacy of the Information Contained in the Disclosure Statement for the NOLA Debtors, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Plan, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 522] (the "**Disclosure Statement Order**"), or the *Order (I) Approving (A) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof for the NOLA Properties, (B) Process for Selecting a Stalking Horse Bidder and Offering Bid Protections, and (C) Assumption and Assignment Procedures, and (II) Granting Related Relief* [Docket No. 382] (the "**Bidding Procedures Order**") as applicable.

Apts Investor LLC, RH Chenault Creek LLC, RH Copper Creek LLC, RH Lakewind East LLC, and RH Windrun LLC.

2.      Except where specifically noted, the statements in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, business affairs, financial performance, and restructuring efforts; (b) information learned from my review of relevant documents; and (c) information I have received from members of the Debtors' management or the Debtors' advisors. This Declaration is intended to supplement, and does not overlap with the factual content set forth in, the *Declaration of Andres A. Estrada of Kurtzman Carson Consultants, LLC dba Verita Global Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Modified Joint Chapter 11 Plan of Crown Capital Holdings LLC and Certain of its Debtor Affiliates* [Docket No. 617] (the "**Voting Report**"), filed contemporaneously herewith.

3.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  I am not being compensated for this testimony other than through payments received by IslandDundon as a professional engaged by the Debtors; none of those payments are specifically payable on account of this testimony.   If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is complete and accurate to the best of my knowledge.

## I.      <u>Background and Qualifications</u>

4.      I have been a principal of Dundon since 2016 and of IslandDundon and its predecessor joint venture vehicles with Island Capital Group LLC ("**Island**") since 2019.  Dundon provides financial restructuring and asset management advice and places loans and other nonsecurities financings on the primary and secondary markets. Island invests in real estate transactions and holds interests in real estate services concerns.  I previously worked as a credit

hedge fund portfolio manager (2010 to 2016), an institutional brokerage fixed income analyst and head of research (2003 to 2010), and a securities and leveraged finance attorney (1998 to 2003).

5.　　I have worked directly with the Debtors, their management, and other advisors to provide services in connection with the preparation, filing, and implementation of the above-captioned chapter 11 cases.  Among other things, I have personally been involved in or oversaw the preparation of the liquidation analysis attached to the Disclosure Statement as Exhibit C (the "**Liquidation Analysis**") and the Debtors' analysis of the claims filed in these Chapter 11 Cases.

6.　　I received a Juris Doctor from the University of Chicago Law School and a Bachelor of Arts from the University of California at Berkeley.  My testimony and declarations in relation to complex chapter 11 matters are regularly accepted by bankruptcy courts in this and many other districts.

## II.　Preliminary Statement

7.　　The Debtors own and operate the "NOLA Properties," consisting of multifamily housing assets owned by Debtors RH Chenault Creek LLC, RH Windrun LLC, RH Copper Creek LLC, and RH Lakewind East LLC.  The NOLA Properties provide housing to low-income residents.  Preserving these properties is essential not only to maximizing the value of the Debtors' Estates, but also to maintaining a critical affordable housing resource for the New Orleans community.

8.　　On May 19, 2025 (the "**Petition Date**"), the Debtors filed these chapter 11 cases (the "**Chapter 11 Cases**").  On August 18, 2025, Laguna Reserve Apts Investor LLC filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  These filings were necessitated by severe operational, financial, and governance challenges stemming from mismanagement of the broader Crown Capital Portfolio and the criminal conviction of its ultimate

equity owner, Mark "Moshe" Silber.  These issues precipitated liquidity constraints, declining property performance, and increasing creditor enforcement actions across the portfolio.

9.      Since the Petition Date, and under the direction of the Independent Fiduciary, the Debtors have stabilized operations, secured postpetition financing, and conducted a robust Court-supervised marketing and sale process designed to maximize value for stakeholders.  Upon completing that marketing process, the Debtors are prepared to confirm the Plan that provides for the implementation of the sale of the NOLA Properties (the "**NOLA Sale Transaction**") to Lynd Acquisitions Group (the "**NOLA Purchaser**"), in accordance with the Purchase and Sale Agreement dated September 12, 2025 (the "**NOLA Purchase Agreement**").

10.     I believe that confirmation of the Plan is the best available path to conclude the Debtors' Chapter 11 Cases and maximize creditor recoveries.  The Plan implements the NOLA Sale Transaction, provides for the satisfaction of Allowed Other Priority Claims and Other Secured Claims, and up to 100% of outstanding CIF Mortgage Claims, NOLA Go-Forward Trade Claims, Other NOLA Unsecured Claims, and RH New Orleans Unsecured Claims, and establishes a Creditor Recovery Trust for the benefit of certain creditors as set forth in the Plan (such creditors, the "**Trust Beneficiaries**").[3]  In addition, pursuant to the Crown Capital Noteholder Settlement and as reflected in the NOLA Purchase Agreement, Holders of Crown Capital Unsecured Claims are to receive thirty percent (30%) of the distributable cash proceeds from any future sale of the NOLA Properties (the "**Noteholder Recovery**").  The Creditor Recovery Trustee will be responsible for administering, prosecuting, settling, or monetizing the Creditor Recovery Trust

---

[3]    The Trust Beneficiaries shall include Holders of all Allowed Crown Capital Unsecured Claims and RH New Orleans Unsecured Claims.

Assets for the benefit of the Trust Beneficiaries as set forth in the Plan, and making distributions in accordance with the Plan and Creditor Recovery Trust Agreement.

11.     Following consummation of the NOLA Sale Transaction and the Effective Date of the Plan, the Debtors will no longer operate an ongoing business and will wind down their affairs. A Wind-Down Officer selected by the Debtors will oversee the wind down, dissolution, and liquidation of the Debtors' Estates in accordance with the Plan.

12.     The Plan ensures that the Debtors' Estates can be wound down efficiently and maximizes creditor recoveries through three sources: (i) the cash consideration from the NOLA Sale Transaction, (ii) the Noteholder Recovery profits-participation for Crown Capital Unsecured Claims, and (iii) monetization of Creditor Recovery Trust Assets.  As set forth in the Voting Report, Holders of Other NOLA Unsecured Claims, Crown Capital Unsecured Claims and RH New Orleans Unsecured Claims voted in the requisite number and amount to accept the Plan.  I believe that confirmation of the Plan is in the best interests of the Debtors' Estates.

## III.     The Sale of the NOLA Properties

13.     It is my understanding that certain objectors to the Plan have asserted that the NOLA Sale Transaction does not maximize the value of the Debtors' assets and instead represents a depressed cash value of the NOLA Properties.  As explained below, I believe that the Debtors ran a comprehensive marketing and competitive bidding process to ensure that the NOLA Properties were sold for the highest and best bid.

14.     Specifically, as set forth in the *Motion for Entry of an Order (I) Approving (A) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof for the NOLA Properties, (B) Process for Selecting a Stalking Horse Bidder and Offering Bid Protections, and (C) Assumption and Assignment Procedures, and (II) Granting Related Relief* [Docket No. 350] (the "**Bidding Procedures Motion**"), the Debtors, with the assistance of Hilco Real Estate, LLC

6

("**Hilco**") and Larry G. Schedler & Associates, Inc. ("**L&A**"), launched a comprehensive marketing process to solicit proposals for the sale of one or more of the NOLA Properties. IslandDundon, as the Debtors' financial advisor, assisted in structuring the sales process, coordinating marketing efforts, and leveraging its extensive real estate experience to identify potential bidders and facilitate the sale of the NOLA Properties.  L&A, as the Debtors' exclusive real estate broker for the NOLA Properties, provided on-the-ground support, ensuring the properties were effectively marketed to the appropriate buyer universe and that value was maximized for the benefit of the Debtors' estates.  Hilco provided outreach to the distressed investment community and assisted L&A with describing the bankruptcy sales process to potential bidders.  These efforts resulted in a thorough sales and marketing effort given a short time frame.

### A.    The NOLA Sale Transaction Was Entered Into in Good Faith

15.    Following entry of the Bidding Procedures Order and prior to the Bid Deadline of September 11, 2025, the Debtors received multiple bids but only one Qualifying Bid from the NOLA Purchaser to purchase all four of the Debtors' NOLA Properties for a purchase price of $26,125,000 (the "**Purchase Price**") to be implemented pursuant to the Plan, subject to the terms and conditions set forth in that certain Purchase and Sale Agreement dated September 12, 2025 (the "**NOLA Purchase Agreement**").

16.    The Purchase Price includes cash and non-cash components.  Specifically, the Purchase Price consists of: (a) assumption of all "Assumed Liabilities," as that term is defined in the NOLA Purchase Agreement, (b) cash at closing, and (c) agreement to fund a monetary amount equal to the "Noteholder Recovery."  I understand that, as set forth in the NOLA Purchase Agreement, the "Noteholder Recovery" consists of an amount equal to thirty (30) percent of future Net Proceeds from any disposition of the NOLA Properties payable to the Noteholders, as incorporated into the Plan pursuant to the Crown Capital Noteholder Settlement."  I understand

that, as set forth in the NOLA Purchase Agreement, the "Noteholder Recovery" consists of an amount equal to thirty (30) percent of future net proceeds from any disposition of the NOLA Properties payable to the Noteholders.  In addition, as part of the NOLA Purchase Agreement, the NOLA Purchaser agreed to forgive approximately $475,000 of its roughly $600,000 postpetition administrative claim, thereby reducing administrative expenses and increasing cash available to the Estates

17.     I understand that one party has objected to the Noteholder Recovery component of the Purchase Price, arguing that, absent this mechanism, the NOLA Purchaser would have offered a higher, cash bid for the NOLA Properties.  However, I believe that the Purchase Price represents the highest and best bid for the NOLA Properties.  Specifically, I understand that the Noteholder Recovery was a key, arm's-length negotiated term designed to resolve disputes with the Noteholders and achieve a comprehensive global settlement that facilitated the sale of the NOLA Properties.  Indeed, I understand the Noteholder Recovery does not represent cash currently held by the NOLA Purchaser and does not divert any cash from the Debtors' Estates.  It is a contingent obligation of the NOLA Purchaser payable only from its future net proceeds realized from any sale, refinancing, or other capital transaction with respect to the NOLA Properties. Accordingly, without the Noteholder Recovery feature, I believe that the NOLA Purchaser would not have offered a higher cash bid for the NOLA Properties, but instead would have likely required a reduced purchase price to account for the lack of support from the Noteholders or, more likely, would have elected to decline to proceed with the NOLA Sale Transaction.

18.     The NOLA Purchase Agreement was negotiated at arm's length, without collusion or fraud, and in good faith.  On September 12, 2025, the Debtors filed the *Notice of Cancellation of Auction and Designation of Successful Bid for the NOLA Properties* (the "**Cancellation**

Notice") [Docket No. 554].  As set forth in the Cancellation Notice, although the Debtors received other bids on or before the Bid Deadline, the Debtors, in consultation with the Consultation Parties, determined that the NOLA Purchaser submitted the only Qualifying Bid for all four of the NOLA Properties and that there was no reasonable probability that any other bidder could provide such significant value to the Holders of Crown Capital Unsecured Claims and, accordingly, the Independent Fiduciary directed the Debtors to enter into the Purchase and Sale Agreement with the NOLA Purchaser.  Notably, the other bids received offered no meaningful upside to the unsecured creditor body, were materially below the Purchase Price proposed by the NOLA Purchaser, and would not have reduced administrative expenses. Moreover, the Noteholder Recovery is a value-enhancing component of the overall consideration that (i) aligned key stakeholders, (ii) enabled confirmation-path consensus, and (iii) produced the highest and best offer when considered in the aggregate with cash and assumed liabilities. The mechanism does **not** divert cash from the Estates; it is a contingent, non-recourse share of post-closing Net Proceeds payable only if and when such proceeds exist.  Further, the NOLA Purchaser's forgiveness of approximately $475,000 of its postpetition administrative claim was a negotiated component of the overall consideration and provided incremental estate value by lowering projected administrative costs at closing.

B.     **The Debtors Complied with the Bidding Procedures Order and Pursued a Robust Marketing Process**

19.     Pursuant to the Bidding Procedures Order, the Debtors and their advisors pursued a robust marketing process to test the market and secure the highest and best offer for the NOLA Properties.  Specifically, the Debtors and IslandDundon, with the assistance of Hilco L&A conducted an extensive marketing process which included reaching out to 249 potentially interested parties, distributed a non-confidential marketing overview to those parties, and provided

9

further diligence materials to 48 parties who executed confidentiality agreements.  Additionally,

Larry G. Schedler & Associates, Inc. conducted 12 property tours.  At the conclusion of this

marketing process, 10 parties submitted offers including some providing offers on the whole

portfolio, some providing offers on subsets of assets and some providing both.  The Debtors

encouraged bidders to provide offers in both forms in order to maximize proceeds of the asset sale.

20.      Parties in interest were afforded approximately six weeks between the filing of the

Debtors' Bidding Procedures Motion [Docket No. 350] and the bid deadline of September 12,

2025 at 4:00 p.m. (prevailing Eastern Time) to diligence and formulate bids for the NOLA

Properties, which I believe was reasonable and appropriate under the circumstances of these

Chapter 11 Cases.  I believe the bidding procedures approved by the Court ensured that all

qualified bids could be solicited, reviewed, and evaluated in a manner consistent with the

milestones and confirmation timeline outlined in the Debtors' solicitation procedures.

21.      As explained above, although the Debtors received other bids on or before the Bid

Deadline, the Debtors, in consultation with the Consultation Parties, determined that the Purchaser

submitted the only Qualifying Bid for all four of the NOLA Properties.  Accordingly, I believe the

NOLA Purchaser's bid represents the highest and best offer for the NOLA Properties.  As a result,

on September 12, 2025, the Debtors cancelled the auction and designated the bid submitted by the

NOLA Purchaser as the successful bid.  The Debtors determined that the NOLA Purchaser's bid

was in the best interest of the Estates, especially considering the drastic impact to the Estates of

being unable to consummate the sale of the NOLA Properties.  The Debtors now seek to effectuate

the terms of the NOLA Sale Transaction through the Plan.

22.      If the Plan is not confirmed or does not go effective, I believe there is no assurance

that the Debtors will be able to implement an alternative transaction that would provide recoveries

equal to or greater than those contemplated by the Plan.  The Plan is based on the consummation of the NOLA Sale Transaction and the orderly wind-down of the Debtors' Estates.  It is my understanding that the Debtors do not have an alternative transaction or plan of reorganization currently negotiated or proposed.  If the NOLA Sale Transaction is not consummated, I believe the Debtors may be required to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, which would likely result in significantly lower recoveries for Holders of Allowed Claims.

### C.     The Debtors Gave Proper Notice of the Confirmation and Sale Hearing

23.     It is my understanding that, in order for the Debtors to consummate the NOLA Sale Transaction, proper notice must be provided to interested parties.  I believe the Debtors complied with their notice obligations by filing the *Notice of Proposed Sale of NOLA Properties, Bidding Procedures, Auction, Sale Hearing, and Confirmation and Sale Hearing* (the "**Sale Notice**") [Docket No. 386] and serving this notice on interested parties in accordance with this Court's Bidding Procedures Order.  The Sale Notice, among other things, provided the date of the auction for the NOLA Properties (if any) and set the deadline to object to the sale of the NOLA Properties. The Debtors also published the Sale Notice in the *New Orleans Advocate*.  *See Affidavit of Publication of Notice of Proposed Sale of NOLA Properties, Bidding Procedures, Auction, Sale Hearing, and Confirmation and Sale Hearing* [Docket No. 529].

## IV.    The Plan

24.     The Plan is the product of extensive, arm's-length negotiations among the Debtors, the Ad Hoc Group of Holders of Crown Capital Notes, Lynd Management Group LLC and its affiliated entities, Cleveland International Fund – NRP West Edge, Ltd., and other key stakeholders.  These negotiations resulted in a consensual framework that resolved competing creditor interests and provided a clear path to maximize value through the NOLA Sale Transaction

and the Wind-Down of the Debtors' Estates following consummation of the NOLA Sale Transaction, including the creation of a Creditor Recovery Trust. The Debtors worked constructively with their stakeholders throughout the process, incorporating their comments into both the Plan and the Confirmation Order. The overwhelming support for the Plan by the creditors that voted in favor of it is strong evidence that the Plan has a proper purpose and enjoys broad stakeholder support.

25. Importantly, the Plan reflects hard-fought but constructive compromises. For example, it provides for the release of certain Released Parties in exchange for substantial contributions that facilitated the Plan's implementation, while at the same time preserving other causes of action to be pursued for the benefit of unsecured creditors through the Creditor Recovery Trust.

26. As set forth below, in exchange for the releases granted under the Plan, the Released Parties made meaningful and valuable contributions to these Chapter 11 Cases, including by providing financing, support, and concessions that were critical to enabling the consummation of the NOLA Sale Transaction. Without these efforts, creditors likely would have faced the lower recoveries of a piecemeal liquidation under chapter 7. I believe that, as a result, the Plan will provide Holders of Allowed Unsecured Claims with materially greater recoveries than they would receive in any alternative restructuring scenario.

27. Additionally, IslandDundon, with the assistance of the Debtors and White & Case LLP, prepared the Liquidation Analysis. The Liquidation Analysis represents a good-faith estimate of what creditors would recover in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The analysis, methodology, and assumptions applied as part of the Liquidation Analysis are set out in greater detail therein. Based on my experience with the Debtors, my review

of their books and records, and my experience as a restructuring advisor, I believe that the methodology used to prepare the Liquidation Analysis is appropriate and the assumptions and conclusions set forth therein are fair and reasonable under the circumstances.

### A.    The Debtor Releases Were Hard Fought and Are Narrowly Tailored

28.    Article VIII.C of the Plan sets forth certain releases granted by the Debtors and their Estates (the "**Debtor Releases**").  These provisions are the product of good-faith, arm's-length negotiations among the Debtors and their key stakeholders, informed by the extensive investigation and review undertaken by the Independent Fiduciary and the Debtors' professionals. The releases are narrowly tailored, supported by valuable consideration provided by the Released Parties—including their efforts to negotiate and implement the Plan and their contributions that enabled the NOLA Sale Transaction and the establishment of the Creditor Recovery Trust—and are critical to achieving the settlements embodied in the Plan.  I believe that the Debtor Releases included in the Plan constitute an appropriate exercise of the Debtors' business judgment and are fair, reasonable, and in the best interests of the Debtors and their Estates.

29.    I believe that each of the Released Parties has been an active participant in these Chapter 11 Cases and has provided a significant and substantial contribution warranting the release of claims embodied in the Debtor Releases.  All of the Debtors' Released Parties engaged as crucial participants in the Plan process and share a common goal with the Debtors in seeing the Plan succeed.  During Plan negotiations and related discussions, the Released Parties demonstrated a desire to seek to confirm the Plan and implement the transactions contemplated thereunder.  Each Released Party has worked constructively with the Debtors and their advisors, including IslandDundon, to promote their wind-down efforts, both prior to and following the Petition Date.

30.    Since September 26, 2024, the Independent Fiduciary has acted in a fiduciary capacity for the Debtors and other non-debtor entities owned by Debtors CBRM Realty Inc. and

Crown Capital Holdings LLC.  *See Declaration of Matthew Dundon, Principal of IslandDundon LLC, in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 44].  Prior to the Petition Date, the Independent Fiduciary took steps to revitalize the Debtors' portfolio, including by ensuring that each property owned by the portfolio had sufficient staffing and other resources, with the goal of ensuring that residents had safe, clean homes, as well as providing periodic updates to the Ad Hoc Group of Crown Capital Notes (the "**Noteholders**").  Since the Petition Date, the Independent Fiduciary has engaged with the Debtors' professionals and stakeholders to promote the Debtors' restructuring efforts, including by directing and overseeing the negotiation and execution of the NOLA Purchase Agreement, the marketing of the NOLA Properties, and the proposed Plan.

31.    Similarly, the NOLA DIP Lender and the NOLA Purchaser are active participants in these Chapter 11 Cases, providing both the debtor-in-possession financing needed to reach confirmation and the successful bid for the NOLA Properties.  Accordingly, the NOLA DIP Lender and the NOLA Purchaser maintain a strong interest in seeing the Plan confirmed and the NOLA Sale Transaction contemplated therein be consummated.  Moreover, as set forth in the in the NOLA DIP Order, the Debtors may be required to indemnify the NOLA DIP Lender for certain claims.  I have been advised that, where such indemnification obligations exist, there is an identity of interest between the indemnitor and the indemnitee.

32.    I understand that, based on my review of relevant documents and conversations with the Noteholders, the Noteholders also played a crucial role in the Plan process.  As stakeholders, the Noteholders share the common goal of confirming the Plan, which includes the creation of the Creditor Recovery Trust for the benefit of, among others, Noteholders with Allowed Unsecured Claims.

33.     Finally, as explained in greater detail below, the Debtors' professionals, including the Debtors' Asset Manager and Property Manager, were also integral parties to the Plan process, including the negotiation and execution of the Plan.  Accordingly, these parties share the common goal of ensuring the Plan's success and consummation.

34.     I believe that the Released Parties have each made a substantial contribution to the Debtors' Estates, as each Released Party played an integral role in the formulation of the Plan and the administration of these Chapter 11 Cases.  As explained above, the Independent Fiduciary has negotiated with critical stakeholders, overseen the administration of these Chapter 11 Cases, and managed the negotiation, drafting, and execution of the Plan, including the NOLA Sale Transaction pursuant to the terms of the NOLA Purchase Agreement.  Moreover, it is my understanding that certain of the Released Parties, including the Independent Fiduciary, have agreed to forego payment of certain fees that arose prior to the Petition Date, in exchange for the releases contemplated in the Plan.  As a result, I believe that the Independent Fiduciary has provided substantial monetary and non-monetary contributions to the Debtors' wind-down efforts.

35.     Moreover, the NOLA DIP Lender and the NOLA Purchaser have affirmatively contributed value that was necessary to consummate the Plan.  Indeed, as set forth above, the NOLA DIP Lender provided the financing needed to fund these Chapter 11 Cases, including to market, auction, and sell the NOLA Properties, and the NOLA Purchaser invested the time and resources to negotiate the NOLA Purchase Agreement.  Accordingly, I believe that the NOLA DIP Lender and the NOLA Purchaser have made substantial contributions to the Debtors' wind-down efforts.

36.     The Noteholders also provided substantial contributions to the Debtors and their Estates and were instrumental in negotiating the terms of the Plan on behalf of a key group of

Holders of unsecured Claims.  Indeed, certain of the Noteholders have agreed to serve on the Creditor Recovery Trust Advisory Committee, which will ensure that the Creditor Recovery Trust is managed by a body with a fiduciary responsibility to its beneficiaries.

37.    I further believe that the Debtors' professionals have made significant contributions to the Debtors' efforts in these Chapter 11 Cases.  With respect to Debtors' counsel, based on my review of relevant documents, I believe that White & Case LLP played an instrumental role in the Debtors' bankruptcy proceedings, including by (i) facilitating the commencement of the chapter 11 cases through the filing of the Debtors' voluntary petitions, (ii) securing, revising, and filing motions that, among other things, secured the necessary postpetition financing needed to administer these Chapter 11 Cases, and (iii) negotiating and filing the proposed Plan and Disclosure Statement.  *See Attorney Monthly Fee Statement for the Period May 19, 2025 Through May 31, 2025* [Docket No. 369]; *Attorney Monthly Fee Statement for the Period August 1, 2025 Through August 31, 2025* [Docket No. 591].  Similarly, I believe that the Debtors' New Jersey counsel, Ken Rosen Advisors PC, has provided vital contributions to the Debtors throughout these Chapter 11 Cases, including by assisting the Debtors as New Jersey counsel with respect to matters and proceedings in the Chapter 11 Cases.

38.    Based on IslandDundon's work in these Chapter 11 Cases, I also believe that IslandDundon has made substantial contributions to the Debtors' bankruptcy efforts.  Indeed, as set forth above and in the Bidding Procedures Declaration, IslandDundon advised the Debtors in connection with the NOLA Purchaser's proposed terms to purchase the NOLA Properties and the parallel process by which the Debtors pursued a marketing process to obtain the highest and best offer for the NOLA Properties.

39. Finally, I believe that the Debtors' Asset Manager, Property Manager and Claims and Noticing Agent provided valuable services that have allowed the Debtors to propose and seek to confirm the Plan. For example, I understand that the Claims and Noticing Agent solicited votes from each class of creditors entitled to vote on the Plan, tabulated these votes, and published the Voting Report setting forth the results of the vote, along with ensuring that the Disclosure Statement and Plan were properly noticed.

40. In addition to the Independent Fiduciary, it is my understanding that the Debtors' professionals, including White & Case LLP, IslandDundon LLC, Ken Rosen Advisors PC, and Kurtzman Carson Consultants, LLC dba Verita Global, have agreed to forego payment of certain fees that arose prior to the Petition Date and/or may be forced to forego payment of certain fees and expenses incurred postpetition, in exchange for the releases contemplated in the Plan, each of which could be fairly considered to be additional consideration for the benefit of the releases the Plan would grant them.

41. Finally, I believe that the Debtors' Asset Manager and Property Manager provided valuable services that have allowed the Debtors to propose and seek to confirm the Plan. As explained above, the NOLA Sale Transaction is a crucial cornerstone of the proposed Plan. I understand that the Debtors' Property Manager was charged with day-to-day operations, tenant relations, staffing, and maintenance of the Debtors' properties, including the NOLA Properties, while the Asset Manager's duties included contracting with professionals, including property managers and contractors, and monitoring their performance, managing and disbursing funds, establishing reserves, and recommending cash resource investment strategies, reviewing and monitoring the property manager's operations, preparing strategic asset and marketing plans, recommending and overseeing major repairs, replacements, and critical improvements at the

Debtors' properties, and providing information for annual financial statements and tax returns. *See Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Certain Amended and Restated Property Management and Asset Management Agreements* [Docket No. 128]. I believe that these services helped obtain the highest and best bid for the NOLA Properties and kept the Debtors operational during the course of these Chapter 11 Cases. Accordingly, I believe that the Asset Manager, Property Manager and the Claims and Noticing Agent provided substantial value to the Debtors, and thus the Debtor Releases are appropriate with respect to these parties.

42.    I believe that the Debtor Releases are essential to the success of the Debtors' Plan because they constitute an integral term of the Plan. Absent the Debtor Releases, the Released Parties would not have agreed to support the Plan. As described above, each Released Party contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors. In the absence of the Released Parties' support, the Debtors would not be in a position to confirm the Plan, implement the Plan, and maximize value for creditors. The Debtor Releases, therefore, are essential to the Debtors' Restructuring Transaction.

43.    For example, I understand that the NOLA DIP Lender insisted on these Debtor Releases during the negotiation of the NOLA DIP Credit Agreement, as evidenced by that certain NOLA Debtors Binding Term Sheet for Senior Secured, Superpriority Debtor-in-Possession Financing dated as of May 26, 2025, attached as Exhibit 1 to the NOLA DIP Order.

44.    It is equally important to note that the Plan does *not* release Mark Silber; his conspirators, indicted, convicted or otherwise; any of his family; or any of their respective transferees, or any of the professionals associated with the issuance of the Crown Capital Notes and the borrowing of the various mortgage loans with which the Debtors and their affiliates

financed the purchase of their respective properties from any of their respective liabilities to the Debtors' Estates or to any third party. To the contrary, the Plan carefully preserves the Estates Causes of Action against such non-releasees, establishes the Creditor Recovery Trust to, among other things, efficiently and effectively investigate and prosecute preserved Causes of Action for investigation and prosecution.

## V.    The Debtors' Rejection of Executory Contracts and Unexpired Leases

45.    It is my understanding that the Sewerage and Water Board of New Orleans ("**SWBNO**") was objected to the Plan, asserting that the Debtors failed to provide sufficient evidentiary support to satisfy the business judgment rule to reject the Debtors' four executory contracts with the SWBNO (collectively, the "**SWBNO Contracts**"). I believe that the Debtors have a sufficient business reason to reject the SWBNO Contracts.

46.    On August 15, 2025, the Court entered the Bidding Procedures Order. The Bidding Procedures Order approved, among other things, certain procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**").

47.    Pursuant to the Assumption and Assignment Procedures, on August 21, 2025, the Debtors filed the *Notice of Possible Assumption and Assignment with Respect to Executory Contracts and Unexpired Leases of the Debtors* [Docket No. 419] (the "**Assumption Notice**"). The Assumption Notice set forth a list of executory contracts and unexpired leases that, at the time, the Debtors sought to potentially assume and assign to the successful purchaser of the NOLA Properties. I understand that the Assumption Notice further stated that the "Debtors' inclusion of an executory contract or unexpired lease" in the Assumption Notice is "not a guarantee that such executory contract or unexpired lease will ultimately be assumed and assigned to the" ultimate purchaser of the NOLA Properties. Assumption Notice at 3.

48.     On October 6, 2025, following a careful and thorough examination of the contracts originally included in the Assumption Notice (including all associated cure costs and ultimate benefit to the estate of maintaining such contracts), and following discussions with the NOLA Purchase regarding the executory contracts and unexpired leases that it selected to be assumed and assigned at confirmation, the Debtors—with the assistance of IslandDundon as financial advisor— filed the *First Notice of Removal of Certain Executory Contracts Designated for Assumption and Assignment in Connection with the Sale of the NOLA Properties* [Docket No. 597] (the "**Removal Notice**").  The Removal Notice set forth the executory contracts or unexpired leases that the Debtors, upon consultation with their advisors, determined should no longer be designated for assumption and assignment to the NOLA Purchaser.  The SWBNO Contracts were included in the Removal Notice.

49.     Based on IslandDundon's analysis of all outstanding executory contracts and unexpired leases, including the SWBNO Contracts, I believe that rejection of the SWBNO Contracts is in the best interests of the Estates.  I determined that continuing to perform under the SWBNO Contracts would be burdensome and would not yield a concrete, ongoing benefit to the Estates.  In particular, continuing to perform under the SWBNO Contracts would require the Debtors—or any successor purchaser—to recognize and potentially satisfy approximately $2,031,670.31 in asserted prepetition obligations. Based on our analysis, a substantial portion of these asserted amounts appears to arise from excessive water usage charges attributable to a leak on the properties that SWBNO did not mitigate.

50.     Moreover, I understand that, under the NOLA Purchase Agreement, any obligation to pay cure costs associated with executory contracts designated for assumption and assignment would rest with the NOLA Purchaser. The NOLA Purchaser determined that

assumption of the SWBNO Contracts would require an unjustified cure payment and therefore elected not to assume or take assignment of those contracts.  As a result, rejection of the SWBNO Contracts will avoid payment of disputed and inflated prepetition amounts, reduce administrative costs, and preserve resources for the benefit of creditors.  This conclusion is further supported by the fact that the properties to which these SWBNO Contracts relate to are being sold and the Debtors Estates are being wound down following consummation of the NOLA Sale Transaction.

51.    Importantly, rejection of the SWBNO Contracts will not result in any disruption of essential utility services. The NOLA Purchaser is able to enter into new agreements directly with SWBNO upon closing of the NOLA Sale Transaction to ensure that water and sewer services for the properties continue uninterrupted. Rejection thus eliminates uneconomic prepetition exposure while preserving continuity of operations for the underlying assets.  Accordingly, I believe that the Debtors have a valid business judgment for rejecting the SWBNO Contracts.

**VI.    Conclusion**

52.    In conclusion, based on the foregoing, I believe that final approval of the Disclosure Statement and confirmation of the Plan is in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 17, 2025

Respectfully submitted,

/s/ *Matthew Dundon*
Matthew J. Dundon
Principal
IslandDundon LLC

*Financial Advisor and Investment Banker of the Debtors and Debtors-in-Possession*